# GOULD EXHIBIT
## "A"

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

RONALD BRITT,

        Plaintiff,

     -against-

THERMALD REALTY I, LP., d/b/a
THERMALD REALTY ASSOCIATES I,
LP. And THERMALD REALTY CORP.,
THE WAVECREST MANAGEMENT TEAM,
LTD. d/b/a WAVECREST MANAGEMENT
GROUP, LLC and WAVECREST EQUITIES, LLC
and DOREEN ALDERMAN,

        Defendants.

----------------------------------------x

               222 Bloomingdale
               White Plains, New York
               June 4, 2014
               10:09 a.m.

    EXAMINATION BEFORE TRIAL of RONALD BRITT, the

Plaintiff in the above-captioned matter, held at

the above time and place, before a Notary Public

of the State of New York.

               Alyssa Bochnik,
               Shorthand Reporter

2

A P P E A R A N C E S :


    KOERNER & ASSOCIATES, LLC
        Attorneys for Plaintiff
        111 John Street, Suite 230
        New York, New York 10038
    BY:  GREGORY KOERNER, ESQ.



    GOULD & BERG, LLP
        Attorneys for Defendants -
        Thermald Realty I, LP, d/b/a
        Thermald Realty Associates I, LP
        and Thermald Realty Corp., and
        Doreen Alderman
        222 Bloomingdale Road
        White Plains, New York 10605
    BY:  JANE GOULD, ESQ.



    KAUFMAN DOLOWICH & VOLUCK, LLP
        Attorneys for Defendants -
        The Wavecrest Management Team, LTD
        d/b/a Wavecrest Management Group, LLC
        and Wavecrest Equities, LLC
        135 Crossways Park Drive, Suite 201
        Woodbury, New York 11797
    BY:  JEFFREY ETTENGER, ESQ., of Counsel



    ALSO PRESENT:  DOREEN ALDERMAN
                   JOAN LENIHAN



                   o0o

3

1

2          IT IS HEREBY STIPULATED AND AGREED, by
and between the attorneys for the respective
3   parties hereto, that the sealing and filing of
the within deposition be waived; that such
4   deposition may be signed and sworn to before any
officer authorized to administer an oath with the
5   same force and effect as if signed and sworn to
before a Justice of this Court.

6

7          IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to form, are
reserved to the time of trial.

8

9          IT IS FURTHER STIPULATED AND AGREED
that the within examination and any corrections
thereto may be signed before any Notary Public
10   with the same force and effect as if signed and
sworn to before this Court.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1

10:09:15  2              MS. GOULD:  Good morning,

10:09:16  3      Mr. Britt, and Mr. Koerner, Mr. Ettenger.

10:09:19  4              With me today is my client, Doreen

10:09:22  5      Alderman, and also Joan Lenihan, who is an

10:09:25  6      attorney admitted to practice in the State

10:09:28  7      of New York.  She's participating in a

10:09:30  8      program at Pace law school, called

10:09:33  9      New Directions, which is for attorneys

10             who either have not been in practice for

11             a period of time and want to come back to

12             practice, or want to shift gears in their

13             practice.  And as part of it, as part of

10:09:43 14      the program, the attorneys either extern

10:09:43 15      at a law office or a government agency for

10:09:46 16      several months.  And Ms. Lenihan has been

10:09:49 17      with us now for several months.  And with

10:09:51 18      your permission, Mr. Koerner --

10:09:51 19          MR. KOERNER:  Good to meet you.

10:09:53 20          MS. LENIHAN:  Thank you.  You too.

21          MS. GOULD:  -- she's going to sit

22      in and see how it goes.

23

24                  *o0o*

25

5

R O N A L D    B R I T T,

having been duly sworn by Alyssa Bochnik,

a Notary Public within and for the State

of New York, was examined and testified

as follows:


oOo


EXAMINATION BY MS. GOULD:

Q.    State your name and address for the
record, please.

A.    Ronald Britt, 195 Greenwich Street,
Apartment 8F, New York, New York 10017.

Q.    Good morning, Mr. Britt.  My name is
Jane Gould.  I'm a member of the law firm of
Gould & Berg here in White Plains, New York.
Our firm represents Thermald Realty Associates I,
LP, and Doreen Alderman, who are among the
defendants in this case.

I'm going to be asking you some
questions today.  If there's anything you don't
understand, please let me know; I will try to
rephrase the question to make it more
understandable.

1    *Ronald Britt*

10:10:23    2              Do you understand what I've just

10:10:23    3    said?

10:10:23    4         A.    Yes, ma'am.

10:10:24    5         Q.    And you understand that you have to

10:10:26    6    answer verbally so that the stenographer can take

10:10:29    7    down what you're saying; is that correct?

10:10:32    8         A.    I do.

10:10:32    9         Q.    You've just given a Greenwich Street,

10:10:36    10   Manhattan address; is that correct?

10:10:37    11        A.    Correct.

10:10:38    12        Q.    And do you actually reside at that

10:10:40    13   address?

10:10:40    14        A.    For the time being, yes.

10:10:41    15        Q.    And you gave an apartment number; is

10:10:44    16   that correct?

10:10:44    17        A.    Yes, I did.

10:10:46    18        Q.    And is that apartment your apartment?

19        A.    No, it isn't.

10:10:47    20        Q.    Whose apartment is it?

10:10:48    21        A.    Janet Ficarra *(ph)*.

22        Q.    And who is Janet Ficarra?

10:10:51    23        A.    A friend of mine.

10:11:01    24        Q.    And when you say that you reside at

10:11:04    25   that address for the time being, do you intend to

7

Ronald Britt

10:11:07 2   find another residence?

10:11:09 3          A.      Yeah, I do.

10:11:11 4          Q.      And have you been looking for another

10:11:14 5   residence?

10:11:14 6          A.      I have.

10:11:15 7          Q.      For what period of time?

10:11:17 8          A.      Ever since I lost my apartment.

10:11:19 9          Q.      And which apartment was that?

10:11:20 10          A.      It's Apartment Number 12 at 91 East

10:11:27 11   3rd Street, New York, New York 10003, I believe.

10:11:30 12          Q.      How long have you been living at the

10:11:33 13   address on Greenwich Street that you've just

10:11:36 14   given?

10:11:36 15          A.      Since I left my apartment.

10:11:38 16          Q.      And when did you leave your

10:11:39 17   apartment?

10:11:40 18          A.      I don't recall.  It's been a few

10:11:42 19   months.

10:11:42 20          Q.      Did you leave your apartment at some

10:11:45 21   point during the year 2014?

10:11:47 22          A.      Yes.

10:11:47 23          Q.      Did you leave your apartment

10:11:51 24   voluntarily?

10:11:52 25          A.      No, I did not.

*Ronald Britt*

1

10:11:53  2     Q.     What were the circumstances in which

10:11:55  3   you left your apartment?

10:11:56  4     A.     I -- I actually did leave my

10:11:58  5   apartment voluntarily as a result of an agreement

10:12:02  6   my attorney made on my behalf.

10:12:05  7     Q.     And that agreement was to resolve an

10:12:10  8   eviction proceeding that was commenced against

10:12:13  9   you; is that correct?

10:12:14 10     A.     That's correct.

10:12:15 11     Q.     Are you paying rent at the apartment

10:12:18 12   in which you currently reside?

10:12:20 13     A.     No.

10:12:20 14     Q.     Sir, can you describe your

10:12:24 15   educational background, beginning with graduation

10:12:27 16   from high school.

10:12:28 17     A.     Well, I took a few years off, and I

10:12:31 18   went to U.S.F., and I got a degree in fine arts.

10:12:35 19     Q.     And what is U.S.F.?

10:12:37 20     A.     University of South Florida.

10:12:39 21     Q.     And you say you got a degree in fine

10:12:41 22   arts.

10:12:41 23            When did you get that degree?

10:12:43 24     A.     I think it was '85.

10:12:44 25     Q.     What is your date of birth?

Ronald Britt

| | |
|---|---|
| 10:12:46 | 2 |
| 10:12:49 | 3 |
| 10:12:52 | 4 |
| 10:12:55 | 5 |
| 10:12:59 | 6 |
| 10:12:59 | 7 |
| 10:13:03 | 8 |
| 10:13:06 | 9 |
| 10:13:11 | 10 |
| 10:13:11 | 11 |
| 10:13:13 | 12 |
| 10:13:13 | 13 |
| 10:13:13 | 14 |
| 10:13:16 | 15 |
| 10:13:17 | 16 |
| 10:13:19 | 17 |
| 10:13:22 | 18 |
| 10:13:22 | 19 |
| 10:13:25 | 20 |
| 10:13:25 | 21 |
| 10:13:28 | 22 |
| 10:13:29 | 23 |
| 10:13:31 | 24 |
| 10:13:35 | 25 |

A.    2/4/58.

Q.    And when you say you got a degree in fine arts, was there a particular form of art that you concentrated in or majored in?

A.    Fine art.

Q.    Is that painting, for example?

A.    I did a lot of painting, a lot of figure drawing, a lot of photography and sculpture.

Q.    Do you hold any professional licenses?

A.    No.

Q.    Do you hold any licenses of any sort?

A.    A driver's license.

Q.    Other than a driver's license, do you hold other licenses?

A.    No.

Q.    Do you hold a plumbing license?

A.    No, I do not.

Q.    Do you hold an electrical license?

A.    No, I do not.

Q.    Do you have any understanding as to whether the City of New York issues any sort of home-improvement licenses?

1          *Ronald Britt*

10:13:38  2          A.     Well, I have a certificate for

10:13:40  3     heating and plumbing.

10:13:41  4          Q.     And where do you have the certificate

5     from?

10:13:44  6          A.     The City of New York Department of

10:13:45  7     Buildings.

10:13:46  8          Q.     And what did you do to get that

10:13:48  9     certificate?

10:13:48  10         A.     And I also have a --

11         Q.     Go ahead.

10:13:50  12         A.     And I also have a license for lead

10:13:53  13    renovators, which is required by all supers.

10:13:55  14         Q.     A license for lead renovators is

10:14:00  15    required for all supers; is that what you said?

10:14:01  16         A.     It's really required for anybody,

10:14:04  17    from an interior decorator, on up.

10:14:07  18         Q.     And what did you do to obtain the

10:14:09  19    certificate for heating and plumbing?

10:14:11  20         A.     I attended classes.

10:14:13  21         Q.     And when did you attend those

10:14:15  22    classes?

10:14:16  23         A.     I don't recall, but I have the

10:14:17  24    certificate.

10:14:17  25         Q.     When did you get the certificate?

1                          *Ronald Britt*

10:14:18  2          A.      A couple years ago.

10:14:19  3          Q.      And is there any requirement that you

10:14:22  4      continue to attend classes to keep up that

10:14:25  5      certificate?

10:14:26  6          A.      There may be.  I'm not sure.

10:14:28  7          Q.      And with regard to -- what did you

10:14:30  8      say?  The lead --

10:14:30  9          A.      Lead renovators.

10:14:33  10         Q.      Lead renovators.  What did you do to

10:14:34  11     get that certificate?

10:14:34  12         A.      I attended several classes.

10:14:37  13         Q.      And those classes were given by --

10:14:40  14         A.      And I took a test.

10:14:40  15         Q.      By what entity were those classes

10:14:43  16     given?

10:14:44  17         A.      It was a fellow who is licensed to

10:14:47  18     give those classes.  And I took it with a bunch

10:14:50  19     of plumbers.

10:14:51  20         Q.      And do you have a certificate from

10:14:52  21     that course, as well?

10:14:54  22         A.      I don't have it, but I can certainly

10:14:56  23     obtain it, a copy.

10:14:58  24         Q.      When you say you don't have it, what

10:15:00  25     do you mean?

12

1                          *Ronald Britt*

10:15:00  2          A.    I mean, I don't know where it is.

10:15:03  3          Q.    And when did you get that

10:15:05  4     certificate?

10:15:05  5          A.    A few years ago.

10:15:06  6          Q.    Can you describe your employment

10:15:10  7     history, beginning with graduation from high

10:15:11  8     school?

10:15:11  9          A.    Well, that would be, I went into

10:15:18 10     graphics animation and special effects.  I worked

10:15:21 11     in television for many years.  I traveled quite a

10:15:26 12     bit as a freelancer.

10:15:28 13          Q.    What you say "as a freelancer," what

10:15:31 14     kind of work did you do?

10:15:32 15          A.    Graphics animation and special

10:15:34 16     effects.

10:15:34 17          Q.    For how long a period of time did you

10:15:37 18     do graphics animation and special effects?

10:15:40 19          A.    Maybe 15, 16 years.

10:15:42 20          Q.    And then, what?

10:15:43 21          A.    And then, I became a handy guy.

10:15:46 22          Q.    And when you say "handy guy," what do

10:15:48 23     you mean?

10:15:48 24          A.    I mean, sort of a generalist - fix

10:15:53 25     this and that.  It started with chairs.

13

1                        *Ronald Britt*

10:15:54  2        Q.    When did you become a handy guy?

10:15:57  3        A.    Well, I've always been kind of handy.

10:16:00  4   Everybody in my hometown is handy.

