1                        *Ronald Britt*

12:02:49  2        A.    Absolutely not.

12:02:50  3        Q.    And did Doreen -- did you ever ask

12:02:52  4   Doreen Alderman for overtime wages?

12:02:54  5        A.    No.

12:02:55  6        Q.    So, Doreen Alderman never refused to

12:03:00  7   pay you overtime wages; is that correct?

12:03:03  8        A.    That would be correct, I suppose.

12:03:05  9        Q.    When is the first time that you

12:03:11 10   actually asked anyone - Jay Yablonsky or anybody

12:03:16 11   else - for any sum of money in addition to what

12:03:20 12   you were already receiving?

12:03:23 13        A.    I believe it was --

12:03:25 14        Q.    -- in your work at 91 East 3rd Street

12:03:27 15   or the other buildings?

12:03:28 16             MR. KOERNER:  Let her finish.

12:03:28 17        A.    I believe it was when I got a call in

12:03:31 18   the middle of the night to go down to Division

12:03:33 19   Street.

12:03:33 20        Q.    When was that?

12:03:34 21        A.    I don't recall exactly, but I could

12:03:36 22   look at the repairs and maybe figure that out for

12:03:40 23   you.

12:03:40 24             MR. KOERNER:  Approximately?  Can

12:03:42 25        you approximate what year?

1                      *Ronald Britt*

12:03:43  2              THE WITNESS:  It was early on.  It

12:03:45  3         was probably in the first few months of

12:03:47  4         employment.

12:03:49  5         Q.    And what did you ask for?

12:03:52  6         A.    "I'm getting called in the middle of

12:03:56  7    the night to go down to Division Street.  Do I

12:03:58  8    get paid for that?"

12:03:59  9         Q.    And what was said to you?

12:04:00 10         A.    He scoffed.

12:04:01 11         Q.    Did he say anything to you?

12:04:02 12         A.    No; he scoffed.

12:04:04 13         Q.    And other than that one time, when is

12:04:07 14    the next time --

         15         A.    I think --

12:04:08 16         Q.    -- if there was one, that you asked

12:04:11 17    Mr. Yablonsky for overtime?

12:04:11 18         A.    I think it was a few years later;

12:04:13 19    there was another emergency in the night, and I

12:04:17 20    said, "You know, I'm getting out of bed to go

12:04:20 21    over there to take care of this."

12:04:21 22              And he said, "It's part of your job."

12:04:24 23         Q.    Now, looking at Exhibit 4, which

12:04:26 24    should also still be in front of you, and would

12:04:38 25    you look at the second page of the exhibit.

90

1                    *Ronald Britt*

12:04:40  2        A.    Yes.

12:04:41  3        Q.    Paragraph 15, do you see that?

12:04:44  4        A.    Mm-hmm.

12:04:44  5        Q.    It says, "In addition to your regular

12:04:47  6    work schedule, you are expected to be available

12:04:49  7    to respond to emergencies at the buildings on a

12:04:52  8    24-hour basis, 7 days a week.  You will not be

12:04:56  9    entitled to receive any additional --

10                    MR. KOERNER:  Okay.  Can I --

12:04:57 11        Q.    -- compensation for such emergency

12:04:59 12    services."

12:05:00 13                    MR. KOERNER:  Can I interrupt for

14             one second?

15                    MS. GOULD:  No, you can't.  Let me

16             finish my question.

17                    MR. KOERNER:  There's no question

18             pending.

12:05:03 19                    MS. GOULD:  Yes, there is a

12:05:04 20             question pending.

21                    MR. KOERNER:  No, it's not pending.

22             You were in the middle of a question.

12:05:07 23                    MS. GOULD:  Sir, you are

12:05:07 24             interrupting my question.

12:05:08 25                    MR. KOERNER:  Right.  And I'm

***Ronald Britt***

asking for a moment.

        MS. GOULD:  No.

        MR. KOERNER:  There's no question
pending; right?

12:05:09        MS. GOULD:  I'm sorry.  You're
12:05:09 interrupting my question.

12:05:11        MR. KOERNER:  Okay.  Sorry you feel
that way.

12:05:12        Stop writing, and see if there's a
12:05:13 question pending.  What is the question
12:05:14 pending?

        MS. GOULD:  You cannot --

12:05:15        MR. KOERNER:  Stop.  What's the
12:05:16 question pending?

12:05:16        MS. GOULD:  You cannot interrupt a
12:05:18 question.

        MR. KOERNER:  Absolutely.

12:05:18        I'm not -- Of course, I can --
12:05:18 There's no question pending, and I want to
12:05:21 speak with my witness.

12:05:23        MS. GOULD:  Let's take a
12:05:24 five-minute break.

        MR. KOERNER:  Fine.

12:06:23        *(Recess held from 12:05 to 12:06 p.m.)*

*Ronald Britt*

CONTINUED EXAMINATION BY MS. GOULD:

Q.   Looking at Exhibit 4, which is now in front of you, and now you've had a moment to consult with your client in the middle of -- with your lawyer in the middle of my question; is that correct?

MR. KOERNER:   Objection.   That's not a -- that's an improper question.

Don't answer it.

Go ahead.

MS. GOULD:   The record will speak for itself.

Q.   Looking at the second page of Exhibit 4 it says, in Paragraph 15, "In addition to your regular work schedule, you are expected to be available to respond to emergencies at the building on a 24-hour basis, 7 days a week.   You will not be entitled to receive any additional compensation for such emergency services, but you may receive compensatory time for any period devoted to such emergency services longer than 30 minutes."

Do you see that?

A.   Yes, ma'am.

1        *Ronald Britt*

12:07:09  2        Q.    Now, do you recall in the agreement

12:07:12  3    that you actually signed with Wavecrest/Thermald,

12:07:17  4    that that paragraph was included?

12:07:19  5        A.    As I said before, it's a long time

12:07:20  6    ago.

12:07:20  7        Q.    So, do you recall?

12:07:22  8        A.    I don't.

12:07:23  9        Q.    And looking at this document doesn't

12:07:26 10    refresh your recollection of that; correct?

12:07:27 11        A.    Only what they said when they said,

12:07:31 12    "Sign this.  You're the super.  Whatever happens,

12:07:33 13    respond.  You're 24/7."

12:07:36 14        Q.    And you just signed anything that was

12:07:37 15    put in front of you; is that right?

12:07:39 16        A.    It -- it was very casual.

12:07:41 17        Q.    Did you just sign anything that was

12:07:43 18    put in front of you?

12:07:44 19        A.    He handed it to me; I signed it; I

12:07:46 20    took the keys.

12:07:47 21        Q.    But you don't remember what you

12:07:49 22    signed; is that right?

12:07:50 23        A.    I don't remember reading it with a

12:07:52 24    magnifying glass, no.

12:07:55 25        Q.    Now, you just made reference to your

1                          *Ronald Britt*

12:07:57  2   alleged request to Mr. Yablonsky regarding these

12:08:02  3   emergency situations, and he responded something

12:08:06  4   about overtime.

12:08:07  5              Do you recall that testimony?

12:08:07  6              MR. KOERNER:  Objection.

12:08:07  7        A.    He just scoffed.

          8        Q.    Or, compensatory time; is that

          9   correct?

12:08:09 10        A.    He just scoffed.  He said, "Yeah, you

12:08:13 11   may -- you may ask for additional time off

12:08:14 12   later."

12:08:15 13        Q.    And that's consistent with Paragraph

12:08:17 14   15 on Page 2 of Exhibit 4; is that correct?

12:08:19 15        A.    I don't know.

12:08:24 16        Q.    Would you take a look at Exhibit 2,

12:08:40 17   which is your complaint in this action, looking

12:09:01 18   at Paragraph 26 on Page 7, please.

12:09:08 19              *(Witness peruses exhibit)*

12:09:08 20        A.    Yes.

12:09:09 21        Q.    You say -- or, it says, "Plaintiff

12:09:11 22   repeatedly inquired of defendants about the

12:09:15 23   failure to pay proper wages."

12:09:17 24              But that's not accurate; is it?

12:09:19 25        A.    I asked more than once --

1                        *Ronald Britt*

12:09:21  2                    MR. KOERNER:  Objection.

3              A.    -- yes.

12:09:22  4              Q.    You asked who more than once?

5              A.    Jay.

12:09:23  6              Q.    And you said you asked him a couple

12:09:24  7     of times; is that correct?

12:09:25  8              A.    At least.

12:09:26  9              Q.    And you changed your testimony with

12:09:27 10     regard to that question after you consulted with

12:09:29 11     your lawyer --

12                    MR. KOERNER:  Objection.

12:09:30 13              Q.    -- is that correct?

12:09:30 14                    MR. KOERNER:  Objection.

12:09:31 15              Objection.

12:09:32 16                    Don't answer that.

12:09:34 17                    MS. GOULD:  You're directing him

12:09:35 18     not to answer?

12:09:35 19                    MR. KOERNER:  Yes, I'm directing

20     him not to answer.

12:09:36 21                    MS. GOULD:  Okay.

12:09:36 22              Q.    You asked him a couple of times; is

12:09:38 23     that correct?

12:09:38 24              A.    At least a couple times, yeah.

12:09:40 25              Q.    And you never asked Ms. Alderman for

96

*Ronald Britt*

1

12:09:43  2  those wages; is that right?

12:09:44  3      A.   No, I did not.

12:09:45  4      Q.   "And despite these complaints,

12:09:51  5  plaintiff's inquires were never answered, and

12:09:51  6  defendants nevertheless repeatedly continued in

12:09:55  7  their failure to pay plaintiff all of the wages

12:09:58  8  due him under the law."

12:10:00  9           Do you see that?

12:10:01 10      A.   Yes, I do.

12:10:01 11      Q.   And when you use the word

12:10:04 12  "repeatedly" there, how many times are you

12:10:05 13  referring to?

12:10:05 14      A.   Counting the last time we spoke, at

12:10:08 15  least three.

12:10:09 16      Q.   In the how many years that you worked

12:10:11 17  at 91 East 3rd Street?

12:10:13 18      A.   In the whole time I worked there.

12:10:15 19      Q.   Looking at Paragraph 21 of the

12:10:22 20  complaint, it says, "On or about May 1st, 2013,

12:10:28 21  plaintiff visited the New York State Department

12:10:30 22  of Labor Division of Labor Standards and

12:10:35 23  described what had transpired."

12:10:37 24           Do you see that?

12:10:37 25      A.   Yes, I do.

1                        *Ronald Britt*

12:10:38  2          Q.    Where did you make that visit to the

12:10:41  3     State Department of Labor?

12:10:42  4          A.    Their office.

12:10:44  5          Q.    Where?

12:10:45  6          A.    I think it's on Vesey Street.

12:10:48  7          Q.    In Manhattan, is that what you're

12:10:50  8     saying?

12:10:50  9          A.    Yeah.

12:10:51 10          Q.    And to whom did you speak when you

12:10:53 11     made that visit on or about May 1st, 2013?

12:10:56 12          A.    One of the investigators.

12:10:58 13          Q.    Do you remember the name of that

12:10:59 14     person?

12:10:59 15          A.    No, I don't.

12:11:01 16          Q.    And you go on to state,

12:11:03 17     "Representatives of the New York State Department

12:11:06 18     of Labor reviewed plaintiff's employment

12:11:09 19     agreement and related documents, as well as his

12:11:12 20     pay records, and advised plaintiff that based

12:11:15 21     upon these documents, and in light of the fact

12:11:17 22     that he made himself available to his employer on

12:11:21 23     a 24-hour basis, he should initiate a claim for

24     unpaid wages against Thermald."

12:11:25 25                Do you see that?

1                          *Ronald Britt*

12:11:25   2        A.      Yes.

12:11:26   3        Q.      Is it your testimony that you showed

12:11:28   4   a representative of the New York State Department

12:11:32   5   of Labor an employment agreement?

12:11:34   6        A.      I don't know that I had that with him --

12:11:36   7   with me at that time, but I showed him what I

12:11:39   8   had.

12:11:39   9        Q.      But in your complaint it says that

12:11:41  10   you showed him your employment agreement; is that

12:11:44  11   accurate, or not?

12:11:44  12        A.      I showed him pay stubs for sure.

12:11:48  13        Q.      I'm asking you --

12:11:48  14              MR. KOERNER:  If you recall.

12:11:49  15        A.      I don't remember.  I showed him what

12:11:52  16   I had.

12:11:54  17        Q.      Sir, I'm asking you to look at your

12:11:56  18   complaint, which you said you've reviewed for

12:11:59  19   accuracy.

12:12:00  20              MR. KOERNER:  Right.  The complaint

12:12:01  21         that was filled over a year ago.

12:12:03  22        Q.      I asked you to look at your

12:12:06  23   complaint, which you said you reviewed for

12:12:08  24   accuracy.  And it says here that on or about

12:12:11  25   May 1st, 2013, you showed the Department of Labor

1                          *Ronald Britt*

12:12:15  2    representative, your employment agreement.

12:12:17  3                    I'm asking you if you did that or

12:12:17  4    not?

