1          *Ronald Britt*

02:10:17   2          *(Whereupon, eight-page, 10/11/13,*

02:10:17   3     *Compensation Report Thermald Realty*

02:10:20   4     *Associates, LP, Check Dates 1/6/2011 to*

02:10:25   5     *12/30/2011, was marked as Exhibit 10,*

6     *for id.)*

02:10:00   7          Q.    I'm asking you to take a look at what

02:10:03   8     we've just marked as Exhibit 10 for

02:10:06   9     identification, Mr. Britt.   *(Handing)*

02:10:06  10          A.    That's this?

02:10:08  11          Q.    I'm asking you just to take a look at

02:10:10  12     it, okay?

13          *(Witness peruses exhibit)*

02:10:11  14          Have you seen this document before

02:10:12  15     today?

02:10:12  16          A.    I don't think so.

02:10:13  17          Q.    And I'm representing that this is a

02:10:16  18     document called Compensation Report Thermald

02:10:20  19     Realty Associates, LP, Check Dates 1/6/2011 to

02:10:25  20     12/30/2011.   And it has your name on every page.

02:10:29  21          Do you see that?

02:10:30  22          A.    I see that.

02:10:36  23          Q.    Would you turn to Page 4 of the

02:10:38  24     exhibit.

02:10:47  25          *(Witness peruses exhibit)*

174

1                        *Ronald Britt*

02:10:49  2           Looking for one more moment at the

02:10:52  3    invoice which is on Page 5 of Exhibit 8.  You say

02:10:56  4    you submitted an invoice for $2,180; is that

02:11:00  5    right?

02:11:00  6           A.    Yes.

02:11:00  7           Q.    And were you actually paid $2,180?

02:11:04  8           A.    I would have no reason to think I

02:11:08  9    wasn't.

02:11:08  10          Q.    And looking at Page 4 of Exhibit 10,

02:11:11  11   the third entry from the bottom --

02:11:13  12          A.    Yes.

02:11:14  13          Q.    -- it has your name on it and it says

02:11:17  14   "Apartment repair earnings:", and then it has

02:11:20  15   "2,179.99."

02:11:22  16          And do you see that?

02:11:23  17          A.    Yes, I do.

02:11:24  18          Q.    And then it says, "Number of hours:".

02:11:27  19          Do you see that?  Next to that.  To

02:11:29  20   the left of the 2,179.99.

02:11:35  21          A.    No, I don't.

02:11:36  22          Q.    Well, you see your name on that line,

02:11:39  23   "Ronald."

02:11:39  24          A.    Okay.  Yes.  And it does show hours.

02:11:42  25          Q.    Right.  It shows hours at

*Ronald Britt*

| | |
|---|---|
| 02:11:43 | 2 |

1

2   249.14 hours; is that correct?

3         A.     It does.

4         Q.     And it says, to the left of that,

5   "Apartment repair earnings:   $13.125 an hour."

6                Do you see that?

7         A.     I do.

8         Q.     Do you have any understanding --

9         A.     I have no idea where they get any of

10  that.

11        Q.     -- of what that represents?

12        A.     No, I don't.

13        Q.     Did you ever submit an invoice to

14  Mr. Yablonsky that reflected 249.14 hours to do

15  the job that's reflected on Page 5 of Exhibit 8?

16        A.     I don't recall ever submitting an

17  invoice that showed hours, period.   But I may

18  have.

19        Q.     But you don't recall?

20        A.     I don't recall.

21        Q.     But certainly Page 5 --

22        A.     I would have to -- I would have to

23  look through, but --

24                MR. KOERNER:   "I don't recall," is

25        fine.

176

*Ronald Britt*

02:12:25  2        A.    It's a range based on materials,

02:12:30  3    hours, and what is reasonable.  And as I said,

02:12:34  4    more often than not, I charged less.

02:12:36  5        Q.    And this was a check that seems to

02:12:39  6    have been issued -- the 2,179.99, to have been

02:12:44  7    issued on 7/22/2011; is that correct?

02:12:48  8        A.    Where are you getting that?

02:12:51  9        Q.    Third entry from the bottom of

02:12:53 10    Page 4.

02:12:54 11        A.    Okay.  I see that.

02:12:55 12        Q.    And you also were issued a check for

02:12:58 13    your regular weekly compensation of $350 --

02:13:01 14        A.    Yes.

02:13:02 15        Q.    -- on 7/22/2011; is that correct?

02:13:05 16        A.    Yes.

02:13:05 17        Q.    And that $350 represented payment for

02:13:09 18    your services, as you say, 24/7; is that correct?

02:13:12 19        A.    That, and the apartment, and the

02:13:16 20    utilities, and the phone.

02:13:17 21        Q.    And for the same -- and that

02:13:20 22    represented your payment for the same time that

02:13:21 23    you were also performing work, which is reflected

02:13:24 24    on Page 5 of Exhibit 8; is that correct?

02:13:27 25        A.    On the weekend.  And probably not

*Ronald Britt*

1

02:13:30 2   just me.  I think there were two other people

02:13:33 3   helping me on that.

02:13:34 4       Q.    Is it correct that the payment of

02:13:37 5   $350 that was issued July 22nd, 2011, was paid

02:13:40 6   for the same period of time in which you

02:13:42 7   performed the services reflected on Page 5 of

02:13:45 8   Exhibit 8?

02:13:45 9       A.    It would be the same week.  But as I

02:13:51 10   said, I wasn't the only one working on that job.

02:13:54 11       Q.    And looking at Page 6, which you are

02:13:58 12   on, of Exhibit 8, can you tell me what that is?

02:14:03 13       A.    What, exactly?

02:14:06 14       Q.    Well, what's the document?

02:14:08 15       A.    It's an invoice.

02:14:09 16       Q.    And it's an invoice which is

02:14:12 17   apparently dated August 15th of 2011; is that

02:14:17 18   correct?

02:14:17 19       A.    Correct.

02:14:17 20       Q.    And what was this an invoice for?

02:14:19 21       A.    A handful of jobs at Division Street,

02:14:25 22   9th Street -- and 9th Street, and some

02:14:34 23   out-of-pocket expenses.

02:14:35 24       Q.    And the total invoice for the labor

02:14:38 25   at these jobs is $3,140; is that correct?

178

1                         *Ronald Britt*

02:14:44   2        A.    Yes.

02:14:47   3        Q.    And were you actually paid $3,140 for

02:14:53   4   this job?

02:14:55   5        A.    I probably was.

02:14:55   6        Q.    And would you look now again at

02:14:58   7   Exhibit 10, this time going to Page 5.  That's

8   the compensation run right over here to your

02:15:01   9   left.

02:15:01  10        A.    Oh, I know what job this is.

02:15:03  11        Q.    Do you want to tell me what job that

02:15:05  12   is?

02:15:05  13        A.    Yeah.  That was Holly's apartment.

02:15:07  14        Q.    And who is Holly?

02:15:09  15        A.    Holly's a tenant ay 319 East 9th

02:15:14  16   Street.

02:15:14  17        Q.    Were you paid $3,140?

02:15:16  18        A.    I was.

02:15:16  19        Q.    And is this work that you discussed

02:15:18  20   with Mr. Yablonsky before you actually did the

02:15:21  21   work?

02:15:21  22        A.    Oh, yes.

02:15:22  23        Q.    And did he agree to a price for this

02:15:24  24   work?

02:15:24  25        A.    I believe he did.

*Ronald Britt*

1

02:15:25  2      Q.      And what was the basis of the price?

02:15:27  3      A.      What it would take to get the job

02:15:30  4   done.

02:15:30  5      Q.      Did you ever tell him how many hours

02:15:33  6   it would take to get the job done?

02:15:35  7      A.      No, I didn't.  But I can tell you

02:15:37  8   that three other people worked with me on that

02:15:40  9   job.  And while I invoiced for it, I paid them

02:15:43 10   out of the amount.

02:15:44 11      Q.      And were you paid $3,140 for that

02:15:47 12   job?

02:15:47 13      A.      I probably was.

02:15:48 14      Q.      Now, taking a look again at

02:15:50 15   Exhibit 10, which is the compensation on Page 5.

02:15:53 16   Page 5.  There's a page number at the top.

02:15:54 17      A.      Okay.

02:15:55 18      Q.      And looking at the fourth entry from

02:15:57 19   the top of the page.

02:15:58 20      A.      Yes.

02:15:59 21      Q.      You see that there is a check which

02:16:03 22   appears to be dated 8/26/2011 for $3,139.99; is

02:16:12 23   that correct?

02:16:12 24      A.      Yes.

02:16:12 25      Q.      One penny less than this invoice,

180

*Ronald Britt*

1  which is represented on Page 6 of Exhibit 8; is

2  that correct?

02:16:16   3       A.   Yes.

02:16:17   4       Q.   And next to it, it says, "Apartment

02:16:20   5  Repair:  358.86 hours."

02:16:26   6       A.   Again, I don't know where they get

02:16:27   7  that number.

02:16:28   8       Q.   And is it accurate that you never

02:16:31  10  submitted an invoice based on hours?  Is that

02:16:33  11  what you're saying?

02:16:34  12       A.   I don't recall ever submitting any

02:16:36  13  hours except for other people.  There was one

02:16:38  14  job, and it's not here.  A lady in the building

02:16:41  15  named Marge, she had never had any work done at

02:16:44  16  all in the apartment in the 40 years that she

02:16:47  17  lived there.  It was a rat hole.  It was like --

02:16:49  18  bugs like you wouldn't believe.  I have photos;

02:16:52  19  and believe me, it's appalling.  She was so

02:16:55  20  embarrassed of the condition of her apartment

02:16:57  21  that she would never let anyone in there.  And

02:17:01  22  she was very close to death.  But after working

02:17:04  23  with her for a few years and pleading nonstop,

02:17:07  24  they finally did approve.  Initially, Doreen said

02:17:10  25  no.  But she came up and looked at the apartment,

181

*Ronald Britt*

02:17:13  2   and then she said, yeah.  And I was told to do

02:17:16  3   the absolute minimum to get it up to speed.  In

02:17:20  4   the meantime, I contacted Social Services for old

02:17:24  5   people.  And they've assigned people to Marge,

6   and she's doing much better.

02:17:25  7          MS. GOULD:  Move to strike as

02:17:26  8      nonresponsive.

02:17:27  9          Q.    Looking at Page 5 of the

02:17:32 10   compensation, which is Exhibit 10, were you also

02:17:37 11   paid $350 for this same period for your regular

02:17:41 12   work as superintendent/janitor?

02:17:43 13          A.    It's always been super, ma'am.

02:17:46 14   There's no janitor in it.

02:17:48 15          Q.    Okay.  Were you paid your regular

02:17:50 16   $350?

02:17:51 17          A.    I was.

02:17:52 18          Q.    Now, when did you do this work which

02:17:54 19   is reflected on Page 6 of Exhibit 8?

02:17:58 20          A.    As I said, other people helped me on

02:18:01 21   this job.

02:18:01 22          Q.    When did you perform the work that

02:18:04 23   you performed reflected on Page 6?

02:18:05 24          A.    It would be after hours and on

02:18:07 25   weekends, most likely.

1        *Ronald Britt*

2        Q.    When you say "after hours," what are

3    you talking about?

02:18:08  4        A.    I mean, after normal business hours.

02:18:10  5        Q.    But you said --

02:18:11  6        A.    Because I have to be available for

02:18:13  7    anybody that calls.  And you know, if you really

02:18:15  8    want to track everything that I'm doing, where

02:18:18  9    are all the inspections, and deliveries, and

02:18:22 10    other duties that just go with the territory?

02:18:25 11    You know, people who are locked out, people who

02:18:29 12    barfed in the hallway, people who are passed out

02:18:32 13    drunk in the hallway and need to be helped to

02:18:34 14    their apartment or helped out the door.  I mean,

02:18:36 15    there's a whole, whole, whole lot of work going

02:18:39 16    on that is not reflected on any of this.

02:18:39 17              MS. GOULD:  Move to strike as

02:18:46 18        nonresponsive.

02:18:47 19        Q.    Did you provide the Department of

02:18:51 20    Labor, when you went to visit them on or about

02:18:54 21    May 1st, 2013, with any of the invoices that are

02:18:58 22    reflected on Exhibit 8?

02:18:59 23        A.    I don't know that I did, ma'am.

02:19:01 24        Q.    Did you provide the Department of

02:19:04 25    Labor with any pay stubs which reflected payment

*Ronald Britt*

1

02:19:08  2  for any of the invoices on Exhibit 8?

02:19:11  3       A.   If they were paid in the way you're

02:19:16  4  showing, then they would be on the pay stub.