10:16:03  5        Q.    And what hometown is that?

10:16:05  6        A.    Dublin, North Carolina.

10:16:07  7        Q.    And did you at some point become

10:16:10  8   employed as a handy guy, as you say?

10:16:10  9        A.    Yeah; I did little, pick-up jobs

10:16:13 10   after leaving my last animation job.

10:16:16 11        Q.    And approximately when was that?

10:16:18 12        A.    I don't know.  Maybe, 13, 14,

10:16:25 13   15 years ago.

10:16:25 14        Q.    And for how long a period of time

10:16:27 15   have you been a handy guy?

10:16:29 16        A.    As I've said, I've always been handy.

10:16:32 17        Q.    Well, I'm referring to:  For how long

10:16:35 18   a period of time have you been paid to be a handy

10:16:37 19   guy?

10:16:37 20        A.    I think I got my first handy job at

10:16:40 21   12.

10:16:43 22        Q.    Are you currently employed?

10:16:45 23        A.    Not really.

10:16:46 24        Q.    Do you currently have any source of

10:16:49 25   income?

*Ronald Britt*

1

10:16:50 2       A.     I'm doing little, pick-up handy jobs,

10:16:54 3   and I help out at the bar from time to time.

10:16:57 4       Q.     Now, when you say "little, pick-up

10:16:59 5   handy jobs," what are you referring to?

10:17:01 6       A.     Whatever comes down the pike.  You

10:17:05 7   need me to help move a couch, I'll help you move

10:17:09 8   a couch.  You need me to put up a shelf, hang a

10:17:13 9   picture.  Whatever.

10:17:13 10       Q.     And when you refer to "the bar," what

10:17:15 11   are you referring to?

10:17:16 12       A.     The Edge bar.

10:17:17 13       Q.     And where is that located?

10:17:18 14       A.     95 East 3rd Street.

10:17:21 15       Q.     And what kinds of work have you done

10:17:24 16   for The Edge bar?

10:17:25 17       A.     I kind of help keep an eye on things.

10:17:28 18       Q.     What does that mean?

10:17:29 19       A.     Whatever they need.

10:17:31 20             Well, help keep an eye on things.

10:17:33 21   It's a bar.

10:17:34 22       Q.     Well, does that mean you're a

10:17:37 23   bouncer?

10:17:37 24       A.     No.  They don't have bouncers there.

10:17:40 25       Q.     Do you do any work with your hands

15

1                           *Ronald Britt*

10:17:43   2    there?

10:17:43   3           A.    Sometimes, yes.

10:17:44   4           Q.    What type of work?

10:17:45   5           A.    Pick up glasses, wipe off tables.

10:17:49   6           Q.    Are you paid for that work?

10:17:51   7           A.    Yes.

10:17:51   8           Q.    On what basis are you paid?

10:17:53   9           A.    100 bucks a night.

10:17:55  10           Q.    Since April 30th, 2013, how much have

10:17:59  11    you earned from Edge bar?

10:18:01  12                 MR. KOERNER:  Objection.

10:18:02  13                 You can answer.

10:18:03  14                 MS. GOULD:  What's the basis of the

10:18:04  15    objection?

10:18:05  16                 MR. KOERNER:  First of all, there's

10:18:06  17    no relevance to that in this case.

10:18:07  18                 MS. GOULD:  Relevance is not an

10:18:10  19    objection.

10:18:12  20                 MR. KOERNER:  I'm objecting.  I'm

10:18:12  21    saying he can answer.

10:18:13  22           Q.    Go ahead.

10:18:13  23           A.    I don't know.

10:18:13  24           Q.    Do you have any records of what

10:18:15  25    you've earned from Edge bar?

1          *Ronald Britt*

10:18:18  2          A.    I don't know.  I don't know if they

10:18:20  3    keep a record or not.  But if there are records,

10:18:23  4    I don't have copies.

10:18:25  5          Q.    Do you keep records of what you've

10:18:28  6    earned at Edge bar?

10:18:29  7          A.    No, I haven't.

10:18:30  8          Q.    Have you been paid in cash by Edge

10:18:33  9    bar?

10:18:33 10          A.    Yes.

10:18:34 11          Q.    Have you given receipts to Edge bar

10:18:37 12    for those payments?

10:18:38 13          A.    No.

10:18:38 14          Q.    So, it's your testimony, as you sit

10:18:40 15    here today, that you don't have any specific

10:18:44 16    knowledge as to how much you've earned from Edge

10:18:48 17    bar since April 30th of 2013; is that correct?

10:18:50 18          A.    A few hundred bucks.  It's not much.

10:18:53 19          Q.    Is it under $1,000?

10:18:55 20          A.    I would imagine so, yes.

10:18:57 21          Q.    So, you've worked less than ten

10:19:01 22    nights at Edge bar; is that correct?

10:19:02 23          A.    I believe so.

10:19:03 24          Q.    And when you talked about the small,

10:19:06 25    pick-up jobs that you're referring to, how much

1          *Ronald Britt*

10:19:09   2    have you earned from those jobs since April 30th

10:19:13   3    of 2013?

10:19:13   4          A.    I wouldn't know.

10:19:14   5          Q.    Do you have any records that would

10:19:19   6    reflect how much you've earned from those jobs

10:19:23   7    since April 30th, 2013?

10:19:25   8          A.    No, I don't.

10:19:26   9          Q.    And when you'd perform those pick-up

10:19:31  10    jobs, were you paid in cash?

10:19:32  11          A.    More often than not, it's some form

10:19:36  12    of barter.

10:19:37  13          Q.    And when you say "more often than

10:19:39  14    not, it's some form of barter," can you describe

10:19:43  15    a form of barter?

10:19:44  16          A.    Like, you give me a ride someplace I

10:19:49  17    need to go, and I'll help you clean off your

10:19:51  18    patio.

10:19:55  19          Q.    Did you file a tax return for the

10:20:01  20    year 2013?

10:20:02  21          A.    No, I have not.

10:20:03  22          Q.    Why is that?

10:20:04  23          A.    I just don't believe I owe any taxes.

10:20:11  24          Q.    Now, do you know Doreen Alderman?

10:20:19  25          A.    I do.

*Ronald Britt*

|   |   |
|---|---|
| 10:20:20 | 2 |

Q.    How long have you known Ms. Alderman?

A.    Since about a year before I became employed by her.  I would say, that would be maybe '05.

Q.    So, is it your testimony that you met her first in 2005?

A.    I don't know for sure, but it was about nine months before I was hired.

Q.    Well, when were you hired?

A.    I think it was in '07.  I'm not sure.

Q.    So --

A.    I think it was January 1st, '07, but I'm not exactly sure.

Q.    So, if you were hired in 2007 and you say that you believe you met Ms. Alderman about nine months before you were hired, when would that be?

A.    I can't be sure.

Q.    Was it in 2005 or 2006?

A.    I'm not really sure.

Q.    How did you meet her?

A.    I leased the basement of 91 East 3rd Street as my shop space.

MR. KOERNER:  Try to answer the

*Ronald Britt*

1

10:21:19  2      question.  Just, how did you meet her?

10:21:23  3           THE WITNESS:  That's how I met her.

10:21:24  4           MR. KOERNER:  Okay.

10:21:24  5      Q.    You make reference to a lease of a

10:21:29  6  basement for shop space; is that correct?

10:21:31  7      A.    That's correct.

10:21:31  8      Q.    And this is a basement located at

10:21:34  9  what address?

10:21:35 10      A.    91 East 3rd Street.

10:21:37 11      Q.    And you say you leased the basement

10:21:48 12  at that address for shop space; is that correct?

10:21:51 13      A.    Correct.

10:21:52 14      Q.    And when you say "the basement," are

10:21:55 15  you referring to the entire basement?

10:21:56 16      A.    The basement there is divided into

10:21:59 17  three large sections.

10:22:03 18      Q.    So, when you refer to "the basement,"

10:22:05 19  what part of -- or, all of those three sections

10:22:08 20  are you saying you leased?

10:22:10 21      A.    I can provide you a diagram that's

10:22:13 22  scale.

10:22:13 23      Q.    Well, let's -- let me step back.

10:22:16 24           You indicated that the basement is

10:22:18 25  divided into three large sections; is that

*Ronald Britt*

1

10:22:21  2    correct?

10:22:21  3        A.    The east-most section.

10:22:23  4        Q.    So, are you saying that you leased

10:22:25  5    the east-most section of that space?

10:22:27  6        A.    Correct; all but one room.

10:22:31  7        Q.    And was that -- was that room

10:22:37  8    included, quote, "in the east-most section"?

10:22:38  9        A.    It is.  There's a small common area

10:22:41 10    when you come down the hatch.  And then, there's

10:22:44 11    what we refer to as the super room.  It was the

10:22:48 12    room that I used when I was super.  And the rest

10:22:51 13    is what I leased.

10:22:53 14        Q.    And approximately how many square

10:22:56 15    feet was that portion of the space that you

10:22:57 16    leased?

10:22:58 17        A.    I don't know.

10:22:58 18        Q.    And you said you leased it as your

10:23:01 19    shop space.

10:23:02 20              What do you mean by that?

10:23:02 21        A.    I mean, I had all my tools there, and

10:23:05 22    I worked out of there.

10:23:06 23        Q.    And this was before you became

10:23:08 24    employed at 91 East 3rd Street; is that correct?

10:23:12 25        A.    Correct, as a super.  Although I did

1                        *Ronald Britt*

10:23:17  2    a few jobs for Doreen before I became super.

10:23:20  3         Q.    Did you have an understanding that

10:23:22  4    that lease was to be for storage space?

10:23:26  5         A.    The understanding was it would be my

10:23:29  6    shop space.  But they said -- Jay said, her

10:23:33  7    managing agent, that he had to put storage on the

10:23:37  8    lease because of the Certificate of Occupancy,

10:23:44  9    that it would be a problem with the D.O.B.

10:23:49  10        Q.    "D.O.B." meaning, Department of

10:23:54  11   Buildings; is that correct?

10:23:54  12        A.    That's what he said.

10:23:56  13        Q.    When did you first rent this basement

10:23:59  14   space?

10:23:59  15        A.    I can't be sure.  I'd have to refer

10:24:03  16   to the lease.

17                    MS. GOULD:  Off the record.

18                    *(off-the-record discussion)*

19                    MS. GOULD:  Can you mark this,

20             please.  It's going to be Exhibit 1.

21                    *(Whereupon, six pages, including*

22             *7/7/05, lease agreement; and 12/20/07,*

23             *lease extension was marked as Exhibit 1,*

10:25:33  24   *for id.)*

10:25:33  25        Q.    Mr. Britt, please take a look at a

1          *Ronald Britt*

10:25:35  2   document that we've marked as Exhibit 1.

10:25:40  3   (Handing)

10:25:40  4              *(Witness peruses exhibit)*

10:25:58  5              Do you recognize the exhibit?

10:26:00  6        A.    Yes, I do.

10:26:01  7        Q.    And can you tell me what it is?

10:26:03  8        A.    It's my lease, and an extension of my

10:26:06  9   lease.

10:26:06  10       Q.    And when you say this is my lease,

10:26:08  11  you're looking at a document that is the exhibit

10:26:11  12  minus the first page; is that correct?

10:26:13  13       A.    I don't know that.

10:26:14  14       Q.    Well, the first page is the

10:26:16  15  extension; isn't that correct?

10:26:18  16       A.    The first page is the extension;

10:26:20  17  correct.

10:26:21  18       Q.    And so, the remainder of the exhibit

10:26:24  19  is the lease that you're referring to for the

10:26:27  20  basement of 91 East 3rd Street; is that correct?

10:26:29  21       A.    Yes; but it doesn't have the drawing

10:26:33  22  that accompanied it.

10:26:33  23       Q.    But other than the fact that it

10:26:36  24  doesn't have the drawing, is this a true and

10:26:39  25  accurate copy of the lease that you singed for

23

*Ronald Britt*

10:26:41 the basement at 91 East 3rd Street?  And this

10:26:42 seems to be dated July 7th of 2005.

10:26:45      A.    I would have to read through it.

10:26:48      Q.    Would you take a look, and then see

10:26:51 if you can answer my question.

            *(Witness peruses exhibit)*

            MR. KOERNER:  Off the record.

10:27:44      *(Off-the-record discussion)*

10:27:44      MS. GOULD:  Okay.  We're going to

10:27:46      take two seconds while counsel goes

10:27:49      downstairs.

            *(Recess held from 10:27 to 10:35 a.m.)*

            MS. GOULD:  Back on the record.

CONTINUED EXAMINATION BY MS. GOULD:

      A.    I can't.

      Q.    To the best of your knowledge.

            MR. KOERNER:  We'll reserve our

      right to look at it.

10:35:41      A.    Would I be able to check it against

10:35:43 my lease and get back to you on this one?

      Q.    How about looking at the last page of

10:35:46 the lease --

10:35:46      MR. ETTENGER:  Can we go off the

      record for a second.

1          *Ronald Britt*

10:38:08    2          *(off-the-record discussion)*

10:38:08    3          MS. GOULD:  Can you read back the

10:38:10    4     question, please.