12:12:17  5         A.    I showed him everything I had.

12:12:19  6         Q.    Did you show them any sort of

12:12:23  7    employment agreement?

12:12:23  8                    MR. KOERNER:  Sitting here today,

12:12:24  9         do you remember showing him that?

12:12:24 10         A.    I don't recall exactly what all I

12:12:27 11    showed them.

12:12:28 12         Q.    Looking at Exhibit A to your

12:12:31 13    complaint, please --

         14         A.    Yes.

12:12:31 15         Q.    -- that two-page document, which is

12:12:34 16    Exhibit A.  It's attached to the complaint, sir.

12:12:49 17    No, no, no.  It's attached.

12:12:50 18         A.    Here?  *(Indicating)*

12:12:51 19         Q.    Yes.  Exhibit A.

12:13:02 20                    Did you show the Department of Labor

12:13:03 21    that document?

12:13:04 22         A.    I can't be sure, ma'am.

12:13:06 23         Q.    Did you show them any sort of

12:13:08 24    employment agreement?

12:13:09 25         A.    I showed them everything I had.

1                      *Ronald Britt*

12:13:11  2        Q.    Did you show them any sort of

12:13:14  3    employment agreement?

12:13:14  4            MR. KOERNER:  Objection; asked and

5        answered.

12:13:16  6            You can just repeat yourself again,

12:13:18  7        Ron.

12:13:20  8        Q.    You can repeat yourself again.

12:13:22  9            You don't recall; is that correct?

12:13:23 10        A.    I kept all of my papers in one bag;

12:13:27 11    I went down there with them.  I said, "Is this

12:13:30 12    right?  They can do this?"

12:13:31 13            And they looked at it and said, "No,

12:13:34 14    this is not right."

12:13:35 15        Q.    Did you show them that employment --

16    the two-page document, which has now been --

17        A.    I don't know, ma'am.

12:13:40 18        Q.    -- attached to your complaint?

12:13:40 19            MR. KOERNER:  I'll just say, once

12:13:41 20        again, that's the third time that he's

12:13:43 21        answered that he does not remember showing

22        them specifically.

12:13:43 23            THE WITNESS:  I showed them

12:13:44 24        everything I had.

25            MR. KOERNER:  But if he had it, he

*COMPU-TRAN COURT REPORTING*

1         *Ronald Britt*

12:13:45  2    showed it to them.

12:13:45  3         Q.    How do you explain the fact that in

12:13:49  4    your complaint, it is stated that you showed them

12:13:51  5    your employment agreement?

12:13:52  6         A.    Ma'am, I showed them everything I

12:13:54  7    had.

12:13:54  8         Q.    How do you explain that you're now

12:13:58  9    saying you don't recall whether you showed them

12:14:00 10    your employment agreement, and you stated in your

12:14:04 11    complaint that you did?  How do you explain that

12:14:08 12    discrepancy?

12:14:08 13              MR. KOERNER:  There's no

12:14:09 14         explanation needed.

12:14:11 15              MS. GOULD:  Please let the witness

12:14:12 16         answer.

17              MR. KOERNER:  He already said he

18         didn't have, you know, any recollection of

12:14:13 19         it.  So...

12:14:13 20              MS. GOULD:  Let him answer the

12:14:14 21         question, please.

12:14:14 22              MR. KOERNER:  He has answered it

12:14:16 23         three times.

12:14:17 24              MS. GOULD:  No; you've been

12:14:18 25         answering it three times.

1          *Ronald Britt*

12:14:19  2          MR. KOERNER:  No.  He answered it

12:14:19  3     three times before I objected.

12:14:19  4          MS. GOULD:  The record will speak

5     for itself.

12:14:20  6          MR. KOERNER:  Good.

12:14:20  7     Q.    *(Reading:)*  Representatives of the

12:14:22  8  Department -- the New York State Department of

12:14:23  9  Labor -- this is also Paragraph 21 of your

12:14:28 10  complaint -- reviewed plaintiff's employment

12:14:30 11  agreement and related documents.

12:14:31 12          What related documents did you show

12:14:33 13  the New York State Department of Labor?

12:14:33 14          MR. KOERNER:  Objection; asked and

12:14:34 15     answered.

12:14:34 16     A.    Everything I had.

12:14:35 17     Q.    And what was that?

12:14:36 18     A.    Everything in that bag of stuff that

12:14:38 19  I kept.

12:14:38 20     Q.    What was in that bag of stuff that

12:14:41 21  you kept?

12:14:41 22     A.    Well, pay stubs, for one.

12:14:44 23     Q.    Aside from -- and for what period of

12:14:47 24  time did you show the Department of Labor pay

12:14:50 25  stubs?

1          *Ronald Britt*

12:14:50  2          MR. KOERNER:  If you know.

12:14:52  3     A.    Everything I had.  I think I kept

12:14:54  4  pretty much every pay stub.  I'm not sure.

12:14:56  5     Q.    So, are you saying you showed them

12:14:58  6  pay stubs from January of 2007, on?

12:15:01  7          MR. KOERNER:  If you know.

12:15:01  8     A.    I think I did.  I'm not sure.

12:15:04  9     Q.    Aside from pay stubs, what related

12:15:09 10  records or related documents did you show the

12:15:13 11  representative of the New York State Department

12:15:14 12  of Labor?

12:15:14 13     A.    whatever else was in that bag of

12:15:16 14  stuff I gave them.

12:15:19 15     Q.    And you don't recall what that was;

16  is that correct?

17     A.    What's that, ma'am?

12:15:21 18     Q.    And you don't recall what that bag of

12:15:22 19  stuff contained; is that correct?

12:15:23 20     A.    Everything that I had.  All the

12:15:25 21  documents I had.

12:15:25 22     Q.    Aside from pay stubs, what were

12:15:28 23  examples of other kinds of documents that you

12:15:30 24  had?

12:15:30 25     A.    Ma'am, I don't know, but I -- I still

Ronald Britt

12:15:32  2    have the bag of stuff if you want.

12:15:34  3         Q.    And where is that?

12:15:34  4         A.    It's back at my shop.

12:15:36  5         Q.    And have you turned that over to your

6    lawyer?

12:15:39  7              THE WITNESS:  Did I give you

8         everything?

9              MR. KOERNER:  Yes, I thought you

10         gave me everything.

12:15:40 11              THE WITNESS:  I think I gave you

12:15:40 12         everything I had.

12:15:44 13         Q.    And looking at Exhibit 6, again.

12:15:52 14         A.    Yeah.

12:15:53 15         Q.    And looking at the last page of the

12:15:54 16    exhibit, is this the $38,928.70 calculation that

12:16:08 17    you're referring to as made by the Department of

12:16:09 18    Labor?

12:16:09 19         A.    On that date, 38,900 and I thought it

12:16:16 20    was 70-some, but okay.

12:16:16 21         Q.    And that's the calculation the

12:16:18 22    Department of Labor made based upon documents

12:16:22 23    that you gave them; is that correct?

12:16:23 24         A.    Yes, ma'am.

12:16:23 25         Q.    But the documents, other than the pay

Ronald Britt

1

12:16:25  2    stubs, are documents that you can't remember; is

12:16:27  3    that right?

12:16:27  4        A.    They may have kept that missing page,

12:16:30  5    now that you mention it.

12:16:31  6        Q.    What missing page?

12:16:32  7        A.    This one.  *(Indicating)*  Because they

12:16:34  8    said that whatever this was, was not right.  And

12:16:40  9    that's why they --

12:16:40 10        Q.    And you're referring to -- let's

12:16:43 11    refer to the exhibit, which is exhibit --

12:16:46 12        A.    Whatever --

12:16:47 13        Q.    That's Exhibit 4.

12:16:47 14        A.    Whatever way they were paying me --

15        Q.    Sorry.  That's Exhibit 5.

12:16:51 16        A.    -- was not in keeping with the

12:16:52 17    Department of Labor, and that I should initiate

12:16:54 18    this claim.

12:16:56 19        Q.    So, you're saying that you showed

12:16:58 20    them what document, aside from pay stubs?

12:17:01 21        A.    I showed them everything I had,

12:17:02 22    ma'am.  And that may have included this

12:17:05 23    employment contract.  And it may account for why

12:17:08 24    I'm missing a page there.

12:17:09 25        Q.    Well, let's clarify that the

1           Ronald Britt

12:17:10  2   employment contract that's attached to your

12:17:13  3   complaint has two pages; correct?

12:17:15  4        A.    Yeah.

12:17:16  5        Q.    And the employment contract that you

12:17:19  6   are referring to as Exhibit -- it's Exhibit 4,

12:17:22  7   although I don't see it in front of you -- has

12:17:24  8   three pages; correct?

12:17:25  9        A.    Yes.

12:17:26 10        Q.    And the draft of an employment

12:17:28 11   contract --

12:17:29 12        A.    Has four or five, yeah.

12:17:31 13        Q.    Four pages.

12:17:31 14              What did you show them?

12:17:32 15        A.    I can't be sure, but everything I

12:17:35 16   had.

12:17:35 17        Q.    So, aside from the employment

12:17:37 18   agreement, which you may or may not have shown

12:17:41 19   them, and the pay stubs, what else did you show

12:17:44 20   them?

12:17:44 21        A.    I don't know.

12:17:47 22              MR. KOERNER:  Can I ask a question?

12:17:49 23              MS. GOULD:  No.  You can ask a

12:17:52 24        question later.

12:17:53 25              MR. KOERNER:  Okay.

1                       *Ronald Britt*

12:17:53   2       Q.     Now, I asked you what pay stubs you

12:17:56   3   gave the Department of Labor, and you said you

12:17:59   4   thought you gave them all the pay stubs since

12:18:03   5   you've been working; is that correct?

12:18:04   6       A.     Yeah. You know, maybe there's one or

12:18:06   7   two missing. But pretty much, yeah. I kept them

12:18:08   8   all in a file.

12:18:10   9       Q.     And you claim that you've turned that

12:18:13 10   all over to your lawyer; is that right?

12:18:15 11       A.     Yeah, I think so.

12:18:17 12       Q.     Okay. Looking again at your

12:18:18 13   complaint, and this time looking at Paragraph 21.

12:18:22 14   This is Exhibit 2, Paragraph 21. And going to

12:18:36 15   Page 7, which is the end of Paragraph 21. You

12:18:39 16   say, "Claim for unpaid wages filed by plaintiff

12:18:44 17   with the New York State Department of Labor on or

12:18:45 18   about May 1, 2013, as well as the printed

12:18:49 19   calculation of plaintiff's underpayment in the

12:18:51 20   amount of 38,928.75 attached hereto as Exhibits D

12:18:57 21   and E."

12:18:58 22             Do you see that?

12:18:58 23       A.     Yes.

12:18:58 24       Q.     Would you take a look at Exhibit E to

12:19:01 25   your complaint.

108

1                          *Ronald Britt*

12:19:28    2              *(Witness peruses exhibit)*

12:19:31    3       A.    Yes.

12:19:31    4       Q.    Can you tell me what Exhibit E is?

12:19:35    5       A.    This is what the Department of Labor

12:19:39    6   generated as to the nature of that unpaid back

12:19:43    7   pay.

12:19:43    8       Q.    Right.  So, this is generated by

12:19:46    9   them, not by you; correct?

12:19:48   10       A.    Correct.

12:19:48   11       Q.    And this is based solely on what you

12:19:51   12   showed them and told them; is that correct?

12:19:53   13              MR. KOERNER:  If you know.

12:19:54   14       A.    I presume it was the pay stubs, but I

12:19:56   15   can't be sure.

12:19:57   16       Q.    Now, according to this, Exhibit E, it

12:20:01   17   says here that you worked commencing the period

12:20:07   18   9/2/11 through May 3rd of '13 -- with the

12:20:10   19   exception of May 3rd of '13, through 4/26/13, you

12:20:15   20   worked 91 hours a week; is that correct?  Can you

12:20:20   21   take a look at the exhibit, please.

12:20:26   22       A.    What page are we looking at, ma'am?

12:20:29   23       Q.    I'm looking at -- it's a two-page

12:20:30   24   exhibit.

12:20:30   25              MR. KOERNER:  These two pages.

1                           *Ronald Britt*

12:20:31    2         (Indicating)

12:20:32    3              THE WITNESS:  Okay.

12:20:32    4         Q.    It says here, "Number of hours

12:20:34    5    worked."  And with the exception of the week of

12:20:39    6    5/3/13, it says you worked 91 hours a week.

12:20:42    7              Do you see that?

12:20:43    8         A.    Okay.

12:20:43    9         Q.    Do you see that?

12:20:43   10         A.    No, actually, I don't.  Can you point

12:20:46   11    it out to me?

12:20:47   12         Q.    It's on the second column.  It says,

12:20:49   13    "Number of hours worked."

12:20:50   14         A.    Okay.

12:20:50   15         Q.    Did you tell the Department of Labor

12:20:53   16    you worked 91 hours a week?