02:19:19  5       Q.   But you don't know; is that correct?

02:19:21  6       A.   I would tell you this, that for the

02:19:24  7  longest time, I was paid as Ron, the handy guy,

02:19:27  8  directly.  And then, when I became super, I was

02:19:30  9  paid as the super, and I was also paid as Ron,

02:19:34 10  the handy guy, doing the side jobs; essentially,

02:19:38 11  their in-house, handy-guy service.  But at a

02:19:41 12  certain point in time, they changed the way

02:19:43 13  they started paying me.  And I think that is

02:19:45 14  where the Department of Labor had a problem.

02:19:45 15       Q.   When did they change the way they

02:19:48 16  paid you, according to you?

02:19:49 17       A.   I don't know for sure, but I could

02:19:51 18  look into it for you.

02:19:52 19       Q.   Well, the claim that you submitted

02:19:56 20  to the Department of Labor and the exhibits that

02:19:58 21  I showed you earlier from the Department of

02:20:03 22  Labor -- let me just pull it up.  Exhibit 6

02:20:13 23  reflects a claim period commencing August 27th,

02:20:18 24  2011; is that correct?

02:20:18 25       A.   So, that's probably when they changed

184

*Ronald Britt*

02:20:21  2   the way they paid me.

02:20:22  3        Q.    So, when you say they changed the way

02:20:24  4   they paid you, who was the "they"?

02:20:26  5        A.    Whoever was issuing my regular

02:20:28  6   paycheck via direct deposit.

02:20:30  7        Q.    And what was the change that you say

02:20:32  8   they made?

02:20:32  9        A.    I think that the change had something

02:20:36  10  to do with -- they previously never listed hours,

02:20:40  11  but then they started listing hours.

02:20:42  12       Q.    Who started listing hours, where?

02:20:44  13       A.    The people issuing the check.  So,

02:20:47  14  that would be Thermald's pay person.

02:20:52  15       Q.    Did you show the Department of Labor

02:20:57  16  any checks issued to you after August 27th of

02:21:01  17  2011?

02:21:02  18       A.    I showed them everything I had.

02:21:04  19       Q.    But do you know whether you had those

02:21:06  20  check stubs subsequent to August 27th, 2011?

02:21:09  21       A.    I would have to go through them.  My

02:21:11  22  attorney has them now, and I'd have to look

02:21:14  23  through and see.

02:21:15  24       Q.    Your attorney has pay stubs from

02:21:17  25  August 27th, 2011?

*Ronald Britt*

1

2     A.    I think he has pay stubs going back

3     to day one, if I'm not mistaken.

4             And I can show you that I used to get

5     paid differently then, at a certain point.

6     Q.    So, at this certain point, which you

7     think was around August 27th, 2011, how were you

8     paid that was different for these extra jobs than

9     you were paid before that?

10            A.    They started appearing on my regular

11    pay -- they would give me one check for

12    everything, as opposed to a separate check.  I'd

13    get one check for being super.  I'd get another

14    check for being handy.

15            MR. ETTENGER:  Prior to August of

16        2011, you're saying?

17            THE WITNESS:  Well, I'd have to

18        check on those dates --

19            MS. GOULD:  Well, I'm not clear.

20            THE WITNESS:  -- but, yeah, there

21        was a shift at one point.

22            MS. GOULD:  Okay.  I'm not clear.

23            THE WITNESS:  And I think that's

24        where the Department of Labor had a

25        problem.  Because as I understand it --

1            *Ronald Britt*

02:22:11   2          MS. GOULD:  Go ahead.

02:22:13   3          THE WITNESS:  -- the rules on how

02:22:15   4      supers are paid are set in Albany.  And

02:22:18   5      when they changed from that, that's when

02:22:21   6      all of this became an issue.  And that's

02:22:23   7      really technical, and I don't fully

02:22:26   8      understand it.  I've discussed it with

02:22:28   9      Greg, and he has a better understanding of

02:22:29  10      it than I do.

02:22:30  11          Q.    So, let's clarify:  Prior to

02:22:33  12  August 27th, 2011, you were paid, how?

02:22:38  13          A.    I got a separate check for all the

02:22:41  14  work that I did as a handy guy, as Ron, the

02:22:45  15  handy guy.

02:22:45  16          Q.    Separate from your regular pay?

02:22:47  17          A.    Right.

02:22:48  18          Q.    And what happened, if anything, after

02:22:51  19  August 27th, 2011?

02:22:52  20          A.    Well, for a while there, they were

02:22:54  21  just paying me based on the number and taking

02:22:58  22  taxes out on even the materials, too.  So, that's

02:23:01  23  why I had started changing the invoice to say,

02:23:03  24  "Tax that part, and don't tax the reimbursement."

02:23:06  25          Q.    And so, you started breaking out the

187

1                           *Ronald Britt*

02:23:12  2    materials and reimbursement --

3         A.      Separately.

02:23:15  4         Q.      -- versus the labor?

02:23:16  5         A.      Correct.

02:23:16  6         Q.      Now, did Mr. Yablonsky ask you to do

02:23:18  7    that?

02:23:18  8         A.      No.  I elected to do that, because

02:23:20  9    they were taxing the money that I put out as

02:23:24 10    materials.

02:23:24 11         Q.      Now, you said just now that prior to

02:23:27 12    August 27th, 2011, you were getting a separate

02:23:29 13    check for Ron, the super and for Ron, the handy

02:23:33 14    guy.

02:23:33 15         A.      Correct.

02:23:35 16         Q.      And how, if at all, did that

02:23:37 17    procedure change after August 27th, 2011?

02:23:41 18         A.      I don't know.  But on the paychecks,

02:23:44 19    it started showing hours, where it never had

02:23:47 20    before.

02:23:47 21         Q.      After August 27th, 2011 --

02:23:51 22         A.      And it started showing that I was

02:23:53 23    being paid something like $8.41 an hour and --

02:23:58 24    whatever minimum wage is.  And that's something I

02:24:02 25    never agreed to.

188

*Ronald Britt*

1

2    Q.    After August 27th, 2011, did you

3  continue to get paid for these extra jobs as

4  Ron, the handy guy?

5    A.    I continued to get paid for those

6  jobs.

7    Q.    How did you go about -- well,

8  withdrawn.

9         What was the procedure by which you

10  got paid for those jobs after August 27th, 2011?

11    A.    The procedure was the same.  I

12  submitted invoices, and they paid me.  But the

13  difference is they started paying me showing it

14  on my regular paycheck, instead of giving me a

15  second check.

16    Q.    So, give me a moment.

17         THE WITNESS:  While you have a

18      moment, would you mind if I visit the

19      men's room?

20         MS. GOULD:  Please.

21      *(Recess held from 2:24 to 2:42 p.m.)*

22         MS. GOULD:  Mark this, please.

23         *(Whereupon, 3-page email chain was*

24      *marked as Exhibit 11, for id.)*

25  CONTINUED EXAMINATION BY MS. GOULD:

*COMPU-TRAN COURT REPORTING*

*Ronald Britt*

1

2   02:42:18   Q.   Mr. Britt, I'm going to ask you to

3   02:42:22   take a look at Exhibit 11.  You're looking at an

4   02:42:26   unmarked copy there, I think.  *(Handing)*

5   02:42:29   *(Witness peruses exhibit)*

6   02:42:34   It's a three-page exhibit, the last

7   02:42:36   page of which is upside down, but...  At least on

8   02:42:42   my copy.

9   02:43:00   Do you recognize Exhibit 11?

10  02:43:02   A.   The first page is an invoice.

11  02:43:06   Q.   What about the second and third

12  02:43:08   pages?

13  02:43:10   A.   The second page is an invoice and

14  02:43:17   reimbursement, as is the first.  And the third

15  02:43:21   one appears to be all labor.

16  02:43:27   Q.   Now, I thought you indicated earlier

17  02:43:31   that at some juncture there was a change in the

18  02:43:35   procedure by which you were paid for these extra

19  02:43:39   jobs; is that correct?

20  02:43:40   A.   Yes, ma'am.

21  02:43:41   Q.   And you thought that might've been in

22  02:43:43   August of 2011?

23  02:43:44   A.   I can't be sure, but I'll check and

24  02:43:46   let you know on Friday.

25  02:43:48   Q.   And are you saying that after that

1                         *Ronald Britt*

02:43:50  2     point - whenever it was - you were paid in one

02:43:53  3     check for both your regularly, weekly

4     compensation --

02:43:57  5         A.    And my Ron, the handy-guy work.

02:43:58  6         Q.    -- and your handy-guy work?  And

02:44:01  7     you're sure about that; is that correct?

02:44:01  8         A.    I'm pretty sure, yes.

02:44:02  9         Q.    And for what period of time did that

02:44:05 10     continue?

02:44:06 11         A.    Whenever the shift was, that was it.

02:44:08 12     I don't recall getting another check that was

02:44:10 13     just a separate invoice check.

02:44:12 14         Q.    But you don't know when the shift

02:44:14 15     was; is that correct?

02:44:14 16         A.    No.  Actually, you know what, I think

02:44:16 17     that the very last check I got was separate.

02:44:21 18     That they -- they gave me my regular, weekly

02:44:25 19     deposit for my super work, and they gave me a

02:44:31 20     deposit for that 1,250 bucks.  And then, they

02:44:36 21     took them both right back out.  So, except for

02:44:39 22     that, I think it's always been one check.

02:44:42 23         Q.    Whenever the shift occurred -- and

02:44:44 24     you don't know when; is this right?  You started

02:44:47 25     to get one check that was a combined total of

Ronald Britt

1

02:44:49   2   your payment as a super and your payment as a

02:44:51   3   handy guy --

02:44:51   4          A.      Right.

5          Q.      -- is that right?

02:44:51   6          A.      And they also started attributing

02:44:55   7   hours, which they never had done before.  And the

02:44:57   8   hours reflected $8 and change per hour, as

02:45:03   9   opposed to what I understand the Albany rule is,

02:45:05  10   based on how many units per week.

02:46:14  11              MS. GOULD:  Mark this.

12              (Whereupon, invoices for pages

13          numbered 43 - 53 were marked as Exhibit

02:46:15  14          12, for id.)

02:46:15  15          Q.      Can you take a look at Exhibit 12,

02:46:18  16   please.  (Handing)

02:46:19  17              (Witness peruses exhibit)

02:46:35  18          A.      Okay.

02:46:36  19          Q.      Can you tell me what Exhibit 12

02:46:38  20   represents?

02:46:39  21          A.      It looks like more invoices.

02:46:40  22          Q.      Are these for the year 2012?

02:46:43  23          A.      Yes.

02:46:47  24          Q.      And these are invoices for work that

02:46:50  25   you did as, quote/unquote, "Ron, the handyman"

1                          *Ronald Britt*

02:46:53  2    in 2012; is that correct?

02:46:54  3         A.    Yeah, all of these seem to be

02:46:57  4    handy-guy jobs.

02:47:27  5              MS. GOULD:  Hold on one second.

02:47:36  6              *(Pause in the record)*

02:48:33  7         Q.    I'd like to take a look now again at

02:48:37  8    the complaint, which was Exhibit 2.  Here you go.

02:48:54  9    *(Handing)*

02:49:11  10             Looking at Paragraph 14 of your

02:49:13  11   complaint, Paragraph 14 says specifically,

02:49:34  12   *(Reading:)*  Shortly after he - meaning, you - was

02:49:36  13   hired by Ms. Alderman, who was divorced and going

02:49:39  14   through the death of her father, the former

02:49:43  15   principal of Thermald, plaintiff began to receive

02:49:46  16   unsolicited and unwanted sexual advances from

02:49:51  17   Ms. Alderman.

02:49:52  18             Specifically, when did you begin

02:49:56  19   receiving these unwanted and unsolicited sexual

02:50:00  20   advances?

02:50:01  21        A.    When I first met her, she was

02:50:03  22   flirting with me at the shop after having signed

02:50:06  23   the lease and when they had offered me the super

02:50:12  24   job to begin with.  I didn't want to do it,

02:50:15  25   because it involved cleaning.  She hired Brendan.

*Ronald Britt*

02:50:18  2   But she went on and hired me to do several other

02:50:22  3   jobs for her.  And in each case, flirted with me

02:50:25  4   a lot to get the price down, which I never budged

02:50:29  5   on my prices.  And I didn't go out for coffees,

02:50:33  6   lunches with her, either.  So, that's when it

7   began.

02:50:33  8             And then, later, when I became the

02:50:36  9   super, she had me doing a lot of other things

02:50:39 10   that had really nothing to do with the job.