5          *(Whereupon, the following portion*

6          *of the record was read back by the*

7          *reporter:*

10:26:34    8          *Q.   But other than the fact that it*

10:26:36    9     *doesn't have the drawing, is this a true*

10:26:38   10     *and accurate copy of the lease that you*

11     *singed for the basement at 91 East 3rd*

10:26:41   12     *Street?  And this seems to be dated*

10:26:44   13     *July 7th of 2005.)*

10:26:45   14          A.    I would have to read through it.

10:38:15   15          *(Witness peruses exhibit)*

10:38:21   16          Yeah.  It says right here, "as per

10:38:26   17     attached drawing."

10:38:29   18          Q.    Mr. Britt --

10:38:31   19          MR. KOERNER:  Yes or no question,

10:38:33   20     Ron.  Or if you don't know, you don't

10:38:36   21     know.

10:38:38   22          A.    Let me just see.

10:38:40   23          *(Witness peruses exhibit)*

10:39:33   24          MR. KOERNER:  I'll note for the

10:39:36   25     record that the font on this document is

25

1          *Ronald Britt*

10:39:38   2          exceptionally small and difficult to read.

10:40:29   3             *(Witness peruses exhibit)*

10:40:55   4          A.     Well, honestly, there's some things

10:40:58   5     in here I don't recall.  I'll have to check

10:41:00   6     against my own copy.  But, it appears to be the

10:41:03   7     same.

10:41:03   8          Q.     It appears to be the same as the

10:41:05   9     lease that you -- a true and accurate copy of the

10:41:07  10     lease you signed for basement space at 91 East

10:41:13  11     3rd Street on or about July 7th, 2005; is that

10:41:14  12     correct?

10:41:14  13          A.     Yes.

10:41:15  14          Q.     And just looking at the last page of

10:41:17  15     the exhibit, calling your attention to what

10:41:19  16     appears to be the signature of a "Ron Britt,"

10:41:23  17     is that your signature, sir?

10:41:24  18          A.     That is.

10:41:25  19          Q.     And do you know whose signature

10:41:27  20     appears above your signature?

10:41:30  21          A.     Jay Yablonsky.

          22          Q.     And who is Jay Yablonsky?

10:41:33  23          A.     The managing agent.

10:41:34  24          Q.     For what?

10:41:35  25          A.     For Thermald Realty.

*Ronald Britt*

1

10:41:37 2      Q.    Now, you indicated that you first met

10:41:40 3  Doreen Alderman at or around the time that you

10:41:43 4  signed this lease, which is part of Exhibit 1; is

10:41:46 5  that correct?

10:41:46 6              MR. KOERNER:   Objection.   Is

10:41:49 7      that --

10:41:49 8              THE WITNESS:   Yeah, she was there

10:41:50 9      in the space.

10:41:51 10     Q.    And it appears that that was on or

10:41:55 11 about July 7th, 2005, or sometime prior to that;

10:41:59 12 is that correct?

10:42:00 13     A.    I met Jay three days before signing

10:42:05 14 this.

10:42:05 15     Q.    I'm talking about when you met Doreen

10:42:08 16 Alderman.

10:42:08 17     A.    I met her at the signing of this.

10:42:10 18     Q.    And that was on July 7th, 2005?

10:42:13 19     A.    It appears so, yes.

10:42:15 20     Q.    Now, looking at the first page of the

10:42:18 21 exhibit, which you indicated earlier was the

10:42:19 22 extension of your lease; is that correct?

10:42:20 23     A.    Yes.

10:42:21 24     Q.    And this extended the lease until

10:42:25 25 July 31st of 2018; is that correct?

1                          *Ronald Britt*

10:42:29  2        A.      Correct.

10:42:30  3        Q.      And when was this extension signed?

10:42:32  4        A.      Well, it's dated 12/20/07.

10:42:37  5        Q.      And was Doreen Alderman present when

10:42:41  6    you signed that extension?

10:42:42  7        A.      I don't recall.

10:42:43  8        Q.      Now, during the period after

10:42:46  9    July 7th, 2005, and until August 1, 2000- --

10:42:55 10    until July 31st, 2000- -- I'm sorry.

10:43:00 11             Until you signed this extension on

10:43:03 12    12/20/07, how did you use that basement space at

10:43:09 13    91 East 3rd Street?

10:43:09 14        A.      As my shop space.

10:43:10 15        Q.      Did you use it for anything else?

10:43:13 16        A.      It's always been a shop space.

10:43:14 17        Q.      Did there come a point in time when

10:43:19 18    you became employed at 91 East 3rd Street?

10:43:23 19        A.      Yes, ma'am.

10:43:24 20        Q.      And when did that occur?

10:43:26 21        A.      I believe it was January 1st, '07,

10:43:30 22    but I'm not sure.

10:43:31 23        Q.      And how did it come about that you

10:43:33 24    became employed there?

10:43:34 25        A.      The previous super, Brendan Burke,

28

1                              *Ronald Britt*

10:43:39  2   had had his pay reduced, because he said Doreen

10:43:45  3   wasn't happy with the way he cleaned, and she

10:43:48  4   hired somebody else to do cleaning.  He was not

10:43:50  5   able to make ends meet on what remained.  And I

10:43:56  6   said that if they offered me the super job, I

10:43:58  7   would adopt his dog, because he couldn't take

10:44:03  8   his dog with him.  So, in that moment, I became

10:44:06  9   the super.  When they offered me the job, I took

10:44:09 10   over Brendan's shop, Brendan's apartment,

10:44:14 11   Brendan's job, and his dog.

10:44:15 12          Q.    Now, when you say in that moment they

10:44:17 13   offered you the job, who is the "they" that

10:44:20 14   you're referring to?

10:44:21 15          A.    Doreen and Jay.

10:44:23 16          Q.    And that's Doreen Alderman and

10:44:26 17   Jay Yablonsky?

10:44:26 18          A.    Yes.

10:44:26 19          Q.    Did you approach them about taking

10:44:29 20   over this job?

10:44:30 21          A.    No.  They had offered me the job when

10:44:32 22   I first met them.

10:44:33 23          Q.    And when was that?

10:44:34 24          A.    When I first signed the lease.

10:44:35 25          Q.    But you declined the job at that time --

29

1                           *Ronald Britt*

2          A.     I did.

10:44:38  3          Q.     -- is that what you're saying?

10:44:40  4          A.     Because I didn't want to do any

10:44:42  5     cleaning.

10:44:43  6          Q.     And when you were offered the job and

10:44:55  7     you were going to take over for Brendan Burke,

10:45:00  8     were you offered any sort of written agreement?

10:45:02  9          A.     I think there was a contract, yes.

10:45:04 10          Q.     And did you sign that contract, as

10:45:07 11     you call it?

10:45:07 12          A.     I think I did.

10:45:08 13          Q.     And do you recall how many pages the

10:45:10 14     contract was?

10:45:11 15          A.     I don't.

10:45:12 16          Q.     Were you given a draft of the

10:45:17 17     contract before you signed it?

10:45:19 18          A.     I think they just presented it;

10:45:24 19     signed it, and start working.

10:45:27 20          Q.     Was there any negotiation of the

10:45:29 21     contract prior to the time that you started

10:45:31 22     working?

10:45:32 23          A.     No.

10:45:32 24          Q.     Well, you said you didn't want to

10:45:34 25     clean; is that correct?

30

1                         *Ronald Britt*

10:45:36  2        A.     That's right.

10:45:37  3        Q.     And do you recall whether the initial

10:45:40  4   contract, as you call it, as presented to you,

10:45:44  5   included cleaning?

10:45:44  6        A.     I don't, but I know they hired a

10:45:47  7   porter to take care of the cleaning.

10:45:49  8        Q.     Do you know the name of the entity

10:45:53  9   that actually hired you?

10:45:55 10        A.     I think it's Thermald Realty

10:46:04 11   Associates.

10:46:05 12        Q.     And do you recall what the terms of

10:46:18 13   the contract were?

10:46:20 14        A.     Not offhand, no.

10:46:22 15        Q.     Do you recall whether the duties that

10:46:25 16   you were supposed to be -- supposed to perform,

10:46:27 17   were outlined in that contract?

10:46:29 18        A.     I imagine they were, yes.

10:46:32 19        Q.     And do you recall what they were?

10:46:34 20        A.     Not offhand, no.

21        MS. GOULD:  Mark this, please.

22        *(Whereupon, 28 pages,*

23        *Complaint/Jury Trial Demanded was marked*

10:47:54 24        *as Exhibit 2, for id.)*

10:47:54 25        Q.     I'm going to ask you to take a look

31

*Ronald Britt*

10:47:58  2   at the official exhibit, which has been marked

10:48:02  3   Exhibit 2.  *(Handing)*

10:48:05  4           *(Witness peruses exhibit)*

10:48:14  5           THE WITNESS:  This is what we

10:48:19  6     submitted?

10:48:20  7         Q.     Take a look, and then I'm going to

10:48:23  8   ask you some questions.

10:48:24  9         A.     May I have a minute?

10:48:26 10         Q.     Surely.

10:48:29 11           *(Witness peruses exhibit)*

10:52:43 12         MR. ETTENGER:  Off the record.

10:53:34 13           *(Off-the-record discussion)*

10:53:34 14         MS. GOULD:  Back on the record.

10:53:38 15           *(Witness peruses exhibit)*

10:56:20 16         MR. KOERNER:  There's no question

10:56:22 17     pending; right?

10:56:23 18         MS. GOULD:  Correct.

10:56:36 19         MR. KOERNER:  I think if you're

10:56:37 20     going to have specific questions, you can --

10:56:40 21         Q.     My first question is going to be -

10:56:43 22   and maybe this will assist you in moving this

10:56:46 23   along - whether this document is the complaint

10:56:50 24   with exhibits that was filed on your behalf in

10:56:52 25   this action.

1          *Ronald Britt*

10:56:54    2          A.      I believe it is.

10:56:55    3          Q.      Did you see this complaint before it

10:56:58    4    was filed?

10:56:58    5          A.      I did.

10:56:58    6          Q.      And did you review it for accuracy?

10:57:03    7          A.      I did.

10:57:03    8          Q.      And did you see the exhibits that

10:57:05    9    were attached to the complaint before the

10:57:08   10    complaint was filed?

10:57:10   11          A.      That's Exhibit A?

10:57:11   12          Q.      Well, there are several exhibits.

10:57:14   13          A.      Well, I'm only up to that page.

10:57:17   14          Q.      Well, there are a number of exhibits.

10:57:20   15    I think they go all the way up through E.   And

10:57:23   16    I'm going to ask you whether you recall reviewing

10:57:26   17    those exhibits attached to the complaint filed on

10:57:30   18    your behalf, before the complaint was filed?

10:57:32   19          A.      I don't know for sure that we had a

10:57:34   20    copy of the employment contract.   But I did sign

10:57:40   21    it back then; so, I have seen it before.

10:57:43   22          Q.      Well, what is it that you say you've

10:57:45   23    seen before?

10:57:46   24          A.      The employment contract.   I don't

10:57:49   25    know that I reviewed it before, but we may have.

33

*Ronald Britt*

10:57:52  2    Q.    Let me just ask the question again to

10:57:55  3  have a clear record:  Do you recognize Exhibit 2

10:57:57  4  as a true and accurate copy of the complaint that

10:58:01  5  was filed on your behalf in this action together

10:58:04  6  with the exhibits that were filed with the

10:58:08  7  complaint?

10:58:11  8         MR. KOERNER:  Objection as asked

       9         and answered.

      10    A.    I'm sorry.  Could you --

10:58:14 11         MR. ETTENGER:  You've got to read

10:58:14 12         all the exhibits, sir.  You said you

      13         haven't read them all.  So, why don't you

      14         review them all so you can answer the

      15         question.

10:58:36 16         *(Witness peruses exhibit)*

10:58:36 17         MR. KOERNER:  Off the record.

      18         *(Off-the-record discussion)*

      19         MR. KOERNER:  Go ahead.  Back on

10:58:40 20    the record.

10:58:40 21    A.    Yes, I believe I've seen all of this.

10:58:48 22    Q.    So, the question, again, is:  Is

10:58:50 23  Exhibit 2, the document that you've been looking

10:58:52 24  at, a true and accurate copy of the complaint

10:58:54 25  that was filed on your behalf in this action,

Ronald Britt

1

2  10:58:57  together with the exhibits that were filed with

3  10:58:59  the complaint?

4  10:58:59      A.    It appears so.

5  10:59:01      Q.    And you've indicated that you

6  10:59:02  reviewed the complaint for accuracy; is that

7  10:59:06  correct?

8  10:59:06      A.    Yes, ma'am.

9  10:59:07      Q.    Now, looking at Exhibit A of the

10 10:59:08  complaint -- withdrawn.

11 10:59:08      Looking at Page 3 and going over to

12 10:59:19  Page 4 of the complaint, Paragraph 12, last

13 10:59:25  sentence in Paragraph 12, it states, "Plaintiff's

14 10:59:29  employment agreement dated January 4th, 2007,

15 10:59:34  setting forth the terms of plaintiff's employment

16 10:59:40  by Thermald attached hereto as Exhibit A."