12:20:56   17         A.    No, ma'am.  They asked me how much do

12:20:59   18    I sleep.  And I said, eight hours.  Which is

12:21:06   19    probably inaccurate.  I sleep a lot less.

12:21:08   20         Q.    They asked you how much you sleep?

12:21:10   21         A.    They asked me how much I sleep, and

12:21:13   22    then they disappeared again.

12:21:15   23         Q.    And you said, eight hours?

12:21:16   24         A.    Yeah.

12:21:17   25         Q.    You recall that?

1                    *Ronald Britt*

12:21:18  2          A.    I do remember saying that.

12:21:19  3          Q.    So, where does this 91 hours a week

12:21:22  4    come from?

12:21:23  5          A.    I don't know.

12:21:24  6          Q.    But you never told anyone that you

12:21:26  7    work 91 hours a week; is that correct?

12:21:28  8          A.    I told them I'm on call 24/7.

12:21:29  9          Q.    Did you ever tell any representative

12:21:31 10    of the Department of Labor that you work 91 hours

12:21:34 11    a week?

12:21:34 12                MR. KOERNER:  Objection.

12:21:35 13                You can answer it.

12:21:36 14                THE WITNESS:  What?

12:21:37 15                MR. KOERNER:  You can answer.

12:21:38 16          A.    They only asked me how much I sleep,

12:21:41 17    ma'am.

12:21:41 18          Q.    No.  I asked you whether you ever

12:21:43 19    told them that you work 91 hours a week.

12:21:46 20          A.    I did not tell them I work 91 hours a

12:21:48 21    week.

12:21:48 22          Q.    Because you didn't work 91 hours a

12:21:51 23    week, did you?

12:21:51 24                MR. KOERNER:  Objection.

12:21:52 25                Don't answer.

*Ronald Britt*

1

2          MS. GOULD:  Are you directing him

3       not to answer that question?

12:21:52  4          MR. KOERNER:  Yes.

12:21:52  5      Q.    Did you work 91 hours a week from the

12:21:56  6   period of September 2nd, 2011, through April 26th

12:22:01  7   of 2013?

12:22:01  8      A.    This is what the Department of Labor

12:22:03  9   gave me, ma'am.

12:22:04 10      Q.    I'm asking you a different question.

12:22:04 11          MR. KOERNER:  Answer the question.

12:22:08 12      Answer the question, Ron.

12:22:08 13      A.    Well, I would say that if I wasn't

12:22:10 14   asleep, that I was still on call.  And even while

12:22:13 15   I was asleep, I was on call.  So, technically, I

12:22:17 16   would say I was working 24/7.

12:22:20 17      Q.    But you never told anyone you were

12:22:22 18   working 91 hours a week; is that right?

12:22:24 19      A.    No, I did not.

12:22:26 20      Q.    Now, is it accurate that the

12:22:35 21   Department of Labor never adjudicated your claim

12:22:38 22   for unclaimed wages?

12:22:40 23      A.    When I filed a federal lawsuit, this

12:22:43 24   got folded in with that as I understand it.

12:22:46 25      Q.    So, the Department of Labor never

112

*Ronald Britt*

1

2  made a determination as to whether that claim was

3  a valid claim; is that right?

4      A.   Well, I spoke to them, and they said

5  that the supervisor was never wrong about this,

6  and she was certain that this was a valid claim.

7      Q.   But there wasn't a determination that

8  it was true; is that correct?

9          MR. KOERNER:  Objection.  He

10         testified that there was a determination.

11         MS. GOULD:  No, no.  There was not

12     a --

13     Q.   Was there an official

14  determination --

15         MR. KOERNER:  Official, okay.

16     Q.   -- that this was a valid claim?

17     A.   I don't know.

18     Q.   Looking at Paragraph -- well,

19  withdrawn.

20          How many hours a week do you claim

21  you worked between August 27th, 2011, and

22  April 30th --

23         MR. KOERNER:  Objection.

24     Q.   -- 2013?

25         MR. KOERNER:  Objection.  He's

113

*Ronald Britt*

12:23:35  2    already testified that he works 24/7.

12:23:35  3        MR. ETTENGER:  Let's clarify:  He

12:23:37  4    takes the position that if he was on call,

12:23:40  5    he was working.

          6        MS. GOULD:  I understand.

          7        MR. ETTENGER:  So, can we break

12:23:41  8    down the difference between work and being

12:23:42  9    on call, physically performing services.

12:23:44 10        MS. GOULD:  That's fine.  Let's do

12:23:46 11    that.

12:23:46 12        Q.    Between August 27th, 2011, up to and

12:23:52 13    including August 26th, 2013, how many hours a

12:23:56 14    week did you actually physically work?

12:24:00 15        A.    I wouldn't be able to tell you,

12:24:05 16    ma'am.  It varied a lot.  But I was always

12:24:10 17    carrying a phone.  And at any moment, I

12:24:12 18    responded.  Most of the time, I beat the big, red

12:24:15 19    truck there.

12:24:16 20        MR. ETTENGER:  That's not what

12:24:18 21    she's asking you.  She's asking you about

12:24:18 22    physically performing services.  Not

12:24:19 23    sitting in your apartment, waiting for

         24    calls.

12:24:21 25        MS. GOULD:  Or sitting somewhere

114

*Ronald Britt*

1

12:24:22  2   else.

3            MR. ETTENGER:  That's a distinction

12:24:23  4   that we need to make, and you need to

12:24:23  5   answer.

12:24:25  6            MR. KOERNER:  And he's testified

12:24:26  7   that that varied greatly.

12:24:27  8            MR. ETTENGER:  Okay.

12:24:27  9       Q.    And do you have any records which

12:24:29 10   would tell you and us during that period -

12:24:33 11   August 27th, 2011, through April 26th, 2013 - how

12:24:41 12   many hours you actually physically worked and

12:24:45 13   performed services?

12:24:46 14            MR. KOERNER:  Objection; asked and

15            answered.

12:24:47 16            You can answer again.

12:24:49 17       A.    Would that include walking back and

12:24:51 18   forth to the call?  Would it include tool time?

12:24:54 19   Would it include being on the phone with a

12:24:56 20   client?

12:24:56 21       Q.    Do you have any records of any sort

12:24:58 22   of time that you spent actually working at the

12:25:01 23   three buildings or, indeed, the fourth building

12:25:04 24   listed in these agreements, which have been

12:25:06 25   marked as various exhibits in the course of this

*Ronald Britt*

1

12:25:09 2   deposition?

12:25:09 3          MR. KOERNER:  Objection; asked and

4          answered.

12:25:10 5          You can answer it again.

12:25:11 6     A.     I could refer to my phone bill.

12:25:13 7     Q.     What would your phone bill tell us?

12:25:16 8     A.     What time I was called, and when, and

12:25:18 9   by who.

12:25:19 10    Q.     Aside from those phone calls, I'm

12:25:21 11  asking you whether you have any records which can

12:25:23 12  tell you - and, therefore, us - how many hours

12:25:26 13  you actually physically performed services at 91

12:25:31 14  East 3rd Street, 415 East 9th Street, 319 East

12:25:37 15  9th Street, or 115 Division Street, during the

12:25:41 16  period August 26th, 2011, through April 26th,

12:25:45 17  2013.

12:25:45 18          MR. KOERNER:  Objection.  You've

12:25:48 19          asked that same question in sum and

12:25:51 20          substance at least five times, and he's

21          stated that he has no records, other than

22          phone records.  So, I mean, if this is how

23          you want to spend your deposition time, go

12:25:54 24          ahead.

12:25:54 25          MS. GOULD:  Thank you.

1                           *Ronald Britt*

12:25:54  2          Q.    Now, looking at your complaint again,

12:26:04  3      and I'm calling your attention to Paragraph 22,

12:26:08  4      Page 7.   Paragraph 22 of your complaint states,

12:26:25  5      "Plaintiff regularly worked 75 hours per week."

12:26:32  6                 What did you mean by that statement?

12:26:35  7          A.    That that sounds about right.

12:26:38  8          Q.    Sounds about right with regard to

12:26:40  9      what?

12:26:40 10          A.    Well, it depends on what you define

12:26:42 11      work as, ma'am.

12:26:43 12          Q.    Well, this is your complaint,

12:26:45 13      Mr. Britt, and I'm asking you what you mean when

12:26:47 14      you say --

12:26:47 15          A.    Well, keeping an eye on the building.

12:26:49 16          Q.    -- when your lawyer said -- excuse

12:26:52 17      me.

12:26:52 18          A.    Keeping an eye on the building.

19          Q.    "Plaintiff regularly works --

20          A.    Keeping an eye on the building.

12:26:54 21          Q.    -- 75 hours per week."

22                 MR. KOERNER:   Do you want him to

12:26:54 23      describe what the 75 hours are comprised

12:26:57 24      of again?

12:26:57 25          A.    Anything that went wrong -- I'm like

*Ronald Britt*

1

12:27:00  2   an Alaskan State Trooper -- get on it; take care

12:27:04  3   of it.  Nobody wants to hear about anything.  I

12:27:06  4   call the management, but they don't call back.  I

5   just have to deal with it.

12:27:09  6         More often than not, I'm putting

12:27:11  7   money out of my own pocket.  And then, of late,

12:27:14  8   I'm not even receiving the money that I laid out

12:27:17  9   even on my debit card for such things as like a

12:27:21  10   dehumidifier to keep a child from dying of black

11   mold.

12         I go down to -- any hour of the day

12:27:27  13   or night to make sure that the buildings are well

12:27:29  14   maintained.  I'm walking around at every hour,

12:27:33  15   making sure that everything's fine.  Everything

12:27:37  16   from light bulbs, to how clean it is, to, is

12:27:39  17   somebody leaving trash out and it's not trash

12:27:42  18   night.  It's ongoing; it's constant.

12:27:43  19     Q.  Did you physically perform work

12:27:46  20   75 hours per week?

12:27:49  21       MR. KOERNER:  Objection.  That's

12:27:49  22      not what it says here.

12:27:51  23       MS. GOULD:  I'm asking him my

12:27:52  24      question, sir.

25       MR. KOERNER:  Okay.

118

1                          *Ronald Britt*

12:27:53  2          Q.    Go ahead.

12:27:54  3          A.    Ma'am, I was working.  If I was

12:27:57  4     awake, I was working.

12:27:58  5          Q.    Did you physically perform work

12:28:00  6     75 hours a week?

12:28:01  7                MR. KOERNER:  Is anyone physically

12:28:02  8          working here?

12:28:03  9                MS. GOULD:  Really?

12:28:03 10                MR. KOERNER:  Really.  He's

12:28:06 11          testified he was working 75 hours.

         12                MS. GOULD:  You know what, cut it

12:28:08 13          out Ron -- Greg.

12:28:10 14                Sorry; I don't mean to cut you off.

12:28:11 15          Q.    Do you have any records which

12:28:13 16     support --

12:28:14 17          A.    Didn't we go through this?

12:28:16 18          Q.    -- this statement that you regularly

12:28:18 19     worked 75 hours a week?

12:28:20 20                MR. KOERNER:  Objection.  That's

12:28:21 21          six times.

12:28:21 22                Go ahead.

12:28:22 23          A.    Ma'am, I think we've been through

12:28:24 24     this.

12:28:25 25          Q.    What is your answer, sir?

Ronald Britt

12:28:26  A.    If I was awake, I was working.

12:28:28  Q.    Do you have any records that document

12:28:29  the fact that you claim you were working 75 hours

12:28:32  a week?

12:28:32  A.    My phone records.

12:28:34  Q.    Other than your phone records --

12:28:34  MR. KOERNER:  Off the record.

(off-the-record discussion)

MR. KOERNER:  Back on the record.

This is insane.  You don't have any

records regarding your time.  Let's go

ahead and say that for the seventh time.

MS. GOULD:  Do you really want a

federal judge to see this deposition and

what you're saying?

MR. KOERNER:  Well, first of all,

you were off the record before, I thought.

12:29:02  He stated several times, at least

12:29:02  seven times on the record, that he does

12:29:04  not have records of his time while he was

12:29:06  working.  He was the superintendant of

12:29:08  four different buildings.

12:29:10  Q.    When you went to the State of

12:29:11  New York Department of Labor, did you tell any

1                              *Ronald Britt*

12:29:13   2   representative of the Department of Labor that,

12:29:15   3   as part of your compensation package, you were

12:29:18   4   given an apartment to live in, rent-free?

12:29:20   5          A.    I believe I did.

12:29:21   6          Q.    What did you say about that?

12:29:23   7          A.    Whatever they asked me, I answered.

12:29:26   8          Q.    You told them that you were given an

12:29:28   9   apartment to live in as part of your package; is

12:29:32  10   that correct?

12:29:32  11          A.    Yes.

12:29:32  12          Q.    And did you tell them that you were

12:29:34  13   given free utilities as part of your package?

12:29:38  14          A.    I don't know for sure, but I would

12:29:40  15   imagine that they figured that in.

12:29:40  16          Q.    But you don't know that; is that

12:29:41  17   correct?