02:50:41 11        Q.    What I'm asking you is:  When did

02:50:44 12   these unsolicited and unwanted sexual advances

02:50:48 13   from Ms. Alderman begin?  A date.

02:50:50 14             MR. KOERNER:  Objection; asked and

02:50:52 15        answered.

02:50:52 16        A.    From day one.

02:50:52 17        Q.    Day one of, what?

02:50:54 18        A.    When I first met her, the day I

02:50:56 19   signed the lease.

02:50:57 20        Q.    And that is in 2005?

02:50:59 21        A.    If that's what the lease says, yeah.

02:51:03 22             MR. KOERNER:  Where's the exhibit?

02:51:06 23             MS. GOULD:  Exhibit 1.

02:51:10 24             MR. ETTENGER:  August 1st, 2005.

02:51:13 25        Q.    I'm showing you Exhibit 1.  So, are

194

Ronald Britt

1

02:51:17  2  you saying that these, quote/unquote, "unwanted

02:51:19  3  and unsolicited advances" began on or about

02:51:24  4  August 1, 2005?

02:51:25  5       A.    Well, the lease was signed July.

02:51:27  6       Q.    So, when did these advances begin?

02:51:30  7       A.    That's when it began, when I first

02:51:32  8  met her.

02:51:32  9       Q.    What form did these unsolicited and

02:51:36 10  unwanted advances take?

02:51:36 11       A.    Initially, just blatant flirting.

02:51:39 12       Q.    What is flirting?

02:51:40 13       A.    Well, I wouldn't care to define it,

02:51:43 14  ma'am.  You know what it is or you don't.

02:51:45 15       Q.    Well, can you define it any way,

02:51:48 16  other than using the word "flirt"?

02:51:48 17       A.    Smiles, eye batting, suggestive

02:51:51 18  conversation.

02:51:52 19       Q.    What kind of suggestive conversation

02:51:54 20  did Ms. Alderman engage in, commencing in or

02:51:58 21  around August of 2005?

02:51:59 22       A.    Just kind of leaning in, leading-me-on

02:52:03 23  kind of banter.

02:52:04 24       Q.    And when you say "leaning in," what

02:52:09 25  do you mean?

1                    *Ronald Britt*

02:52:10  2         A.    Ma'am, when a woman is interested,

02:52:15  3    she has all subtle ways of telling you that she's

02:52:19  4    interested.  Like, you know -- she has ways.

02:52:24  5         Q.    And what were the ways that

02:52:26  6    Ms. Alderman used to tell you --

02:52:27  7         A.    I said --

02:52:27  8         Q.    -- when you say she was interested?

02:52:29  9         A.    Well, initially, I thought it was

02:52:32 10    just --

02:52:32 11              MR. KOERNER:  Other than what

02:52:33 12         you've already testified to.

02:52:34 13         A.    -- what -- what many women will do

02:52:37 14    when they're hiring a handy guy, is try to flirt

02:52:40 15    with him to get the price down - I get a lot of

02:52:43 16    that.  But later when I became the super, it

02:52:46 17    became clear to me if I wanted to keep my job, I

02:52:50 18    would have to do a lot more than just strictly

02:52:53 19    super jobs.

02:52:53 20         Q.    Now, when you say it became clear to

02:52:56 21    you that if you had to keep -- if you wanted to

02:52:56 22    keep your job you would have to do more than

02:52:59 23    super jobs, did Ms. Alderman make this clear to

02:53:03 24    you?

02:53:03 25         A.    Oh, yeah.

1                          *Ronald Britt*

02:53:04  2          Q.      What did she do to make this clear to

02:53:07  3      you?

02:53:07  4          A.      It's just veiled language.

02:53:11  5          Q.      What kind of veiled language?  What

02:53:15  6      were the words that she used?

02:53:16  7          A.      Ma'am, I don't know if you've ever

02:53:19  8      been sexually harassed, but you know when

02:53:22  9      somebody is pressuring you for sex.

02:53:23 10          Q.      Well, sir, you've made a complaint of

02:53:25 11      sexual harassment against my client in this

02:53:28 12      action, and I am going to explore what it was,

02:53:31 13      what were the actions, what were the words that

02:53:33 14      you claim were sexual harassment.

02:53:33 15          A.      Initially --

02:53:34 16          Q.      So, what were they?

02:53:35 17          A.      Initially, it was just she wanted my

02:53:37 18      opinion on this or that.  And then, it's like,

02:53:41 19      "Oh, you're -- you're a man; you can help me with

02:53:43 20      this."  And then if I'm pulling away or

02:53:47 21      resisting, I got indications that if I want to

02:53:50 22      keep my job, I better play along.

02:53:53 23          Q.      Well, when did Ms. Alderman say

02:53:55 24      things like, if you're a man, you know this?

02:53:58 25      When did she start to say those things to you?

1                          *Ronald Britt*

02:53:58    2          A.     In a car ride out to Pennsylvania.

02:54:01    3          Q.     And when did that occur?

02:54:02    4          A.     I think it was just a few months

02:54:04    5   after I began employment with her.

02:54:06    6          Q.     So, you began your employment in

02:54:08    7   January of 2007; is that correct?

02:54:09    8          A.     I don't recall the exact date that we

02:54:12    9   rode out there, but I'm sure she does.

02:54:15   10          Q.     Well, I'm asking you what -- you

02:54:16   11   began your employment in January of 2007; is that

02:54:19   12   correct?

02:54:19   13          A.     Okay.

02:54:19   14          Q.     How long after you began your

02:54:22   15   employment did this ride to Pennsylvania take

02:54:25   16   place?

02:54:25   17          A.     It was a few months into it.

02:54:27   18          Q.     And how did this ride to Pennsylvania

02:54:29   19   come about?

02:54:30   20          A.     'Cause she wanted me to go to her

02:54:33   21   house in Pennsylvania and help her square away a

02:54:36   22   few things out there.

02:54:36   23          Q.     And when you say "help her square

02:54:38   24   away a few things out there," did she tell you

02:54:40   25   what she wanted you to do?

1                          *Ronald Britt*

02:54:40  2        A.     Not specifically, no.

02:54:42  3        Q.     Well, did you ask any questions?

02:54:44  4        A.     I wanted to keep my job; so, I agreed

02:54:47  5   to go.

02:54:47  6        Q.     Did you ask her what she wanted you

02:54:49  7   to do in Pennsylvania?

02:54:50  8        A.     She said she had a house that was

02:54:53  9   closed up there, and she wanted to square away a

02:54:55 10   few things.  She was not specific.

02:54:55 11        Q.     And did you ask her to be specific?

02:54:58 12        A.     No, I did not.  I went along.

02:55:00 13        Q.     And did you have an expectation that

02:55:02 14   you were going to perform some kind of work when

02:55:04 15   you got there?

02:55:05 16        A.     I figured that she would want my

02:55:09 17   opinion on some work.

02:55:10 18        Q.     This is a few months after you began

02:55:12 19   working as super; is that correct?

02:55:14 20        A.     Correct.

02:55:16 21               I had already done several jobs for

02:55:19 22   her.

02:55:19 23        Q.     Where?

02:55:19 24        A.     In the buildings in -- listed on this

02:55:24 25   page.

1                          *Ronald Britt*

02:55:26  2              MR. KOERNER:  I've got to make a

02:55:29  3        few quick phone calls.  I won't be more

4        than two minutes.  Okay?  A few minutes.

5              MS. GOULD:  Okay.

02:57:23  6        *(Recess held from 2:55 to 2:57 p.m.)*

02:57:24  7    CONTINUED EXAMINATION BY MS. GOULD:

02:57:24  8        Q.     Prior to the time that you took this

02:57:25  9    trip to Pennsylvania, had you had any kind of

02:57:28  10   sexual relationship with Ms. Alderman?  Prior to

02:57:31  11   the time that you went on this trip to

02:57:34  12   Pennsylvania, had you had any kind of sexual

02:57:36  13   relationship with Ms. Alderman?

02:57:37  14       A.     No.

02:57:38  15       Q.     And where in Pennsylvania did you go?

02:57:40  16       A.     It's -- I forget the name of the

02:57:45  17   place.  It's outside of Pottsville.

02:57:47  18              I can probably find it on a map.

02:57:49  19       Q.     And what was the nature of the

02:57:51  20   property that you went to?

02:57:52  21       A.     It's a house.  It belonged to her

02:57:54  22   father and mother.  He purchased it some time

02:57:57  23   ago, and she was in the process of getting it

02:58:01  24   renovated.  She wanted to know if the contractor

02:58:03  25   was doing right by her.

1                    *Ronald Britt*

02:58:05  2         Q.      And what did you do when you went to

02:58:09  3    this house in Pennsylvania?

02:58:10  4         A.      Well, initially, we stopped off at a

02:58:15  5    restaurant on the way, and she bought me a couple

02:58:17  6    of beers.  And when we went to the house, I

02:58:20  7    pointed out what I thought was correct and what

02:58:22  8    wasn't.  She was going to issue the contractor

02:58:24  9    another check.

02:58:25 10              But then, once I was there, she asked

02:58:27 11    me to help her with the bathroom.  And I ended up

02:58:30 12    painting the bathroom, twice, installing some

02:58:33 13    fixtures - without any charge.  And then,

02:58:36 14    cleaning out the whole basement and organizing

02:58:39 15    that.

02:58:39 16              And then, I did stay the night.  And

02:58:42 17    I stayed down the hall.  And throughout the night

02:58:44 18    Ms. Alderman was moving about scantily clad,

02:58:48 19    giving me all kinds of signals that we should

02:58:49 20    jump in bed.

02:58:49 21         Q.      So, you started by sleeping in a

02:58:52 22    separate bedroom down the hall, as you said?

02:58:54 23         A.      Correct.

02:58:55 24         Q.      And then, through the night you say

02:58:57 25    Ms. Alderman was darting about -- is that what

1                            *Ronald Britt*

02:59:02   2    you said?

02:59:02   3           A.    I would say, parading.

02:59:03   4           Q.    Parading about.  And you said she was

02:59:07   5    scantily clad; is that correct?

02:59:09   6           A.    Correct.

02:59:09   7           Q.    And what do you mean by "scantily

02:59:11   8    clad"?

02:59:11   9           A.    Not wearing much clothing.

02:59:13  10           Q.    But was she wearing a nightgown?

02:59:14  11           A.    She was wearing like a sheer T-shirt

02:59:18  12    and underwear.

02:59:19  13           Q.    Clothes that people wear to bed; is

02:59:24  14    that correct?

02:59:24  15           A.    Yes; but inappropriate in this

02:59:28  16    situation.

02:59:28  17           Q.    And why was that?

02:59:29  18           A.    Because I'm an employee.

02:59:32  19           Q.    Now, how many times did you see her

02:59:42  20    about, scantily clad during that night?

02:59:45  21           A.    Two or three times, I suppose.

02:59:47  22           Q.    Okay.  And did she come into your

02:59:51  23    room?

02:59:51  24           A.    She asked if I was all right, if

02:59:54  25    there was anything I wanted.

1                    *Ronald Britt*

02:59:55  2        Q.      And what did you tell her?

02:59:56  3        A.      I said I was fine.

02:59:57  4        Q.      Did she come into your room?

02:59:59  5        A.      No, she didn't.

03:00:00  6        Q.      And how many nights did you spend

03:00:03  7     there on that occasion?

03:00:04  8        A.      Just one, I believe.

03:00:04  9        Q.      And what happened -- what did you do

03:00:08 10     the next day?

03:00:08 11        A.      The next day, she took me for ice

03:00:12 12     cream, and we went fishing.

03:00:13 13        Q.      And that's something that you like to

03:00:15 14     do; is that correct?

03:00:15 15        A.      It is something I like to do.

03:00:18 16        Q.      And you suggested that you go

03:00:20 17     fishing; is that correct?

03:00:20 18        A.      She asked me if there's anything I'd

03:00:24 19     like to do.  I said, "we could go fishing."

03:00:24 20        Q.      And you did?

         21        A.      And we did.

03:00:24 22        Q.      And how many hours did you spend

03:00:26 23     fishing?

03:00:26 24        A.      Maybe an hour and a half.

03:00:28 25        Q.      Sir, isn't it true that you

1          *Ronald Britt*

03:00:31   2   volunteered to do some of that work you just

03:00:34   3   described at that house in Pennsylvania?

03:00:36   4          A.   Ma'am, I felt pressed into it.

03:00:38   5          Q.   Isn't it true that you volunteered to

03:00:40   6   do some of that work?

03:00:42   7               MR. KOERNER:  Objection; asked and

8          answered.

9               MS. GOULD:  No, it's not asked and

10          answered.  He didn't answer the question

11          at all.