17 10:59:47      Do you see that?

18 10:59:47      A.    Page 3?

19 10:59:48      Q.    Going on to Page 4, Paragraph 12.

20 10:59:52      A.    So, what are we looking for?

21 10:59:52      Q.    Looking at the bottom of the page

22 10:59:53  starting with Paragraph 12.  And that paragraph

23 10:59:56  continues to Page 4.

24 10:59:58      A.    Okay.

25 10:59:58      Q.    Looking at the end of that paragraph,

*Ronald Britt*

1

2  which is on the top of Page 4 it says:

3  "Plaintiff's employment agreement dated

4  January 4th, 2007, setting forth the terms of

5  plaintiff's employment by Thermald, attached

6  hereto as Exhibit A.

7           Do you see that?

8      A.    I do.

9      Q.    Now, would you take a look at the

10 Exhibit A that's attached to this complaint.

11           *(Witness peruses exhibit)*

12     A.    Yes.

13     Q.    This is a two-page exhibit; is that

14 correct?

15     A.    Yes, ma'am.

16     Q.    And the first page appears to be

17 dated January 4th, 2007; is that correct?

18     A.    Yes, ma'am.

19     Q.    And it appears to be on the

20 stationery of the Wavecrest Management Team

21 Limited; is that right?

22     A.    Yes, ma'am.

23     Q.    And on the second page, is it

24 accurate that your signature appears?

25     A.    Yes, ma'am.

36

1                          *Ronald Britt*

11:00:54  2          Q.     Can you identify Exhibit A?  Can you

11:00:56  3     tell me what it is?

11:00:56  4          A.     It appears to be the employment

11:00:59  5     contract that I signed with Jay Yablonsky.

11:01:02  6          Q.     Is this the entirety of the

11:01:04  7     employment contract that you signed with

11:01:06  8     Jay Yablonsky?

11:01:07  9          A.     It appears to be.

11:01:08 10          Q.     Well, would you take a look at the

11:01:10 11     first page, and then look at the second page,

11:01:13 12     and tell me whether you think that there aren't

11:01:17 13     pages missing in this agreement?

11:01:19 14          A.     I can't be sure.

11:01:20 15          Q.     Take a look at it.

11:01:25 16              *(witness peruses exhibit)*

11:01:25 17          A.     Yes.

11:01:25 18          Q.     There are pages missing?  Do you know

11:01:29 19     how many pages missing?

11:01:31 20          A.     No; I say I -- I've had a look at it,

11:01:33 21     but I can't be sure if there are pages missing.

11:01:35 22          Q.     Well, as you look at the document,

11:01:36 23     looking at the bottom of the first page of the

11:01:38 24     document, you see a paragraph numbered 6.  And

11:01:42 25     going to the second page of the document --

37

*Ronald Britt*

11:01:43  A.    Nothing else is numbered.

11:01:46  Q.    Well, more than that, it starts in
11:01:48  the middle of a sentence; doesn't it?

11:01:50  A.    Well, I don't know.

*(Witness peruses exhibit)*

11:01:58        Yes, it does.

11:01:59  Q.    So, I ask you again:  Is this the
11:02:02  entirety of the agreement that you signed, as you
11:02:04  say, with Jay Yablonsky on about January 4th,
11:02:08  2007?

11:02:08        MR. KOERNER:  Objection.  On the
11:02:10        record, we've had communications between
11:02:10        counsel, where I said there may be missing
11:02:13        pages, but these are all the pages that we
11:02:16        have.

11:02:16        MS. GOULD:  That's what you said,
11:02:19        but you're not the witness.

11:02:19        MR. KOERNER:  Okay.  So...

11:02:19        MS. GOULD:  And you are now
11:02:19        engaging in a speaking objection, which
11:02:19        you know you're not supposed to do.

11:02:21  Q.    Is this the entirety of the
11:02:23  agreement?

11:02:23  A.    I can't be sure, ma'am.

*Ronald Britt*

1

11:02:25 2    Q.    Do you recall being given a draft of

11:02:26 3    this agreement prior to the time you signed it?

11:02:32 4    A.    No.

11:02:32 5    Q.    Do you recall whether, in the

11:02:47 6    agreement that you actually signed, your duties

11:02:50 7    were listed?

11:02:53 8    A.    To be honest, ma'am, no.

11:02:55 9    Q.    Do you recall whether, in the

11:02:56 10   agreement that you actually signed, your

11:03:00 11   compensation was set forth?

11:03:01 12   A.    I imagine it was, yes.

11:03:04 13   Q.    Well, do you recall what that

11:03:06 14   compensation was in the agreement that you

11:03:07 15   actually signed?

11:03:08 16   A.    No, I don't.

11:03:10 17   Q.    And you note here -- withdrawn.

11:03:13 18        Looking at Exhibit A to the

11:03:17 19   complaint, which is Exhibit 2, is it accurate

11:03:22 20   that there's no compensation set forth in these

11:03:28 21   two pages?

11:03:29 22   A.    What was the question again, please?

11:03:31 23   Q.    Looking at Exhibit A to your

11:03:34 24   complaint --

11:03:34 25   A.    All right.  Yes.

39

*Ronald Britt*

11:03:34  2      Q.      -- which is a two-page exhibit, which

11:03:37  3  you've said you don't know whether or not it

11:03:40  4  constitutes the whole agreement that you signed;

11:03:42  5  is that correct?

11:03:42  6      A.      I can't be sure.

11:03:43  7      Q.      As you look at this exhibit, is there

11:03:46  8  any compensation set forth in the exhibit?

11:03:52  9          *(witness peruses exhibit)*

11:03:52 10      A.      No, I don't see any.

11:03:59 11      Q.      When you signed the employment

11:04:02 12  agreement that you're referring to on or about

11:04:07 13  January 4th, 2007, was the compensation for your

11:04:12 14  roles and responsibilities set forth in the

11:04:16 15  agreement?

11:04:16 16      A.      I would imagine it was, ma'am, but I

11:04:18 17  can't be sure.

11:04:18 18      Q.      You can't be sure?

11:04:19 19      A.      It's many years ago, and I don't have

11:04:22 20  a copy of it.

11:04:22 21      Q.      Well, what was your understanding --

11:04:24 22  as you sit here today, what was your

11:04:25 23  understanding of how you were going to be

11:04:27 24  compensated for your roles and responsibilities

11:04:30 25  at 91 East 3rd Street?

1                          *Ronald Britt*

11:04:32  2          A.    I think it was something like $3.67

11:04:39  3     per unit that I was super of record for, but I

11:04:43  4     can't be sure.

11:04:43  5          Q.    Do you believe that that was set

11:04:46  6     forth in the agreement?

11:04:46  7          A.    I don't know.  But I think that the

11:04:48  8     pay reflects that, yes.

11:04:50  9          Q.    The pay reflects, what?

11:04:52 10          A.    That that's about correct.

11:04:55 11          Q.    And how many units were you going to

11:04:57 12     be responsible for?

11:04:58 13          A.    Something like 76 apartments.  1, 2,

11:05:09 14     3 -- 4 storefronts.  And 4 basements.

11:05:14 15          Q.    So, it was your understanding that

11:05:16 16     the compensation that was set forth in the

11:05:17 17     agreement that you actually signed, was on a

11:05:22 18     per-unit basis?

11:05:23 19          A.    I think so.

11:05:23 20          Q.    And with respect to the agreement

11:05:28 21     that you believe you signed, what were the duties

11:05:30 22     that you were supposed to perform?

11:05:32 23          A.    Frankly, ma'am, it was quite casual.

11:05:36 24     It was like, bang, you're super.  There was no

11:05:40 25     training, other than a conversation --

*Ronald Britt*

2   Q.   I'm asking:  What were the duties

3   that were outlined in the agreement that you were

4   supposed to perform?

5         MR. KOERNER:  If you know.  If you

6      recall.

7   A.   That I would be on call 24/7; and

8   that whatever happened, take care of it.

9   Q.   Well, looking at the Exhibit A that

10  you attached to your complaint, there are at

11  least six enumerated duties; is that correct?

12  A.   At least.

13  Q.   Do you recall - Looking at the first

14  page of that exhibit, Paragraphs 1 through 6 -

15  that these were among the responsibilities set

16  forth in the agreement that you actually signed?

17  A.   Yes, I do.

18  Q.   And do you recall that there were

19  other duties actually set forth in the agreement

20  that you signed?

21  A.   Only what Jay told me.

22  Q.   And what did he tell you?

23  A.   "Whatever happens, take care of it."

24  Q.   So, as you sit here today, you don't

25  recall whether there were more duties set forth

42

*Ronald Britt*

11:06:31 2    in the agreement that you actually signed than

11:06:34 3    these one through six listed on Exhibit A of your

11:06:38 4    complaint; is that right?

11:06:39 5        A.    Well, I'm sure that he said, "You're

11:06:42 6    super.  Take care of the buildings.  Take care of

11:06:44 7    the tenants.  And whatever happens, deal with it

11:06:46 8    right away."

11:06:48 9        Q.    I'm asking you a different question.

11:06:51 10   I'm asking you whether you recall that with

11:06:53 11   respect to the agreement that you actually

11:06:54 12   signed, that there were duties in addition to the

11:06:58 13   paragraphs numbered one through six on the first

11:07:01 14   page of this Exhibit A to your complaint?

11:07:04 15       A.    As I said, ma'am, I can't be sure.

11:07:06 16   It was some time ago.

11:07:07 17       Q.    And you don't recall whether you ever

11:07:10 18   received a draft of the agreement prior to the

11:07:12 19   time that you signed it; is that correct?

11:07:13 20            MR. KOERNER:  Objection.

11:07:14 21            You can answer.

11:07:16 22       A.    It was a long time ago.

23            MS. GOULD:  Mark this, please.

24            *(Whereupon, five-page document*

25        *dated 12/28/06, was marked as Exhibit 3,*

43

*Ronald Britt*

| | | |
|---|---|---|
| 11:07:59 | 2 | *for id.)* |
| 11:07:59 | 3 | Q.    Please take a look at the document |
| 11:08:03 | 4 | we've marked as Exhibit 3.   *(Handing)* |
| 11:08:06 | 5 | *(Witness peruses exhibit)* |
| 11:08:45 | 6 | MR. KOERNER:  This is a draft. |
| 11:08:47 | 7 | MS. GOULD:  Well, sir, you are now |
| 11:08:50 | 8 | coaching your witness. |
| | 9 | MR. KOERNER:  I'm not coaching my |
| | 10 | witness. |
| | 11 | MS. GOULD:  I'm suggesting you are. |
| 11:08:51 | 12 | MR. KOERNER:  I'm repeating what |
| 11:08:52 | 13 | you just said. |
| 11:08:54 | 14 | MS. GOULD:  I didn't say that. |
| 11:08:55 | 15 | I'm asking him to take a look at a |
| 11:08:58 | 16 | document.  All right? |
| | 17 | Please go on and have this on the |
| | 18 | record. |
| 11:08:58 | 19 | And you are coaching your witness, |
| 11:09:01 | 20 | on the record. |
| 11:09:09 | 21 | MR. KOERNER:  Absolutely not. |
| 11:09:30 | 22 | *(Witness peruses exhibit)* |
| 11:09:30 | 23 | MS. GOULD:  I'm noting for the |
| 11:09:31 | 24 | record that Mr. Britt's counsel is |
| 11:09:33 | 25 | pointing things out to him on the exhibit. |

*Ronald Britt*

1
11:09:35  2    There's been no question about the exhibit
3    yet.  What he's doing is completely
11:09:39  4    inappropriate.
11:09:39  5        MR. KOERNER:  Absolutely not.  You
11:09:41  6    showed him a document to review.  I'm
11:09:43  7    reviewing the document with him.
11:09:45  8        MS. GOULD:  No.  He's supposed to
11:09:47  9    be reviewing it.  You're not supposed to
11:09:47 10    be reviewing it with him.
11:09:47 11        MR. KOERNER:  I'm making sure he's
11:09:50 12    paying attention to relevant sections of
13    the document and answering your questions.
14        MS. GOULD:  Well, you know, sir --
11:09:50 15        MR. KOERNER:  There's no coaching.
11:09:52 16    There's nothing improper, you know,
11:09:54 17    except for your statements on record I'm
11:09:57 18    doing something improper.
11:10:00 19        MS. GOULD:  Okay.  All right.
11:10:02 20        *(Witness peruses exhibit)*
11:10:35 21    A.    Okay.
11:10:35 22    Q.    My question -- let me just ask the
11:10:38 23    question.  My question to you is:  Now, looking
11:10:40 24    at Exhibit 3, do you recognize the document?
11:10:43 25    A.    It's similar to the one in the

45

*Ronald Britt*

11:10:46  complaint, yes.

11:10:47      Q.    Well, do you recognize it as being a
11:10:51  document that you saw prior to today?

11:10:54      A.    I can't be sure, ma'am.

11:10:56      Q.    And this is a document that appears
11:10:58  to be dated -- it's five pages -- sorry; four
11:11:04  pages.  It appears to be dated December 28th,
11:11:08  2006.  And it's addressed to you, Ron Britt, at
11:11:11  91 East 3rd Street, New York, New York; correct?