12:29:41  18          A.    Again, that's been a little while,

12:29:43  19   too.  I gave them what I had; they gave me this;

12:29:46  20   and they said I should proceed.

12:29:48  21          Q.    And did you tell them that you also

12:29:50  22   received reimbursement for your phone, your phone

12:29:54  23   service?

12:29:54  24          A.    I don't know.  But if it was in the

12:29:57  25   employment contract that I may have provided,

121

*Ronald Britt*

12:29:59  2    then I guess they would know that.

12:30:00  3         Q.    If it was in the employment contract

12:30:04  4    that you may have provided, but you don't know if

       5    you provided it.  And if you provided, you don't

12:30:06  6    know what you provided --

12:30:06  7         A.    I gave them everything I had.

       8         Q.    -- is that correct?

12:30:09  9         MR. KOERNER:  That's fine.

12:30:10 10         Q.    Is that correct?

12:30:10 11         A.    I gave them everything I had, ma'am.

12:30:13 12         Q.    Now, it's not your testimony, is it,

12:30:17 13    that during the period August 27th, 2011, through

12:30:20 14    the time that you were terminated, that the only

12:30:23 15    compensation you received was a weekly check of

12:30:26 16    $350?  That's not your testimony, is it?

12:30:30 17         MR. KOERNER:  Objection; asked and --

12:30:32 18    objection.

12:30:32 19         You can answer.

12:30:32 20         A.    I got an apartment.

12:30:34 21         Q.    But you received other compensation

12:30:38 22    in addition to your weekly salary while you were

12:30:42 23    employed at 91 East 3rd and the other buildings;

12:30:46 24    is that correct?

12:30:46 25         A.    To do outside jobs for a number of

1                    *Ronald Britt*

12:30:49  2   people including Thermald Realty, yes.

12:30:52  3        Q.    During the period August 27th, 2011,

12:30:58  4   through April 30th, 2013, what was your weekly

12:31:04  5   salary?

12:31:04  6        A.    I would have to check my records on

12:31:05  7   that, ma'am.

12:31:07  8        Q.    You don't have a recollection of

12:31:08  9   that?

12:31:08  10       A.    It's been some time.

12:32:25  11            MS. GOULD:   Mark this, please.

          12            *(Whereupon, 23 pages containing pay*

12:32:26  13        *stubs were marked as Exhibit 7, for id.)*

12:32:26  14       Q.    This is the Exhibit 7.   *(Handing)*

          15            *(Witness peruses exhibit)*

12:33:08  16            Have you had a chance to look at

12:33:11  17   Exhibit 7?  And for ease of questioning, I

12:33:14  18   numbered the pages 1 through 23.

12:33:15  19            THE WITNESS:   These are pay stubs;

12:33:16  20       right?

12:33:16  21            MR. KOERNER:   Looks like it to me.

12:33:18  22       Q.    Well, the question is, what it looks

12:33:20  23   like to you, Mr. Britt.

12:33:21  24       A.    It looks like pay stubs to me.

12:33:25  25       Q.    And they're your pay stubs; is that

1                          *Ronald Britt*

12:33:26  2    right?

12:33:26  3         A.    Yes, ma'am.

12:33:27  4         Q.    And looking at the first -- and this

12:33:28  5    is your pay stubs from your work for Thermald/

12:33:33  6    Wavecrest; is that correct?

12:33:33  7         A.    Yes.

12:33:33  8         Q.    And the first page of Exhibit 7 is a

12:33:36  9    pay period that's indicated here 1/1/11 to

12:33:40 10    1/7/11, and the check date is 1/6/11; is that

12:33:46 11    correct?  Look at the first page.

12:33:46 12         A.    Yes.   What are we looking at?

12:33:50 13         Q.    We're looking at the date of the

12:33:52 14    check and the pay period.

12:33:54 15              *(witness peruses exhibit)*

12:34:02 16         A.    Okay.   Okay.   Pay period 1/1/11 to

12:34:05 17    1/07/11, yes.

12:34:07 18         Q.    And the last page of the exhibit,

12:34:09 19    which is Page 23, is a check for the pay period

12:34:16 20    8/27/11 to 9/2/11; is that correct?

12:34:20 21         A.    Yes.

12:34:20 22         Q.    So, does this Exhibit 7 represent

12:34:28 23    true and accurate copies of your pay stubs for

12:34:31 24    the period January 1, '11, until September 2nd,

12:34:44 25    2011?

124

*Ronald Britt*

12:34:44  2     A.    I suppose I'd have to read through

12:34:48  3  each one.

12:34:49  4     Q.    Well, is there any doubt in your

12:34:51  5  mind?  Take a quick look -- well, take a look

12:34:53  6  through the exhibit.

12:34:55  7     *(Witness peruses exhibit)*

12:34:56  8     A.    You know, not to hold things up, I

12:34:58  9  could look at this over lunch.

12:35:00  10    Q.    Well, my question to you is whether

12:35:03  11  this exhibit and the 23 pages of the exhibit,

12:35:05  12  refresh your recollection as to what your weekly

12:35:10  13  salary was in 2011?

12:35:13  14    A.    I'd have to go through this

12:35:18  15  carefully, ma'am.  I don't want to make any --

12:35:22  16    Q.    Do you have any doubt about what your

12:35:25  17  salary was?

12:35:25  18    A.    -- false statements.

12:35:26  19    Q.    By the way, how were you paid at the

12:35:28  20  beginning of 2011?  Was it once a week?  Once

12:35:29  21  every two weeks?  What was it?

12:35:32  22    A.    I think it -- initially, when I first

12:35:34  23  started, it was once a week, and then it went to

12:35:36  24  once every two weeks.

12:35:37  25    Q.    So, in 2011, at least at the

*Ronald Britt*

1
12:35:40  2  beginning of 2011, how frequently were you paid?
12:35:46  3          MR. KOERNER:  If you know.
12:35:46  4      A.   I'm going to have to look at this
12:35:49  5  carefully.  What is the question again?
        6      Q.   The question was --
12:35:51  7          MR. KOERNER:  I'll show you
12:35:52  8  quickly.  The last page starts in '07.
        9          MS. GOULD:  Please.
12:35:57 10          MR. KOERNER:  No.  I'm showing him
12:35:58 11  this.  He doesn't understand.  So, looking
12:35:59 12  at it -- you're asking him how much he was
       13  paid.
12:36:01 14          It looks like you were getting paid
12:36:02 15  that much at that point per week.
       16          THE WITNESS:  Yes.
       17          MR. KOERNER:  And it looks to me
12:36:04 18  like you were getting paid that much at
12:36:05 19  this point per week.  So, I don't know if
       20  that's true, but answer her question.
12:36:08 21          THE WITNESS:  Okay.  So, along the
12:36:09 22  way I got a raise, apparently.
12:36:11 23      Q.   Were you paid $350 a week in the year
12:36:14 24  2011?
12:36:16 25      A.   I don't know, ma'am.

1                        *Ronald Britt*

12:36:17  2            MR. KOERNER:  That's 2007; right?

12:36:21  3        *(Indicating)*  So, in 2011 it shows that

12:36:24  4        you were getting more.  So, I don't know

12:36:26  5        if that's true or not.

12:36:26  6            A.    Yeah, if they show it.  Whatever the

12:36:29  7    pay stub says, the check probably matched.

12:36:32  8            Q.    And you're testifying, as you sit

12:36:34  9    here today, that you don't know what you were

12:36:36 10    paid on a weekly basis in the year 2011; is that

12:36:41 11    correct?

12:36:41 12            A.    Whatever the pay stub reflects, is

12:36:45 13    probably accurate, ma'am.

12:36:46 14            Q.    Well, the first pay stub in

12:36:49 15    Exhibit 7, Page 1, it says:  "Regular:  $700."

12:36:56 16            Do you see that?

12:37:01 17            A.    Yes.

12:37:02 18            Q.    And what does that number reflect?

12:37:08 19            A.    I would presume that it's 350 per

12:37:14 20    week.

12:37:15 21            MS. GOULD:  Now, you may take a

12:37:16 22        break.

23        *(Luncheon recess held from 12:37 to 1:24 p.m.)*

01:24:37 24    CONTINUED EXAMINATION BY MS. GOULD:

01:24:37 25            Q.    I was asking you some questions,

127

Ronald Britt

1

01:24:40  2   Mr. Britt, about Exhibit 7, which was a series of

01:24:44  3   pay stubs.  And I asked you whether taking a look

01:24:49  4   at those pay stubs refreshed your recollection as

01:24:54  5   to, in 2011, what your weekly salary was.  And I

01:24:58  6   believe you said it was $350 a week; is that

01:25:02  7   correct?

01:25:02  8        A.    I think I said if that's what the pay

01:25:04  9   stub reflects, it's probably correct.

01:25:06  10        Q.    Well, do you have a recollection of

01:25:07  11   what your salary was in 2011?

01:25:09  12        A.    No, not really.

01:25:10  13        Q.    Well, then, I'm again asking you to

01:25:13  14   take a look at Exhibit 7 and see whether that

01:25:16  15   document refreshes your recollection as to what

01:25:19  16   it was.

01:25:19  17        A.    Ma'am, for the most part, a lot of

01:25:22  18   this was direct deposit.

01:25:24  19        Q.    Right.  But you kept track of what

01:25:29  20   you were earning, didn't you?

01:25:30  21        A.    I only kept the pay stub.

22        Q.    But the pay stub tells you what you

23   were earning, doesn't it?

01:25:32  24        A.    I suppose it does, but I didn't

01:25:34  25   really look at it.  It went to direct deposit.

1                          *Ronald Britt*

01:25:37  2        Q.     Well, are you saying you never looked

01:25:40  3   at it?

01:25:40  4        A.     Only when I threw it in the file.

01:25:43  5        Q.     Do you know what you were earning in

01:25:45  6   2012 on a weekly basis?

01:25:48  7        A.     I can't say for sure, ma'am.  I'd

01:25:50  8   have to check.

01:25:52  9        Q.     And what about in 2013?  What would

01:25:54 10   you have to check?

01:25:55 11        A.     Pay stubs.

01:25:56 12        Q.     Well, I'm giving you the pay stubs

01:25:59 13   for a period of time commencing on January 6th,

01:26:03 14   2011.

01:26:03 15        A.     Well, then, I would tell you that

01:26:05 16   whatever the pay stub reflects is probably

01:26:10 17   correct.  And here they are.

01:26:10 18        Q.     So, were you earning $350 a week in

01:26:13 19   2012?

01:26:14 20        A.     If that's what it says, then yes.

01:26:16 21        Q.     But you have no recollection of that?

01:26:16 22        A.     I can't be sure, ma'am.  I'd have to

01:26:19 23   sit down and be careful about being exact about

01:26:20 24   this.

01:26:20 25        Q.     Did you review any documents in

1                    *Ronald Britt*

01:26:22  2    preparation for today's deposition?

01:26:24  3         A.    Not really.

01:26:25  4         Q.    Well, is that a yes or a no?

01:26:28  5         A.    That would be only when you hand them

01:26:33  6    to me.

01:26:33  7         Q.    So, prior to today, you did not

01:26:35  8    review any documents in preparation for the

01:26:38  9    deposition; is that correct?

01:26:39 10         MR. KOERNER:  Yes or no.

01:26:41 11         A.    Well, when I sat down with my

01:26:42 12    attorney, certainly.

01:26:43 13         Q.    Yes.  And when was that?

01:26:44 14         A.    Several times over the last couple of

01:26:47 15    weeks.

01:26:47 16         Q.    And what documents did you review

01:26:49 17    when you sat down with your attorney in

01:26:54 18    preparation for today's deposition?

01:26:54 19         MR. KOERNER:  Objection.  We're not

20         going to go into lawyer/client privilege.

21         First of all, if you remember.

22         And, we're getting into lawyer/

23         client confidentiality.

01:26:55 24         MS. GOULD:  No, we're not.  I think --

25         MR. KOERNER:  Yes, we are.

130

1                        *Ronald Britt*

01:26:56  2        MS. GOULD:  Mr. Koerner, I think

01:26:56  3    that actually it's a fairly standard

01:26:58  4    question to ask a witness --

01:26:59  5        MR. KOERNER:  What documents did

6    you review --

7        MS. GOULD:  -- what documents they

8    reviewed in conjunction and preparation

9    for today's deposition.

01:27:01 10        MR. KOERNER:  Do you remember what

11    documents you reviewed?

01:27:03 12        THE WITNESS:  Not all of them.

01:27:05 13    Stacks.

01:27:05 14    Q.    What were some of the documents you

01:27:07 15    reviewed?

01:27:07 16    A.    Well, we looked at all of those --

01:27:11 17        MR. KOERNER:  Objection to this

01:27:12 18    entire line of questioning.

01:27:14 19    A.    We looked at all of those letters of

01:27:17 20    recommendation.  We looked at all of those

01:27:19 21    Christmas cards.  We looked at the letter that

01:27:23 22    Jay wrote me, the letter of recommendation.

01:27:27 23    Several others.  I don't know.

01:27:30 24        MR. KOERNER:  Don't look at me.