12               MR. KOERNER:  He did.

03:00:43  13          Q.   Did you volunteer to do that work?

03:00:45  14          A.   It seemed perfectly -- perfectly

03:00:48  15   clear to me that I would be doing extra work for

03:00:52  16   her if I wanted to keep my job.

03:00:54  17          Q.   And from what did you deduce that it

03:00:56  18   was perfectly clear that you would be doing extra

03:00:57  19   work if you wanted to keep your job?

03:00:57  20          A.   Because she would ask me, do I want

03:01:00  21   to keep my job.

03:01:01  22          Q.   When did she first ask you, "Do you

03:01:04  23   want to keep your job"?

03:01:06  24          A.   When she's suggesting we get busy

03:01:09  25   doing this, doing that, doing the other.  And

1      *Ronald Britt*

03:01:12  2      then, she would tell me these stories about how

03:01:17  3      her brother died of a drug overdose, and that's

03:01:20  4      his motorcycle; and how her father's dying; and --

03:01:22  5      and she felt so alone; and there's no man in her

03:01:26  6      life; et cetera; et cetera.

03:01:27  7           Q.    And after you spent your time fishing

03:01:29  8      and having ice cream this next day, did you go

03:01:32  9      back to the city, to New York City?

03:01:35  10          A.    Actually, we went back to her place,

03:01:37  11     and we cooked and ate that fish.

03:01:40  12          Q.    You cooked and ate the fish that you

03:01:40  13     caught?

03:01:40  14          A.    We caught a fish -- actually, she

15     did.

03:01:42  16          Q.    And you cooked and ate the fish that

03:01:44  17     she caught, in her apartment?

03:01:46  18          A.    In her kitchen in her building -- in

03:01:49  19     her house there in Pennsylvania.

03:01:51  20          Q.    In Pennsylvania, okay.

03:01:53  21                And did there come a point in time

03:01:55  22     that weekend when you returned to New York?

03:01:57  23          A.    We did.

03:01:58  24          Q.    So, you spent one night at that point

03:02:01  25     in time in Pennsylvania?

1                    *Ronald Britt*

03:02:02   2        A.    Correct.

03:02:03   3        Q.    And did you have any sexual

03:02:04   4    relationship with Ms. Alderman that night?

03:02:06   5        A.    I did not.

03:02:07   6        Q.    You say at Paragraph 15 of your

03:02:10   7    complaint, "Plaintiff resisted but was fearful

03:02:14   8    that if he did not acquiesce in Ms. Alderman's

03:02:18   9    sexual advances, he would lose his job and

03:02:24   10   residence."

03:02:24   11       A.    It was plain --

03:02:24   12       Q.    What sexual advances are you

03:02:26   13   referring to in this paragraph, and when did they

03:02:29   14   occur?

03:02:29   15       A.    Well, I'm referring to -- to getting

03:02:32   16   me off to the country in her house alone and

03:02:35   17   making it pretty clear that she was expecting

03:02:37   18   sex.

03:02:38   19       Q.    But no sex occurred; is that right?

03:02:40   20       A.    No.

03:02:41   21       Q.    So, in Paragraph 15 when you say,

03:02:45   22   "Plaintiff resisted but was fearful that if he

03:02:49   23   did not acquiesce in Ms. Alderman's sexual

03:02:50   24   advances, he would lose his job and residence.",

03:02:51   25   what sexual advances are you referring to, other

1        *Ronald Britt*

03:02:55  2    than what you described as a sexual advance by

03:02:58  3    going to her house for the weekend?

03:03:00  4         A.    Right.  Buying me a few beers, making

03:03:04  5    me dinner, parading around in her underwear, and

03:03:07  6    just checking on me frequently.  I mean, she --

03:03:12  7    it was clear to me that she wanted to fool

03:03:16  8    around, and I wasn't having it, because I was

03:03:19  9    uncomfortable.  And frankly, it was humiliating.

03:03:19 10         Q.    After that weekend where you did not

03:03:21 11    have sex -- correct?  -- when, if at all, did she

03:03:26 12    make any sort of sexual advance to you?

03:03:28 13         A.    It was sometime later.

03:03:31 14         Q.    When?

03:03:31 15         A.    I can't be sure, but it was a few

03:03:33 16    weeks, I think.

03:03:34 17         Q.    So, this is sometime in the first

03:03:37 18    part of 2007?

03:03:38 19         A.    I think so.

03:03:39 20         Q.    And --

03:03:41 21         A.    She --

03:03:42 22         Q.    What did she do that you describe as

03:03:44 23    a sexual advance?

03:03:45 24         A.    She came over to my apartment,

03:03:48 25    essentially, 'cause she had nothing to do, and

207

1                           *Ronald Britt*

03:03:51  2    cable wasn't working, and she just wanted to

03:03:52  3    watch a movie.  And I was sitting on my bed, and

03:03:54  4    she was sitting on the couch.  She got on my bed

03:03:57  5    and, basically, made it clear that we were gonna

03:04:00  6    have sex right then and there.

03:04:01  7            Q.    How did she do that?

03:04:03  8            A.    She took off her clothes.

03:04:06  9                  I said, "This is a bad idea."

03:04:09 10                  And she said, "So --"

03:04:10 11            Q.    Did she say anything to you?

03:04:12 12            A.    She said, "So what."

03:04:14 13                  And I didn't want to have sex with

03:04:16 14    her when I saw her with her clothes off.

03:04:19 15            Q.    Did you tell her that?

03:04:20 16            A.    I said, "I don't want to do this.

03:04:23 17    It's a bad idea."

03:04:24 18                  And she said, "Do you like your

03:04:27 19    apartment?  Do you like keeping your job?"

03:04:28 20                  And I said, "This is wrong."

03:04:32 21                  And she wouldn't let up.

03:04:33 22            Q.    Well --

03:04:36 23            A.    And in the moment, I had --

03:04:36 24            Q.    When you say "she wouldn't let up,"

03:04:38 25    what do you mean by that?

*Ronald Britt*

A.      I mean, she was touching me and

pulling at my clothes.  And it was clear to me in

that moment, either I put out or I lose my job.

And when you lose your job as super, you lose

your apartment.

And although she's incredibly

unattractive naked, with her cottage cheese butt,

and her smelly -- fish-smelling twat, and her

sagging tits, and breath that would knock a

buzzard off a fertilizer wagon -- and I apologize

to the nice ladies in the room that they have to

hear this.  But you do work for her.  And you

better know that sexual harassment is not about

the sex; it's about control.  And it's not a

women's issue; it's an employment issue.  And it

was humiliating and disgusting.  And I did it

because I wanted to keep my job.  I care about

my job.  I care about the people in the building.

And I'm done being bullied by the new queen of

mean, Doreen, complete with little dog, which bit

me, by the way.

Q.      Is that your complete answer?

A.      That's my complete answer.

Q.      So, this advance, as you say,

209

*Ronald Britt*

03:05:47  2  happened several weeks after you went to

03:05:49  3  Pennsylvania; is that correct?

03:05:51  4      A.    That's correct.

03:05:51  5      Q.    And you say that it was clear to you

03:05:58  6  that if you didn't have sex with Ms. Alderman,

03:06:00  7  you wouldn't keep your job and your apartment; is

03:06:03  8  that correct?

03:06:03  9      A.    That's correct.

03:06:03  10     Q.    What, if anything, did she say about

03:06:05  11 your job during this advance, as you describe it?

03:06:08  12             MR. KOERNER:  Objection.  He

03:06:09  13        already testified that he made -- she

03:06:10  14        said, do you like -- want to keep your

03:06:13  15        job?

03:06:13  16             MS. GOULD:  Excuse me.  I'm

03:06:14  17        entitled to explore.

         18             MR. KOERNER:  Okay.  Go ahead.

         19        Repeat it.

03:06:15  20             MS. GOULD:  So, back off.

03:06:16  21     Q.    Go ahead.

03:06:18  22     A.    What was the question?

03:06:19  23     Q.    What did she say to you when she was

03:06:21  24 making this advance a few weeks after you came

03:06:24  25 back from Pennsylvania?

210

1                           *Ronald Britt*

03:06:24   2        A.      She said, "Do you want to keep your

03:06:26   3    job?", as she's pulling at my clothes, and she's

03:06:30   4    naked in my bed.

03:06:31   5        Q.      And did you respond to her verbally

03:06:34   6    in any way?

03:06:34   7        A.      I said, "This is a bad idea."

03:06:36   8        Q.      Did you say, "I'm not going to do

03:06:38   9    this"?

03:06:38  10        MR. KOERNER:   Objection; asked and

03:06:39  11        answered.

03:06:39  12        A.      No.  In that moment, I realized that

03:06:42  13    she was not backing off.  Doreen will have her

03:06:45  14    way.  And as you get to know her, you'll find

03:06:49  15    that out.

03:06:49  16        Q.      What happened at this point in time?

03:06:51  17        A.      At this point in time, to be honest,

03:06:53  18    I found it difficult to perform.  So, she sucked

03:06:57  19    on my member.  And when I did get it up, I did my

03:07:01  20    very best to please her, but I don't think that

03:07:04  21    she orgasmed.  But it didn't seem to matter to

03:07:07  22    her.  Because at that moment, it seemed like she

03:07:10  23    felt she had control of me, and I was just her

03:07:12  24    minion at that point.

03:07:12  25        Q.      How long did this incident take?

1                          *Ronald Britt*

03:07:14  2          A.    Probably from the moment she arrived

03:07:19  3    to the moment she left, about an hour and a half.

03:07:23  4          Q.    And this was, again, sometime in the

03:07:25  5    first half of 2007?

03:07:27  6          A.    It was early on, yeah.

03:07:30  7          Q.    And you say that the sexual

03:07:39  8    harassment by Ms. Alderman continued for -- this

03:07:41  9    is in Paragraph 15 of your complaint.  "The

03:07:43 10    sexual harassment by Ms. Alderman continued for a

03:07:46 11    period of approximately seven months;" is that

03:07:48 12    correct?

03:07:48 13          A.    It continued straight on.

         14          Q.    Sir, look --

03:07:50 15          A.    In fact, I'm still being harassed by

03:07:53 16    her.

03:07:54 17          Q.    Please look at Paragraph 15 of your

03:07:56 18    complaint.

03:07:57 19                *(Witness peruses exhibit)*

03:08:02 20                And I'm calling your attention to the

03:08:04 21    second sentence in that paragraph.

         22                *(Witness peruses exhibit)*

         23          A.    Yes.

03:08:08 24          Q.    It says, "The sexual harassment by

03:08:10 25    Ms. Alderman continued for a period of

212

*Ronald Britt*

03:08:12  2   approximately seven months and included instances

03:08:15  3   of oral sex and sexual intercourse;" is that

03:08:19  4   correct?  That's what it says?

03:08:19  5        A.    That's true.

03:08:20  6        Q.    What is that seven-month period that

03:08:23  7   is referred to in Paragraph 15 of the complaint?

03:08:26  8        A.    Well, throughout the time she was

03:08:27  9   back in California, she would call me at all

03:08:29 10   hours, odd hours.

03:08:30 11        Q.    No.  I'm asking a different question,

03:08:30 12   sir.  I'm asking:  What is the seven-month period

03:08:33 13   of time that is specifically referred to in

03:08:34 14   Paragraph 15 of the complaint?

03:08:36 15        A.    I don't recall exactly.  But it's

03:08:38 16   easy enough to come up with those dates by

03:08:42 17   subpoenaing her phone records.

03:08:43 18        Q.    But your lawyer --

03:08:45 19        A.    And based on her phone records --

         20        Q.    Sir.  Sir --

         21        A.    -- you would be able to tell.

03:08:48 22              MR. KOERNER:  Is it possible the

03:08:48 23        seven months was the period that you guys

03:08:51 24        were having sex?

03:08:53 25              THE WITNESS:  Well, we only had sex

213

*Ronald Britt*

2  a few times.

3          MS. GOULD:  Is it possible that

4     you're giving speaking objections again

5     and coaching the witness again?

6          THE WITNESS:  We only had sex a few

7     times.

8     Q.     You had sex a few times.

9            How many times did you have sex?

10    A.     Three times.

11    Q.     And the first time is the one you

12    just described; is that correct?

13    A.     Correct.

14    Q.     When was the next time?

15    A.     The next time is, she flew in from

16    California, unannounced, on a Friday.

17    Q.     Well, she resides in California,

18    doesn't she?

19    A.     She did.

20    Q.     And how frequently did she come to

21    New York in 2007?

22    A.     I don't know.

23    Q.     Well, when she came to New York, is

24    it true that she lived in an apartment at 91 East

25    3rd Street?