11:11:13      A.    If I may, ma'am, I can't help but
11:11:16  notice that the last page of the document you
11:11:19  just gave me is not the same as the page I
11:11:22  signed.  You'll notice that the one I signed
11:11:26  begins "Period of 90 days consecutive," where the
11:11:29  one you handed me begins, "Physically selected by
11:11:37  company to continue," -- "Physician selected by
11:11:40  company to continue."

11:11:41      Q.    That may be true.  So, that's why I'm
11:11:44  asking you whether you recall having seen
11:11:48  Exhibit 3 before today.

11:11:50      A.    I said, I can't be sure; it's a long
11:11:50  time ago.  But I would point out that it's not
11:11:53  the same as the one that I signed.

11:11:55      Q.    But you don't really know what you

1              *Ronald Britt*

11:11:57  2  signed; is that correct?

11:11:58  3              MR. KOERNER:  Objection.

11:11:58  4        A.    Ma'am, I can tell you that anybody

11:12:01  5  can look at this and see it's not the same as

11:12:04  6  that.

11:12:04  7        Q.    And my only question to you -- and

11:12:05  8  it can be a yes or no answer -- is:  Do you

11:12:06  9  recall having seen Exhibit 3, which is dated

11:12:12 10  December 8th, 2006, and addressed to you?

11:12:15 11              MR. ETTENGER:  December 28th.

11:12:17 12        Q.    I'm sorry.  December 28th, 2006, and

11:12:19 13  addressed to you.  It's a four-page exhibit.

11:12:22 14              Do you recall having seen it before

11:12:24 15  today?

11:12:25 16        A.    I can't be sure.

11:12:25 17        Q.    Do you recall whether the document

11:12:37 18  that you signed that you refer to as an

11:12:40 19  employment agreement, set forth your

11:12:50 20  compensation?

11:12:50 21              MR. KOERNER:  Objection; asked and

22         answered.

11:12:52 23              You can answer again if you want.

11:12:59 24              THE WITNESS:  Haven't I answered

11:13:00 25         this?

1       *Ronald Britt*

11:13:01  2        MR. KOERNER:  Yes.

11:13:03  3        Objection; asked and answered.

11:13:07  4     He's testified that he imagined it would,

11:13:10  5     but he can't recall.  That's what he

11:13:11  6     testified.  So...

11:13:13  7     Q.    Do you recall whether the agreement

11:13:15  8  you actually signed set forth your compensation?

11:13:18  9        MR. KOERNER:  Objection.

11:13:19 10        You can answer it.

11:13:19 11     A.    No, I don't.

11:13:20 12     Q.    Do you recall whether the agreement

11:13:22 13  that you actually signed stated that you were an

11:13:25 14  employee at will?

11:13:26 15     A.    What does that mean?

11:13:28 16     Q.    Do you recall whether the agreement

11:13:29 17  you actually signed stated that?

11:13:34 18     A.    This is a long time ago.

11:13:41 19        MS. GOULD:  Mark this, please.

11:13:41 20     A.    And as I said, it was casual.  Like,

11:13:43 21  here you go; sign this; you're the super.

22        *(whereupon, three-page document*

23        *dated 1/4/07 was marked as Exhibit 4,*

24        *for id.)*

11:14:25 25     Q.    Please take a look at Exhibit 4 for

48

1                        *Ronald Britt*

11:14:27  2    identification.  This is a three-page exhibit.

11:14:42  3    *(Handing)*

11:14:42  4                    *(Witness peruses exhibit)*

11:17:01  5                    Do you recognize Exhibit 4?

11:17:07  6                    *(Witness peruses exhibit)*

11:17:07  7         A.    I notice that it doesn't say anything

11:17:09  8    about the apartment being part of the

11:17:13  9    compensation.

11:17:14 10         Q.    So, was it your recollection --

11:17:16 11    withdrawn.

11:17:16 12                    Exhibit 4, just for the record, is

11:17:19 13    a three-page exhibit, apparently on Wavecrest

11:17:23 14    Management Team Limited stationery, dated

11:17:27 15    January 4th, 2007, addressed to Ron Britt at

11:17:31 16    91 East 3rd Street, New York, New York.

11:17:32 17                    And you're saying that you note --

11:17:34 18    first of all, do you recognize the exhibit?

11:17:36 19         A.    Yeah, it looks vaguely familiar.

11:17:40 20         Q.    And what does it look vaguely

11:17:43 21    familiar to be?

11:17:44 22         A.    A contract of employment.

11:17:46 23         Q.    And you're noting -- withdrawn.

11:17:47 24                    Looking at the last page of the

11:17:49 25    exhibit, does it have your signature on it?

1          *Ronald Britt*

11:17:51  2          A.     It does.

11:17:52  3          Q.     But you're indicating to me that this

11:17:55  4     particular Exhibit 4 does not mention anything

11:17:58  5     about an apartment; is that correct?

11:18:01  6          A.     Being part of my compensation.   It

11:18:03  7     does say, I should leave it.

11:18:07  8          Q.     And to the best of your recollection,

11:18:10  9     did the agreement that you actually signed

11:18:12 10     indicate that an apartment would be part of your

11:18:14 11     compensation?

11:18:14 12          A.     I think so.

11:18:15 13          Q.     And did the agreement -- withdrawn.

11:18:17 14                 Looking at Exhibit 4, at the second

11:18:22 15     page of this document at the bottom of the page.

11:18:26 16          A.     Mm-hmm.

11:18:27 17          Q.     It says, "As full compensation for

11:18:30 18     your services to be rendered as an employee at

11:18:33 19     will, the company shall pay you a salary on a

11:18:40 20     biweekly basis of $315 per week, which is $630

11:18:43 21     for each biweekly period, to be paid on a period

11:18:45 22     of --" withdrawn.

11:18:46 23                 Do you see that?

11:18:48 24          A.     Yeah, I see that paragraph.

11:18:49 25          Q.     All right.   Do you recall whether

1          *Ronald Britt*

11:18:51  2    this is information that was set forth in the

11:18:55  3    agreement that you actually signed?

11:18:56  4          A.    I can't be sure, ma'am.  That's a

11:18:59  5    long time ago.

11:19:00  6          Q.    What would make you sure?

11:19:02  7          A.    Well --

11:19:03  8          MR. KOERNER:  If anything.

11:19:05  9          A.    -- this seems incomplete; because the

11:19:08 10    apartment certainly was part of the compensation

11:19:10 11    package, and I took possession on the day I

11:19:13 12    signed it.

11:19:13 13          Q.    And looking at the second page of

11:19:15 14    this Exhibit 4 and the third page of the exhibit,

11:19:17 15    does it seem to you that there's a fourth page

11:19:20 16    that's missing from the exhibit?

11:19:29 17          *(Witness peruses exhibit)*

11:19:30 18          A.    I don't know.

11:19:32 19          Q.    You don't know.

11:19:34 20          But you do recall that an apartment

11:19:36 21    was mentioned in the agreement that you actually

11:19:37 22    signed; is that correct?

11:19:39 23          A.    They gave me the keys the day I

11:19:42 24    signed this.

11:19:43 25          Q.    And which apartment was that?

1                        *Ronald Britt*

11:19:43  2        A.      Apartment Number 12 at 91 East 3rd

11:19:47  3   Street.

11:19:47  4        Q.      And what floor was it on?

11:19:49  5        A.      Well, not counting the lobby, it

11:19:51  6   would be on the second floor.

11:19:53  7        Q.      And there was some agreement as to

11:19:56  8   compensation; is that correct?

11:19:58  9        A.      Yes.

11:19:59 10        Q.      But you can't recall what that was?

11:20:01 11        A.      It's the same as what they were

11:20:03 12   paying Brendan.

11:20:04 13        Q.      And what was that?

11:20:05 14        A.      Well, I believe that it was in the

11:20:08 15   neighborhood of 350 bucks, with 50 bucks for a

11:20:13 16   phone.

11:20:13 17        Q.      Well, Exhibit 4 makes reference to

11:20:16 18   $315; is that correct?

11:20:17 19        A.      I can't be sure.  But if you want me

11:20:19 20   to read --

         21        Q.      Looking at the second page --

11:20:20 22        A.      -- what you handed me, yeah; I'll be

11:20:22 23   happy to read what you handed me.

         24                *(witness peruses exhibit)*

11:20:24 25                Yeah, 315.

1                          *Ronald Britt*

11:20:25  2        Q.    And what was your agreement with

11:20:28  3    Jay Yablonsky and/or Thermald as to what you

11:20:32  4    would be paid?

11:20:34  5        A.    The same as Brendan.

11:20:35  6        Q.    And you don't know if that was 315?

11:20:38  7        A.    I can't be sure, ma'am.  That was a

11:20:40  8    long time ago.

11:20:40  9        Q.    And that was to be full compensation

11:20:43 10    for your services, wasn't it?

11:20:45 11        A.    And an apartment.

11:20:46 12        Q.    And an apartment.

11:20:46 13              Now, was there anything else that was

11:20:48 14    provided in the employment agreement that you

11:20:50 15    actually signed?  In addition to a weekly wage,

11:20:54 16    an apartment, was there anything else that was

11:20:56 17    provided as compensation to you in that

11:20:58 18    agreement?

11:20:58 19        A.    As I recall, there was something

11:21:00 20    about overtime.

11:21:01 21        Q.    You recall that there was something

11:21:03 22    about overtime in the agreement; is that correct?

11:21:05 23        A.    That I'd be on call 24/7, 365.  And

11:21:10 24    if I had to respond to things after hours, there

11:21:13 25    would be compensation.

*Ronald Britt*

11:21:16  2    Q.    And when you say "overtime," was the

11:21:19  3  word "overtime" mentioned in any agreement that

11:21:22  4  you signed?

11:21:23  5            MR. KOERNER:  If you recall.

11:21:24  6    A.    As I said, ma'am, it's a while ago.

11:21:26  7    Q.    And looking at Exhibit 4, Page 2 -- I

11:21:32  8  think that's in front of you.  Would you look at

11:21:37  9  Paragraph 15 on that page -- paragraph numbered

11:21:41 10  15 on that page.

11:21:42 11    A.    Mm-hmm.

11:21:43 12    Q.    And this says, "In addition to your

11:21:45 13  regular work schedule, you are expected to be

11:21:47 14  available to respond to emergencies at the

11:21:49 15  building on a 24-hour basis, seven days a week."

11:21:53 16    A.    And I was.

11:21:53 17    Q.    "You will not be entitled to receive

11:21:55 18  any additional compensation for such emergency

11:21:59 19  services, but you may receive compensatory time

11:22:03 20  for any period devoted to such emergency services

11:22:06 21  longer than 30 minutes."

11:22:07 22            Do you see that?

11:22:08 23    A.    Yeah, I do.

11:22:08 24    Q.    Is that the language that you're

11:22:10 25  referring to as "overtime"?

54

*Ronald Britt*

11:22:12  2          MR. KOERNER:  Objection.  He is not --

11:22:13  3     he's not referring to having recalled any

11:22:16  4     language in this agreement.  He's

11:22:17  5     referring to what his agreement was with

11:22:19  6     the defendants in this case.

11:22:21  7     Q.     Do you recall the language set forth

11:22:23  8  in Paragraph 15 on Page 2 of Exhibit 4?

11:22:26  9     A.     I can tell you, I never received any

11:22:28  10  additional compensation for those calls that came

11:22:31  11  in on a 24-hours basis.  Not once.

11:22:37  12          MR. KOERNER:  But the question is:

11:22:37  13     Do you recall seeing that language before?

11:22:41  14          THE WITNESS:  It's been a long

11:22:43  15     time.  I can't be sure.

11:22:46  16          MR. KOERNER:  What a waste of time.

11:22:49  17          MS. GOULD:  Really, Mr. Koerner?

11:22:50  18          MR. KOERNER:  Really.  We've

11:22:52  19     already testified he doesn't remember the

11:22:55  20     terms of the contract.  You want to waste

      21     your whole deposition doing this...  He

      22     doesn't remember --

11:22:55  23          MS. GOULD:  I'll tell you, I'll

11:22:57  24     waste my deposition as I see fit.

      25          MR. KOERNER:  Okay.  Fine.  Well,

1          *Ronald Britt*

11:22:59  2       there's been conversation about how time

11:23:00  3       constraints are an issue here --

4              MS. GOULD:  Yes.

5              MR. KOERNER:  -- and you're

11:23:02  6       spending the whole time going over terms,

11:23:02  7       which he's already testified he doesn't

11:23:05  8       remember.

11:23:05  9              Continue.

11:23:06 10              MS. GOULD:  Thank you.

11:23:08 11       Q.    Do you recall ever seeing the word

11:23:10 12   "overtime" in any agreement that you signed with

11:23:13 13   Thermald or Wavecrest?

11:23:14 14       A.    I can't be sure, ma'am.

11:23:15 15       Q.    Now, what is the role that you were

11:23:18 16   hired to fulfill?

11:23:19 17       A.    To be the super of record.

11:23:22 18       Q.    And what did that role entail?