01:27:31 25    Q.    Did you look at the complaint that

1                          *Ronald Britt*

01:27:32  2    was filed on your behalf?

01:27:33  3         A.    I looked at that some time ago.  But

01:27:36  4    to be honest, I hadn't looked at it until you

01:27:38  5    handed it to me again.  A lot of it's very

01:27:43  6    technical, beyond what I understand.  So, I

01:27:45  7    talked it over with him --

01:27:46  8         Q.    Your lawyer?

01:27:47  9         A.    -- and he understood, so...

01:27:47 10         MR. KOERNER:  Objection, again, to

11         any lawyer/client privilege.

01:27:49 12         Q.    Don't relate to me any conversations

01:27:51 13    with your lawyer.

01:27:52 14         A.    Right.  Well, he understood what my

01:27:54 15    complaint was, and then he put it down to paper.

01:27:56 16         Q.    And did you review any of your pay

01:27:59 17    stubs in preparation for today's deposition?

01:28:01 18         A.    I just handed them to him.

01:28:03 19         Q.    Did you review them in preparation

01:28:08 20    for today's deposition?

01:28:09 21         A.    I did not.

01:28:10 22         Q.    Did you review any sort of invoice

01:28:13 23    that you submitted to Wavecrest in preparation

01:28:15 24    for today's deposition?

01:28:16 25         A.    Not really, no.

132

*Ronald Britt*

01:28:17   2       Q.    Was there any point in time when you

01:28:23   3   were employed by Thermald/Wavecrest that you

01:28:27   4   entered into any sort of arrangement whereby you

01:28:31   5   would perform services or work in addition to

01:28:35   6   your services or work as a superintendant or

01:28:39   7   janitor?

01:28:39   8       A.    Well, yeah.

01:28:45   9       Q.    And when did you enter this

01:28:50  10   arrangement?

01:28:51  11       A.    It was near the beginning of the time

01:28:53  12   I began working for Doreen.

01:28:57  13       Q.    And with whom did you enter such an

01:29:01  14   arrangement?

01:29:02  15       A.    Doreen.

01:29:02  16       Q.    And what is the arrangement that you

01:29:07  17   entered with Doreen?

01:29:07  18       A.    Ma'am, I'm embarrassed to go into it,

01:29:14  19   but I have to.

01:29:15  20       Q.    No, no, no.  I'm talking about the

01:29:17  21   issues of your payment.  I'm not talking about

01:29:19  22   other issues, which we'll get to later.

01:29:22  23       A.    Employment?

01:29:22  24       Q.    Right.

01:29:23  25       A.    Well, it became clear to me that if I

133

1                           *Ronald Britt*

01:29:26  2   didn't have sex with Doreen, I wouldn't be

3   employed.

4                    MS. GOULD:  Move to strike.

01:29:30  5                    THE WITNESS:  I would be out of a

01:29:30  6         job, and I would be out of an apartment.

7                    MS. GOULD:  Move to strike.

01:29:32  8                    THE WITNESS:  Well, I'd like to

01:29:33  9         answer the question completely.

10                    MS. GOULD:  Move to strike as not

01:29:34 11         responsive.

01:29:34 12         Q.    Let me ask you a different question.

01:29:37 13   Aside from your weekly pay - whatever the number

01:29:41 14   was - as reflected on the pay stubs in Exhibit 11

01:29:45 15   and on other pay stubs, were you ever paid monies

01:29:49 16   in addition to that pay by Thermald/Wavecrest?

01:29:54 17         A.    For outside jobs, yes.  Actually, I

01:29:56 18   was paid before I became an employee.  They hired

01:30:00 19   me to do several jobs out of my shop after they

01:30:03 20   hired -- after they rented me the shop.

01:30:07 21         Q.    I'm talking about during the period

01:30:08 22   of your employment.  You said you were paid for,

01:30:10 23   quote, "outside jobs;" is that correct?

01:30:12 24         A.    That's correct.

01:30:13 25         Q.    And what do you mean by "outside

*Ronald Britt*

1

01:30:13   2    jobs"?

01:30:13   3         A.    I mean, if there was additional work

01:30:15   4    to do on the buildings, like somebody has --

01:30:18   5    missing some tile or whatever, I would contact

01:30:21   6    Jay, give him an estimate of what it would cost.

01:30:25   7    He would then okay it.  I would do it, and I

01:30:28   8    would invoice it.  And for the most part, I would

01:30:32   9    just invoice the first -- the full amount, until

         10    they started taking taxes even on materials I was

01:30:34  11    buying.  And then I would have to break it up,

01:30:37  12    labor and materials.

01:30:38  13         Q.    And when you say -- withdrawn.

01:30:39  14              When did you first agree with -- and

01:30:42  15    you're saying "Jay."  You mean Jay Yablonsky; is

01:30:44  16    that correct?

01:30:44  17         A.    Correct.

01:30:46  18         Q.    And he was a representative of

01:30:47  19    Wavecrest; is that correct?

01:30:47  20         A.    Correct.

01:30:48  21         Q.    And so, there was a point in time

01:30:50  22    when you agreed with Jay Yablonsky that you would

01:30:52  23    do certain additional work, and you would get

         24    paid certain additional sums of money; is that

01:30:54  25    correct?

1               *Ronald Britt*

01:30:54  2        A.     Right.

01:30:55  3        Q.     And I asked you when you first

01:30:56  4   entered this arrangement, and you thought it was

01:30:59  5   toward the beginning of your employment at 9 --

01:31:02  6        A.     And, technically, ma'am, before I

01:31:04  7   even began working for them.

01:31:04  8        Q.     Well, I'm talking about since you

01:31:06  9   started working for Thermald/Wavecrest, when did

01:31:11 10   you enter an arrangement whereby you would be

01:31:14 11   paid for certain extra work that you did?

01:31:17 12            MR. KOERNER:  Objection.  He tried

01:31:18 13        to testify that he had that arrangement

01:31:20 14        before he was employed.

01:31:22 15        A.     I kept it throughout.

01:31:23 16            MS. GOULD:  But I'm talking about

17        since the time he was employed.

18            MR. KOERNER:  So, then say, from

01:31:25 19        the time he was employed.

01:31:25 20            MS. GOULD:  I just asked that

01:31:26 21        question.

01:31:27 22        Q.     So, you're saying from the beginning,

01:31:29 23   you had that arrangement; is that correct?

01:31:30 24        A.     That's correct.

01:31:31 25        Q.     And you entered this arrangement with

1        *Ronald Britt*

01:31:34  2   Jay Yablonsky?

01:31:35  3        A.   All work was approved by Doreen.

01:31:37  4   That was her stipulation.

01:31:38  5        Q.   How do you know that?

01:31:39  6        A.   Well, she emailed me that.

01:31:41  7        Q.   She emailed you that when?

01:31:43  8        A.   That no -- no jobs could proceed --

01:31:46  9   after she stiffed me for 3,000 on a -- on a

01:31:51 10   window thing that she approved of, but then later

01:31:55 11   conveniently forgot.

01:31:56 12        Q.   Let's talk about any arrangement that

01:31:58 13   you had with Jay Yablonsky.   Okay?

01:32:00 14             What arrangement did you enter into,

01:32:03 15   if any, with Jay Yablonsky regarding extra work

        16   at the buildings and being paid money for that

        17   work?

01:32:06 18        A.   The agreement was that I would submit

01:32:09 19   an estimate of what it would cost, Doreen would

01:32:13 20   approve it.   And then, when he green-lighted it,

01:32:16 21   I would do it.   And if I had to lay out money out

01:32:19 22   of my own pocket, I should provide receipts.

01:32:22 23        Q.   And you said that this was -- that

01:32:25 24   you entered this arrangement at the beginning of

01:32:26 25   the time that you became an employee; is that

*Ronald Britt*

correct?

A.    It was an agreement in place
throughout the time since before I was an
employee.

Q.    And this extra work or extra jobs, as
you call it, were going to be performed and you
were going to be paid in addition to your weekly
salary; is that correct?

A.    Correct.

MS. GOULD:  One second.

*(Pause in the record)*

Can you mark this, please.

*(Whereupon, 6-page email chain was
marked as Exhibit 8, for id.)*

Q.    Taking a look, Mr. Britt, at
Exhibit 8...  *(Handing)*

*(Witness peruses exhibit)*

A.    Yes.

Q.    Do you recognize Exhibit 8?

A.    I do.

Q.    Can you tell me what it is, please.

A.    Well, it seems to be some of the
invoices that I submitted for additional work
done for Thermald.

138

*Ronald Britt*

1

01:34:53  2        Q.    So, taking a look at -- and I've

01:34:57  3    numbered the pages of Exhibit 8 just for ease.

01:35:00  4    Taking a look at the first page of Exhibit 8, can

01:35:02  5    you tell me what that page represents?

01:35:02  6        A.    An invoice from January 2010.

01:35:06  7        Q.    For what?

01:35:07  8        A.    To replace a bedroom door in Number 8.

01:35:13  9    To remove, replace, repaint damaged areas and

01:35:21 10    ceiling walls from water damage of two floods.

01:35:25 11    Getting matching paint from Home Depot.

01:35:28 12    Installing 14 kitchen handles and -- and 42 --

01:35:33 13    no.  $42 for cabinet handles.

01:35:36 14        Q.    Now, did you and Mr. -- and this

01:35:38 15    total invoice was for $882; is that right?

01:35:42 16        A.    Yes.

01:35:42 17        Q.    And now, did you discuss this job --

18    withdrawn.

01:35:44 19             Is this one of the side jobs or extra

01:35:47 20    jobs that you're referring to?

01:35:49 21        A.    Yeah.  Everything that -- all work I

01:35:51 22    did was discussed with Jay Yablonsky, for sure.

01:35:53 23        Q.    So, did you discuss with

01:35:57 24    Mr. Yablonsky this job prior to the time that you

01:36:00 25    actually did the work?

1          *Ronald Britt*

01:36:01   2      A.     Yes, I did.

01:36:02   3      Q.     And what did you discuss with him?

01:36:03   4      A.     Well, I remember when the flood

01:36:06   5   happened in Number 8, he said, get it fixed right

01:36:10   6   away, because that is a troublesome tenant.

01:36:13   7             And the -- I don't remember the story

01:36:16   8   on the cabinet handle doors, but it seems like

01:36:20   9   there was a wrinkle on that one.

01:36:22  10      Q.     Did you discuss with Mr. Yablonsky --

01:36:25  11   before you actually performed the work that's

01:36:28  12   represented on Page 1 of Exhibit A, did you

01:36:30  13   discuss with him how much you were going to

01:36:33  14   charge to do the work?

          15      A.     I always quote the range.

01:36:36  16      Q.     You quote a range, is that what

01:36:36  17   you're saying?

01:36:37  18      A.     Yes.

          19      Q.     And in this particular case, you have

01:36:37  20   an $882 total.

01:36:40  21             Do you recall what the range was that

01:36:41  22   you quoted Mr. Yablonsky?

01:36:43  23      A.     I do not.

01:36:44  24      Q.     And what was the range based on?

01:36:47  25      A.     How many hours I expected to take and

1          *Ronald Britt*

01:36:50  2    what the materials would be.

01:36:51  3          Q.    And looking at the first page of

01:36:54  4    Exhibit 8, which is an invoice from January of

01:36:56  5    2010, do you set forth -- no.  Well, it says

01:37:02  6    January 2010, but was it actually work done on

01:37:05  7    January -- in January of 2011?

01:37:07  8          A.    I can't be sure, but as -- I would

01:37:10  9    only invoice every so often, when things added up.

01:37:14  10         Q.    Well, looking at -- this invoice is

01:37:18  11   contained in an email; isn't it?

01:37:20  12         A.    Yes.

01:37:21  13         Q.    And it seems to say, "On Tuesday,

01:37:23  14   January 4, 2011, Ron Britt wrote," and then,

01:37:25  15   "Invoice from Ron, January 2010."

01:37:31  16              Do you recall whether, in fact, this

01:37:32  17   was in January 2011 that you submitted this

01:37:35  18   invoice?

01:37:36  19         A.    It's outstanding work that I was

01:37:39  20   billing for, but I can't be --

01:37:39  21         Q.    Did you wait a year to submit an

01:37:43  22   invoice?

01:37:43  23         A.    No, I don't think I would, ma'am.

01:37:45  24         Q.    People tend to get the dates wrong at

25   the beginning of the year; don't they?

1                          *Ronald Britt*

01:37:46  2        A.    I don't know that.

01:37:46  3        Q.    Now, you said this was based on the

01:37:49  4   hours that you thought it would take you --

5        A.    And the materials.

01:37:50  6        Q.    -- and the materials you thought you

7   needed.

01:37:52  8              Is there any mention of any hours in

01:37:54  9   this particular invoice?  The first page of

01:37:57 10   Exhibit 8.

01:37:57 11        A.    No, there are not.

01:37:58 12        Q.    So, how was it that you estimated

01:38:02 13   what you ought to be paid for this job when you

01:38:05 14   had a conversation with Mr. Yablonsky?