214

*Ronald Britt*

| | | |
|--|--|--|
03:09:27  2      A.    No, she didn't.

03:09:27  3      Q.    Where did she live?

4      A.    She lived on 9th Street.

03:09:29  5      Q.    One of her other buildings; is that --

6      A.    415 East 9th Street.

03:09:33  7      Q.    Okay.  So, are you saying that you

03:09:34  8  didn't know when she came to town to check on the

03:09:37  9  buildings?

03:09:37  10      A.    She would never say when she was

03:09:39  11  coming to town.

03:09:40  12      Q.    But you knew -- when she arrived, you

03:09:43  13  knew that she was there; is that right?

03:09:43  14      A.    She called me from the airport and

03:09:46  15  said, "Get ready."

03:09:47  16      Q.    Well, I'm asking you whether --

17  withdrawn.

03:09:48  18           I'm asking you:  How frequently --

03:09:49  19  during the time you were employed by Thermald/

03:09:52  20  Wavecrest, how frequently Ms. Alderman came to

03:09:55  21  town.

03:09:55  22      A.    I don't know.

03:09:57  23      Q.    And now, you're referring to an

03:10:01  24  incident that occurred after the one that you

03:10:03  25  have just described; right?

215

Ronald Britt

03:10:04  2      A.    Correct.

03:10:05  3      Q.    When you had sex in -- whose

03:10:07  4 apartment was it?

03:10:07  5      A.    It was her apartment.

03:10:08  6      Q.    And she called you from the airport,

03:10:10  7 is that what you're telling me?

03:10:12  8      A.    That's right.  That she was in town,

03:10:13  9 and she was in the mood.

03:10:15 10      Q.    And when did that occur?

03:10:16 11      A.    It was one Friday.

03:10:18 12      Q.    In what year?

03:10:21 13      A.    It was within that seven-month

03:10:23 14 period.

03:10:23 15      Q.    And that seven-month period commenced

03:10:27 16 when?

03:10:27 17      A.    It was not long after taking the job.

03:10:29 18 I can't be sure on the date, but I could

03:10:31 19 certainly nail it down if I can have her phone

03:10:34 20 records, and I'll go to my carrier and see if

03:10:37 21 they have phone records.  And based on that, and

03:10:40 22 the invoices I was doing, and all the work I was

03:10:42 23 doing, I can certainly narrow that range down.

03:10:42 24      Q.    But you hadn't bothered to do that

03:10:45 25 before today; is that correct?

1                        *Ronald Britt*

03:10:45  2          A.    No.

03:10:46  3          Q.    Now, she called you from the airport,

03:10:49  4     and what did she say?

03:10:50  5          A.    She said that she was in the mood;

03:10:52  6     she was in town; and I should be ready.

03:10:54  7          Q.    And did you respond to her in any

03:10:56  8     way?

03:10:56  9          A.    I said I would come over.

03:10:58 10          Q.    And did you?

03:10:58 11          A.    I did.

03:10:59 12          Q.    Where did you go?

03:11:00 13          A.    I went to her apartment.

03:11:02 14          Q.    And this was on which street?

03:11:04 15          A.    It was on 9th Street.

03:11:06 16          Q.    And what happened?  What time of day

03:11:08 17     was this, by the way?

03:11:09 18          A.    It was in the evening.

03:11:10 19          Q.    And what happened when you got to her

03:11:11 20     apartment?

03:11:12 21          A.    When I got to the apartment she

03:11:15 22     jumped on me, and we had sex.

03:11:18 23          Q.    And did you tell her you weren't

03:11:21 24     interested in having sex with her at that time?

03:11:24 25          A.    At that point, I was just playing

217

*Ronald Britt*

ball.

Q.   You were playing, what?

A.   I was just going along with it,
because I knew that I would lose my job if I
didn't.

MR. KOERNER:   "Playing ball" is
what he said.

MS. GOULD:   Sorry.   I didn't
understand what you said.

Q.   And you had sex in her apartment.

How long did this last?

A.   We had sex twice.

Q.   That night?

A.   Correct.

And then I left, and I went to The
Edge bar, where I was before, and I was having
drinks with a few of the boys.   And she called me
like 15 times, insisting I come back.

Q.   And did you?

A.   At which time I went back, and I gave
her a horse whip and told her that I am not her
property and that I would not be having sex with
her again.

Q.   What is a horse chip?

218

*Ronald Britt*

03:12:04  2      A.    It's a piece of braided leather you

03:12:07  3  used to whip horses.

03:12:09  4      Q.    And you used a piece of leather on

5  Ms. Alderman; is that what you're saying?

03:12:10  6      A.    No.   I gave it to her to tell her

03:12:12  7  that I was not her property; I was not her

03:12:16  8  whipping boy and that I was not gonna be going to

03:12:18  9  bed with her again.

03:12:20  10     Q.    And what did she say?

03:12:21  11     A.    She told me to get out.

03:12:23  12     Q.    And did you have sex with her again

03:12:25  13  after that?

03:12:26  14     A.    I did not.

03:12:27  15     Q.    And is it fair to say that this

03:12:29  16  incident that you're describing now, when you got

03:12:33  17  this phone call on a Friday and you had sex with

03:12:36  18  her twice that night, occurred sometime in 2007?

03:12:39  19     A.    I would have to look at the records,

03:12:40  20  but I don't know.

03:12:41  21     Q.    Well, it occurred within the

03:12:45  22  seven-month period that you're describing in

03:12:48  23  Paragraph 15; isn't that correct?

03:12:49  24     A.    I would expect so, yes, ma'am.

03:12:51  25     Q.    And I'm asking you:   Was it in 2007

*Ronald Britt*

1

2  that that occurred?

3      A.    I don't know.  I'd have to look at a

4  calendar and see.

5      Q.    Well --

6      A.    To be honest, I would -- I would want

7  to review what records I do have.

8      Q.    But you didn't do that before you

9  came to this deposition?

10     A.    I did not, because I really, you

11 know, was hoping Doreen wouldn't lie about this.

12 But, we'll see.

13     Q.    And again, I'm asking you what the

14 seven-month period is that you're referring to in

15 your complaint.

16     A.    Well, I can tell you that after I had

17 sex with her that time, I did not have sex with

18 her again.  And we went to her mother's house the

19 very next day to look into a few things there.

20 And we had a little sit-down conversation, and we

21 agreed that I would remain the super, and I would

22 keep doing these jobs - many of which were not by

23 the book and quite illegal - and I could keep my

24 job.

25         MS. GOULD:  Move to strike as

220

*Ronald Britt*

2   nonresponsive.

3        A.     And I did several of these jobs.

4        Q.     So, after the incident that you're

5   just describing when she flew in and, quote,

6   "surprised you," unquote, from California, you

7   didn't have sex with her again; is that correct?

8        A.     After that night, no.

9        Q.     And she didn't ask you to have sex

10  again; is that correct?

11       A.     Instead, she kind of left it open.

12       Q.     Did she ask you to have sex again?

13       A.     No, she did not ask me to have sex

14  again.

15            But she called me at all hours, on

16  Christmas and in the middle of the night.  She

17  would come over to my apartment with a bottle of

18  wine and say, "Oh, you've got to unfuck this job

19  they're doing in my apartment renovation."  She

20  had me do all of the drawings and didn't pay me

21  for them.  She filed those drawings.  And I have

22  those drawings.  So, if you want to see, did I do

23  the work and did she have me do it without

24  permits and -- and strictly by the book, yeah, I

25  can show you all of that, as well.

*Ronald Britt*

As I said, sexual harassment's about control, and it's an employment issue.

MS. GOULD:  Move to strike as nonresponsive, because there's no pending question.

Q.   Now, after you told Ms. Alderman that you weren't going to have sex with her again, did you ever see her socially after that?

A.   I don't recall.

Q.   Did you ever go to lunch with her after that?

A.   I don't think so.

Q.   And did you ever go to lunch --

A.   Oh, yes, you know what --

Q.   -- in Chinatown with her?

A.   -- I did.  I did.

Q.   How many times did you go to lunch with her?

A.   We went for escar -- we went for escargot.  And in the cab, that's when she approved the extra 3,000 for the windows.  And then, conveniently forgot to pay.  And this gives me a really easy way to tell you exactly when that was, because that's when she fired off the

222

*Ronald Britt*

03:15:33  2    memo that, henceforth, any repairs were to be

03:15:37  3    discussed, and bidded, and approved by

03:15:40  4    Jay Yablonsky.

03:15:41  5         Q.    Do you have a copy of that memo?

03:15:43  6         A.    I can scare that one up.  I think I

7    can.

03:15:45  8         Q.    Did you provide that to Mr. Koerner?

03:15:48  9         A.    I think I may have.  I'll have to

10    look.

03:15:49 11         Q.    I'm sure one of you will take a look.

03:15:51 12              So, in addition to that time that

03:15:53 13    you're describing when you had escargot, did you

03:15:57 14    ever have meals with Ms. Alderman again after you

03:15:58 15    told her you weren't going to have sex with her?

03:15:59 16         A.    There were other -- there were other

03:16:00 17    outings before having sex with her initially.  Is

18    that what you're referring to?

03:16:04 19         Q.    And what about after?  No.  What I'm

03:16:04 20    referring to is after you told her you weren't

03:16:08 21    going to have sex with her anymore, did you have

03:16:10 22    any other outings with her?

03:16:12 23         A.    I can't be sure -- oh, yes.  There

03:16:14 24    was a time we went to Far East Corner in

03:16:18 25    Chinatown.

223

1                            *Ronald Britt*

03:16:19  2          Q.    That's a restaurant?

03:16:20  3          A.    Yes.

03:16:20  4          Q.    Okay.  And when did that occur?

03:16:21  5          A.    It was when we were down looking at

03:16:24  6     Division Street for something.

03:16:25  7          Q.    How much time elapsed -- between this

03:16:27  8     incident that you described in which you had sex

03:16:31  9     with her in her apartment when she called you

03:16:33 10     from the airport, how much time elapsed between

03:16:35 11     that and the time you had lunch with her down in

03:16:39 12     Chinatown?

03:16:39 13          A.    I can't be sure.

03:16:40 14          Q.    Did you have lunch with her on any

03:16:42 15     other occasion after you told her you were no

03:16:44 16     longer going to have sex with her?

03:16:46 17          A.    I may have.

03:16:47 18          Q.    How many times?

03:16:48 19          A.    I wouldn't know.

03:16:49 20          Q.    What records would you have that

03:16:51 21     would show that?

03:16:52 22               MR. KOERNER:  If any.

03:16:54 23               MS. GOULD:  Always, if any.

03:16:54 24          A.    I don't know that I would have any.

03:16:55 25          Q.    And do you recall having any outings

*Ronald Britt*

1
2   03:16:57   with Ms. Alderman outside of New York City after
3   03:17:01   you told her that you wouldn't have any more
4   03:17:04   sex with her?
5   03:17:04       A.    Not after.
6   03:17:05       Q.    Do you recall going to the beach with
7   03:17:08   Ms. Alderman after you told her you would not
8   03:17:10   have sex with her?
9   03:17:11       A.    That was not after.  I went to the
10  03:17:13   beach with her and her daughter.  And I arranged
11  03:17:15   for a chaperone for her daughter, as well, Jake
12  03:17:21   Austlander.  And I put money out of my pocket, so
13  03:17:24   they could go ride the rides and have fun.
14  03:17:27           And I also once went to Lincoln
15  03:17:29   Center with her.
16  03:17:29       Q.    Oh.   What did you see there?
17  03:17:33       A.    They had a salsa band, and she liked
18  03:17:34   salsa dancing.  And I recruited some good salsa
19  03:17:39   dancers to dance with her, because I don't dance.
20  03:17:42   And I had a few drinks with her, and I thought
21  03:17:45   everything would just be fine like that.
22  03:17:45       Q.    And when did it -- this outing to
23  03:17:47   Lincoln Center take place?
24  03:17:50       A.    I could look at the schedule for
25           Lincoln Center and give you an exact date on

225

*Ronald Britt*

1
2      that.
03:17:53   3          Q.      If you can --
03:17:53   4              MR. KOERNER:  Well, not an exact
03:17:54   5      date.  But was it in between some of the
6      events that you're talking about?
7              MS. GOULD:  Withdraw that.  Wait.
03:17:57   8      Wait.  Wait.  Wait.  Objection to your
03:17:58   9      coaching the witness.
03:17:59  10          Q.      This was after you told her you would
03:18:01  11      not have sex with her; is that correct?
03:18:03  12          A.      No, no, no.
03:18:03  13          Q.      I'm asking you specifically:  Did you
03:18:05  14      go on any social outings with Ms. Alderman after
03:18:09  15      you told her you would not have sex with her?
03:18:12  16          A.      I don't recall, other than maybe some
03:18:14  17      lunches.
03:18:15  18              MR. KOERNER:  What you've testified
03:18:16  19      already about?
03:18:17  20          Q.      How many lunches?
03:18:18  21          A.      I don't know.
03:18:18  22          Q.      And are you testifying that you did
03:18:21  23      not go to any outings with Ms. Alderman that were
03:18:25  24      outside of the city after you told her you would
03:18:28  25      not have sex with her?