11:23:24 19       A.    Repair things as they became broke,

11:23:29 20   help the tenants, take care of the buildings, and

11:23:32 21   keep an eye on everything.

11:23:33 22       Q.    And were there physical duties

11:23:35 23   involved in all of this?

11:23:36 24       A.    Oh, yeah.

11:23:37 25       Q.    And what were they?

1                          *Ronald Britt*

11:23:40  2        A.    Well, any time anything was broke,

11:23:42  3    I'd have to fix it.

11:23:43  4        Q.    And what kinds of things did you have

11:23:45  5    to fix?

11:23:46  6        A.    All matter of things, ma'am.

11:23:47  7        Q.    Please describe a few of them.

11:23:50  8        A.    Painting apartments, fixing holes in

11:23:53  9    walls, stopping leaks.  You name it.  Anything

11:24:01 10    that goes wrong with the building, I had to

11:24:04 11    either be there to fix it or be there to let a

11:24:07 12    contractor in to fix it.

11:24:08 13        Q.    And you did both of those things -

11:24:10 14    you both fixed and you let contractors in to fix?

11:24:11 15        A.    I did.  And a lot of other things,

11:24:13 16    too.

11:24:13 17        Q.    Did you have any involvement with

11:24:15 18    trash and trash removal?

11:24:16 19        A.    I supervised the porters.

11:24:18 20        Q.    And did you have any involvement with

11:24:23 21    water lines on the premises?

11:24:25 22        A.    Occasionally they would burst, and I

11:24:28 23    would be there to shut them off.

11:24:31 24        Q.    And was there a water tower on any

11:24:32 25    one of the buildings?

1       *Ronald Britt*

11:24:33  2       A.     No, there was not.

11:24:34  3       Q.     Was there a boiler in any one of the

11:24:37  4    buildings?

11:24:37  5       A.     Yes, ma'am.

11:24:38  6       Q.     And what were your responsibilities

11:24:40  7    with regard to the boiler?

11:24:41  8       A.     To maintain them as I was instructed.

11:24:43  9       Q.     And this was your responsibility in

11:24:44 10    how many buildings?

11:24:45 11       A.     Three.  But to be on call for a

12    fourth one in Chinatown.

11:24:53 13       Q.     And those were the buildings listed

11:24:55 14    on the first page of Exhibit 4; is that correct?

11:24:57 15              *(witness peruses exhibit)*

11:24:57 16       A.     Correct.

11:24:58 17       Q.     And were you responsible for being

11:25:01 18    sure that the elevators in the buildings were

11:25:04 19    working?

11:25:04 20       A.     Only to report when they weren't, or

11:25:07 21    to get people out when they were trapped.

11:25:10 22       Q.     And when you had to do that, what was

11:25:12 23    it that you did?

11:25:13 24       A.     I got them out.

11:25:14 25       Q.     Now, you indicated that you didn't

58

### Ronald Britt

2   want to clean; is that correct?

3       A.   Correct.

4       Q.   Did you do something instead of

5   cleaning?

6            MR. KOERNER:  Objection.

7       A.   No; I ended up doing a lot of

8   cleaning, anyway.

9       Q.   Was there someone that was hired to

10  do cleaning?

11      A.   There were porters.

12      Q.   And during the period 2010 through

13  April 30th, 2013, how many porters were employed

14  at 91 East 3rd Street?

15      A.   Two that I recall.

16      Q.   Who are they?

17      A.   Richard Usera.  And a fellow named

18  Zing, and I wouldn't care to try to spell his

19  last name.

20      Q.   And at 415 East 9th Street, who were

21  the porters that were employed there?

22      A.   Same fellows.

23      Q.   Those two, Mr. Usera and Zing?

24      A.   Yes.

25      Q.   What about at 319 East 9th Street?

59

*Ronald Britt*

11:26:14   2      A.     The same.

11:26:14   3      Q.     And with regard to the building in

11:26:19   4  Chinatown, do you know whether porters were

         5  employed there?

11:26:21   6      A.     There was a fellow named Manuel, and

11:26:24   7  he was the super of that building.  But if there

11:26:26   8  were things that happened, they called me,

11:26:28   9  because he was old.

11:26:29  10      Q.     Now, going back to your agreement

11:26:34  11  with Wavecrest/Thermald, you indicated you had a

11:26:40  12  certain amount of compensation and you had an

11:26:43  13  apartment; is that correct?

        14      A.     *(Witness nods head).*

11:26:45  15      Q.     Were free utilities also provided in

11:26:48  16  that agreement?

11:26:49  17      A.     Yes, ma'am.

11:26:49  18      Q.     And was phone reimbursement also

11:26:54  19  provided in that agreement?

11:26:55  20      A.     There was $50 for me to carry a cell

11:26:58  21  phone.

11:26:58  22      Q.     $50 per what period of time?

11:27:01  23      A.     A month.

11:27:01  24      Q.     Did that ever change?

11:27:03  25      A.     No.

1                              *Ronald Britt*

11:27:04  2        Q.    Was it ever $50 a week?

11:27:05  3        A.    I don't believe so.

11:27:06  4        Q.    There was reference in Exhibit 4 to

11:27:17  5    $315 per week, on Page 2 of the exhibit.

11:27:20  6              Did you ever receive more than that

11:27:24  7    amount of money a week from Wavecrest/Thermald?

11:27:27  8              MR. KOERNER:  If you recall.

11:27:28  9        A.    Well, for the jobs that I did on the

11:27:32 10    side for them, yes.

11:27:33 11        Q.    Well, putting aside the jobs that you

11:27:37 12    did on the side, in terms of weekly base salary,

11:27:40 13    did you ever receive more than $315 a week?

11:27:42 14        A.    I believe I got a raise at some point

11:27:44 15    in time.

11:27:44 16        Q.    And that was a raise to how much?

11:27:46 17        A.    I don't know.  I would have to look

11:27:47 18    at my pay stubs.

11:27:49 19        Q.    Do you have a recollection that the

11:27:50 20    number that you were receiving per week was

11:27:53 21    increased to $350 a week?

11:27:56 22        A.    Something like that sounds about

11:27:57 23    right, yes.

11:27:58 24        Q.    At 91 East 3rd Street, how many

11:28:16 25    floors in the building were located above street

*Ronald Britt*

11:28:18  2   level?

11:28:18  3        A.    There are six apartments per floor,

11:28:22  4   going up to 36 apartments, not counting the

11:28:25  5   lobby.

11:28:26  6        Q.    And you were in Apartment 12; is that

11:28:28  7   correct?

11:28:28  8        A.    Yes, ma'am.

11:28:29  9        Q.    And what are the other apartments in

11:28:31 10   that line at 91 East 3rd Street?

11:28:35 11        A.    That would be Apartment 6, 12, 18,

11:28:39 12   24, 30, and 36.

11:28:41 13        Q.    And as you sit here today, do you

11:28:43 14   have any knowledge of what the base rent is for

11:28:45 15   the apartment that you lived in while employed at

11:28:54 16   91 East 3rd Street?

11:28:54 17        A.    I could tell you that it varies.

11:28:57 18        Q.    And it varies between what and what?

11:28:59 19        A.    I'd have to refer to a copy of the

11:29:04 20   rent rolls that they sent me.

11:29:09 21        Q.    Who sent you rent rolls?

11:29:15 22        A.    The management.

11:29:16 23        Q.    And how frequently did that occur?

11:29:17 24        A.    Once.

11:29:18 25        Q.    And when was that?

1                      *Ronald Britt*

11:29:20  2        A.    I don't recall.

11:29:20  3        Q.    On a percentage basis, commencing on

11:29:30  4    or about January 4th, 2007, what percentage of

11:29:34  5    your time did you spend at 91 East 3rd Street?

11:29:39  6        A.    I'm sorry?

11:29:40  7        Q.    Yes.  On a percentage basis, what

11:29:43  8    percentage of your time did you spend at 91 East

11:29:47  9    3rd Street?

11:29:47 10        A.    I would say --

11:29:48 11              MR. KOERNER:   24 hours a day or

11:29:50 12        during his workdays?  What are you talking

11:29:52 13        about?

11:29:52 14        A.    Most of my time.

11:29:52 15        Q.    You spent most of your time at

11:29:55 16    91 East 3rd Street.

11:29:55 17              And how frequently did you go to the

11:29:57 18    other buildings?

11:29:58 19        A.    Almost daily, I would say.

11:30:00 20        Q.    And what part of your day was spent,

11:30:02 21    on a percentage basis, at 415 East 9th Street?

11:30:08 22        A.    It would depend on what was happening

11:30:10 23    that day.

11:30:11 24        Q.    It varied; is that correct?

11:30:12 25        A.    All the time.

63

1                          *Ronald Britt*

11:30:12  2          Q.    And is that also true for 319 East

11:30:16  3    9th Street?

11:30:16  4          A.    Yes, ma'am.

11:30:17  5          Q.    Was there any requirement, either by

11:30:24  6    Mr. Yablonsky at Wavecrest or by Ms. Alderman,

11:30:29  7    that you be present at any particular premises

11:30:32  8    during any particular hours?

11:30:34  9          A.    If there was an inspection, I was to

11:30:38 10    be there.  If there was an eviction, I was to be

11:30:41 11    there.  If there was a contractor, I was to be

11:30:43 12    there.  And I was to respond to any complaints

11:30:46 13    that anyone had.

11:30:47 14          Q.    Were you ever away from the buildings

11:30:49 15    at night?

11:30:49 16          A.    For the most part, I'd say, no.

11:30:55 17          Q.    Did you ever go out at night?

11:30:56 18          A.    Only in the neighborhood.

11:30:58 19          Q.    But you left the premises; is that

11:31:00 20    correct?

11:31:00 21          A.    In the neighborhood; I'm near the

11:31:02 22    premises.

11:31:03 23          Q.    You left the premises; is that

11:31:05 24    correct?

11:31:05 25          A.    Well, if the premises extends from

64

*Ronald Britt*

1

11:31:10  2  Chinatown to 9th Street, then I would say,

11:31:14  3  rarely.

11:31:14  4      Q.    So, are you saying you stayed in the

11:31:16  5  buildings every night during the period of time

11:31:18  6  that you were employed?  Is that what your

11:31:19  7  testimony is?

11:31:20  8      A.    I couldn't say.  No.

11:31:22  9      Q.    Well, did you ever go to Edge bar at

11:31:25 10  night?

11:31:25 11      A.    That's in the building, yes.

11:31:26 12          MR. KOERNER:   That's part of the

11:31:28 13      premises.

11:31:28 14      Q.    And did you ever go to any other

11:31:31 15  establishment in the evenings?

11:31:32 16      A.    Of course.

11:31:32 17      Q.    And I mean, establishment, other than

11:31:36 18  the buildings owned my Thermald.

11:31:38 19      A.    Of course.

11:31:38 20      Q.    And did you ever go away on weekends?

11:31:42 21      A.    Rarely.

11:31:43 22      Q.    Do you like to fish?

11:31:44 23      A.    I do.

11:31:44 24      Q.    And did you ever go fishing on

11:31:47 25  weekends?

65

*Ronald Britt*

11:31:47  2   A.   Oh, very rarely.

11:31:50  3   Q.   Did you ever go fishing on weekends?

4         MR. KOERNER:  He just answered,

5   yes, very rarely.

6         MS. GOULD:  He didn't say, yes.  He

11:31:52  7   said, "Very rarely."

11:31:52  8   A.   Very rarely.  Like, on vacation or

11:31:55  9   once with Ms. Alderman.

11:31:57  10   Q.   Oh, you went fishing once with

11:31:59  11   Ms. Alderman.

11:32:00  12         When was that?

11:32:01  13   A.   I don't recall, but it was when we

11:32:03  14   went to Pennsylvania.

11:32:04  15   Q.   Did you maintain any sort of time

11:32:10  16   records during the period of time that you were

11:32:14  17   employed by Thermald/Wavecrest?

11:32:20  18   A.   To be available 24/7 is --

11:32:22  19   Q.   Did you, personally, maintain any

11:32:24  20   time records?  Time sheets, for example.

11:32:27  21   A.   No.

11:32:27  22   Q.   Did you record your work times?

11:32:31  23         MR. KOERNER:  He just answered,

11:32:32  24   "No."

11:32:34  25         MR. ETTENGER:  I think he said,

*Ronald Britt*

1

11:32:35 2  other than time records.

11:32:38 3          Any documentation of any kind

11:32:41 4  regarding when you worked --

11:32:43 5          THE WITNESS:  Phone records.

11:32:45 6          MR. ETTENGER:  -- what you did.

11:32:46 7          THE WITNESS:  Phone records.

11:32:46 8      Q.    And what kinds of phone records do

11:32:51 9  you have?

11:32:51 10     A.    Bills.

11:32:52 11     Q.    And what do those bills show?

11:32:54 12     A.    Every call I made and received.

11:32:56 13     Q.    And for what period of time do you

11:33:02 14 have bills?

11:33:02 15     A.    Well, I don't actually have them.

11:33:05 16 I'd have to look it up.

11:33:07 17     Q.    How would you look it up?

11:33:08 18     A.    I'd imagine that the N.S.A. would

11:33:11 19 have copies.