01:38:08 15        A.    I would quote him a range.  So, if it

01:38:12 16   was 240 -- certainly, it's well within that

01:38:15 17   range, whatever I quoted.  But if you want to

18   know what a replacement door costs, or what it

01:38:21 19   costs to go get it, or a replacement handle, and

01:38:21 20   then to hang it, I think that's a reasonable

01:38:23 21   amount of money.

01:38:23 22        Q.    What I'm asking you is whether you

01:38:24 23   quoted Mr. Yablonsky a range of the time that it

01:38:29 24   was going to take you --

01:38:29 25        A.    No.

*Ronald Britt*

01:38:30 2    Q.    -- to do the job?

01:38:31 3    A.    Not on these jobs, I didn't.   I just

01:38:34 4    quoted it based on what I thought was how much

01:38:36 5    time it would take, how much materials it would

01:38:38 6    take, and what was reasonable.

01:38:40 7    Q.    So, with regard to the first page of

01:38:44 8    Exhibit 8, this invoice, which appears to come

01:38:46 9    from January 4th, 2011, although it's dated

01:38:50 10   January 2010, do you know how many hours it took

01:38:52 11   you to do this job?

01:38:53 12   A.    I would say, divide 420 bucks by $35

01:38:59 13   an hour.

01:39:00 14   Q.    And what was the number $35 an hour

01:39:03 15   based on?

01:39:03 16   A.    That's what I generally charged

01:39:05 17   Wavecrest.   For other outside clients, 45 or 55,

01:39:10 18   depending on their issue.

01:39:11 19   Q.    You generally charged Wavecrest 35?

01:39:15 20   A.    And other people more, yeah.

01:39:16 21   Q.    And when you say you charged other

01:39:18 22   people more, who were those other people?

01:39:21 23   A.    Well, several repeat clients.   I

01:39:24 24   could get you a list of some of them if you'd

01:39:25 25   like.

1          *Ronald Britt*

01:39:25  2          Q.     And those are repeat clients in the

01:39:27  3     neighborhood?

01:39:28  4          A.     Yes.

01:39:28  5          Q.     And so, you were doing work for those

01:39:31  6     repeat clients while you were employed as a super

01:39:37  7     or janitor for Thermald/Wavecrest; is that right?

01:39:38  8          A.     On occasion there would be a pick-up

01:39:40  9     job, yes.

01:39:40 10          Q.     And how frequently did you do that?

01:39:43 11          A.     I don't know.  Whenever something

01:39:46 12     happened.

01:39:46 13          Q.     And you typically charged those

01:39:47 14     clients more than you charged Wavecrest; is that

01:39:50 15     correct?

01:39:50 16          A.     I did.

01:39:50 17          Q.     And do you have records of how much

01:39:52 18     money you earned doing those other jobs?

01:39:56 19          A.     Somewhere probably, yes.

01:39:58 20          Q.     What's the nature of those records?

01:39:59 21          A.     I'd have to fish through my notes.

01:40:03 22     Because when people call in, I generally write

01:40:06 23     down what the issue is, and where, and when, and

01:40:08 24     who's going to be there.

01:40:09 25          Q.     And then, you said you generally

144

*Ronald Britt*

1

01:40:11  2   charged either 45 or $50 an -- $55 an hour for

01:40:15  3   that work; is that correct?

01:40:16  4        A.    Depending, yeah.

01:40:17  5        Q.    And were you typically paid by check

01:40:25  6   for those jobs?

01:40:25  7        A.    On occasion.

01:40:26  8        Q.    And how else were you paid?

01:40:27  9        A.    Cash.

01:40:28 10        Q.    And do you have any estimate with

01:40:35 11   regard to the year 2011, as to how much you

01:40:37 12   earned on those other jobs?

01:40:39 13        A.    I would have to look at it.  But it's

01:40:44 14   worth mentioning that when I took the job as

01:40:46 15   super, I pretty much cut out everybody except a

01:40:51 16   few repeat clients.

01:40:52 17        Q.    And who are those few repeat clients?

18        A.    Swifts.

01:40:53 19        Q.    Who's Swifts -- what is Swifts?

01:40:55 20   Sorry.

01:40:56 21        A.    It's a bar on 4th Street.

01:40:58 22        Q.    Who else?

01:40:59 23        A.    The Bean; it's a coffee shop.

01:41:03 24        Q.    And where is that?

01:41:03 25        A.    It's on 3rd Street.

1                              *Ronald Britt*

01:41:05  2        Q.    Who else?

01:41:06  3        A.    I don't know.  I'd have to think

01:41:09  4   about it.

01:41:11  5        Q.    And sometimes you were paid in check

01:41:13  6   and -- by check and sometimes in cash; is that

01:41:16  7   correct?

01:41:16  8        A.    Correct.

01:41:16  9        Q.    And did any of the entities for whom

01:41:19 10   you did this work issue you 1099s?

01:41:23 11        A.    No.

01:41:24 12        Q.    And with respect to the year 2011, do

01:41:35 13   you know how much you earned doing these other

01:41:41 14   outside jobs?

01:41:42 15        A.    No, I don't.  But I can tell you, it

01:41:44 16   wasn't much.

01:41:45 17        Q.    Can you estimate how much you earned?

01:41:47 18        A.    No.  But I could -- if we're gonna

01:41:49 19   come back tomorrow, I could work up something for

01:41:52 20   you.

01:41:52 21        Q.    And when did you do those other jobs?

01:41:56 22   In other words, did you do them while you were

01:41:58 23   also performing work as a super/janitor at the

01:42:03 24   Thermald buildings?

01:42:03 25        A.    It just depends on when the job came

Ronald Britt

1

01:42:06  2   up.  But for the most part, weekends if it's

01:42:09  3   something I could schedule.

01:42:11  4          Q.    And did you ever do those jobs at

01:42:13  5   night?

01:42:13  6          A.    It depends on when it happened.  But

01:42:16  7   for the most part, it would be something simple.

01:42:19  8   You know, like faucets leaking.  It would take

01:42:25  9   20, 30 minutes.

01:42:25 10          Q.    Did you ever perform those jobs

01:42:27 11   during the hours between 9:00 and 5:00 or 6:00

01:42:31 12   during the day?

01:42:32 13          A.    Usually, after 5:00, I would say.

01:42:37 14          Q.    But you were also paid to work for

01:42:39 15   Thermald after 5:00; isn't that true?

01:42:42 16          A.    Oh, yeah.

01:42:43 17          Q.    So, going back to Exhibit 8, the

01:42:59 18   first page, you submitted an invoice to

01:43:07 19   Mr. Yablonsky dated January, it says, of 2010 -

01:43:11 20   we don't know if it's '10 or '11 - for $882; is

01:43:17 21   that correct?

01:43:17 22          A.    Yes.

01:43:17 23          Q.    And were you paid that $882?

01:43:20 24          A.    Probably, yes.

01:43:20 25          Q.    Well, looking at the second page of

COMPU-TRAN COURT REPORTING

1                         *Ronald Britt*

01:43:23  2    Exhibit 7, which should also be in front of you,

01:43:30  3    does that refresh your recollection as to whether

01:43:31  4    you were paid that $882?

01:43:35  5                 *(witness peruses exhibit)*

01:43:41  6         A.    Yes.

01:43:41  7         Q.    And, in fact, you were paid; is that

01:43:44  8    correct?

01:43:44  9         A.    Yes.

01:43:44 10         Q.    Okay.  And that is listed here as --

01:43:48 11    on Page 2 of Exhibit 7, as "Apartment repair

01:43:52 12    earnings;" is that correct?

01:43:53 13         A.    Yes.

01:43:53 14         Q.    And who issued the check for these

01:43:58 15    payments?

01:43:58 16         A.    Thermald Realty.

01:44:00 17         Q.    And who signed the check?

01:44:02 18         A.    Doreen Alderman.

01:44:03 19         Q.    Are you sure about that?

01:44:04 20         A.    I can't be sure, no.  But it seems to

01:44:07 21    me that she signs all her own checks.

01:44:09 22         Q.    Does she sign payroll checks?

01:44:12 23         A.    I believe she told me once she signs

01:44:14 24    all checks.

01:44:14 25         Q.    Well, did you ever see any check that --

148

*Ronald Britt*

01:44:16  2   any payroll check that she signed?

01:44:18  3        A.    I don't know.  I'd have to look into

01:44:20  4   it.

01:44:23  5             As I said, a lot of this is direct

01:44:25  6   deposit.  I could show you one that she paid

01:44:32  7   direct --

          8        Q.    I'm not asking for that now.

01:44:33  9        A.    -- deposit --

          10       Q.    I'm not asking --

01:44:33 11        A.    -- and then took back out of my bank

01:44:37 12   account.

01:44:37 13        Q.    Well, you can talk about that later,

01:44:39 14   and maybe we will.

01:44:41 15             But for right now, looking at Page 2

01:44:43 16   of Exhibit 7, does that indicate whether this

01:44:50 17   payment was direct deposit, or not?

01:44:52 18        A.    Where would that be?

01:44:56 19        Q.    I'm asking you to take a look at Page 2

01:45:00 20   to ascertain whether there is any indication that

01:45:03 21   this was paid by direct deposit.

01:45:05 22             *(witness peruses exhibit)*

01:45:05 23        A.    I can't tell.

01:45:10 24        Q.    And the check for this $882 less

01:45:18 25   withholding, was issued on January 14th of 2011;

1                            *Ronald Britt*

01:45:23  2   is that correct?  Looking at the check date on

01:45:25  3   Page 2.

01:45:26  4          A.    I don't see that.

01:45:32  5                Okay.  Check date, yes, 1/14/11.

01:45:35  6          Q.    Were you also paid your $350 a week

01:45:38  7   for that pay period?

01:45:39  8          A.    I was.

01:45:39  9          Q.    Looking at Page 2 of Exhibit 8,

01:45:46 10   that's the second invoice, can you tell me what

01:46:05 11   that invoice is?

01:46:07 12          A.    That's a total of $580 for various,

01:46:11 13   small, handy-guy things.

01:46:12 14          Q.    And did you discuss this job and this --

01:46:23 15   whatever these jobs were with Mr. Yablonsky,

01:46:27 16   prior to the time that you did the job?

01:46:31 17          A.    Yes.

01:46:32 18          Q.    And how did you come to the number

01:46:36 19   $580?

01:46:37 20          A.    Well, it would be the total of the

01:46:43 21   materials and labor.

01:46:45 22          Q.    And did you list the number of hours

01:46:48 23   that you were going to spend on this particular

01:46:51 24   endeavor?

01:46:52 25          A.    No, I did not.

*Ronald Britt*

Q.   So, how did you arrive at the number $580?

A.   Well, ma'am, if you just look at the last thing on the list, "Paint out graffiti on front door trash can at 319, $20." That would probably be $5 for a can of paint, and $15 to walk over and paint it out.

Q.   But you don't list any particular number of hours on this invoice, do you?

A.   No, ma'am, but that seems like a reasonable number.

Q.   Well, how did you arrive at the $580, is what I'm asking you.

A.   Because it probably took me about ten minutes to walk over and take care of that, maybe 30 minutes max. And I felt 20 bucks was a nominal charge.

Q.   And the rest of it was, what?

A.   The 20 bucks would include the price of the paint, I suppose.

         And then, the -- in the lower corridor, "Close up the ceiling, repair pipes with Hong sticks, paint with stain blocker." That would indicate at least three trips.

1            *Ronald Britt*

01:47:54  2        Q.    So, you indicated in response to my

01:47:56  3    earlier questions that you typically charged

01:47:59  4    Thermald/Wavecrest $35 an hour for your work.

01:48:03  5        A.    Or less.

01:48:03  6        Q.    And did you have an hourly charge for

01:48:06  7    this invoice, which is Page 2 of Exhibit 8?

01:48:09  8        A.    I didn't show any hours on that, no,

01:48:13  9    ma'am.

01:48:13 10        Q.    Did you give Mr. Yablonsky a range

01:48:16 11    for this work before you did it?

01:48:18 12        A.    Yes, of course.

01:48:19 13        Q.    And did you ever discuss this work,

01:48:21 14    which is reflected on Page 2, or the work

01:48:23 15    reflected on Page 1 of Exhibit 8, with

01:48:31 16    Ms. Alderman?

01:48:31 17        A.    Nope.

01:48:32 18        Q.    And were you paid this $580?

01:48:35 19        A.    I probably was, yes.

01:48:36 20        Q.    And were you also paid for the time

01:48:38 21    in which you -- during the time that you worked

01:48:42 22    and did the work reflected on Page 2 of

01:48:46 23    Exhibit 8, did you also receive your weekly

01:48:48 24    paycheck or weekly pay in the amount of $350?

01:48:53 25        A.    Probably, yes.

*Ronald Britt*

01:48:54  2    Q.    Well, you don't doubt that, do you?

01:48:56  3    A.    No, ma'am.  But I would say that many

01:49:01  4    times there were mistakes made on my paycheck.

01:49:05  5    Q.    And were they corrected?