1                           *Ronald Britt*

03:18:30  2        A.    The only times I left the city with

03:18:33  3    Doreen was to go to her mother's place --

03:18:35  4        Q.    Which was where?

03:18:36  5        A.    -- to her place in Pennsylvania.

03:18:39  6              It's in New Jersey.

03:18:41  7              To Coney Island.  And part of that

03:18:45  8    Coney Island trip was to Breezy Point, I think.

03:18:51  9    And the trip to Lincoln Center.  That's all I

03:18:55 10    recall.

03:19:02 11        Q.    And these outings occurred when in

03:19:06 12    relationship to your telling Ms. Alderman that

03:19:09 13    you wouldn't have sex with her anymore?

03:19:11 14        A.    Well, I don't know that I had

03:19:13 15    anything but lunch after the last time we had

03:19:16 16    sex.

03:19:17 17        Q.    You don't know that you did or you

03:19:19 18    didn't have any more lunches; is that correct?

03:19:21 19        A.    I don't recall exactly if we went out

03:19:24 20    of town for any other reason, other than that,

03:19:25 21    but I don't believe so.

03:19:27 22        Q.    And how many lunches did you have

03:19:28 23    with her after you told her you wouldn't have

03:19:29 24    sex?

03:19:29 25              MR. KOERNER:  Objection; asked and

1                       *Ronald Britt*

03:19:30  2        answered.

03:19:30  3        A.    As many as she wanted to have.

03:19:33  4        Q.    And did you ever find yourself in

03:19:36  5   Edge bar with her after you told her that you

03:19:39  6   didn't want to have sex with her?

03:19:42  7        A.    Edge bar happens to be in the same

03:19:44  8   building she owns, so I don't doubt that it's

03:19:48  9   possible.

03:19:48 10        Q.    Now, you referred -- withdrawn.  I'll

03:20:06 11   get back to that.

03:20:06 12              Looking at Paragraph 16 of the

03:20:16 13   complaint, please.  It's on Page 5.

03:20:26 14              And by the way, after you told

03:20:28 15   Ms. Alderman that you were not going to have sex

03:20:30 16   with her again, she didn't fire you, did she?

03:20:33 17        A.    No, she didn't.

03:20:34 18        Q.    And how much time elapsed between the

03:20:37 19   time you told Ms. Alderman you wouldn't have sex

03:20:39 20   with her again and the time you were terminated?

03:20:43 21        A.    Several years.

03:20:46 22        Q.    Now, looking at Paragraph 16 of the

03:20:49 23   complaint, it says, "As soon as the sexual

03:20:54 24   relationship ended, Ms. Alderman initiated a

03:20:57 25   campaign to make plaintiff's work life miserable,

1                          *Ronald Britt*

03:21:01  2    increasing the work demands on plaintiff."

03:21:03  3         A.    That's correct.

03:21:04  4         Q.    What do you mean by that?

03:21:04  5         A.    Well, there were a few apartments to

03:21:06  6    renovate.  Jay said that everyone who works in

03:21:10  7    the buildings really should be -- have their own

03:21:13  8    insurance, which is a whole list of things you

03:21:15  9    have to have, including, like, a million dollars

03:21:19 10    worth of insurance.  But Doreen said to simply

03:21:22 11    get it done and not tell Jay about it.

03:21:25 12         Q.    Get what done?

03:21:25 13         A.    And get the renovations done.  And

03:21:27 14    they were not filed.  And several people worked

03:21:30 15    for them.  So, I noticed that she didn't have any

03:21:33 16    invoices from that period.  But all of that money

03:21:36 17    was paid to me on my invoices, and I then

03:21:40 18    distributed that money to the people that did the

03:21:41 19    work with me.

03:21:41 20         Q.    So, you were paid for these

03:21:44 21    renovations that you're talking about; is that

03:21:46 22    correct?

03:21:46 23         A.    I was.

03:21:47 24         Q.    So, if there was an increased work

03:21:53 25    demand, you also got increased compensation; is

229

1                         *Ronald Britt*

03:21:56  2      that correct?

03:21:56  3           A.    Yes; but it was work that I really

03:21:57  4      didn't want to do.

03:21:58  5           Q.    Did you ever tell Ms. Alderman that

03:22:00  6      you didn't want to do that work?

03:22:02  7           A.    I told her that it was against

03:22:04  8      building code and illegal.  And she said, "Just

03:22:07  9      make sure it happens, and in a timely --

03:22:08 10           Q.    And then, you did; is that right?

03:22:09 11           A.    -- way.  In a timely way.

03:22:12 12                 Correct, I did.

03:22:12 13                 And for that time, she was being

03:22:14 14      sweet to me like she wanted to get back together.

03:22:17 15           Q.    Did she pay you for that work, sir?

03:22:19 16           A.    She did.  But not all the work that I

03:22:22 17      did, was I paid for.

03:22:24 18           Q.    And did you ever complain to anyone

03:22:26 19      that you weren't paid for, quote, "all the work

03:22:29 20      that you did"?

03:22:29 21           A.    I just wanted to hang onto my job, so

03:22:32 22      I didn't say anything.  I went along with it.

03:22:34 23      And frankly, I was ashamed, humiliated, and

03:22:39 24      embarrassed.

03:22:39 25           Q.    But you didn't quit your job?

*Ronald Britt*

A.    No.

I like my job, and I like the people in the buildings, and I like taking care of them.

Q.    And you then go on to say in Paragraph 16 of your complaint, "Ms. Alderman subsequently engaged in a pattern of discrimination against plaintiff, consistently yelling at him, directing insults at him, disparaging his abilities, delaying and denying various payments to him, and sporadically refusing to address plaintiff's legitimate concerns regarding maintenance issues related to the four buildings he maintained for Thermald."

A.    That's all quite true.

Q.    Okay.  When you say she was consistently yelling at you, what are you referring to?

A.    Well, there was a period I just couldn't do anything right.  No matter how hard I tried or how good things were, it just wasn't ever enough.  But I never received any written reprimands.  Only just her vicious mouth.

Q.    And where was she when she was consistently yelling at you?

1                          *Ronald Britt*

03:23:33   2          A.      When she would come into town.

03:23:35   3          Q.      And how frequently did she come into

03:23:37   4     town between 2007 and 2013?

03:23:40   5          A.      I don't know.

03:23:40   6          Q.      And when she yelled at you --

03:23:42   7          A.      I would say once every four or

03:23:45   8     five months.

03:23:45   9          Q.      So, about twice a year; is that

03:23:48  10     correct?

03:23:48  11          A.      Probably more than that.

03:23:49  12          Q.      Not more than three times a year; is

03:23:51  13     that correct?

03:23:51  14          A.      I wouldn't know, but I'm sure she has

03:23:54  15     a record.

03:23:55  16          Q.      And when you say that she was yelling

03:23:57  17     at you --

03:23:58  18          A.      Yeah.   In front of Jay; and in front

03:24:01  19     of Rich, the porter; and sometimes in front of

03:24:06  20     Zing.   Although he only speaks Chinese, it's

03:24:12  21     still pretty clear when your boss is yelling

          22     at you for nothing, that it's embarrassing and

03:24:14  23     demeaning.

03:24:14  24          Q.      And when you say -- when she yelled

03:24:16  25     at you in front of Jay, did Jay say anything to

*Ronald Britt*

1

03:24:21  2    her?

03:24:21  3         A.    No.

03:24:21  4         Q.    Did you say anything to Jay about the

03:24:24  5    fact that she was yelling at you?

03:24:25  6         A.    I think it was pretty understood

03:24:27  7    between Jay and I that Doreen is kind of crazy.

03:24:30  8         Q.    She's kind of crazy?

03:24:34  9         A.    Yeah.

03:24:34 10         Q.    Did you ever tell Jay --

03:24:35 11         A.    Like, she'll tell you something --

03:24:37 12         Q.    Did you ever tell Jay that you had a

03:24:40 13    sexual relationship of any sort with Doreen

03:24:43 14    Alderman?

03:24:43 15         A.    I did.

03:24:44 16         Q.    When did you tell him that?

        17         A.    The day that he told me my -- my

        18    employment was terminated.

03:24:47 19         Q.    Prior to the time that he told you

03:24:48 20    your employment was terminated, had you ever told

03:24:51 21    Jay that you had a sexual relationship with

03:24:54 22    Doreen Alderman?

03:24:54 23         A.    I didn't.

03:24:54 24         Q.    Did you ever tell Jay, prior to the

03:24:57 25    time that he terminated you, that Ms. Alderman

233

*Ronald Britt*

| | |
|---|---|
| 03:25:00 | 2 |

was sexually harassing you?

03:25:03  3      A.    I did not.

03:25:04  4      Q.    And you never complained to any

03:25:06  5  governmental agency, prior to the time that you

03:25:09  6  were terminated, that Ms. Alderman was sexually

03:25:12  7  harassing you, did you?

03:25:15  8      A.    I did not.

03:25:15  9            I was embarrassed and ashamed.

03:25:19  10           MS. GOULD:   Move to strike as

03:25:20  11  nonresponsive.

03:25:21  12      Q.    Now, when you say that Ms. Alderman

03:25:22  13  was directing insults at you, what do you mean by

03:25:25  14  that?

03:25:25  15      A.    It means that nothing was ever good

03:25:28  16  enough.

03:25:28  17      Q.    Well, what were the insults that she

03:25:30  18  directed at you?

03:25:30  19      A.    Well, just your standard name

03:25:33  20  calling.  My name's Ron, so I would be mor-Ron,

03:25:37  21  or some kind of idiot.  Or, you know, "why do I

03:25:40  22  even let you work for me?"  This kind of thing.

03:25:43  23      Q.    And during this time when she was

03:25:45  24  directing insults at you, did she mention sex in

03:25:49  25  any way?

1                          *Ronald Britt*

03:25:49  2        A.    No.

03:25:50  3        Q.    And then, you indicate or you state

03:25:52  4    at Paragraph 16 that she was disparaging your

5    abilities.

03:25:56  6              What form did that take?

03:25:57  7        A.    Just that nothing was ever good

03:26:00  8    enough.

03:26:00  9        Q.    And over what period of time did that

03:26:03 10    occur?

03:26:03 11        A.    Straight through to the -- to the

03:26:04 12    very end.

03:26:05 13        Q.    So, over a period of --

03:26:07 14        A.    The -- the remainder of that time.

03:26:09 15        Q.    -- five or six years; is that what

03:26:11 16    you're saying?

03:26:12 17        A.    For the first few months after the

03:26:14 18    last time we had sex, Doreen would call me at odd

03:26:17 19    hours to commiserate, cry on my shoulder.  Called

03:26:22 20    me at Christmas in the middle of -- at midnight

03:26:24 21    and talk about how her father was passing.  And,

03:26:28 22    you know, basically, just a lot of what I

03:26:31 23    consider just inappropriate stuff.

03:26:33 24        Q.    And did you ever tell her it was

03:26:35 25    inappropriate stuff?

*Ronald Britt*

A.     I didn't.

Q.     And when you -- again, when you say
in your complaint that she was disparaging your
abilities, what did she say that disparaged your
abilities?

MR. KOERNER:   Other than "mor-Ron"?

MS. GOULD:   Yes.

A.     Well, if you want an example, one of
the invoices that you provided shows that there
was a leak in her apartment.  And I fixed it, and
the leak came back.  And she blamed the plumber
for the problem and blamed me for not hassling
the plumber about it.  But it turned out it was
a second problem.  He had fixed the one problem,
and there was another problem.  But I'm some kind
of idiot, because now there's a wet spot in the
same place that there was another one.  And, you
know, never mind that it's a different problem.
It's my fault for being a bad super.