11:33:12 20     Q.    And other than the N.S.A. --

11:33:15 21         MR. KOERNER:  Your phone company,

22      perhaps.

11:33:18 23         THE WITNESS:  Through the phone

11:33:19 24 company, yes.

11:33:19 25     Q.    And who was your phone company?

1                              *Ronald Britt*

11:33:21   2          A.    Well, I had two different ones.

11:33:23   3    There was Verizon and MetroPCS.

11:33:26   4          Q.    And Metro...?

11:33:27   5          A.    MetroPCS.

11:33:29   6          Q.    For what period of time did you have

11:33:31   7    Verizon?

11:33:32   8          A.    A few years.

11:33:34   9          Q.    When did you cease using Verizon as

11:33:37  10    your carrier?

11:33:38  11          A.    I can't be sure.

11:33:40  12          Q.    Approximately when?

11:33:41  13          A.    I wouldn't care to guess.

11:33:44  14          Q.    And what was your phone number when

11:33:46  15    you used Verizon?

11:33:47  16          A.    I don't know; it's been a while.

11:33:54  17          Q.    Did you change phone numbers when you

11:33:58  18    switched to MetroPCS?

11:34:00  19          A.    I did.

11:34:01  20          Q.    And what was your phone number for

          21    MetroPCS?

11:34:01  22          A.    It still is, (917) 284-5678.

11:34:07  23          Q.    Did anyone ever ask you to maintain

11:34:16  24    time records while you were working for Thermald/

11:34:19  25    Wavecrest?

*Ronald Britt*

1

11:34:19   2    A.    No, ma'am.

11:34:23   3    Q.    Did you understand when you became

11:34:39   4    employed by Thermald/Wavecrest, that you could be

11:34:43   5    terminated for any reason or no reason?

11:34:46   6    A.    No, not really.  I would think they'd

11:34:53   7    have a reason.  But when they fired me, they

11:34:56   8    didn't give one.

11:34:57   9    Q.    Do you have anything in writing that

11:34:59  10    tells you that they need to give you --

11:34:59  11    withdrawn.

11:34:59  12          Do you have anything in writing from

11:35:02  13    Thermald or Wavecrest that tells you that they

11:35:05  14    can only fire you when they give you a reason?

11:35:08  15    A.    I -- no, ma'am, not that I'm aware

11:35:11  16    of.

11:35:12  17    Q.    Do you understand what an at-will

11:35:16  18    employee means?

11:35:17  19    A.    No, I don't.

11:35:17  20    Q.    Looking at Exhibit 4, which should

11:35:22  21    still be in front of you.  The second page of the

11:35:28  22    exhibit, at the bottom of the page --

11:35:29  23    A.    Yes.

11:35:30  24    Q.    -- it says, "As full compensation for

11:35:32  25    your services to be rendered as an employee at

69

*Ronald Britt*

11:35:35  will."

11:35:37          Do you understand what that means?

11:35:38          MR. KOERNER:  Objection.  He just

11:35:40  said, "No."

11:35:41  A.    I did say, "No."

11:35:46          MR. KOERNER:  Just one second.

                 *(Pause in the record)*

                 MS. GOULD:  Can you mark this.

                 *(Whereupon, 1/26/12, 2-page*

11:36:04  *document was marked as Exhibit 5, for id.)*

11:36:04          MR. ETTENGER:  Do you want to take

11:36:06  a five-minute break?

                 MS. GOULD:  Yes.  Sure.

11:44:13    *(Recess held from 11:36 to 11:45 a.m.)*

                 MS. GOULD:  Back on the record.

         CONTINUED EXAMINATION BY MS. GOULD:

11:45:08  Q.    Mr. Britt, I'm showing you what we've

11:45:10  marked for identification as Exhibit 5.

11:45:16  *(Handing)*

11:45:17          *(Witness peruses exhibit)*

11:45:38  A.    Yes.

11:45:38  Q.    This is a two-page exhibit.  The

11:45:40  first page is a page that says, "To:  All

11:45:45  employees.  From:  Tara Clyburn."

1              *Ronald Britt*

11:45:49  2          Who is Tara Clyburn?

11:45:50  3     A.     A pay person at Wavecrest, maybe.

11:45:54  4     Q.     And it's dated January 26th, 2012.

11:45:57  5            And it says, *(Reading:)*  Regarding

11:45:59  6   your employment, attached please find notice and

11:46:01  7   acknowledgement of pay rate and payday.  Please

8   review, sign, and return to me as soon as

11:46:06  9   possible, but no later than February 3rd, 2012.

11:46:10 10            If you have any questions, please

11:46:11 11   feel free to email me at - and she gives her

11:46:13 12   email address - or call at extension 3760.

11:46:17 13            And then, there's a second page.

11:46:19 14            Do you see that?

11:46:19 15     A.     Yes, ma'am.

11:46:20 16     Q.     Do you recall having seen either one

11:46:22 17   of these documents before today?

11:46:25 18     A.     I can't be sure, no.

11:46:25 19     Q.     You can't be sure one way or the

11:46:29 20   other; is that correct?

11:46:29 21     A.     I can't be sure that I've seen this

11:46:30 22   document before, no.

11:46:30 23     Q.     Okay.  And the second page is

11:46:31 24   entitled "Notice and acknowledgement of pay rate

11:46:34 25   and payday," and then it has the translation in

*Ronald Britt*

11:46:40  2  Spanish; is that correct?

11:46:40  3      A.    That appears to be correct.

11:46:42  4      Q.    And is it your testimony that you

11:46:44  5  can't recall whether you did or did not see this

11:46:47  6  document before today; is that right?

11:46:48  7      A.    I don't know that I did.

11:46:49  8      Q.    And you don't know that you don't; is

11:46:52  9  that also correct?

11:46:52 10      A.    Right.

11:46:53 11      Q.    Now, is it accurate, Mr. Britt, that

11:47:03 12  in this lawsuit, this federal lawsuit, you're

11:47:08 13  making a claim for overtime wages and for so-

11:47:11 14  called spread-of-hours pay?

11:47:13 15      A.    Whatever the Department of Labor said

11:47:17 16  in that page of the claim, is what they say.

11:47:21 17      Q.    No; I'm asking you what your claim

11:47:25 18  is.

11:47:25 19      A.    Well, I'm with the Department of

11:47:27 20  Labor.

11:47:27 21      Q.    So, is it your testimony that the

11:47:30 22  claim that you're making in your federal lawsuit

11:47:32 23  is the same claim that you made with the New York

11:47:38 24  State Department of Labor?

11:47:39 25      MR. KOERNER:  It's one of the

1                          *Ronald Britt*

11:47:41  2      claims.

11:47:41  3           Q.    Well, I'm asking about the overtime

11:47:42  4      claim right now.

11:47:43  5                 Is it your testimony that the

11:47:45  6      overtime claim that you're making in this lawsuit

11:47:48  7      is the same overtime claim that you made in the

11:47:52  8      New York State Department of Labor?

11:47:53  9                 MR. KOERNER:  Objection to the

11:47:54  10          extent it calls for legal conclusions.  I

11:47:56  11          will allow him to --

11:47:56  12     A.    Yeah; there's lot of legalese there.

11:47:59  13          Q.    Well, what is it you're claiming by

11:48:01  14     way of overtime in this federal lawsuit?

11:48:04  15     A.    When I went to the Department of

11:48:06  16     Labor, they said that Thermald owes me 38,900 and

11:48:12  17     change.

11:48:13  18          Q.    And is that the claim that you're

11:48:15  19     making in this federal lawsuit?

11:48:16  20     A.    It's one of the claims.

11:48:17  21          Q.    And was that an overtime claim that

11:48:20  22     you made to the New York State Department of

11:48:23  23     Labor?

11:48:24  24     A.    Ma'am, I'm not clear exactly why they

11:48:26  25     think that, but the supervisor says that.

73

*Ronald Britt*

11:48:27  Q.  No.  I'm asking you what your claim
11:48:30  is in this lawsuit with regard to overtime.

11:48:32  A.  Well, my claim is that the Department
11:48:36  of Labor says that they owe me back pay.

11:48:39  Q.  How much overtime are you claiming in
11:48:42  this lawsuit?

11:48:42  A.  The number they gave me was
11:48:50  $38,970-some, I think.

11:48:52  Q.  And is that the overtime claim, under
11:48:55  whatever statute, that you're making in this
11:48:58  lawsuit?

11:48:58  MR. KOERNER:  If you know.  If you
11:48:59  know.

11:48:59  A.  I don't know.

11:49:01  MR. KOERNER:  Again, he said he --
he said it calls for knowledge of legal --
11:49:04  a lot of legal --

11:49:04  A.  This is a lot of legal stuff that I
11:49:06  don't fully understand.

Q.  No, no.

11:49:08  MR. KOERNER:  The claim is he
11:49:08  wasn't paid for his overtime, and he
11:49:10  wasn't paid according to the spread of
11:49:13  hours.

1          *Ronald Britt*

11:49:13  2          MS. GOULD:  Counselor, I'm entitled

11:49:14  3     to know the amount of the claim that your

11:49:17  4     client is making in this lawsuit.

5          MR. KOERNER:  Right.  He's saying

11:49:18  6     it's $38,000 and however many cents.

11:49:23  7     Q.    Is that what you're saying?

11:49:25  8     A.    Yes, ma'am.  It's what they told me.

11:49:28  9          MR. KOERNER:  Well, an amount to be

11:49:30 10     determined at trial, but at least that

11:49:30 11     much.

11:49:30 12     A.    That's what they told me.

11:49:32 13     Q.    No, no, no.

14     A.    And they said that --

15     Q.    No, no, no.

11:49:33 16          MS. GOULD:  Let me just stop and go

11:49:34 17     on the record right now, okay?  You can

11:49:36 18     say whatever you want in the complaint and

19     then that is to be determined at trial.

11:49:39 20          Your Rule 26 disclosures were

11:49:42 21     incomplete in that you did not give a

11:49:45 22     calculation of damages.

23          I am entitled to know and to

11:49:46 24     explore what the claim for damages is in

11:49:49 25     this case.

1          *Ronald Britt*

11:49:49  2     Q.    And the first question was:  What are

11:49:51  3  the over -- what are the claim for overtime

11:49:53  4  damages?  And if you could, please tell me what

11:49:55  5  they are.

11:49:55  6     Are you saying it's the same as what

11:49:57  7  the Department of Labor told you?

11:49:59  8     A.    It may be more, ma'am, to be honest.

9     Q.    Well, how much more?

11:50:02 10     A.    Oh, I don't know.  They said that it

11:50:04 11  didn't count as time and a half, and it didn't

11:50:07 12  count as penalties, is what they told me.

11:50:09 13     Q.    Sir, are you testifying that you

11:50:11 14  don't know how much you are claiming by way of

11:50:14 15  overtime wages in this lawsuit?

11:50:16 16     A.    I am saying that according to the

11:50:18 17  Department of Labor, it's at least 38,900 and

11:50:23 18  change.

11:50:23 19     Q.    Other than that number, 38,900 and

11:50:27 20  change, are you making any other claim for

11:50:29 21  overtime in this lawsuit?

11:50:30 22     A.    I guess not.

11:50:33 23     Q.    Did you discuss spread-of-hours pay

11:50:40 24  when you went to the Department of Labor?

11:50:42 25     A.    I gave them my pay stubs.  They

1          *Ronald Britt*

11:50:45 2   reviewed them.  Then, they went to their

11:50:48 3   supervisor, and then they went to their top

11:50:52 4   supervisor, and they came back with that number.

11:50:55 5          Q.    With which number?

11:50:57 6          A.    38,000 and change.

7          MS. GOULD:  Mark this, please.

8          *(Whereupon, four-page letter from*

9          *the New York State Department of Labor to*

10          *Ronald Britt, dated 5/10/13 was marked as*

11:51:55 11   *Exhibit 6, for id.)*

11:51:55 12          Q.    Taking a look at Exhibit 6 --

13   *(Handing)*

14          *(Off-the-record discussion between*

15          *Mr. Koerner and the witness)*

11:52:04 16          MS. GOULD:  Note that counsel is

11:52:07 17   conferring with his witness.

11:52:08 18          MR. KOERNER:  Absolutely, yes; I'm

11:52:10 19   conferring with my witness.

11:52:25 20          Q.    Sir, would you take a look at

11:52:29 21   Exhibit 6.  It's a four-page exhibit.

11:52:32 22          A.    That's what you just handed me here?

11:52:35 23          Q.    Yes.

11:52:36 24          A.    Oh, you want me to look at this one?

11:52:39 25          Q.    Yes.  Look at the marked exhibit.

77

1                     *Ronald Britt*

11:52:46  2              *(Witness peruses exhibit)*

11:52:51  3        A.    Yes.

11:52:52  4        Q.    Do you recognize Exhibit 6?

11:52:54  5        A.    Yes.  It looks like the letter they

11:53:07  6   sent me.

11:53:07  7        Q.    That's the first page of the exhibit

11:53:08  8   that you're referring to; is that correct?

11:53:10  9        A.    Yes, ma'am.