01:49:07  6    A.    Not always.

01:49:08  7    Q.    How many times were they not

01:49:10  8    corrected?

01:49:11  9    A.    Well, here's an example.

10    *(Indicating)*

01:49:12  11    Q.    Which example is it?

01:49:14  12    A.    This is, like, a total of 1,200 still

01:49:18  13    due.  They did pay it, but then they went into my

01:49:22  14    account and took it back out.

15    Q.    Why don't you hold on to that, and

01:49:22  16    we'll talk about it later.

01:49:22  17           MR. KOERNER:  You don't want to

01:49:24  18       mark it as an exhibit?

01:49:25  19           MS. GOULD:  No, not now, because

20       I'm asking other questions now.  We'll get

21       to it later.

22           We'll hold it over here.  We'll

23       make some copies of it.

01:49:27  24           THE WITNESS:  That would be one

25       example.

153

1                    *Ronald Britt*

01:49:28    2        Q.    That's after you were terminated; is

01:49:30    3    that correct?

01:49:30    4            MR. KOERNER:  Why don't you just

5        read and describe what it is.

01:49:31    6        A.    I submitted this --

7            MS. GOULD:  I'm not reading or

01:49:32    8        describing it.  I'm asking questions.

01:49:32    9            MR. KOERNER:  Well, that's my

10        question.

11            MS. GOULD:  No.  We're not going --

01:49:37   12            MR. KOERNER:  Why don't you take a

01:49:38   13        look of what you just, of your own

14        volition, got out and describe what it is?

01:49:41   15            THE WITNESS:  This is an invoice

01:49:42   16        that I had submitted before I was

01:49:44   17        terminated.  After I was terminated, they

01:49:46   18        deposited it in my account, and then

01:49:48   19        reached back in and took it out.

01:49:50   20        Q.    And who did that?

01:49:52   21        A.    The pay person at Thermald, I

01:49:59   22    suppose.

01:49:59   23        Q.    The pay person at Thermald or at

01:50:00   24    Wavecrest?

01:50:00   25        A.    At Wavecrest?

1                           *Ronald Britt*

01:50:01  2          MR. KOERNER:  Was it dated?

01:50:02  3          THE WITNESS:  Yes.

01:50:03  4          MR. KOERNER:  What was the date?

01:50:05  5          THE WITNESS:  That's the second

01:50:06  6    time I invoiced them on it.  This is --

01:50:11  7    this is receipts I gave them by hand.  And

01:50:13  8    this is Monday, May 19th.  So, this is,

01:50:16  9    like, the second or third time I submitted

01:50:19 10    this.  And here you can see that instead

01:50:21 11    of just billing what the total job was,

01:50:23 12    where I just quoted range, this is broke

01:50:26 13    out to be materials and labor.  And I

01:50:31 14    wasn't reimbursed for any of the materials

01:50:34 15    I put out, or paid for my labor.

01:50:37 16          MS. GOULD:  Okay.  Let's just mark

01:50:39 17    this, and we'll then make some copies of

         18    it.

         19          *(Whereupon, two-page 5/19/14 email*

01:51:24 20    *was marked as Exhibit 9, for id.)*

01:51:24 21          MS. GOULD:  Just give me one

01:51:25 22    second; I'll make copies for everybody.

01:51:31 23          MS. LENIHAN:  Do you want me to do

01:51:32 24    that, Jane?

01:51:34 25          MS. GOULD:  That would be great.

155

Ronald Britt

01:51:35   2      Q.    Going to the third page of

01:51:39   3   Exhibit 8 -- do you recognize this exhibit?

01:52:00   4      A.    Yes.

01:52:00   5      Q.    And what is it?

01:52:02   6      A.    It's an invoice.

01:52:04   7      Q.    And what is the total amount of this

01:52:08   8   invoice?

01:52:09   9      A.    Well, there's a total reimbursement

01:52:14  10   of $276, and then there's a total labor of 310.

01:52:20  11      Q.    So, that's $586?

01:52:23  12      A.    Yeah, if you say so.

01:52:25  13      Q.    Do you have any doubt about that?

01:52:26  14      A.    Well, give me a second.

          15      Q.    Okay.

01:52:27  16      A.    No, $586 seems right.

01:52:30  17      Q.    And this was for work done, when?

01:52:32  18      A.    Well, it would have to be in the

01:52:37  19   month of April, I suppose.

01:52:38  20      Q.    April of what year?

01:52:39  21      A.    2011.

01:52:42  22      Q.    And did you discuss the work

01:52:46  23   reflected in this invoice?

01:52:48  24      A.    Actually, it says March; so, it may

01:52:51  25   be from March.

156

*Ronald Britt*

01:52:51  2    Q.    Did you discuss -- March of 2011; is

01:52:54  3    that right?

01:52:54  4    A.    Yeah.  But this invoice -- this

01:52:59  5    particular invoice is dated April.  That means I

01:53:02  6    probably had to submit it more than once to get

01:53:06  7    paid.

01:53:06  8    Q.    Well, it's dated -- the invoice seems

01:53:08  9    to be for work done on March 29th; is that

01:53:12  10   correct?

01:53:12  11   A.    I could double check that for you and

01:53:14  12   let you know tomorrow.

01:53:15  13   Q.    Now, did you discuss the work

01:53:18  14   reflected by this invoice with Jay Yablonsky

01:53:22  15   prior to doing the work?

01:53:23  16   A.    As I said, after Doreen stiffed me

01:53:27  17   for $3,000 on one job, she emailed me, very

01:53:33  18   curtly, that in the future no work would be done

19   without Jay's approval.

20            MS. GOULD:  Move to strike as

01:53:35  21       nonresponsive.

01:53:35  22   Q.    Did you discuss the work reflected on

01:53:38  23   Page 3 of Exhibit 8 with Mr. Yablonsky prior to

01:53:42  24   actually doing the work?

01:53:44  25   A.    I believe I would have had to.

1                          *Ronald Britt*

01:53:46  2        Q.     And did you give him a range that the

01:53:50  3    work would be billed at?

01:53:52  4        A.     You know, on "print the laminate

01:53:56  5    signs," maybe not, because I wouldn't know what

01:53:59  6    that would cost until I did it.

01:54:03  7               And then, "Reimbursement of

01:54:04  8    computer-related expenses and office supplies,"

01:54:06  9    that, I probably just handed him receipts.

01:54:09 10        Q.     Now, what about the labor, which you

01:54:14 11    say here, "Total labor amount due:  $310."

01:54:16 12               What was that based on?

01:54:18 13        A.     Based on the time it took to get it

01:54:20 14    done.

01:54:20 15        Q.     And how much time was that?

01:54:22 16        A.     Well, I would say in the neighborhood

01:54:25 17    of ten hours, probably more.

01:54:27 18        Q.     And what's the basis of that

01:54:29 19    statement?

01:54:30 20        A.     Because I'm looking at $80 repair for

01:54:34 21    the damage of the herb shop, and I remember it

01:54:36 22    taking a long time to get that right.  There was

01:54:39 23    two holes in the wall.  And when we went to close

01:54:43 24    it up the first time, the leak came back; so, we

01:54:47 25    had to open it up and reclose it.

158

1             *Ronald Britt*

01:54:49  2        Q.    Mr. Britt, isn't it true, though,

01:54:50  3    that on Page 3 of Exhibit 8, which is this

01:54:53  4    invoice for work apparently done on March 29th,

01:54:57  5    2011, you don't list the number of hours that the

01:54:59  6    job took you?

01:55:00  7        A.    No, I don't.

01:55:01  8        Q.    So, how did you arrive at the figure

01:55:03  9    of $310 for the total amount --

          10             MR. KOERNER:  Objection.

01:55:07 11        Q.    -- due for labor?

01:55:08 12             MR. KOERNER:  Objection as asked

          13    and answered.

          14             MS. GOULD:  I don't think so.

01:55:12 15             MR. KOERNER:  All of these were

01:55:12 16    based on your own reasonable --

          17             MS. GOULD:  Is that your testimony,

          18    or the witness'?

          19             MR. KOERNER:  That's what he said.

01:55:13 20             THE WITNESS:  Ma'am, just to walk

01:55:14 21    to Division Street takes about 40 minutes

01:55:19 22    if you take a leisurely pace.  If you walk

01:55:21 23    really fast, which I have done it a couple

01:55:24 24    of times, it's more like 25, 28 minutes.

01:55:26 25        Q.    Sir, what I'm really looking at is

*COMPU-TRAN COURT REPORTING*

*Ronald Britt*

01:55:30  2    the $310 number, and I'm asking you if that

01:55:33  3    reflects some number of hours that this job took

01:55:33  4    you.

01:55:33  5         MR. KOERNER:  Objection.

01:55:34  6         A.    It does.  But as I said, I didn't

01:55:36  7    always charge him the full amount.

01:55:38  8         Q.    So, you don't know how long this job

01:55:41  9    took you; is that correct?

01:55:41 10         A.    No, ma'am.  But I can tell you, based

01:55:44 11    on my experience, that that looks like reasonable

01:55:48 12    numbers.

01:55:48 13         MR. KOERNER:  You're asking him --

01:55:49 14         you're asking him -- objection.  You're

01:55:50 15         asking him to tell a one-line item in an

01:55:54 16         invoice containing dozens --

01:55:55 17         MS. GOULD:  No, I'm not, a one-line

01:55:55 18         item.  It's the total -- it's the total

01:55:57 19         labor amount due on a particular invoice,

01:56:00 20         that's what I'm asking him.

01:56:00 21         MR. KOERNER:  Of an invoice that

01:56:01 22         was submitted many --

         23         THE WITNESS:  But I would say --

01:56:02 24         MR. KOERNER:   -- many years ago,

         25         and you're asking him how much money he

160

1    *Ronald Britt*

2    spent, how much time he spent on it.

01:56:06   3        THE WITNESS:  I would say --

01:56:06   4        MR. ETTENGER:  Hold on.  Hold on.

01:56:06   5    You can't speak over each other, because

6    the court reporter --

01:56:08   7        MR. KOERNER:  It's not productive.

8        MR. ETTENGER:  -- can't take it

9    down.

10        MR. KOERNER:  It's not what this

11    case is about.

01:56:10   12        THE WITNESS:  I would say that this

01:56:11   13    line, $25 to respond to a roof alarm and

01:56:16   14    install a No-One-Allowed-on-the-Roof sign,

01:56:20   15    25 bucks, that is no way reflecting how

01:56:24   16    long it took.

01:56:24   17    Q.    And were you paid this $586?

01:56:28   18    A.    Probably.

01:56:28   19    Q.    And looking at Page 12 of Exhibit 7,

01:56:41   20    does this -- this is a pay stub; is that correct?

01:56:44   21    A.    Yes.  It shows $586.

01:56:48   22    Q.    Right.  And this is a check that was

01:56:50   23    dated April 29th, 2011; is that correct?

24        *(witness peruses exhibit)*

01:56:58   25    A.    Yes.

161

1                   *Ronald Britt*

01:56:58   2        Q.    And looking at Page 11 of Exhibit 7,

01:57:08   3   this is another check dated April 29th, 2011; is

01:57:12   4   that correct?

01:57:12   5        A.    Yes.

01:57:17   6        Q.    And this is a check for $350, your

01:57:22   7   regular, weekly pay; is that correct?

01:57:24   8        A.    Yes.

01:57:24   9        Q.    During what hours did you perform the

01:57:29  10   services that are reflected on Page 3 of

01:57:33  11   Exhibit 8?

01:57:33  12        A.    You're asking Doreen, or you're

01:57:36  13   asking me?

01:57:38  14        Q.    You.

01:57:38  15             MR. ETTENGER:   She said "during."

01:57:39  16        Not "Doreen."

01:57:41  17             THE WITNESS:   Oh.

01:57:42  18             MR. KOERNER:   Objection; asked and

          19        answered.

01:57:43  20             But you can...

01:57:43  21        A.    I couldn't be sure, but I'm sure it's

01:57:46  22   within the time of the invoice.

01:57:47  23        Q.    Well, what I'm asking you is:   Did

01:57:49  24   you perform the work that's reflected on Page 3

01:57:52  25   of Exhibit 8 --

162

1                      *Ronald Britt*

01:57:53   2        A.      It would be hard --

01:57:53   3        Q.      Let me just finish.

01:57:54   4                -- when you were also performing your

01:57:57   5     duties as superintendant/janitor of the Thermald

01:58:00   6     buildings?

01:58:01   7                MR. KOERNER:  Objection.  He's

01:58:03   8           testified that he was on call 24/7.  So,

01:58:06   9           by definition, any work he did at any time --

01:58:06  10                MS. GOULD:  No, you are --

          11                MR. KOERNER:   -- was performed

          12           while he was working for Thermald.

          13                MS. GOULD:  You are -- please,

01:58:08  14           Mr. Koerner, cut the speaking objections.

          15                MR. KOERNER:  So...

          16        Q.      Go ahead.

01:58:10  17        A.      Didn't we already talk about this?