Q.     And this you say is part of a pattern
of discrimination; is that correct?

A.     Yeah.  At a certain point -- I guess
it was right around the time that she started
dating the fellow she's dating now -- I couldn't

236

*Ronald Britt*

| | |
|---|---|
| 03:27:39 | 2 |

do anything right.

| 03:27:40 | 3 |

    Q.    And when was it that she started

4

dating the fellow that she's dating now?

| 03:27:40 | 5 |

    A.    I think it's a couple years.

| 03:27:42 | 6 |

    Q.    And who is that fellow?

| 03:27:43 | 7 |

    A.    He was introduced to me as Richard.

| 03:27:47 | 8 |

    Q.    So, that's a couple of years ago, and

| 03:27:51 | 9 |

several years after you had sex with her; is that

| 03:27:53 | 10 |

correct?

| 03:27:53 | 11 |

    A.    Yes.

| 03:27:54 | 12 |

    Q.    And that's when she started

| 03:27:57 | 13 |

disparaging your abilities; is that correct?

| 03:28:00 | 14 |

    A.    No.  It was pretty much when it was

| 03:28:03 | 15 |

clear I wasn't going back to bed with her, that's

| 03:28:06 | 16 |

when the constant chiding and riding began.

| 03:28:07 | 17 |

    Q.    And did she disparage your abilities

| 03:28:11 | 18 |

in front of anyone?

| 03:28:12 | 19 |

    A.    You mean, besides my coworkers and

20

Jay?

21

    Q.    Well, which coworkers was she

| 03:28:15 | 22 |

disparaging --

| 03:28:15 | 23 |

    A.    Richard Usera, the sup -- the --

| 03:28:18 | 24 |

    MR. KOERNER:  Objection; asked and

25

answered.

1                          *Ronald Britt*

03:28:19   2              You can go ahead and answer.

03:28:20   3         Q.    Go ahead.

03:28:21   4         A.    And Zing.

03:28:22   5         Q.    And Jay, is what you're saying?

           6         A.    And Jay.

03:28:24   7         Q.    And when she disparaged your

03:28:27   8    abilities in front of Jay, did Jay say anything?

03:28:30   9         A.    No.

03:28:30  10         Q.    And did you say anything to Jay?

03:28:31  11         A.    We would talk privately sometimes.

03:28:33  12         Q.    And what was it that you talked about

03:28:36  13    privately?

03:28:36  14         A.    That Doreen was crazy, and that she

03:28:39  15    would say things that she would immediately

03:28:41  16    forget and correct herself later, and constantly

03:28:45  17    contradict herself - approve one thing, and then

03:28:48  18    not another.  And the last time we spoke

03:28:51  19    privately was when he fired me, and I told him

03:28:52  20    that I had made the mistake of going to bed with

03:28:53  21    her.  He said, quote, "That explains everything."

03:28:59  22         Q.    And who else was present when you had

03:29:01  23    this conversation?

03:29:02  24         A.    Just Jay and I.

03:29:06  25              But I feel quite certain Jay won't

1              *Ronald Britt*

03:29:10  2    lie.  He goes to shul a lot.

03:29:13  3              MS. GOULD:  Move to strike as

03:29:15  4        nonresponsive.

03:29:16  5        Q.    And you mentioned that as part of

03:29:18  6    this so called pattern of discrimination,

03:29:21  7    Ms. Alderman delayed and denied various payments

03:29:25  8    to you; is that correct?

03:29:25  9        A.    I think we submitted some invoices

03:29:27 10    that demonstrate that clearly.

03:29:29 11              MR. KOERNER:  You talked about one

03:29:31 12        of them today.

03:29:31 13        Q.    You submitted some invoices --

03:29:32 14        A.    You have one in your hand.

03:29:33 15        Q.    You submitted some invoices which you

03:29:36 16    say were not paid; is that correct?

03:29:37 17        A.    It's been over a year --

        18        Q.    How many invoices --

03:29:39 19        A.    -- and that was $1,250.

03:29:41 20        Q.    And how many invoices did you submit

03:29:43 21    that were not paid?

03:29:45 22        A.    I'd have to draw that up.  But if

03:29:47 23    you'd like, I'll have that for you Friday.

03:29:47 24        Q.    More than one?

03:29:48 25        A.    Oh, yes, ma'am.

239

1                              *Ronald Britt*

03:29:49  2        Q.     More than two?

03:29:50  3        A.     Oh, yes, ma'am.

03:29:52  4        Q.     But you don't know how many; is that

03:29:54  5   correct?

03:29:54  6        A.     Well, I can give you a big list of

03:29:56  7   them, including some, like, ridiculous emails

03:30:01  8   that she tagged onto it about, "Oh, there's a lot

03:30:02  9   of bills, and we don't -- and, you know, we don't

03:30:05 10   really have that much money right now."

03:30:08 11        Q.     And how many emails along those lines

03:30:09 12   did she send you?

03:30:09 13        A.     I'd have to look through them.

03:30:10 14        Q.     Was any one of them related to

15   Manuel?

03:30:14 16        A.     Manuel?

03:30:15 17        Q.     Yeah, Manuel.

03:30:16 18        A.     I don't know.

03:30:17 19               But he was in the hospital a few

03:30:19 20   times, and she didn't even so much as send him a

03:30:23 21   set of flowers or a card.

03:30:24 22               I would go and check on him.

03:30:27 23        Q.     So, was that part of the pattern of

03:30:30 24   the discrimination against you - that she didn't

03:30:32 25   check on Manuel?

1                    *Ronald Britt*

2          A.     No, ma'am.

03:30:36   3          Q.     And when you say, "Sporadically

03:30:38   4     refusing to address plaintiff's legitimate

03:30:38   5     concerns regarding maintenance issues related to

03:30:42   6     the four buildings he maintained for Thermald,"

03:30:44   7     what are you referring to?

03:30:45   8          A.     Specifically?

03:30:46   9          Q.     Yes.

03:30:46   10         A.     Well, I would point out, the one

03:30:49   11    time I was standing on the roof of 319 East 9th

03:30:54   12    Street, and there was a broken vent pipe leaning

03:31:01   13    hazardously, and her concern was getting rid of a

03:31:05   14    satellite dish that had been married to the --

03:31:09   15    this wall.  She had promised me, in front of Jay,

03:31:12   16    that if I took care of that, painted the

03:31:16   17    corridors, which is not part of my mandate, and a

03:31:19   18    few other freebies, that she would give me the

03:31:21   19    job at Division Street to paint, because they had

03:31:23   20    a lot of chipped pain.  And I might have all this

03:31:27   21    documented.  The issue was that it had to be done

03:31:29   22    in accordance with the lead renovators

03:31:34   23    stipulation; and so, I gave her a price based on

03:31:37   24    that.  I took care of her rider of do this, do

03:31:40   25    that, do the other, and you can have the job.

1          *Ronald Britt*

03:31:42   2          And then, she awarded the job to the

03:31:45   3   people who are working for her now, Bill and Amy.

03:31:49   4   And they did not take care of any of that stuff,

03:31:51   5   and put everyone in that building at risk - there

03:31:52   6   are children, women of pregnancy age.  And she

03:31:57   7   just banged it out with no regard.

03:31:59   8          Q.    When did this occur?

03:32:01   9          A.    It's a few years ago.  I can get you

03:32:04  10   a time.

03:32:11  11          But the legitimate concern would be

03:32:15  12   that lead poison is no joke, and there are laws

03:32:18  13   about it.  And she was risking a $38,000 fine if

03:32:23  14   she got caught.

03:32:24  15          Q.    And did you ever report this

03:32:26  16   condition to anyone?

03:32:27  17          A.    I explained it to her, but I did not

03:32:30  18   rat her out, no.

03:32:30  19          Q.    You didn't report it to any

03:32:34  20   governmental agency?

03:32:34  21          A.    I did not.

03:32:35  22          Q.    And did you ever report this concern

03:32:37  23   to Jay Yablonsky?

03:32:38  24          A.    I did.

03:32:39  25          Q.    And what did he tell you?

242

Ronald Britt

03:32:39  2      A.      He said, "Let it ride."

03:32:42  3      Q.      And this was a few years ago; is that

03:32:45  4   correct?

03:32:45  5      A.      It's when we did the job, yeah.

03:32:49  6              But as far as my procedure, I

03:32:52  7   documented it all, as required.  And I provided

03:32:59  8   her a copy of the lead renovators handbook, as

03:33:04  9   well.

03:33:04  10     Q.      Where is that documentation?

03:33:06  11     A.      It's on my computer.

03:33:08  12     Q.      You indicated that you didn't make

03:33:10  13  any complaints to any governmental agency

03:33:13  14  regarding the alleged harassment by Ms. Alderman

03:33:18  15  prior to the time that you were terminated; is

          16  that right?

03:33:20  17     A.      As I said, I was humiliated,

03:33:24  18  embarrassed, and I wanted to keep my job.

03:33:24  19     Q.      And you didn't make a complaint to a

03:33:25  20  governmental agency; is that correct?

03:33:27  21     A.      Correct.

03:33:28  22     Q.      Now, did you complain to anyone --

          23  withdrawn.

03:33:30  24              And you didn't complain to Jay

03:33:31  25  Yablonsky --

243

*Ronald Britt*

2      MR. KOERNER:  Objection.

03:33:31  3      Q.    -- about any sort of sexual

03:33:34  4  harassment prior to the time that he --

5      MR. KOERNER:  Objection; asked and

6         answered.

03:33:37  7      Q.    -- terminated you; is that correct?

03:33:37  8      A.    I answered that.

03:33:39  9      Q.    You did not make that complaint, is

03:33:42  10  that correct, to Jay?

03:33:43  11      A.    Not until the day he said, "You're

03:33:46  12  fired.  I need the keys back."

03:33:48  13      Q.    Did you make a complaint to anyone

03:33:50  14  that you were sexually harassed by --

03:33:51  15      A.    Yeah, I did.

03:33:52  16      Q.    Well, let me just finish my question,

17  please.

03:33:52  18      Did you make a complaint to anyone

03:33:54  19  that you were sexually harassed by Ms. Alderman

03:33:58  20  prior to the time that you were terminated?

03:34:00  21      A.    Yes, I did.

03:34:00  22      MR. KOERNER:  Objection; asked and

23         answered.

03:34:01  24      You can go ahead and answer.

03:34:01  25      A.    Yes, I did.

244

1                           *Ronald Britt*

03:34:03  2        Q.     And to whom did you make such a

03:34:06  3  complaint?

03:34:06  4        A.     Oh, maybe 50, 60 people.

03:34:09  5        Q.     And give me the names of some of

03:34:10  6  those people.

03:34:12  7        A.     All right.  Mike Rich.

03:34:15  8        Q.     Mike Rich is, who?

03:34:16  9        A.     He owns The Edge bar.  And he was

03:34:19 10  drinking with me on the night that Doreen was

03:34:21 11  calling nonstop.  And he said, "You know, you

03:34:25 12  should just go over there and service her, and

03:34:28 13  keep it to yourself."

03:34:29 14        Q.     Well, isn't it true that he told you

03:34:32 15  it was a bad idea to have a sexual relationship

03:34:34 16  with Ms. Alderman?

03:34:35 17        A.     He did.  But once I was having a

03:34:38 18  sexual relationship, he's like, "You want to keep

03:34:39 19  your job, you better just play ball."

03:34:39 20               And a couple of women in the

03:34:41 21  building.

03:34:41 22        Q.     Which women?

03:34:42 23        A.     A couple of women in the building.

03:34:44 24        Q.     Which women?

03:34:45 25        A.     Well, I don't want to have to name

1                          *Ronald Britt*

03:34:48   2     them, because, obviously, there will be

03:34:51   3     repercussions.

03:34:51   4                  MR. KOERNER:   You have to name

03:34:52   5          them, Ron.

03:34:52   6          A.    All right.   Joann Wasserman.

03:34:57   7          Q.    Where does she live?

03:34:58   8          A.    She lives at 91 East 3rd.

03:35:00   9          Q.    When did you complain to her?

03:35:01  10          A.    She confronted me about it, because

03:35:06  11     she heard about it from Patty, who was my

03:35:09  12     neighbor.

03:35:10  13          Q.    Who's Patty?

          14          A.    She --

03:35:10  15          Q.    Is that Patricia Clark?

03:35:12  16          A.    Correct.

03:35:12  17                And they --

03:35:12  18          Q.    And did you complain to Patty?

03:35:14  19          A.    Patty was aware of the situation.

03:35:16  20          Q.    How was she aware of the situation?

03:35:18  21          A.    Because in the village people gossip,

03:35:21  22     and everybody knew this was going on.

03:35:24  23          Q.    What was going on?

03:35:25  24          A.    That I had had sex with Doreen, and I

03:35:28  25     wasn't having sex Doreen, and she was making my

1                    *Ronald Britt*

03:35:31  2    life miserable.  And every time she was in town,

03:35:36  3    it was common code among my group of friends, who

03:35:37  4    are mostly musicians and do stop into the

03:35:41  5    basement and play music with me all the time,

03:35:45  6    that if there was a light on at her apartment, it

03:35:47  7    was a light on at the Frankenstein Place.  And

03:35:48  8    everybody would be walking on eggshells.