11:53:11 10        Q.    And this is a letter that appears to

11:53:13 11   be dated May 10th, 2013, addressed to a Ronald

11:53:17 12   Britt at 91 East 3rd Street, Apartment 12,

11:53:19 13   New York, New York, and it's on the letterhead

11:53:22 14   of the New York State Department of Labor; is

11:53:25 15   that correct?

11:53:25 16        A.    Yes, ma'am.

11:53:26 17        Q.    And do you recall having received

11:53:27 18   this letter, the first page of Exhibit 6, before

11:53:30 19   today?

11:53:30 20        A.    I think so, yes.

11:53:31 21        Q.    And would you look at the second page

11:53:34 22   of the exhibit.

11:53:36 23        A.    Yes, ma'am.

11:53:37 24        Q.    And the top of that page says,

11:53:43 25   "Please answer all questions on both sides.

1                          *Ronald Britt*

11:53:46  2    Please print clearly."

11:53:47  3              Do you see that?

11:53:50  4              *(Witness peruses exhibit)*

11:53:50  5        A.    Yes.

11:53:51  6        Q.    Do you see your signature on this

11:53:54  7    page, Mr. Britt?

11:53:56  8        A.    I do.

11:53:58  9        Q.    Okay.  And do you recall having

11:53:58 10    filled out this page when you went to the

11:54:01 11    Department of Labor to make a complaint?

11:54:02 12        A.    They filled it out for me, yes.

11:54:05 13        Q.    Well, what was the process by which

11:54:08 14    they filled it out for you?

11:54:10 15        A.    They asked me questions, and I

11:54:12 16    answered them.

17        Q.    And then, they took down --

11:54:12 18        A.    They looked at my pay stubs, and they

11:54:15 19    disappeared.  And then, they came back, and they

11:54:17 20    disappeared.  And then, they came back.

11:54:19 21        Q.    And who is the "they" that

11:54:22 22    disappeared?

11:54:22 23        A.    The people that were working there.

11:54:24 24        Q.    So, some representative or more than

11:54:26 25    one representative of the Department of Labor

79

*Ronald Britt*

11:54:28   2  asked you questions; is that correct?

11:54:29   3          A.    That's right.

11:54:30   4          Q.    And you answered those questions; is

11:54:33   5  that correct?

11:54:33   6          A.    I did.

11:54:34   7          Q.    And they filled in this form for you;

11:54:37   8  is that correct?

11:54:37   9          A.    Yes, ma'am.

11:54:38  10          Q.    And then, you signed it; is that

11:54:40  11  correct?

11:54:40  12          A.    Yes, ma'am.

11:54:40  13          Q.    And it appears to be dated May 1 of

11:54:43  14  2013; is that right?

11:54:50  15          Bottom lower -- lower right-hand side

11:54:52  16  of the page.

11:54:52  17          *(Witness peruses exhibit)*

11:54:52  18          A.    Yes.

11:54:52  19          Q.    And above your signature it says,

11:54:56  20  "Any false statements knowingly made are

11:55:01  21  punishable as a Class A misdemeanor, Section

          22  210.45 of the New York State Penal Law.

11:55:05  23          I affirm that the above statements

11:55:06  24  are true."

11:55:07  25          Do you see that?

80

*Ronald Britt*

| | | |
|---|---|---|
| 11:55:07 | 2 | A.   Yes, ma'am. |
| 11:55:08 | 3 | Q.   And then, you signed the document; |
| 11:55:10 | 4 | is that right? |
| 11:55:10 | 5 | A.   I did. |
| 11:55:11 | 6 | Q.   Okay.  Now, looking at Question 23 on |
| 11:55:16 | 7 | the second page of Exhibit 6. |
| 11:55:21 | 8 | A.   Yes. |
| 11:55:21 | 9 | Q.   It says, "Wages claimed for period:" |
| 11:55:29 | 10 | And then it says, "First date to last date." |
| 11:55:32 | 11 | Do you see that? |
| 11:55:33 | 12 | A.   Yes, I see that. |
| 11:55:34 | 13 | Q.   And then, there are dates there; is |
| 11:55:37 | 14 | that correct? |
| 11:55:37 | 15 | A.   It's tough to make out on my copy. |
| 11:55:43 | 16 | Q.   Does it say 8/27/11 to 5/3/13? |
| 11:55:48 | 17 | A.   I think so.  That 13 may be a 15, but |
| 11:55:56 | 18 | that wouldn't make any sense. |
| 11:55:58 | 19 | Q.   Correct.  That would make no sense. |
| 11:56:01 | 20 | So, are the dates there 8/27/11 to |
| 11:56:05 | 21 | 5/3/13? |
| 11:56:06 | 22 | A.   I can't -- yeah, if you say so. |
| 11:56:08 | 23 | Q.   No.  I'm not -- I'm asking you if you |
| 11:56:10 | 24 | can read them. |
| | 25 | MR. KOERNER:  If you can tell.  If |

*Ronald Britt*

11:56:11  2    you can't --

11:56:11  3       A.    I can't read them.

11:56:13  4       Q.    Well, do you know for what period you

11:56:17  5    are claiming overtime both with the New York

11:56:21  6    State Department of Labor and in this action?

11:56:23  7       A.    As I said, they filled it out based

11:56:26  8    on my pay stubs.

11:56:28  9       Q.    And how was it determined that the

11:56:30 10    period of the claim would be August 27th of 2011

11:56:33 11    to 5/3 of '13?

11:56:35 12       A.    I don't know, ma'am.

11:56:38 13       Q.    But you signed the document; is that

11:56:41 14    correct?

11:56:41 15       A.    I did.

11:56:41 16       Q.    So, that's the claim that you made

11:56:43 17    with the Department of Labor; is that correct?

11:56:46 18       A.    It's the form they filled out based

11:56:47 19    on my pay stubs.

11:56:49 20       Q.    Did you sign this under the penalty

11:56:51 21    of perjury, sir?

11:56:53 22       A.    I did.

11:56:53 23       Q.    And that is the claim that you are

11:56:56 24    making in this federal action for overtime; is

11:56:59 25    that correct?

1                           *Ronald Britt*

11:56:59  2        A.    As I said, ma'am, they filled it out,

3     and I signed it.

11:57:01  4        Q.    Is that the claim that you're making,

11:57:02  5     Mr. Britt?  Yes or no.

11:57:03  6        A.    Yes.

11:57:04  7        Q.    And looking at Question 29, it says,

11:57:18  8     "Did employer refuse to pay for these wages?"

11:57:22  9     And there's a notation "N/A."

11:57:25 10            Do you see that?

11:57:26 11        A.    Yes.

11:57:26 12        Q.    Do you have an understanding of what

11:57:31 13     that means?

11:57:31 14        A.    Nonap -- aclable -- aclable --

15            MR. KOERNER:  Nonapplicable.

16        Q.    Nonapplicable?

11:57:37 17        A.    Yes.

11:57:37 18        Q.    And that's based upon your answers;

11:57:40 19     is that correct?

11:57:40 20        A.    I assume so.

11:57:42 21        Q.    Looking at Question 26, it says, "Did

11:57:47 22     you request these wages?"

11:57:49 23            Do you see that?

11:57:49 24        A.    Yes.

11:57:50 25        Q.    And the box is checked off, "No."

                              *Ronald Britt*

11:57:53    2          Do you see that?

11:57:54    3     A.    Yes.

11:57:54    4     Q.    And that check-off was made by you?

11:58:00    5     A.    No, ma'am.  They filled it out.

11:58:02    6     Q.    But you signed it as being true; is

11:58:06    7  that correct?

11:58:06    8     A.    That's right.

11:58:07    9     Q.    So, you did not request the wages

11:58:10   10  that you're now claiming; is that correct?

11:58:11   11     A.    As I said, I've never been paid any

11:58:14   12  overtime.

11:58:16   13     Q.    I'm not asking you that question.

11:58:16   14          MR. KOERNER:  In fact, actually --

11:58:18   15  one moment.

11:58:18   16     Q.    Did you request those wages?

11:58:22   17          MR. KOERNER:  One moment.

           18          MS. GOULD:  No, no, no.  There's a

           19  pending question.

           20          MR. ETTENGER:  There's a pending

           21  question.

11:58:23   22          MR. KOERNER:  Okay.  Then, I'll say

11:58:24   23  it for the record:  Did you request the

11:58:26   24  wages in that amount?  I think that's what

11:58:29   25  you're referring to.

1                   *Ronald Britt*

11:58:30 2          MS. GOULD:  No.  That is -- you

11:58:31 3     know, sir, you are coaching the witness.

4          MR. KOERNER:  No, I'm not.

11:58:34 5          MS. GOULD:  You are giving a

11:58:35 6     speaking objection, and that is not

11:58:37 7     permitted.  So, kindly, cease and desist

8     from doing that.

11:58:40 9       A.     Well, I can -- I can tell you that

11:58:40 10   when Jay brought me my last paycheck, and I

11:58:45 11   surrendered what keys there were, and he gave me

11:58:47 12   that sterling letter of recommendation, I told

11:58:49 13   him in that time, that the Department of Labor

11:58:52 14   owed me this -- said that they owed me this

11:58:56 15   money, and he might want to get out ahead of it.

16       Q.     Prior to the time --

11:59:00 17       A.     So, I hope that answers your

11:59:01 18   question.

11:59:01 19       Q.     That actually doesn't answer my

20   question.

11:59:02 21       Prior to the time that you were

11:59:05 22   terminated from your position at 91 East 3rd and

11:59:11 23   with regard to the other Thermald buildings on

11:59:14 24   April 30th, 2013, did you request overtime wages?

11:59:19 25       A.     No.

85

1                       *Ronald Britt*

11:59:36  2          MS. GOULD:  Just give me one

11:59:37  3      second.

11:59:39  4          MR. KOERNER:  There's no pending

11:59:40  5      question?

11:59:41  6          MS. GOULD:  There's no pending

11:59:43  7      question.

11:59:43  8          MR. KOERNER:  Okay.  Come on

11:59:44  9      outside.

10           *(Recess held from 11:59 to 12:00 p.m.)*

11           MS. GOULD:  Can I have the last two

12      questions and answers read back.

13              *(Record read)*

12:00:56 14          THE WITNESS:  When I did discuss

12:00:58 15      it, it was scoffed at.  So, no, I never

12:01:01 16      answered, because I like keeping my job.

12:01:03 17          MS. GOULD:  No, no, no.  The

12:01:04 18      question wasn't that.

19      CONTINUED EXAMINATION BY MS. GOULD:

12:01:05 20          Q.    The question was:  Prior to the time

12:01:07 21      you were terminated on April 30th, 2013, did you

12:01:13 22      request overtime wages?  And.

12:01:14 23              I thought you answered, no.

12:01:16 24          A.    There were a couple occasions when I

12:01:20 25      discussed it with Jay.  And he said, take

86

*Ronald Britt*

12:01:22  2    additional time off, might be an option.

12:01:25  3        Q.    And when were those occasions that

12:01:27  4    you discussed it with Jay?

12:01:28  5        A.    It wasn't very many.  Because each

12:01:30  6    time it was really clear, don't ask.

12:01:33  7        Q.    So, looking at the form that was

12:01:34  8    filled out under -- that you signed under penalty

12:01:38  9    of perjury with the Department of Labor at --

12:01:42  10   Question 26 when it says, "Did you request these

12:01:46  11   wages?", and the box, "No" is checked off, and

12:01:49  12   you signed that under penalty of perjury, are

12:01:52  13   you saying that you didn't tell the truth?

12:01:56  14            MR. KOERNER:  Objection.

12:01:57  15            No, he's not.

12:02:01  16            MS. GOULD:  Sir, you know, I don't

12:02:02  17       want to get into a pissing match with you,

12:02:05  18       but we will call the judge if you keep

12:02:09  19       this up.

          20            MR. KOERNER:  Go ahead; call the

          21       judge.

12:02:10  22            MS. GOULD:  Okay.  Cut it out.

12:02:10  23            MR. KOERNER:  You're asking people,

          24       did he lie?

12:02:13  25            Of course not.  You didn't

1                   *Ronald Britt*

2         calculate his damages.  That's what

3         he's...

12:02:13  4             MS. GOULD:  You are engaging in

12:02:15  5         speaking objections, and you need to cut

12:02:17  6         it out.

12:02:19  7         A.   Ma'am, as I said --

12:02:20  8             MR. KOERNER:  You need to stop

12:02:21  9         misrepresenting his testimony.

10             MS. GOULD:  The answer -- the

11         answer --

12             MR. KOERNER:  You need to stop

13         misrepresenting his testimony.

12:02:22 14             MS. GOULD:  The record speaks for

12:02:24 15         itself.

12:02:25 16             MR. KOERNER:  Exactly.

12:02:26 17         Q.   And did you ever ask -- you said that

12:02:37 18  Jay scoffed at you when you asked for some sort

12:02:39 19  of overtime; is that correct?

12:02:40 20         A.   That's right.

12:02:41 21         Q.   And you can't recall how many times

12:02:43 22  you asked him for that; is that correct?

12:02:45 23         A.   Only a couple of times.

12:02:46 24         Q.   And did you ever ask for those wages

12:02:47 25  in writing?