01:58:12  18     But I can tell you this --

01:58:14  19        Q.      Just answer yes or no, sir.

01:58:15  20        A.      -- the $25 -- I can tell you that the

01:58:17  21     $25, respond to a roof alarm and install a

01:58:21  22     No-One-on-the-Roof sign, that was at night.  And

01:58:22  23     most painting out the graffiti, I do at night,

01:58:27  24     because it's just easier, and people don't have

01:58:30  25     to smell it.  I've been down there as late as

Ronald Britt

1

2  1 o'clock in the morning, painting out graffiti

3  at Division Street, and had cops come up to me

4  and had to prove I was super to be allowed to

5  do it.

6        Q.    Sir, did you perform any of this

7  extra work during the time for which you were

8  also paid to be superintendant or janitor of the

9  Thermald buildings?

10        A.    I would say, yes.  But it's $350 and

11  an apartment for 24/7.  That's a slave's wage,

12  ma'am.

13             And I would also point out --

14             MS. GOULD:  Move to strike.

15             There's no question pending.

16        A.    Well, earlier you said --

17             MS. GOULD:  Move to strike.

18             There's no question pending.

19             MR. KOERNER:  You can move it.

20             But, go ahead and finish.

21        A.    He said that, did Doreen approve all

22  of these?  And you can see that it says, "Please

23  have these checks ready so when we meet with

24  Doreen, she will be -- you'll have them for her

25  to sign."  It's right on the invoice.

1          *Ronald Britt*

02:00:01   2          Q.    Taking a look at Page 4 of Exhibit 8.

3                *(Witness peruses exhibit)*

02:00:16   4                Do you recognize that exhibit?

02:00:17   5          A.    It's an invoice.

02:00:19   6          Q.    And what is it an invoice for?

02:00:22   7          A.    Labor and materials, I suppose.

02:00:26   8          Q.    And do you recall what the job or

02:00:30   9    jobs were that you did and -- for what you

02:00:33   10   submitted this invoice?

02:00:34   11         A.    Well, they're all labeled.

02:00:37   12         Q.    Okay.  And did you discuss the work

02:00:45   13   that you were going to do for which you submitted

02:00:50   14   this invoice, with Jay Yablonsky prior to the

02:00:54   15   time that you actually did the work?

02:00:55   16         A.    Yeah; that is the policy.

02:00:56   17         Q.    And did you give him a range of what

02:00:58   18   you were going to charge for this work?

02:01:01   19         A.    I generally did, yes.

02:01:04   20         Q.    And you ended up charging him --

02:01:07   21   charging $1,760 total for labor; is that correct?

02:01:11   22         A.    That's what the invoice reflects,

02:01:13   23   yes.

02:01:13   24         Q.    What was the basis of that charge?

02:01:13   25         A.    How much time it took.  And in some

165

1                    *Ronald Britt*

02:01:16  2   cases, who was helping me.

02:01:18  3        Q.    And were you paid the $1,760 for

02:01:25  4   labor?

02:01:26  5        A.    Yes, I was.

02:01:27  6        Q.    And did you ever indicate, in any

02:01:29  7   way, how many hours you spent performing this

02:01:31  8   work?

02:01:31  9        A.    No, I did not.

02:01:32 10        Q.    And did Mr. Yablonsky ever ask you

02:01:35 11   how many hours you spent performing this work?

02:01:37 12        A.    No, he did not.

02:01:38 13        Q.    So, was your arrangement with

02:01:40 14   Mr. Yablonsky that you would submit an invoice;

02:01:43 15   and if he had approved the work in advance, he

02:01:46 16   would pay that invoice, irrespective of the

02:01:51 17   number of hours that you spent; is that correct?

02:01:52 18        A.    I would submit a range.  And if he

02:01:55 19   thought it was reasonable, he would have me do

02:01:58 20   the work.  If he didn't, he'd get someone else.

02:02:01 21   And what, actually, I billed is reflective of the

02:02:04 22   hours.  So, it may be --

02:02:06 23        Q.    How many hours did it take you to do

02:02:09 24   the job that's billed on May 4th?

02:02:09 25        A.    Ma'am, if I may, it also mentions

*Ronald Britt*

1

2  02:02:13  Marvin doing a little bit of work there and a

3  02:02:16  check being cut directly to Marvin.  But before

4  02:02:20  Marvin started getting paid directly by

5  02:02:23  Wavecrest, he used to help me a lot, and I would

6  02:02:24  have to pay him out of my pocket, too.  Bill

7  02:02:28  that -- a much lower amount, maybe 20 bucks an

8  02:02:32  hour, to help carry out stuff.  And in this case,

9  02:02:35  there was a lot of demolition.  So, some of that

10 02:02:37  money may well have gone to carting.

11 02:02:37      Q.    But you don't know that, do you?

12 02:02:39      A.    I don't break it out like that, no,

13 02:02:42  ma'am.  I give them what I consider reasonable

14 02:02:44  numbers.  And I'm sure that if you run any of

15 02:02:46  these numbers by any reputable handy-guy

16 02:02:50  contractor, you'll find that they're in keeping

17 02:02:50  with what's reasonable.

18 02:02:50      Q.    Well, what I'm asking you and trying

19 02:02:52  to get at is, how you came to the numbers you

20 02:02:56  came to when you submitted the invoice?

21 02:02:59      A.    Hours, and materials, and whatever

22 02:03:01  out-of -- out-of-pocket other expenses there are.

23 02:03:05  Sometimes there's a cab involved.  Sometimes

24 02:03:08  there's a metal guy coming by.  Sometimes I have

25 02:03:13  helpers show up.

1                          *Ronald Britt*

02:03:14  2        Q.    And were you paid the $1,760?

02:03:18  3        A.    Yes, I was.

02:03:18  4        Q.    During what hours did you perform the

02:03:21  5   work that's reflected in the invoice which

02:03:23  6   appears on Page 4 of Exhibit 8?

02:03:26  7        A.    Well, "Clear out and paint

02:03:29  8   basements," that would have had to happen on the

02:03:31  9   weekend.

02:03:32 10        Q.    Why is that?

02:03:32 11        A.    Because that's what we agreed on, as

02:03:34 12   I recall.

02:03:35 13        Q.    And what about the other work?

02:03:37 14        A.    And I do recall doing that on the

02:03:38 15   weekend.

02:03:39 16        Q.    And what about the other work?

02:03:40 17        A.    "Painting out graffiti," that would

02:03:44 18   happen after hours.  "Make and mount signs,"

02:03:47 19   probably drop that off walking from one place

02:03:50 20   to another, and picking it up on the way back.

02:03:50 21        Q.    Did any of this work reflected on

02:03:53 22   Page 4 of Exhibit 8, occur between 9:00 and 5:00

02:03:57 23   during the day?

02:03:58 24        A.    You know, dropping off those signs

02:04:01 25   might have, because I would expect the copy shop

*Ronald Britt*

02:04:04  2   to be open regular hours.

02:04:06  3          Q.    And were you paid during this period

02:04:08  4   your regular weekly compensation of $350?

02:04:16  5          A.    Yes, ma'am.

6              *(Off-the-record discussion between*

02:05:00  7              *the witness and Mr. Koerner)*

02:05:00  8          MS. GOULD:  I thought your lawsuit

02:05:02  9   related to overtime.

02:05:03 10          MR. KOERNER:  What's that?

11          MS. GOULD:  Doesn't your lawsuit

12   relate to overtime?

13          MR. KOERNER:  Yes; and I said,

02:05:06 14   specifically, that's a much smaller branch

02:05:08 15   of our claim than the sexual harassment.

16          MS. GOULD:  Oh, I see.

17          MR. KOERNER:  As you know.

18          MS. GOULD:  Well, I don't know

02:05:12 19   anything.  I only know what I see in your

02:05:14 20   complaint.

02:05:15 21          Q.    Looking at Page 6 of Exhibit 8 -- I'm

02:05:27 22   sorry.  Looking at Page 5 of Exhibit 8, can you

02:05:32 23   identify what this exhibit represents?

02:05:35 24          A.    Yes.

02:05:38 25          Q.    And what is it?

1                           *Ronald Britt*

02:05:39  2        A.    This was removing violation and

02:05:45  3   health hazards in the storefront at Division

02:05:50  4   Street.

02:05:50  5        Q.    And did you discuss this work with

02:05:52  6   Mr. Yablonsky before you performed it?

02:05:55  7        A.    I did, on the site.

02:05:56  8        Q.    And when you say "on the site," you

02:05:58  9   mean he was at the site at that time?

02:06:00 10        A.    We went together and looked at it

02:06:03 11   before I began the work.

02:06:04 12        Q.    And did you give him a range at that

02:06:07 13   time, as well?

02:06:08 14        A.    I think I gave him a definite price.

02:06:10 15        Q.    And how did you go about giving him a

02:06:17 16   definite price?

02:06:17 17        A.    I looked at the amount of work.  I

02:06:19 18   probably made a list and told him what it was

02:06:21 19   gonna be.

02:06:21 20        Q.    And why on this occasion did you give

         21   a definite price, whereas on other occasions you

02:06:24 22   gave what you say was a range?

02:06:25 23        A.    Because I think they don't pay a lot

02:06:28 24   of money down there, and he liked to keep things

02:06:31 25   as cheap as possible.

1          *Ronald Britt*

02:06:33   2          Q.     And so, you gave a price of $2,180

02:06:37   3     for labor; is that correct?

02:06:38   4          A.     I think, probably, yeah.

02:06:40   5          Q.     And what was the basis of that price?

02:06:44   6          A.     Estimating how long it would take and

02:06:47   7     the materials.

02:06:48   8          Q.     And in terms of how long it would

02:06:49   9     take, did you estimate how many hours this job

02:06:52  10     would take?

02:06:52  11          A.     I did.

02:06:53  12          Q.     And what did you estimate?

02:06:54  13          A.     I don't recall at this time.

02:06:56  14          Q.     So, what was the $2,180 in labor

02:07:03  15     based on?

02:07:03  16          MR. KOERNER:   Objection; asked and

02:07:04  17          answered.

02:07:04  18          A.     My time, and the people that helped

02:07:06  19     me.

02:07:06  20          Q.     But you don't know how much time you

02:07:10  21     spent; is that correct?

02:07:10  22          MR. KOERNER:   Objection.

02:07:11  23          A.     I would say that it was based on the

02:07:13  24     range I quoted, and the time I spent.

02:07:15  25          Q.     And how much time was that?

1          *Ronald Britt*

02:07:16  2          A.    Well, I would have to look to see if

02:07:18  3    I have any records there, but I do remember a

02:07:21  4    couple people helping me with that.

02:07:23  5          Q.    Well, if you --

02:07:24  6          A.    So, that would be an expense out of

7    my own pocket, as well.

02:07:24  8          Q.    If you have any records, what would

02:07:26  9    those records be?

02:07:27 10          A.    I'll just look and see.

02:07:30 11          Q.    Well, can you identify the kind of

02:07:32 12    record it would be?

02:07:33 13          A.    Well, in this particular case, I

02:07:36 14    would call up the two people that helped me and

02:07:39 15    ask them how much they made on it, and then I

02:07:43 16    would know how many hours they spent and how many

02:07:45 17    hours I spent.

02:07:46 18          But I can tell you that for the work

02:07:47 19    we did, that was a heck of a good price.

02:07:50 20          Q.    That was a price that you agreed to

02:07:52 21    with Mr. Yablonsky; is that right?

02:07:53 22          A.    Yes, it was.  And as I recall, as we

02:07:55 23    got into it, there were a lot of elements that

02:07:59 24    were unforeseen, which we just absorbed.

02:08:00 25          Q.    Now, were you also doing -- when did

172

*Ronald Britt*

1

02:08:03  2   you do this work that's reflected on Page 5?

02:08:05  3        A.    I think it was over one weekend.

02:08:08  4        Q.    How do you know that?

02:08:09  5        A.    Because Jay was very -- insisted that

02:08:12  6   these outside jobs never interfere with my

02:08:16  7   regular work schedule.  And if ever there was

02:08:20  8   something pending for Wavecrest, it was always

02:08:23  9   before anybody else got any help from me.

02:08:25 10        Q.    But this was work done for Wavecrest;

02:08:28 11   isn't that true?

02:08:28 12        A.    Yes, it was.  But there was -- but

02:08:29 13   this would be secondary to anything else of

02:08:32 14   keeping the buildings up.  And this, although,

02:08:35 15   urgent, was not an emergency.  There were

02:08:38 16   children in this place, and it tested positive

02:08:41 17   for lead.  And we had to take a lot of

02:08:44 18   precautions, as lined out in the lead renovators

02:08:49 19   handbook - a procedure that's required by law,

02:08:54 20   which she has not always stuck to.

02:08:56 21        MS. GOULD:  Move to strike as

02:08:58 22     nonresponsive.

02:08:59 23        Q.    Now, do you know whether you actually

02:09:01 24   got paid 2,100 and --

02:09:04 25        MS. GOULD:  Well, let's mark this.

*COMPU-TRAN COURT REPORTING*