03:35:50  9         Q.    And what does that mean,

03:35:52 10    "Frankenstein Place"?

03:35:54 11         A.    It's a reference to a movie.

03:35:56 12         Q.    And what does it mean when there's a

03:35:57 13    light on at Frankenstein's?

03:35:57 14         A.    That Doreen was in town, and to walk

03:36:01 15    on eggshells.

03:36:02 16         Q.    To be quiet, is that what you mean?

03:36:05 17         A.    Everything.  Just -- you couldn't

03:36:06 18    even breathe.

03:36:07 19         Q.    Who did you actually -- withdrawn.

03:36:09 20               To whom did you actually complain

03:36:12 21    that Ms. Alderman sexually harassed you, prior to

03:36:16 22    the time that you were terminated?

03:36:18 23         A.    I think we've provided a list with

03:36:21 24    phone numbers to you guys.

03:36:24 25         Q.    With some phone numbers.

247

1                        *Ronald Britt*

03:36:26  2            MS. GOULD:  Give me a second.

03:36:29  3      A.     Anyway, when I --

03:36:30  4            MR. KOERNER:  Wait.  Wait.  There's

03:36:32  5      no question.

03:36:34  6            MS. GOULD:  Just give me a second.

03:36:36  7            MR. KOERNER:  As the day goes on,

03:36:38  8      you get tired and you start forgetting

03:36:40  9      about the guidelines.  Answer the

03:36:44 10      questions, yes, no.  Listen to the

03:36:44 11      question and answer it.  Don't start

03:36:46 12      talking about other stuff.

03:37:01 13            Give me one second.

03:37:03 14            MS. GOULD:  Sure.

15            *(Recess held from 3:37 to 3:41 p.m.)*

03:41:06 16      CONTINUED EXAMINATION BY MS. GOULD:

03:41:06 17      Q.     So, you were referring, Mr. Britt, to

03:41:09 18      a list that you provided to us with some names

03:41:12 19      and phone numbers; is that correct?

03:41:14 20      A.     That's right.

03:41:15 21      Q.     And what was that list intended to

22      be?

03:41:17 23      A.     I think you guys asked me for people

03:41:20 24      I complained to about this.

03:41:22 25      Q.     Right.

*Ronald Britt*

1

2          MS. GOULD:  Mark this, please.

3          *(Whereupon, 11-page Plaintiff's*

03:42:26  4      *Amended Response to Defendant Thermald*

03:42:30  5      *Realty I, LP and Doreen Alderman First Set*

03:42:30  6      *of Interrogatory Requests was marked as*

03:42:13  7      *Exhibit 13, for id.)*

03:42:13  8          Q.    Mr. Britt, looking at Exhibit 13,

03:42:23  9   which is entitled Plaintiff's Amended Response to

03:42:27 10   Defendant Thermald Realty I, LP and Doreen

03:42:30 11   Alderman First Set of Interrogatory Requests.

12   (Handing)

13          *(Witness peruses exhibit)*

03:42:32 14          Do you see that?

03:42:33 15      A.    Yes.

03:42:33 16      Q.    And next to this - and I've tabbed

03:42:34 17   this off for you in orange - is a rider.

03:42:38 18          Do you see that?

03:42:38 19      A.    Yes.

03:42:39 20      Q.    And there are 21 names variously with

03:42:46 21   phone numbers, or addresses, or both, or neither

03:42:49 22   on this rider.

03:42:50 23          Do you see that?

03:42:51 24      A.    Yes.

03:42:51 25      Q.    And what are these names intended to

*Ronald Britt*

be?

A.    These are people that are aware of
how stressful it was whenever Doreen was in town.
And people I complained to about, having had sex
with Doreen, that now she was giving me what a
poet once described as no fury like a woman
scorned.

Q.    Did you ever use the words "sexual
harassment" to any one of the people on this
rider?

MR. KOERNER:  If you remember using
those specific words.

A.    I believe so, yes.

Q.    To which individuals did you complain
specifically that Doreen Alderman was engaging in
sexual harassment of you?

A.    Mike Rich.  Mike Lublin.  Haig Hovin.
Ken O'Rourke.  That's my cousin; he's aware of
every minute of it.  Pietro Cappello.

MR. KOERNER:  You said "sexual
harassment" to each of these people?

THE WITNESS:  Oh, yeah.

Q.    Go ahead.

A.    Patricia Clark.

250

*Ronald Britt*

1

2   I don't know why Sean Seymour is

3   listed on this.

4        Q.   Did you complain about sexual

5   harassment to him?

6        A.   No.  You know what, that's -- I know

7   him as Cleet.  Yeah.

8        Q.   Cleet, can you spell it?

9        MR. KOERNER:  Cleet the Beat.

10       A.   C-l-e-e-t.

11       Yeah, Cleet the Beat.

12       Darryl Thomas, Matt Mentzger,

13  Giovanni P-l -- I'm sorry.  P-a-l-a-c-i-o-s.

14  Eliza Blynn.

15       Q.   Well, without going through each of

16  the remaining names, 12 through 21, is there

17  anyone to whom or with whom you did not use the

18  phrase "sexual harassment"?

19       A.   I don't believe so.

20       Gary Austlander.

21       MR. KOERNER:  Yes, basically, all

22     of them?

23       THE WITNESS:  Yeah.

24       MR. KOERNER:  The question now is:

25  Who did you not say "sexual harassment"

251

*Ronald Britt*

2   to?

3        A.    You know, I don't think I said

4   "sexual harassment" to Oliver.  But he asked me

5   why I was so keyed up once, and I said, because

6   Doreen's in town, and I'm living under this sort

7   of Damocles, and she makes my life a living hell.

8   So, except for Oliver, I would say, everyone.

9        Q.    Now, who is Mike Lublin?  What

10  relationship does he have to you?

11       A.    He was an employee of Doreen's for

12  some time, helping out and covering while I was

13  on vacation.  He's also a guitar player.

14       Q.    And where does he play his guitar?

15       A.    Sometimes we play together in a band.

16       Q.    Now, speaking of guitar, I showed you

17  earlier in the deposition a lease for that

18  basement space, about which you answered

19  questions earlier.

20             Do you remember that?

21       A.    My shop.

22       Q.    Your shop.

23             And what other activities do you

24  engage in, in your shop?

25       A.    I work.

252

*Ronald Britt*

03:46:39  2     Q.    What kind of work do you do?

03:46:42  3     A.    All manner of things.

03:46:43  4     Q.    Do you play music in your shop?

03:46:46  5     A.    Sometimes I'm working on amplifiers.

03:46:49  6  Sometimes I'm working on guitars.  Sometimes I'm

03:46:49  7  working on a song.

03:46:49  8     Q.    Do you play music in your shop?

03:46:51  9     A.    Oh, yeah.  Sometimes we do.

03:46:53  10    Q.    And do other people play music with

03:46:55  11  you in your shop?

03:46:56  12    A.    Yes, we do.

03:46:57  13    Q.    And how frequently does that occur?

03:47:00  14    A.    Not often enough in my book.  But,

03:47:02  15  occasionally.

03:47:03  16    Q.    How many times a week does that

03:47:04  17  occur?

03:47:04  18    MR. KOERNER:  Objection.

03:47:06  19    You can answer.

03:47:06  20    A.    There's whole weeks that go by where

03:47:10  21  no music is played.  And then, there's weeks

03:47:10  22  where two or three times through the week.

03:47:13  23    Q.    And at any one time, what's the

03:47:16  24  maximum number of people that are in that

03:47:19  25  basement space, playing music, when they play?

253

1                        *Ronald Britt*

2              A.     It varies.

3              Q.     What's the maximum number that you

03:47:23  4    ever had there, playing music?

03:47:23  5              MR. KOERNER:  That are playing

03:47:24  6         music at one time?

7              MS. GOULD:  Yes.

03:47:25  8              MR. KOERNER:  Maximum number of

03:47:27  9         people playing music.

03:47:29  10             A.     Maybe 11 or 12.

03:47:31  11             Q.     And how many times have you had 11 or

03:47:34  12   12 playing music in this space?

03:47:35  13             A.     Many times.

03:47:37  14             Q.     Okay.  Over what period of time have

03:47:41  15   you and others been playing music in that space?

03:47:43  16             A.     Since day one.

03:47:45  17             Q.     Who is Haig Hovin?

03:47:54  18             A.     He's a friend of mine.

03:47:54  19             Q.     Where does he live?

03:47:56  20             A.     I think he lives now in Greenpoint.

03:48:00  21             Q.     Greenpoint, New York?

03:48:01  22             A.     Yeah.

03:48:02  23             Q.     Do you have an address for him?

03:48:03  24             A.     Brooklyn.

03:48:05  25                    Yeah, I think I do.

254

*Ronald Britt*

03:48:07  2     Q.    And will you provide that to your

03:48:10  3  lawyer, please?

03:48:11  4     A.    Yeah.

03:48:12  5         Do you want me to look it up right

03:48:14  6  now?

03:48:14  7     Q.    No.

8  *DOCUMENT/DATA REQUESTED:*_____

03:48:16  9     Q.    Who is Ken O'Rourke -- or, you said

03:48:17  10  he's your cousin.

03:48:18  11     A.    That's my cousin.

03:48:18  12     Q.    Where does he live?

03:48:20  13     A.    Tampa, Florida -- actually,

03:48:22  14  St. Petersburg.

03:48:23  15     Q.    When did you complain to him about

03:48:24  16  Ms. Alderman?

03:48:25  17     A.    From day one.

03:48:27  18     Q.    And you used the phrase "sexual

03:48:30  19  harassment" to Mr. O'Rourke?

03:48:32  20     A.    Yes.

03:48:33  21     Q.    And do you have an address for him?

03:48:34  22     A.    No; but I can get you one.

03:48:37  23  *DOCUMENT/DATA REQUESTED:*_____

03:48:37  24     Q.    And who is Mr. Cappello?

03:48:39  25     A.    He's just a person I know.  He's

255

Ronald Britt

03:48:43 2    helped me on occasion with various handy jobs.

03:48:47 3         Q.    Has he helped you at any Thermald

03:48:50 4    property?

03:48:50 5         A.    I don't recall if he has or not.

03:48:52 6         Q.    When's the last time you saw him?

03:48:53 7         A.    Last time I saw Pietro was, I think,

03:48:57 8    four -- four days ago.

03:48:59 9         Q.    When did you complain to him about

03:49:01 10   Ms. Alderman?

03:49:01 11        A.    All along.

03:49:03 12        Q.    And Ms. Clark is a tenant; is that

03:49:06 13   correct?

03:49:06 14        A.    Yes, she is.

03:49:07 15        Q.    And are you saying that you

03:49:09 16   complained to her about Ms. Alderman?

03:49:10 17        A.    Yes.

03:49:11 18        Q.    When did you do that?

03:49:12 19        A.    After the first time we had sex.

03:49:14 20        Q.    And any time thereafter?

03:49:16 21        A.    She always asks me about it.

03:49:18 22        Q.    She asks you about what?

03:49:20 23        A.    About, is Doreen still hassling me.

03:49:24 24        Q.    And who is Cleet Seymour?

03:49:28 25        A.    He's a friend of mine.

*Ronald Britt*

1

2  03:49:29      Q.    And what is his address?

3  03:49:31      A.    I can get that for you.

4  03:49:34            MS. GOULD:  Please provide it to

5  03:49:35      your lawyer.

6  03:49:37  *DOCUMENT/DATA REQUESTED:*_____

7  03:49:37      Q.    And when did you complain to him

8  03:49:38  about Ms. Alderman?

9  03:49:39      A.    All along.

10 03:49:40     Q.    And who is Darryl Thomas?

11 03:49:42     A.    He's a friend of mine.

12 03:49:44     Q.    And what's his address?

13 03:49:45     A.    I'll get it for you.  He lives in

14 03:49:48  Elmont.

15         *DOCUMENT/DATA REQUESTED:*_____

16 03:49:49           THE WITNESS:  Darryl was there from

17 03:49:50     the very beginning.  At the time, he was

18 03:49:53     living in a shelter; and when I first

19 03:49:56     agreed to rent the basement, he went to

20 03:49:59     the shelter and got 12 other guys to help

21 03:50:03     me transform it from a total, total sewer.

22 03:50:09     I mean, if you want a description, I'll

23 03:50:11     happily tell you, but Darryl was

24 03:50:13     instrumental in helping me get it

25 03:50:15     together, and he's been there from day