# GOULD EXHIBIT "B"

1

1

2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      -------------------------------------x
       RONALD BRITT,
4
                              Plaintiff,
5
                    - against -                 Docket No.
6                                               13 CV 8289
       THERMALD REALTY I, LP d/b/a REALTY
7      ASSOCIATES I, LP and WAVECREST
       MANAGEMENT TEAM, LTD d/b/a WAVECREST
8      MANAGEMENT GROUP, LLC and WAVECREST
       EQUITIES, LLC, and DOREEN ALDERMAN,
9
                              Defendants.
10     -------------------------------------x

11

12            EXAMINATION BEFORE TRIAL of the Defendant,

13     Wavecrest Management Team, LTD, d/b/a Wavecrest

14     Management Group, LLC and Wavecrest Equities,

15     LLC, by JAY YABLONSKY, taken pursuant to

16     Notice, held at the Koerner Law Firm, 111 John

17     Street, New York, New York 10038, on June 24,

18     2014, commencing at 10:10 a.m., before IRIS

19     FERNHOFF, a Shorthand Reporter and Notary

20     Public within and for the State of New York.

21

22

23                    📄 COPY

24

25

2

```
 1

 2      A P P E A R A N C E S:

 3

 4      KOERNER LAW FIRM
        Attorney for Plaintiff
 5              111 John Street, Suite 420
                New York, New York 10038
 6
        BY:     GREGORY KOERNER, ESQ.
 7

 8

        KAUFMAN DOLOWICH VOLUCK, ESQS.
 9      Attorneys for Defendant
        Wavecrest Management Team, LTD.
10      d/b/a Wavecrest Management Group, LLC
        and Wavecrest Equities, LLC
11              135 Crossways Park Drive, Suite 201
                Woodbury, New York 11797
12
        BY:     JEFFREY ETTENGER, ESQ.
13

14

        GOULD & BERG, LLP
15      Attorneys for Defendants
        Thermald Realty Associates I, LP
16      and Doreen Alderman
                222 Bloomingdale Road
17              White Plains, New York 10605

18      BY:     JANE BILUS GOULD, ESQ.

19

20      ALSO PRESENT:

21              Doreen Alderman - Defendant
                Gregory Haroutunian - Intern
22

23

24

25
```

IRIS FERNHOFF REPORTING     (516) 317-3426

1

2                        STIPULATIONS

3

4        IT IS HEREBY STIPULATED AND AGREED by

5     and between the attorneys for the respective

6     parties herein that the filing, sealing and

7     certification of the within deposition be

8     waived.

9        That such deposition may be signed

10    and sworn to before any officer authorized to

11    administer an oath with the same force and

12    effect as if signed and sworn to before the

13    officer before whom said deposition was taken.

14       IT IS FURTHER STIPULATED AND AGREED that

15    all objections except as to form are reserved

16    for the time of trial.

17

18

19

20

21

22

23

24

25

```
1                        J. Yablonsky

2     J A Y   Y A B L O N S K Y, having been first

3     duly sworn by a Notary Public within and for

4     the State of New York, was examined and

5     testified under oath as follows:

6

7     EXAMINATION BY

8     MR. KOERNER:

9          Q     State your name for the record.

10         A     Jay Yablonsky.

11         Q     State your address for the record.

12         A     87-14 116th Street, Richmond Hill,

13    New York 11418.

14         Q     Thank you for being here, Mr.

15    Yablonsky.  Do you understand why you're here

16    today?

17         A     Yes, I do.

18         Q     Can you tell me what your

19    understanding is?

20         A     Giving a deposition on a case that

21    Mr. Britt brought against several defendants,

22    my company included.

23         Q     And the address you gave the court

24    reporter before, is that your home address?

25         A     No, it's not.
```

```
1                           J. Yablonsky

2           Q       That's your work address?

3           A       That's correct.

4           Q       Do you have a work address in

5    Manhattan?

6           A       No, I don't.

7           Q       Have you sat for a deposition

8    before today?

9           A       Yes, I have.

10          Q       Have you ever been a defendant in

11   a lawsuit before?

12          A       Yes, I have.

13          Q       And in your capacity as an

14   employee of Wavecrest or in another capacity?

15          A       Both.

16          Q       Can you tell me the situation

17   where you were a defendant in a lawsuit before

18   personally?

19          A       Management building-related cases.

20          Q       Have any of the cases ever

21   involved claims of sexual harassment?

22          A       No.

23          Q       The same instructions that applied

24   in your prior depositions are going to apply

25   today.  If I ask you a question, I would ask
```

```
1                          J. Yablonsky
2       you to wait until I finish asking the question
3       before you answer.
4                    If you don't understand a
5       question, please me know you don't understand,
6       otherwise, I will assume that you understood
7       the question.   Okay?
8             A      That's fine.
9             Q      Who is your current employer?
10            A      Wavecrest Management Team Limited.
11            Q      What is your job there?
12            A      Director of property management.
13            Q      How long have you had that job?
14            A      Since December of 2001.
15            Q      And that address is in Richmond
16      Hill?
17            A      That is correct.
18            Q      And what is your salary?
19                   MR. ETTENGER:   Objection.
20                   You can answer over my objection.
21            A      It is none of your concern.
22            Q      It is my concern.
23                   MR. ETTENGER:   You can answer.
24                   We'll have it stricken at a later time.
25            A      Somewhere around a hundred and
```

J. Yablonsky

1

2    forty thousand.

3         Q    And do you get health benefits?

4         A    No, I don't.

5         Q    Are you currently married?

6         A    Yes, I am.

7              MR. ETTENGER:  Objection.

8         Q    Do you have children?

9              MR. ETTENGER:  Objection.

10        A    Yes, I do.

11        Q    How many?

12             MR. ETTENGER:  Counsel, he is not

13   a defendant in the case.  He's coming as

14   a corporate representative of the

15   defendant.  Personal questions are

16   not --

17             MR. KOERNER:  That's not a

18   personal question.  Just answer it and

19   I'll move on, unless you're directing

20   him not to answer and --

21             MR. ETTENGER:  I don't understand

22   the question so --

23   BY MR. KOERNER:

24        Q    How many children do you have?

25             MR. ETTENGER:  This is the last

IRIS FERNHOFF REPORTING    (516) 317-3426

```
 1                      J. Yablonsky

 2          question of this nature I'm going to

 3          permit him to answer.

 4          A    Three.

 5          Q    Thank you.

 6               Have you ever been arrested?

 7               MR. ETTENGER:  Objection.

 8          A    No.

 9          Q    Have you ever entered into any

10    agreement whatsoever with anyone regarding this

11    lawsuit?

12               MR. ETTENGER:  Objection.

13               Excuse me?

14               MS. BILUS-GOULD:  Objection to

15          form.

16    BY MR. KOERNER:

17          Q    ^RULING^ Have you ever entered

18    into any agreement whatsoever with anyone

19    concerning the lawsuit?

20               MR. ETTENGER:  I am going to

21          direct him not to answer.  I have no

22          idea what that question means.

23               MR. KOERNER:  We're going to mark

24          that for a ruling.

25               MR. ETTENGER:  Fine, mark it for a
```

IRIS FERNHOFF REPORTING     (516) 317-3426

9

```
 1                  J. Yablonsky
 2          ruling.
 3     BY MR. KOERNER:
 4          Q    Have you ever entered into
 5     agreement with any of the parties with respect
 6     to this lawsuit?
 7               MS. BILUS-GOULD:  Objection to
 8          form.
 9               MR. ETTENGER:  I don't understand.
10          I'm not objecting.  I don't understand
11          what do you mean by "an agreement"?
12               MR. KOERNER:  Any agreement.
13               MR. ETTENGER:  Of what nature?
14               MR. KOERNER:  Regarding any
15          nature.  This is background questions.
16               MR. ETTENGER:  They're not
17          background questions.  It makes no
18          sense.
19     BY MR. KOERNER:
20          Q    Have you ever entered into any
21     agreement with anyone regarding this lawsuit?
22               MS. BILUS-GOULD:  Same objection.
23               MR. ETTENGER:  What do you mean
24          "with anyone"?  I don't understand what
25          you --
```

IRIS FERNHOFF REPORTING    (516) 317-3426

```
1                    J. Yablonsky
2            MR. KOERNER:  It could be an
3        insurance company.  It could be with
4        Miss Alderman.
5            MR. ETTENGER:  He, him personally?
6    BY MR. KOERNER:
7        Q    Any question I ask you from here
8    on end is you personally or as a representative
9    of Wavecrest.
10           Have you personally or as a
11   representative of Wavecrest entered into any
12   agreement with respect to this lawsuit?
13           MS. BILUS-GOULD:  Objection to
14       form.
15           MR. ETTENGER:  You can answer to
16       the extent you know what he's talking
17       about.
18       A    I have not personally entered into
19   any agreements.
20       Q    Have you ever entered into any
21   agreement on behalf of Wavecrest?
22           MS. BILUS-GOULD:  Objection to
23       form.
24       A    I have not entered into any
25   agreement on behalf of myself or on behalf of
```

1                    .             J. Yablonsky

2    Wavecrest.

3         Q    Are you aware of any insurance

4    which would cover Wavecrest or any of the

5    defendants with respect to this lawsuit?

6              MR. ETTENGER:  Objection.  You've

7              been provided a copy of his insurance

8              policy.

9              MR. KOERNER:  I'm asking whether

10             he's aware of it.

11             MR. ETTENGER:  If he's aware that

12             they have insurance?

13             MR. KOERNER:  This is going to be

14             a really long deposition.  Yes.

15             MR. ETTENGER:  It's not a relevant

16             question.  It's not an appropriate

17             question --

18             MR. KOERNER:  Yes, it is.

19             MR. ETTENGER:  -- but you can ask.

20             To the extent you know if

21             Wavecrest has insurance, you can answer.

22        A    Wavecrest does maintain insurance.

23        Q    And is that insurance policy

24    covering the defense of this lawsuit?

25             MS. BILUS-GOULD:  Objection to

1                    J. Yablonsky

2          form.

3               MR. ETTENGER:  To the extent you

4          know anything about the insurance

5          information, you can answer.

6          A    I don't know what parts of it may

7     be covered.  I don't know what limits of

8     liability may have been expressed by the

9     insurance company, so I couldn't answer beyond

10    that.

11         Q    Do you know what the limits of the

12    insurance policy are?

13         A    No, I don't.

14              MR. KOERNER:  Mark this as an

15         exhibit.  Something that was produced

16         this morning by Mr. Ettenger, the

17         witness's lawyer, purportedly showing

18         one million dollars of coverage.

19    BY MR. KOERNER:

20         Q    And I would ask you if you have

21    seen this insurance policy before?

22              MS. BILUS-GOULD:  Are we're

23         marking it as an exhibit?

24              MR. KOERNER:  Sure.

25              MR. ETTENGER:  Are we marking this

IRIS FERNHOFF REPORTING    (516) 317-3426

13

1           J. Yablonsky

2       as the next exhibit?

3           MS. BILUS-GOULD:  Yes.  I propose

4       that we continue to mark them and the

5       next one would be 22 according to my

6       account.

7           MR. KOERNER:  Let her mark it

8       first and then you can look at it.

9           (Whereupon, insurance document was

10      marked Exhibit 22 for identification as

11      of this date by the reporter.)

12      A    No, I have not seen this

13  previously.

14      Q    And you were not involved in the

15  production of this document to your attorneys

16  in connection with this litigation?

17      A    No, I wasn't.

18      Q    Okay.  Thank you.

19          What is your highest level of

20  education, Mr. Yablonsky?

21      A    I've done master's work.

22      Q    In?

23      A    Urban planning.

24      Q    And prior to working at Wavecrest,

25  can you describe for me what your work history

J. Yablonsky

1

2   has been?

3       A    I was doing property management

4   prior to working for Wavecrest as well.

5       Q    Can you tell me what the names of

6   the companies were that you have been doing

7   property management with?

8       A    The name of the company I worked

9   with prior to Wavecrest was Apran Associates,

10  A-P-R-A-N.

11      Q    And did you have any property

12  management jobs prior to that?

13      A    Yes, I did.

14      Q    Can you just go ahead and list

15  each one that you had?

16      A    Prior to Apran I worked for a firm

17  by the name of Crestmont.  Prior to that I

18  worked for a company by the name of Home

19  Marketing of America.  And prior to that I

20  worked for Starrett Housing.

21      Q    And how long of a period do these

22  different jobs encompass?

23          MS. BILUS-GOULD:  Objection to

24      form.

25  BY MR. KOERNER:

IRIS FERNHOFF REPORTING    (516) 317-3426

1                          J. Yablonsky

2          Q    Can you describe the chronology of

3     your employment?

4              MR. ETTENGER:  Meaning, when did

5          you start --

6     BY MR. KOERNER:

7          Q    When did you start becoming

8     property manager, approximately?

9          A    Let's see.  I've been with

10    Wavecrest since 2001.  Prior to that was

11    probably early '90s.  I don't remember the

12    exact timing.  Each was for an extended period.

13             MR. ETTENGER:  I think he wants to

14         know when you started as a property

15         manager.

16         A    I started working in related

17    industries in construction management with

18    Starrett Housing back in -- I guess it will be

19    around '71, '72.

20         Q    And at your position at Wavecrest

21    did you have supervisory responsibilities?

22         A    Yes, I did.

23         Q    How many persons did you

24    supervise?

25         A    Depends on whether you consider

J. Yablonsky

1

2   building maintenance staff, but it would

3   probably be, I guess, thirty some odd.

4        Q    And as part of your supervisory

5   position were you responsible for

6   administering, monitoring Title 7 management

7   duties?

8        A    Not familiar with what that would

9   be.

10       Q    As part of your supervisory

11  responsibilities were you responsible for

12  making sure that those that you were

13  supervising and working with did not violate

14  employment laws?

15            MS. BILUS-GOULD:  Objection to

16       form.

17       A    Not sure that ever came up as a

18  subject matter.

19       Q    During the course of your entire

20  career since 1971, have you ever had any

21  involvement in any lawsuits that involved

22  sexual harassment?

23       A    I believe you've already asked

24  that.

25       Q    I don't think so.

IRIS FERNHOFF REPORTING    (516) 317-3426

```
1                    J. Yablonsky

2              MR. ETTENGER:  You did.  He said

3         "no."

4              MS. BILUS-GOULD:  You did.

5    BY MR. KOERNER:

6         Q    When you were hired by Wavecrest

7    who hired you?

8         A    Fred and Susan Camerata,

9    C-A-M-E-R-A-T-A.

10        Q    And who interviewed you for the

11   position?

12        A    Both of them did.

13        Q    And that position that you were

14   hired for, is that the position that you

15   currently have now?

16        A    Essentially.

17        Q    When you were hired what

18   information, if any, were you given about

19   sexual harassment?

20        A    None that I recall.

21        Q    At any point during the time you

22   were working at Wavecrest were you ever given

23   any information about sexual harassment?

24        A    Yes.

25        Q    Can you describe for me the first
```

1                         J. Yablonsky

2    time you were given any such information?

3            A    Within the last year or two we had

4    a in-office seminar regarding it.

5            Q    And who initiated that seminar?

6            A    I don't know.

7            Q    How many people attended?

8            A    I don't know.

9            Q    Who led the seminar?

10           A    I believe it was an outside

11   attorney, but I don't recall specifically.

12               MR. KOERNER:  Can you find that

13           out, the information about who led the

14           seminar and when it took place and who

15           attended; can you get that information?

16               I'm making a request now.

17               MR. ETTENGER:  We can make that

18           available.

19   BY MR. KOERNER:

20           Q    How long did the seminar last?

21           A    Maybe an hour or two.

22           Q    Can you describe what was

23   discussed?

24           A    Not really.

25           Q    Why not?

1                    J. Yablonsky

2         A     Because I don't recall the

3    specifics of it.

4         Q     Do you recall anything about it?

5         A     Only that it occurred.

6         Q     And you have no information as to

7    what prompted that seminar?

8         A     No, I don't.

9         Q     To your belief was this seminar

10   related to the filing of this lawsuit?

11        A     Not to my knowledge, no.

12        Q     Sitting here today is defendant,

13   Doreen Alderman.  Do you know her?

14        A     Yes, I do.

15        Q     When was the first time you met

16   her?

17        A     Probably back in 2003 or '4.

18        Q     Can you describe the circumstances

19   when you first met her?

20        A     I first met her when we were

21   interviewing to assume the management of the

22   properties that she's involved in.

23        Q     And what properties are those?

24        A     There are four properties located

25   at 91 East 3rd Street, 419 East 9th Street --

```
1                    J. Yablonsky
2    I'm sorry.
3                 415 East 9th Street, 319 East 9th
4    Street, 115 Division Street and 91 East 3rd
5    Street.
6         Q    And is it your understanding that
7    those properties were owned by an entity called
8    Thermald Realty?
9                 MS. BILUS-GOULD:   Objection to the
10        form.
11        A    It's my understanding that three
12   of them were.
13        Q    And the fourth property was owned
14   by who?
15        A    A different corporate entity.
16        Q    Do you know the name of that
17   corporate entity?
18        A    I don't remember.  Shanghai
19   Properties maybe.  I don't remember the full
20   corporate name.
21        Q    Do you know the who are the
22   principal of the Shanghai Properties?
23        A    No, I don't.
24        Q    Do you know who the principals of
25   Thermald Realty were?
```

1                           J. Yablonsky

2              A      I believe at the time they were

3      Thermald Alderman.

4              Q      And is that Doreen Alderman's

5      father?

6              A      That's correct.

7              Q      And did there come a time when Mr.

8      Alderman's ownership interest in these

9      properties transferred to Doreen Alderman?

10             A      I don't know what happened in

11     terms of corporate entities and transfer of

12     ownership.

13             Q      Is Mr. Alderman, is he currently

14     alive?

15             A      No, he's not.

16             Q      Do you know when he passed away?

17             A      No, I don't.

18             Q      With respect to these properties

19     when you first interviewed to get that business

20     did you interview with Mr. Alderman?

21             A      No, I didn't.

22             Q      Who did you interview with?

23             A      I personally met with Miss

24     Alderman.

25             Q      And can you describe what happened

1                     J. Yablonsky

2    at that meeting?

3              MS. BILUS-GOULD:  Objection to

4         form.

5              You can answer.

6         A    That meeting was basically a

7    walkthrough of the properties.

8         Q    And at that time were you awarded

9    the contract to manage those properties?

10        A    Ultimately we were, yes.

11        Q    At when did you start managing

12   these properties?

13        A    I believe it was sometime in 2004.

14        Q    And during that time when you

15   wanted to get direction with respect to the

16   management of those properties, who did you

17   report to?

18        A    Ms. Alderman.

19        Q    So during the entire course of

20   your involvement with these properties your

21   boss was Miss Alderman; is that correct?

22              MR. ETTENGER:  Objection.

23              MS. BILUS-GOULD:  Objection to

24         form.

25              MR. ETTENGER:  You can answer.

```
 1                    J. Yablonsky

 2        A     She was my ownership contact.

 3        Q     And was she responsible for

 4   Wavecrest continuing to act as the management?

 5              MS. BILUS-GOULD:  Objection to

 6        form.

 7              MR. KOERNER:  Let me rephrase

 8        that.

 9   BY MR. KOERNER:

10        Q     Was she, based on your

11   understanding, was she the individual who could

12   decide whether or not Wavecrest would continue

13   to work in those properties?

14        A     That was my understanding.

15        Q     Is it fair to characterize her as

16   your client?

17              MS. BILUS-GOULD:  Objection to

18        form.

19   BY MR. KOERNER:

20        Q     How would you characterize her in

21   your words, her relationship to you?

22        A     That would be with a fair

23   characterization.

24        Q     And it was your job to address her

25   concerns; is that correct?
```

IRIS FERNHOFF REPORTING    (516) 317-3426

```
 1                    J. Yablonsky
 2            MR. ETTENGER:  Objection.
 3            MS. BILUS-GOULD:  Same objection.
 4            MR. ETTENGER:  You're talking
 5        about for the entire period of the
 6        contract?
 7            MR. KOERNER:  Yes.
 8        A    That's essentially correct.
 9        Q    And with respect to the buildings
10    that Miss Alderman and Thermald Realty owned,
11    did you supervise any employees with respect to
12    those buildings?
13        A    Yes.
14        Q    Who were those employees?
15        A    Would depend on the time frame
16    that you're talking about.
17        Q    So let's start from beginning and
18    go on all the way until the end.
19            MS. BILUS-GOULD:  What's the
20        question?
21            MR. ETTENGER:  I think in 2004
22        when you got there, was there a
23        superintendent, was there a janitor or
24        something else?
25        A    I'm trying to recall.  I think at
```

IRIS FERNHOFF REPORTING     (516) 317-3426

1                    J. Yablonsky

2     the beginning there was a non-resident.  I

3     don't remember if it was a direct employee or a

4     service.

5                    At some point we hired a resident

6     superintendent, and down the road we wound up

7     hiring both a resident superintendent as well

8     as a porter.

9     BY MR. KOERNER:

10             Q    Can you give me the names of the

11    resident superintendent, the first one, and

12    then ultimately who else may have been hired?

13             A    First one I remember, I don't know

14    if he was the first one, was a Brendan Burke, I

15    believe his last name was.

16             Q    Can you describe for me what Mr.

17    Burke's job was and your view of how well he

18    did the job?

19                    MS. BILUS-GOULD:  Objection to

20             form.

21                    You can answer.

22             A    His job was to both maintain the

23    building and the building's mechanical systems,

24    to respond to tenants complaints, to clean the

25    properties, to take out the rubbish, take out

1                    J. Yablonsky

2       the recycling, general building maintenance.

3             Q     And he lived in the building?

4             A     He lived in one of the buildings.

5             Q     And can you describe for me your

6       opinion as to the quality of his work?

7                   MS. BILUS-GOULD:  Objection to

8             form.

9                   You can answer.

10            A     I think the quality of his work

11      started out satisfactory and slipped over time.

12            Q     And was he eventually fired,

13      Brendan we're talking about?

14            A     I don't recall whether he was

15      terminated or left voluntarily.

16            Q     But were there problems with his

17      job performance prior to his departure?

18                  MS. BILUS-GOULD:  Objection to

19            form.

20            A     There were some issues with it,

21      yes.

22            Q     Did you express those issues to

23      him?

24            A     We would have, yes.

25            Q     Can you tell me your recollection

1                    J. Yablonsky

2       of how you expressed those to him?

3            A    Would have been verbally.

4            Q    Can you describe to me the content

5       of any of the verbal discussion that you would

6       have had?

7            A    Not that I recall specifically.

8            Q    And after Brendan left, was he

9       replaced as a superintendent?

10           A    Yes, he was.

11           Q    Who was he replaced by?

12           A    He was replaced by Mr. Britt to do

13      the basic superintendent work.  And we also

14      hired somebody to do the porter work; the

15      cleaning the garbage, the recycling.

16           Q    When you hired Mr. Britt did you

17      know him previously?

18           A    Yes, sir.

19           Q    Can you describe for me how you

20      first came to know Mr. Britt?  We're talking

21      about the Plaintiff in this, Ronald Britt, how

22      you first came to know him, when and what

23      circumstances?

24           A    He was renting some basement space

25      from us.

```
 1                    J. Yablonsky

 2        Q     And do you recall when he started

 3   renting the basement space?

 4        A     Not specifically, no.

 5        Q     But it was certainly prior to when

 6   he became superintendent of the building,

 7   correct?

 8        A     That's correct.

 9        Q     And can you describe for me

10   approximately how long it was that he was a

11   tenant before he became a superintendent?

12        A     Don't know offhand.

13        Q     And during the time that he was a

14   tenant, before he became a superintendent, were

15   you aware of any problems with respect to his

16   tenancy?

17             MS. BILUS-GOULD:  Objection to

18        form.

19             You can answer.

20        A     Not that I recall.

21        Q     Would you have hired him as a

22   superintendent if there had been any problems

23   with his tenancy?

24             MR. ETTENGER:  Objection.

25             MS. BILUS-GOULD:  Objection to
```

1                    J. Yablonsky

2          form.

3                    MR. ETTENGER:   You can answer.

4          A     Probably not.

5          Q     And the basement space that he

6     rented from Miss Alderman, Thermald Realty, do

7     you know for what purpose that basement space

8     was used for?

9          A     It was used basically for storage

10    of materials and equipment that he had.   And I

11    believe he was also using it for some shop

12    work.

13         Q     And was he also ever using it to

14    play music, to your knowledge?

15         A     Initially.   I don't recall.

16         Q     Did there come a time when he was

17    using it to play music in some capacity that

18    you recall?

19         A     Yes.

20         Q     When was the first time you became

21    aware of that?

22         A     No idea.

23         Q     Was it prior to the time he was

24    terminated from the job?

25         A     Yes.

1                        J. Yablonsky

2          Q     Was his playing music in that

3     space, was it ever a problem as far as you were

4     concerned in your capacity as management for

5     Wavecrest?

6                MS. BILUS-GOULD:   Objection to

7          form.

8          A     Yes.

9          Q     When was it first expressed as a

10    problem?

11         A     It was.   I don't know when.

12         Q     Approximately?

13         A     I don't have a time frame.

14         Q     Within the last year?

15         A     I would say prior to then.

16         Q     And do you recall when Mr. Britt

17    was fired?

18         A     Sometime in the spring of 2013.

19         Q     Can you describe the circumstances

20    whereby Mr. Britt changed his role from just a

21    tenant to being a tenant and a superintendent

22    of the building?

23                MS. BILUS-GOULD:   Objection to

24          form.

25    BY MR. KOERNER:

                IRIS FERNHOFF REPORTING     (516) 317-3426

```
 1                    J. Yablonsky

 2         Q    How did that happen?

 3              MS. BILUS-GOULD:  Objection to

 4         form.

 5         A    I'm not sure I understand the

 6    question.

 7         Q    Do you know how Mr. Britt was

 8    hired?

 9              MS. BILUS-GOULD:  Objection to

10         form.

11    BY MR. KOERNER:

12         Q    Mr. Britt was hired as a

13    superintendent of these buildings; is that

14    correct?

15         A    That's correct.

16         Q    Who was he hired by?

17         A    He was hired by Ms. Alderman and

18    myself.

19         Q    Whose idea was it to hire Mr.

20    Britt?

21         A    I don't recall.

22         Q    Was it your idea?

23         A    I don't recall.

24         Q    Can you describe for me the

25    quality of Mr. Britt's work while he was a
```

```
 1                    J. Yablonsky
 2    superintendent there?
 3              MR. ETTENGER:  For the entire
 4         period of time?
 5              MR. KOERNER:  Let's start with the
 6         -- yes, the entire period of time, and
 7         then I'd like him to introduce this, an
 8         exhibit.  This is the letter that you
 9         wrote for him on May 6, 2013 stating,
10         among other things, that Mr. Britt has
11         proven himself to be a loyal, hard
12         working dedicated employee.
13              MS. BILUS-GOULD:  Why don't we
14         mark that?
15              MR. KOERNER:  Let's mark it and
16         then I want you to say, sitting here
17         today if you agree with everything you
18         wrote back then?  That's the question.
19              (Letter is marked Exhibit 23 for
20         identification, as of this date.)
21              MR. ETTENGER:  He's read it, so
22         whatever question you want to ask.
23              THE WITNESS:  Would you repeat the
24         last question, please?
25    BY MR. KOERNER:
```

1                    J. Yablonsky

2          Q     Do you agree with everything you

3    wrote on May 6, 2013, as you sit here today?

4          A     I would say that the letter was

5    written with a certain spin in the hope that it

6    would land him a job, and that's the fastest

7    way of having a terminated super leave the

8    building.

9          Q     Is there anything in this letter

10   that's false?

11         A     As I said, it's written with a

12   certain spin.  I wouldn't characterize it as

13   false, no.

14         Q     Everything in this letter is true?

15               MS. BILUS-GOULD:   Objection to

16         form.

17         A     I think I already answered that.

18         Q     Did you write a letter of

19   recommendation for Brendan when he left the

20   building as superintendent?

21         A     I don't recall.  I probably did.

22         Q     Sitting here today, without any

23   spin, can you describe for me what your opinion

24   was with respect to Mr. Britt's work as a

25   superintendent?

```
 1                    J. Yablonsky
 2           MS. BILUS-GOULD:  Objection to
 3      form.
 4           MR. ETTENGER:  You could answer.
 5      A    I would say Mr. Britt's work was
 6  average.  There were things that he did well.
 7  There were things that he created and many
 8  problems that he solved.  I certainly received
 9  multiple complaints about him from tenants and
10  contractors.  I also received at times
11  compliments about him.
12      Q    Which tenants complained about
13  him?
14      A    There were several that did as I
15  recall.  There was a first-floor tenant in -- a
16  relatively new tenant in 415 East 9th Street,
17  the name is escaping me, that complained quite
18  a bit.  Mary Shields.  There was --
19      Q    No, no.  Let's go to each one.
20           First tenant, you don't remember
21  his name?
22      A    I don't remember the name offhand.
23      Q    Was there any documentation
24  regarding complaints about him?
25      A    Not that I recall.
```

```
 1                      J. Yablonsky

 2              MR. KOERNER:  We would ask that

 3         that person's information be furnished

 4         to us.

 5              MR. ETTENGER:  Put all your

 6         requests in writing.

 7    BY MR. KOERNER:

 8         Q    Is that tenant currently still

 9    there?

10         A    No.

11         Q    How long was he there?

12         A    I don't remember.  Probably two

13    years.

14         Q    Who else?

15         A    I don't remember it specifically.

16    There were several tenants.

17         Q    Well, I'm asking you.  This is a

18    lawsuit and it's very important for me that we

19    identify the specific people that complained

20    about Mr. Britt because I have a whole list of

21    people who rave about him.

22              I'm asking again, please give me

23    the specific names of anyone who complained

24    about Mr. Britt?

25              MR. ETTENGER:  To the extent that
```

IRIS FERNHOFF REPORTING     (516) 317-3426

1                           J. Yablonsky

2               you can recall.

3               A    I know there was a complaint from

4    a Mary Shields.

5               Q    Is she currently a tenant there?

6               A    No, she's not.

7               Q    When did she leave?

8               A    She left about two years ago, I

9    would guess.

10              Q    Do you have her current

11   information?

12              A    No, I don't think so.

13              Q    Where I can contact her?

14              A    No idea.

15              Q    Would you be able to find that for

16   me?

17              A    I would doubt it.

18              Q    So Mary Shields, who we don't know

19   who she is and she's not currently at the

20   building.   Anybody else?

21              A    We received complaints from a

22   Danny Chevez.

23              Q    Who is he?

24              A    He's a tenant in the building.

25              Q    What's his unit number?

```
 1                    J. Yablonsky
 2            MR. ETTENGER:  If you don't
 3        recall, we can leave a space in the
 4        transcript.  That's fine.
 5        A    I want to say Unit 8 but I'm not a
 6   hundred percent sure.
 7        Q    Is he currently a tenant there?
 8        A    Yes, he is.
 9        Q    Anybody else?
10        A    There were, but I don't recall the
11   specifics.
12        Q    You stated that you also received
13   compliments about Mr. Britt's dedication to the
14   job; is that correct?
15            MS. BILUS-GOULD:  Objection to
16        form.
17        A    That's correct.
18        Q    Can you tell me who you received
19   those compliments from?
20        A    Again, not that I recall
21   specifically.
22        Q    Do you recall the work he did for
23   a tenant named Marge?
24        A    Yes.
25        Q    Can you describe for me the work
```

1                    J. Yablonsky

2     that he did?

3          A     Basically her apartment was in

4     very bad disrepair and she was a borderline

5     hoarder, I suppose.  And he was able to make

6     repairs in the apartment.  I remember

7     specifically something, you know, with the

8     ceiling.  And he helped her get the apartment

9     clean.

10         Q     Can you describe for me the

11    quality of the work he did with respect to that

12    job?

13         A     The quality of that work was fine.

14         Q     Can you describe for me instances

15    where the quality of his work was not fine?

16         A     I don't have any specific

17    instances now.

18         Q     This letter that was introduced as

19    an exhibit, did you write this after Mr. Britt

20    requested a letter of recommendation?

21         A     Yes.

22         Q     Did you feel you had a choice as

23    to whether or not you were going to write this

24    letter of recommendation?

25         A     Yes.

1                    J. Yablonsky

2          Q     With respect to Mr. Britt's

3    termination as a superintendent, whose decision

4    was it to terminate him?

5          A     Ultimately it was Miss Alderman.

6          Q     Do you have an understanding as to

7    why she made that decision?

8                MS. BILUS-GOULD:   Objection to

9          form.

10         A     I think the main basis was

11   probably economic.

12         Q     Can you describe that for me?

13         A     It was more cost effective for the

14   building to terminate the superintendent and

15   the porter and hire an outside service and rent

16   the apartment that was being used by the

17   superintendent.

18         Q     How much were you paying Mr. Britt

19   during the time he was working there?

20         A     I don't know without checking the

21   records.

22         Q     Can you estimate?

23         A     No.

24         Q     Do you know which unit was Mr.

25   Britt living in during the time that he was a

```
 1                    J. Yablonsky
 2    superintendent?
 3         A     I believe it's Apartment 12.
 4         Q     And is that apartment currently
 5    being rented?
 6         A     It's currently being renovated.
 7         Q     Do you know what the rent that
 8    you're going to be asking for it?
 9         A     I'm not sure, no.
10         Q     Did you ever give any performance
11    evaluations of Mr. Britt during the time that
12    he was employed?
13         A     Only verbal.
14         Q     Can you describe for me the
15    content of those evaluations?
16         A     I think I probably told him that
17    -- I think the actual thought was at times he
18    was more trouble than he was worth.
19         Q     Can you describe for me what you
20    meant by that?
21         A     Again, I found that Mr. Britt had
22    a tendency to complicate matters, to put
23    himself in the center of things, and I would
24    get complaints, as I said, both from tenants
25    and from contractors that just, you know,
```

```
 1                        J. Yablonsky

 2    created issues.

 3          Q     And other than the tenant

 4    complaints that you testified to there's no

 5    other kind of complaints?

 6                  MS. BILUS-GOULD:   Objection to

 7          form.

 8          A     No.  I said I received complaints

 9    from contractors.  I received complaints from a

10    broker that we used.  I received complaints

11    from even the city marshall.

12          Q     Let's go through each one of those

13    complaints that you are talking about.

14                  First of all with the contractors,

15    who complained?

16          A     I would receive complaints from

17    the boil contractor.  I received complaints

18    from the general contractor that we were using

19    to do certain renovations in the building.

20          Q     What were the nature of those

21    complaints?

22          A     I think the nature of a lot of the

23    complaints had to do with access, coordination,

24    and him working with them to allow them to get

25    their jobs done.
```

J. Yablonsky

1

2     Q     Was there a written record of any

3     of these complaints?

4     A     I don't believe so.

5     Q     With respect to the city marshall,

6     what was the nature of that complaints?

7     A     The nature of that complaints was

8     him not showing up at appointments when there

9     were evictions scheduled.

10    Q     Which city marshall complained to

11    you?

12    A     I would have to go back and look.

13    I don't know offhand.

14    Q     Is there any written records of

15    these complaints?

16    A     I don't believe so.

17    Q     But with respect to all of these

18    complaints that you're mentioning now, which

19    weren't mentioned in your letter of May 6,

20    2013, was Mr. Britt terminated because of any

21    of these complaints?

22              MR. ETTENGER:  Objection to form.

23              MS. BILUS-GOULD:  Objection to

24         form.

25              MR. ETTENGER:  I believe he

```
1                    J. Yablonsky

2          already testified as to why he was

3          terminated.

4    BY MR. KOERNER:

5          Q    Were these complaints related in

6    any way to his termination?

7               MR. ETTENGER:  I'm going to object

8          only to the extent he already testified

9          that Ms. Alderman made the decision to

10         terminate.  So her basis for her

11         decision is what she'll testify to.

12              MR. KOERNER:  I'm asking him his

13         understanding.

14              MR. ETTENGER:  Of what she told

15         him or otherwise?

16              MR. KOERNER:  Based on whatever

17         source.

18         Q    What your understanding is of

19    whether or not his termination was related to

20    any complaints about his job performance?

21         A    As I said before his termination,

22    I believe, the prime reason was economic, but

23    certainly the perception of what his job

24    performance was would have gone into the

25    equation and into the thinking in terms of
```

```
 1                    J. Yablonsky

 2    terminating.

 3         Q    I notice when you answered some of

 4    these questions you look at Miss Alderman

 5    before you answered, and I would ask you to

 6    please not do that to try to get any indication

 7    from her, please.

 8         A    I don't think she's given me any

 9    indication of anything.

10         Q    Are you aware that Miss Alderman

11    has acknowledged that she had a sexual

12    relationship with Mr. Britt?

13         A    I don't know that she has or

14    hasn't acknowledged it.

15              MR. ETTENGER:  If you want to -- I

16         have not shown him a Notice to Admit.

17              MR. KOERNER:  Right.

18              MR. ETTENGER:  So if you want to

19         take judicial notice that he --

20              MR. KOERNER:  Let's take judicial

21         notice that Miss Alderman has

22         acknowledged in court papers that she

23         had a sexual relationship with Mr.

24         Britt.

25              MS. BILUS-GOULD:  I'm going to
```

1                 J. Yablonsky

2         object to your characterization of what

3         she admitted as a, quote, sexual

4         relationship, unquote.

5             Do you have a copy?  Maybe you

6         want to show it to him?

7             MR. KOERNER:  Yes, I have a copy.

8             MR. ETTENGER:  Let's take a

9         two-minute break.

10            MR. KOERNER:  Sure.

11            (Whereupon, a recess was taken.)

12  BY MR. KOERNER:

13       Q    So going back with respect to any

14  complaints about Mr. Britt's job performance,

15  is there any written evidence with respect to

16  any of these complaints?

17       A    Not that I recall specifically.

18       Q    As a general practice, when you

19  had complaints with your employees, if they

20  were serious complaints, did you create a

21  record of them?

22       A    We generally did not do written

23  complaints of superintendents unless there was

24  a union situation.

25       Q    Did there come a time where Mr.

IRIS FERNHOFF REPORTING    (516) 317-3426

```
 1                      J. Yablonsky
 2    Britt made you aware that he had a sexual
 3    relationship with Miss Alderman?
 4              A    Yes, he did.
 5              Q    Can you describe for me when that
 6    occurred?
 7              A    It was after he was terminated.
 8              Q    And can you describe for me where
 9    that conversation took place and what was said?
10              A    As I recall I think it took place
11    in one of his trailers, I guess, you would call
12    it.  And he mentioned it and rambled on about
13    it for a while.
14              Q    Do you recall what you said?
15              A    I believe I said very little.
16              Q    Did you say, "Wow, now it all
17    makes sense"?
18              A    Not that I recall, no.
19              Q    Do you have any reason to believe
20    that there was not a sexual relationship
21    between Miss Alderman and Mr. Britt?
22              MS. BILUS-GOULD:  Objection to
23              form.
24              A    I've had no basis to either
25    believe it or not believe it.
```

IRIS FERNHOFF REPORTING    (516) 317-3426

```
1                    J. Yablonsky

2          Q    At the time that Miss Alderman was

3    having sex with Mr. Britt do you know whether

4    he was an employee of Wavecrest?

5               MS. BILUS-GOULD:  Objection to

6          form.

7          A    I have no idea of what time we're

8    talking about.

9          Q    When you say he "rambled on," can

10   you describe for me what he said?

11         A    I don't remember the specifics.  I

12   just know that he was talking in the trailer,

13   and as I just said, going on and on about his

14   situation.

15         Q    Did he seem upset?

16              MS. BILUS-GOULD:  Objection to

17         form.

18         A    He certainly wasn't happy.

19         Q    With respect to the criticisms

20   about Mr. Britt's job performance, when was the

21   first one received?

22         A    I don't recall.

23         Q    When was the last one received?

24         A    Don't recall that specifically

25   either.
```

1                    J. Yablonsky

2          Q    Were any of these criticisms ever

3    resolved that you would recall?

4                MS. BILUS-GOULD:  Objection to

5          form.

6                MR. ETTENGER:  What do you mean by

7          the word "resolved"?

8                MR. KOERNER:  Satisfactorily

9          address.

10                MS. BILUS-GOULD:  Objection to

11          form.

12          A    I don't think the nature of them

13    were things that were being addressed.  If a

14    contractor was complaining about him not

15    showing up on time to meet them to let them

16    into the building or something along those

17    lines, which was frequent, ultimately they

18    would get in but you weren't able to address

19    what had already occurred.

20          Q    Was there ever any employee

21    handbook that were given to people that you

22    supervised as Wavecrest?

23          A    No.

24          Q    Currently is there a handbook?

25          A    To whom?  I'm not understanding.

```
 1                    J. Yablonsky

 2         Q     To employees of Wavecrest.

 3               MR. ETTENGER:  You're talking

 4         about superintendents or otherwise?

 5               MR. KOERNER:  Superintendents or

 6         otherwise.

 7         A     Superintendents are not employees

 8    of Wavecrest.

 9         Q     Were there any, you know,

10    handbooks, employee handbooks given to any

11    employees of Wavecrest?

12         A     To employees of Wavecrest, yes.

13         Q     Did those handbooks contain any

14    information about sexual harassment?

15         A     I don't know.

16         Q     But those handbooks were not

17    provided to the superintendents, correct?

18         A     That's correct.

19         Q     With respect to Mr. Britt, your

20    understanding is that he was employed directly

21    by Thermald Realty?

22               MS. BILUS-GOULD:  Objection to

23         form.

24         A     That's correct.

25         Q     And you don't know whether or not
```

```
1                      J. Yablonsky
2    he was provided with any handbooks, employee
3    handbooks whatsoever?
4              MR. ETTENGER:  By Thermald Realty?
5              MR. KOERNER:  By any source.
6              MR. ETTENGER:  Well, he said it
7         wasn't supplied by Wavecrest.  So you're
8         saying by Thermald?
9              MR. KOERNER:  By Thermald or
10        anyone else.
11   A    Not to my knowledge.
12   Q    Do you know whether or not
13   superintendents were ever given any instruction
14   or training with respect to sexual harassment?
15   A    Not to my knowledge.
16   Q    What is your understanding of your
17   obligations as a manager if you were confronted
18   with allegations of sexual harassment?
19             MS. BILUS-GOULD:  Objection to
20        form.
21             MR. ETTENGER:  Objection.
22   BY MR. KOERNER:
23   Q    If you have an understanding?
24   A    I'm not sure I understand what
25   you're asking.
```

1                    J. Yablonsky

2          Q    I'm asking if you have any

3    understanding of what your obligations as an

4    employee of Wavecrest are if you are aware of

5    allegations of sexual harassment?  If you have

6    no understanding --

7          A    It would be something that would

8    be reported to my superiors.

9          Q    And with respect to Mr. Britt's

10   situation, when he let you become aware of the

11   fact that he had had a sexual relationship with

12   his employer who was your client, did you alert

13   your superiors?

14         A    Not immediately, no.

15         Q    Did there come a time when you did

16   alert them?

17         A    Yes, I did.

18         Q    When was that?

19         A    When I saw it alleged in a

20   lawsuit.

21         Q    Why didn't you alert them when you

22   first became aware of it?

23         A    Because, one, I had no way of

24   knowing whether there was any truth to it, and

25   B, he was no longer an employee.

J. Yablonsky

1

2      Q    Other than this instance, have you

3    ever reported any incident of sexual

4    harassment?

5      A    No.

6      Q    Let's go back to the hiring of Mr.

7    Britt.  When he was hired, was Brendan employed

8    as a superintendent at that time when he was

9    hired or had he already left?

10     A    I don't recall if there was an

11   overlap.

12     Q    And you state that had don't

13   recall whose idea it was to approach Mr. Britt

14   to be hired?

15     A    That is correct.

16     Q    Do you recall whether or not Mr.

17   Britt approached you guys or you approached Mr.

18   Britt?

19     A    Could have gone either way.   I

20   don't recall.

21     Q    I believe you testified that

22   ultimately it was Miss Alderman's decision as

23   to whether or not Mr. Britt would be hired; is

24   that correct?

25     A    That's correct.

J. Yablonsky

1

2     Q    Were you consulted with respect to

3  this decision?

4     A    I would have been, yes.

5     Q    And do you recall what advice you

6  gave or what opinion you had at that point?

7     A    I'm sure I concurred.

8     Q    You concurred that he should be

9  hired?

10     A    Mm-hmm.

11     Q    Can you describe for me why you

12  thought he should be hired?

13     A    I don't recall the specifics.  I

14  know that certainly we thought that he had some

15  skills as a handyman.  He had been in and

16  around the building.  He was available to do

17  the job.  And we made a decision to hire him.

18     Q    With respect to his skills as a

19  handyman, can you describe what skills you're

20  referring to?

21     A    I know that he certainly was able

22  to do carpentry work, painting, that sort of

23  thing.

24     Q    Can you describe the quality of

25  his carpentry work?

1                    J. Yablonsky

2              MS. BILUS-GOULD:  Objection to

3        form.

4        A    Not specifically, no.

5        Q    Can you describe the quality of

6   any of the skilled carpentry work that he did?

7              MS. BILUS-GOULD:  Objection to

8        form.

9        A    Again, not specifically.

10       Q    And at the time that he was hired

11   you were not aware of any criticisms of his

12   work as a handyman?

13             MR. ETTENGER:  Objection.

14             MS. BILUS-GOULD:  Objection to

15       form.

16       A    No, I wasn't.

17       Q    Were there ever any criticisms of

18   the quality of his work as opposed to -- you

19   described sometimes he would not be there for

20   the city marshall.  But with respect to the

21   quality of his work were there any complaints

22   about that?

23       A    I don't recall specifically.

24       Q    Can you recall, you testified

25   before that you did get compliments about the

55

1                    J. Yablonsky

2    quality of his work.  Can you recall for me,

3    sir, what some of these compliments were?

4         A    Again, not specifically, no.

5         Q    And you stated with respect to

6    performance reviews, the only performance

7    review you ever gave during the approximately

8    six or seven years that Mr. Britt was working

9    under your supervision, that you never gave him

10   any written reports; is that correct?

11        A    That's correct.

12        Q    Did you give any written report to

13   any of the superintendents that you were

14   supervising?

15        A    No.

16        Q    And with respect to Mr. Britt's

17   job performance, over time did it improve,

18   decline or anything else?

19             MS. BILUS-GOULD:  Objection to

20        form.

21   BY MR. KOERNER:

22        Q    I guess improved, declined or

23   stayed the same?

24        A    I think it was probably somewhat

25   erratic.  At times it was fine.  At other times

```
 1                    J. Yablonsky

 2    it was more problematic.

 3         Q    But is it accurate to say that his

 4    performance did not decline over time?

 5              MR. ETTENGER:  Objection.

 6              MS. BILUS-GOULD:  Objection to

 7         form.

 8         A    As I said, I think that there were

 9    times that it was better.  There were other

10    times that it was more problematic.

11         Q    Do you recall that Mr. Britt was

12    working as a superintendent of these buildings

13    during 9/11?

14              MR. ETTENGER:  You're talking

15         about 9/11 or Hurricane Sandy?

16              MR. KOERNER:  I'm sorry.  I

17         apologize.  Withdrawn.

18    BY MR. KOERNER:

19         Q    During Hurricane Sandy?

20         A    He was the superintendent at that

21    point in time.

22         Q    Can you describe for me the work

23    he did during that time frame?

24         A    No, I can't.

25         Q    Did you visit any of the buildings
```

1                       J. Yablonsky

2     during that time frame?

3          A     I was out of the country at the

4     time.

5          Q     Where were you?

6          A     I believe I was in Greece.

7          Q     On vacation?

8          A     Yes.

9          Q     And do you recall getting any

10    comments from any source regarding Mr. Britt's

11    performance of his duties during the Hurricane

12    Sandy period?

13         A     Only from him.

14         Q     What did he say?

15         A     He said he was a hero.

16         Q     None of the tenants commented on

17    what occurred at the building during Hurricane

18    Sandy?

19         A     No.

20         Q     Did you get any complaints from

21    anyone at the building during the time of

22    Hurricane Sandy?

23         A     I never heard from anybody during

24    that period.

25         Q     Is it safe to say that Mr. Britt

1                      J. Yablonsky

2      addressed their concerns during that period of

3      time?

4           A    As I said, I wasn't here so I

5      can't answer that.

6           Q    You stated that when Mr. Britt was

7      hired you also hired a porter to do the

8      cleaning duties; is that correct?

9           A    That's correct.

10          Q    Why did you hire a porter in

11     addition to Mr. Britt at that time?

12          A    As I recall he was willing to do

13     and take on the superintendent portion of the

14     job.  He did not want to be doing the porter

15     portion.  And the economics were such in terms

16     of what we were paying each party that we were

17     able to, you know, do that at pretty much the

18     same cost as it had been previously.  And we

19     thought it gave us more versatility by having

20     the second person.

21          Q    Did Mr. Britt express to you that

22     he did not want to do the cleaning?

23          A    That's my recollection, yes.

24          Q    And the individual who was hired

25     to do the porter job, did he report to Mr.

IRIS FERNHOFF REPORTING    (516) 317-3426

1                    J. Yablonsky

2     Britt or to you or to someone else?

3          A     To Mr. Britt.

4          Q     And who was that individual?

5          A     We called him Zheng.  I'm not sure

6     what his -- I don't recall his actual given

7     name.

8          Q     And how was he paid?

9          A     He was paid by check through

10    payroll.

11         Q     By Wavecrest?

12         A     By Thermald.

13         Q     And do you know who signed

14    Thermald's checks?

15         A     Either -- well, at some point it

16    would have been Mr. Camerata.  At some point it

17    was Miss Alderman or at some point he might

18    have had a direct deposit, but I don't recall.

19         Q     And Mr. Zheng continued to work as

20    the porter during the entire time that Mr.

21    Britt was the superintendent on these

22    properties?

23         A     That's my recollection, yes.

24         Q     And can you describe for me the

25    quality of Mr. Zheng's work?

1                        J. Yablonsky

2          A     Satisfactory.

3          Q     Any criticism about his work?

4          A     Not that I recall specifically,

5     no.

6          Q     Mr. Zheng was terminated at the

7     same time as Mr. Britt; is that correct?

8          A     That's correct.

9          Q     Can you describe for me why

10    Mr. Zheng was terminated?

11         A     As I said, the primary reason for

12    termination was an economic decision.  And for

13    that to work we were replacing the building

14    staff with an outside service.

15         Q     And who made the decision to

16    terminate Mr. Zheng?

17         A     Ultimately it was Miss Alderman's

18    decision.

19         Q     Did you ever see Mr. Britt off the

20    premises of the buildings where he was

21    superintendent?

22         A     I'm not sure I understand.

23         Q     Did you ever see Mr. Britt on the

24    premises, either in front of or in the premises

25    of the buildings that he was the

```
 1                    J. Yablonsky
 2     superintendent?
 3              MR. ETTENGER:  You mean did he
 4          actually ever see him working?  I don't
 5          understand the question.
 6     BY MR. KOERNER:
 7          Q    Did you ever see him outside of
 8     either the building or in front of the
 9     building?
10              MR. ETTENGER:  Just so we're
11          clear, when he went to the property did
12          he see Mr. Britt outside?  You're
13          talking about during his employment?
14              MR. KOERNER:  During his
15          employment, did he ever see Mr. Britt
16          outside of the building or in front of
17          the building?
18          A    Sure.
19          Q    Where?
20          A    We would -- if I was with him
21     there were multiple times when we would go from
22     one building to another, so we would be walking
23     between sites.
24          Q    But other than walking between the
25     buildings or in the buildings or in front of
```

IRIS FERNHOFF REPORTING    (516) 317-3426

1                         J. Yablonsky

2      the buildings, you never saw Mr. Britt; is that

3      correct?

4                    MS. BILUS-GOULD:   Objection to

5            form.

6            A     Did I ever see him in the street?

7      Not that I -- I don't recall.

8            Q     You stated before that, you know,

9      that the only job performance reviews of

10     Mr. Britt that you ever gave him were oral, and

11     you stated to him that "You're more trouble

12     than you're worth."

13                  Can you describe for me when these

14     conversations took place?  Were they scheduled

15     formally, were they informal or what?

16           A     They were informal.

17           Q     Who was present when you conducted

18     these reviews other than you and Mr. Britt?

19           A     It would have just been the two of

20     us.

21           Q     And there's no written record of

22     it?

23           A     No, there's not.

24           Q     Did Mr. Britt ever complain to you

25     that he was being asked to do work that were

1                    J. Yablonsky

2      outside the scope of his responsibility as the

3      superintendent of the building?

4            A      Did he ever complain about it?

5      No.

6            Q      When you communicated with Mr.

7      Britt did you communicate generally via e-mail

8      or phone or some other way?

9            A      Would have been in person, by

10     phone or by e-mail.

11           Q      Did you have frequent e-mail

12     correspondence with Mr. Britt?

13           A      There were certainly e-mail

14     correspondence.  I don't know that I would

15     characterize it as frequent.

16           Q      Have you produced any and all

17     e-mail correspondence that you had with Mr.

18     Britt to your attorneys that you had in

19     connection with this litigation?

20           A      Anything we had has been produced,

21     yes.

22           Q      Did you ever send him any e-mails

23     that were not related to the business?

24           A      No.

25           Q      This is the complaint that's filed

```
 1                    J. Yablonsky

 2      in this case.

 3               MS. BILUS-GOULD:  It's already

 4           marked as Exhibit 2.

 5               MR. ETTENGER:  You want him to

 6           read the whole thing?

 7               MR. KOERNER:  Just review it right

 8           now.

 9      BY MR. KOERNER:

10          Q    My first question is:  Have you

11      reviewed this document at some point prior to

12      today?

13          A    Yes, I've seen it prior to today.

14          Q    And when did you first receive the

15      document?

16          A    I don't know what date that would

17      have been.

18          Q    Was it approximately around the

19      time that it's dated?

20               MR. ETTENGER:  It's dated November

21           19, 2013.

22          A    That would be my assumption.

23          Q    Do you recall how you received

24      this document?

25          A    No, I don't.
```

IRIS FERNHOFF REPORTING    (516) 317-3426

1                    J. Yablonsky

2          Q    Or from whom?

3          A    No, I don't.

4          Q    Did you discuss this document with

5    anyone when you received it?

6          A    Yes, I did.

7          Q    Who did you discuss it with?

8          A    I would have discussed it with the

9    principals of the firm as well as the person

10   who takes care of our insurance.

11         Q    What was discussed in those

12   conversations?

13         A    I think the substance of it would

14   have been primarily to report it to our

15   insurance carrier for defense purposes.

16              MR. ETTENGER:  One second.  I just

17         want a statement on the record that I

18         stated it was dated November 19th.  My

19         recollection is there was a prior

20         complaint and it was probably filed in

21         August and they probably would have

22         received the document then.  And then

23         this is the second complaint in

24         November.

25              MR. KOERNER:  That's fine.

IRIS FERNHOFF REPORTING    (516) 317-3426

```
 1                    J. Yablonsky

 2              MR. ETTENGER:  Just to clarify.

 3    BY MR. KOERNER:

 4         Q    During these initial conversations

 5    with your principals and the insurer, did you

 6    discuss the substance of the allegations and

 7    whether you thought that they were true?

 8              MR. ETTENGER:  Objection.

 9              MS. BILUS-GOULD:  Objection to

10         form.

11              MR. ETTENGER:  No.  He didn't

12         state the insurer.  The person who

13         coordinates the insurance for Wavecrest.

14              MR. KOERNER:  No.

15              MR. ETTENGER:  There's a person at

16         their company that's responsible for

17         that type of matter.

18              MR. KOERNER:  So these are all

19         people within Wavecrest?

20              MR. ETTENGER:  Correct.

21    BY MR. KOERNER:

22         Q    And during these conversations

23    with these people, was it ever discussed as to

24    whether or not the allegations from the

25    complaint were true or not?
```

```
1                    J. Yablonsky

2              MR. ETTENGER:  Objection to form.

3              MS. BILUS-GOULD:  Objection to

4         form.

5         A    We probably discussed the

6    harassment complaints and said that we would

7    have no idea whether it was true or not.  And

8    we discussed the portion of the complaint

9    where, you know, it talked about working 75

10   hours a week and pretty much found it

11   laughable.

12             Q    Why did you consider it laughable?

13             A    Because to my knowledge and from

14   what I observed there was no way that Mr. Britt

15   was working 75 hours a week.

16             Q    And were you observing him on a

17   daily basis?

18             A    I wasn't observing him on a daily

19   basis, but I certainly was in the buildings.

20   Saw him.  Was interacting with him.  And had no

21   sense that he was working anywhere near that

22   type of hours.

23             Q    Did he submit time sheets to you?

24             A    No, he didn't.

25             Q    So how did you know how much hours
```

1                     J. Yablonsky

2    he was working per week?

3         A    Again, from interacting with him I

4    would know.  And certainly had he been working

5    75 hours a week I would have been hearing about

6    it.

7         Q    How often did you see him on a

8    given week?

9         A    Probably weekly.

10        Q    Once a week?

11        A    About that.

12        Q    And how long during that once a

13   week when you saw him, how long would you spend

14   with him?

15        A    It would vary.

16        Q    Approximately from what to what?

17   What was the shortest visit?

18        A    Could have been from five minutes

19   to an hour.

20        Q    Is it true that Mr. Britt was

21   on-call 24 hours a day?

22        A    Mr. Britt was a resident

23   superintendent.  As such, if there was an

24   emergency call, he would be part of the list of

25   who would be responding to it.

```
 1                        J. Yablonsky

 2            Q     So was he on-call 24/7 or not?

 3    Was that part of his job responsibility?

 4            A     I thought I just answered.

 5            Q     It was a yes or no question.

 6                  MR. ETTENGER:  I don't think it's

 7            as simple as a yes or no question.  Your

 8            definition of on-call is different than

 9            his definition of on-call.  He answered

10            it in a manner in which he's comfortable

11            answering it.

12    BY MR. KOERNER:

13            Q     With respect to these

14    conversations of Wavecrest, you said you

15    discussed the allegations of the complaint with

16    the principal.  And who is that?

17            A     Susan and Fred Camerata.

18            Q     And also with respect to any other

19    people in Wavecrest, who were those people?

20            A·    I would have discussed it with

21    Rita Pavone, P-A-V-O-N-E.

22            Q     And what's her title?

23            A     She's our insurance coordinator.

24            Q     Anybody else?

25            A     I don't believe so.
```

J. Yablonsky

1

2      Q      Was that a single meeting or were

3   there several meetings?

4      A      I don't know that there were

5   meetings per se.  It's people that I see all

6   the time.  It would have been discussed when

7   the lawsuit came in.

8      Q      Okay.

9      A      Probably separately with

10   Mr. Camerata and Mrs. Camerata.  And certainly

11   separately with Miss Pavone.  But how many

12   times it came up in conversation, I couldn't

13   tell you.

14      Q      And with respect to the

15   truthfulness of the allegations of sexual

16   harassment, the only thing that was ever

17   discussed by any of these parties was you had

18   no idea whether or not these charges are true

19   or false?

20      A      We wouldn't have had any basis to

21   know.

22      Q      And, in fact, to your knowledge

23   none of you did know?

24      A.     That's correct.

25      Q      And other than the conversation

IRIS FERNHOFF REPORTING    (516) 317-3426

1          J. Yablonsky

2     you had with Mr. Britt when he first let you

3     know that, you know, there had been a sexual

4     relationship with Miss Alderman, were there any

5     other conversations that you had with Mr. Britt

6     regarding that?

7               MS. BILUS-GOULD:   Objection to

8          form.

9          A    Not that I recall, no.

10         Q    So it was just a single

11    conversation?

12         A    I don't recall whether he brought

13    it up at the time that he was terminated or

14    when he got the letter of recommendation.   So

15    whether or not there was one or two

16    conversations, I'm not sure.

17         Q    Did you take any notes with

18    respect to that conversation?

19         A    No, I didn't.

20         Q    Did you keep any notes or journal

21    with respect to Mr. Britt's employment?

22         A    No.

23         Q    With respect to the job

24    performance criticism of the Plaintiff that you

25    testified to today, specifically you said that

1                    J. Yablonsky

2      there was a complaint that he was not there to

3      meet marshals for evictions; that's one

4      complaint, correct?

5            A      Correct.

6            Q      Can you describe the nature of any

7      other complaints or was it just general that he

8      put himself in the middle things?

9            A      I think it was the combination of

10     putting himself in the middle of things.  There

11     were times, like I said, that there were people

12     scheduled to be at the building that he wasn't

13     there to meet them and give them access.  Those

14     were the general nature of the complaints from

15     outside vendors.

16           Q      And with respect to the tenants'

17     complaints that you testified to, can you

18     describe the nature of those complaints?

19           A      I don't recall the specifics of

20     them, no.

21           Q      Would you describe them as serious

22     complaints?

23           A      Again, I don't recall the

24     specifics of it.

25           Q      Can you describe with respect to

J. Yablonsky

2   the compliments that Mr. Britt got from the

3   tenants?  Can you describe specifically the

4   nature of those comments?

5       A    Again, I don't recall the

6   specifics.

7       Q    You never got any compliments that

8   you heard about his kindness to the older

9   tenants in the building?  You never heard that?

10      A    Not that I recall, no.

11      Q    And other than, you know, the

12   informal performance reviews where you said

13   sometimes "you're more trouble than you're

14   worth," did you ever let Mr. Britt know of

15   these criticisms?

16      A    Yes.

17      Q    How?

18      A    Verbally.  Mr. Britt had a

19   tendency to tell me how everybody loved him and

20   all these compliments that we was getting and I

21   would remind him what people may be telling him

22   are not the same as what they are telling me.

23      Q    Did you ever report your concerns

24   about Mr. Britt's performances to anybody?

25      A    I don't believe so, no.

1                    J. Yablonsky

2          Q    Did Miss Alderman ever complain to

3    you about Mr. Britt?

4          A    Yes.

5          Q    Can you describe to me the nature

6    of her complaints about Mr. Britt?

7          A    I think that she had indicated at

8    times that she wasn't happy with some of his

9    performance.  She wasn't happy with him having

10   a dog that was using the backyard as a dog run

11   and bathroom.  Noise coming from his music

12   studio.  And just, you know, that type of

13   general unhappiness if you will.

14         Q    When was the first time that she

15   expressed an unhappiness to you?

16         A    I couldn't tell you specifically.

17         Q    Generally?

18         A    Generally I couldn't tell you.

19         Q    Was it within the year after he

20   first started working?

21         A    I don't recall.

22         Q    With respect to his actual job

23   performance -- I'm not talking about his dog or

24   noise from the basement.  I'm talking about his

25   job performance.  Did she ever have any

J. Yablonsky

1

2      specific criticism regarding that to you?

3           A     I recall there being some

4      criticism having to do with his interaction

5      with the elevator contractor during a

6      modernization that we were doing.  I recall

7      there being some concern with his interaction

8      with the contractor during an apartment

9      renovation that we were doing.  Things of that

10     nature.

11          Q     Which apartment renovation was

12     that?

13          A     I don't --

14          Q     Just so that we could get a time

15     frame, because you don't remember when it was.

16          A     I believe it was Apartment 26

17     maybe.  I would have to double check.

18          Q     Did she ever put any of these

19     concerns in writing to you?

20          A     Not that I recall.

21          Q     Did you relay these concerns to

22     Mr. Britt?

23          A     Not specifically.

24          Q     Why not?

25          A     Because I had over time relayed

```
1                    J. Yablonsky
2   what concerns that I had to Mr. Britt.   I
3   wasn't having conversations with him beyond
4   that that were talking about anything that Miss
5   Alderman may have said to me.
6          Q    Did you ever observe Mr. Britt and
7   Mr. Alderman interacting with each other?
8                MS. BILUS-GOULD:  Objection to
9          form.
10                Miss Alderman?
11                MR. ETTENGER:  You said, "Mr.
12          Alderman."
13                MR. KOERNER:  I'm sorry.
14   BY MR. KOERNER:
15          Q    Did you ever observe them
16   interacting together?
17          A    Sure.
18          Q    Can you describe for me what you
19   observed?
20          A    We would typically, when Miss
21   Alderman was in town, meet.  Go over sort of
22   things.  Walk the buildings.  Look at
23   conditions.  Somewhere in that context there
24   was interaction with the three of us.
25          Q    Did you ever notice anything
```

1              J. Yablonsky

2    inappropriate with respect to that interaction?

3              MS. BILUS-GOULD:  Objection to

4         form.

5              You can answer.

6    A    Not to my mind, no.

7    Q    Did you ever notice anything

8    unusual in Mr. Britt's demeanor with respect to

9    those interactions?

10             MS. BILUS-GOULD:  Objection to the

11        form.

12   A    Not that I noticed.

13   Q    Did she ever complain to you that

14   Mr. Britt was a bully?

15   A    I think I recall her using that

16   terminology but I don't remember the exact

17   context.

18   Q    Do you think that Mr. Britt was a

19   bully?

20             MS. BILUS-GOULD:  Objection to

21        form.

22   A    Not in his interaction with me,

23   no.

24   Q    In his interaction with anyone?

25             MS. BILUS-GOULD:  Objection to

1                    J. Yablonsky

2          form.

3          A    I couldn't answer about his

4     interaction with anybody else.

5          Q    Well, you observed him, interacted

6     with him, right, for six or seven years.

7               Ron Britt, is he a bully based on

8     your observation of him?

9          A    As I said, I never felt in terms

10    of our interactions that that was a word that

11    would come to mind.

12         Q    Are you aware that Mr. Britt made

13    a complaint to the New York Department of Labor

14    for unpaid wages?

15         A    Yes, I am.

16         Q    Have you reviewed that complaint?

17         A    Yes, I have.

18         Q    And what is your opinion with

19    respect to the allegations in that complaint?

20              MR. ETTENGER:   Objection.

21              You can answer.

22         A    My opinion is that Mr. Britt got

23    paid as contracted for the superintendent work

24    that he was doing.   That he got paid for any

25    work that he did that was outside the scope of

```
 1                    J. Yablonsky
 2     the work.  And that, as I said before, to my
 3     knowledge and from my perception, there was no
 4     overtime that he was putting in unless it was
 5     in the context of outside work which he was
 6     being compensated for.
 7          Q     Who computed the amount that Mr.
 8     Britt was being paid by Wavecrest?  Who
 9     determined that?
10               MR. ETTENGER:  In terms of his
11          salary or in terms --
12               MR. KOERNER:  The amount.
13               MR. ETTENGER:  -- of outside
14          compensation?
15               MR. KOERNER:  No.  His salary.
16          A     It was an agreed upon weekly
17     amount that he was paid.
18          Q     Who was that agreement between?
19          A     The agreement was between him and
20     Thermald Realty where there was a set weekly
21     amount that he was being paid on payroll.
22          Q     And do you know who negotiated
23     that amount or was it something that was just
24     presented and Mr. Britt accepted, if you have
25     any knowledge?
```

1                    J. Yablonsky

2           MS. BILUS-GOULD:  Objection to

3       form.

4       A     Whether it was Miss Alderman,

5   myself or both I don't recall.

6       Q     You first learned of allegations

7   of sexual harassment in this conversation that

8   you had with Mr. Britt shortly after he was

9   terminated in the trailer; is that correct?

10      A     Correct.

11      Q     Can you recall for me what you

12  said when you learned of the allegation?

13      A     I probably said very little.  I

14  just listened.

15      Q     But what very little that you did

16  say, do you recall what you said?

17      A     Specifically, no.

18      Q     And at that point did you discuss

19  the allegations with your supervisor?

20      A     I believe that was asked and

21  answered.

22           MR. ETTENGER:  Objection.

23      Q     And?

24           MR. ETTENGER:  He said "no."

25  BY MR. KOERNER:

1                    J. Yablonsky

2          Q     And you stated that during this

3     conversation Mr. Britt was -- I think was upset

4     or how would you describe his demeanor during

5     that conversation?

6          A     I believe I said not happy.

7          Q     Did he same distraught?

8                MS. BILUS-GOULD:  Objection to

9          form.

10         A     I don't know that I'm qualified to

11    answer that.

12         Q     Why do you think he was not happy,

13    to your knowledge?

14               MR. ETTENGER:  Objection.

15               MS. BILUS-GOULD:  Objection.

16               MR. ETTENGER:  He can't answer as

17         to why he wasn't happy.

18               You don't have to answer that

19         question.

20    BY MR. KOERNER:

21         Q     Do you have an opinion as to if

22    Mr. Britt and Miss Alderman were, in fact,

23    having a sexual relationship, which she said

24    and we have notice of it that she has admitted

25    during the term of his employ, do you have an

```
 1                         J. Yablonsky

 2      opinion whether or not it was appropriate or

 3      not?

 4                    MR. ETTENGER:  Objection.

 5                    MS. BILUS-GOULD:  Objection to

 6             form.

 7      BY MR. KOERNER:

 8           Q    Last question:  Do you have an

 9      opinion whether it was appropriate or not?

10                    MS. BILUS-GOULD:  Objection to

11             form.

12                    MR. KOERNER:  Okay.

13           Q    You can answer.

14                    MR. ETTENGER:  You're asking his

15             opinion of --

16                    MS. BILUS-GOULD:  And you've

17             editorialized way more than anything

18             that's been submitted in this --

19                    MR. KOERNER:  It's not an

20             editorial.  There's a judicial notice

21             that she has acknowledged that she had a

22             sexual relationship while the time he

23             was employed.

24      BY MR. KOERNER:

25           Q    ^RULING^ And I'm asking you, and
```

```
1                    J. Yablonsky

2    it's a simple question, whether you think

3    that's appropriate or not?

4              MS. BILUS-GOULD:  Objection to

5         form.

6              MR. ETTENGER:  You're asking the

7         witness a core question regarding the

8         substance of a legal issue --

9              MS. BILUS-GOULD:  Correct.

10             MR. ETTENGER:  -- in which he's

11        not qualified to answer.

12             MR. KOERNER:  It's not a legal

13        issue.

14             MR. ETTENGER:  Well, I'm going to

15        object and direct him not to answer the

16        question.

17             MR. KOERNER:  You can mark that

18        for a ruling.

19             I'm going to take a break and then

20        you can start asking questions.

21             MS. BILUS-GOULD:  I want a few

22        minutes.  Let's take 10 to 15 minutes

23        and then we'll come back.

24             (Whereupon, a recess was taken.)

25             (Time noted:  11:35 a.m.)
```

```
1                    J. Yablonsky

2             MS. BILUS-GOULD:  Back on the

3             record.

4             (Time noted:  11:50 a.m.)

5    EXAMINATION BY

6    MS. BILUS-GOULD:

7         Q    Still morning.  So good morning,

8    Mr. Yablonsky.  My name is Jane Gould.  I'm a

9    member of the White Plains law firm of Gould &

10   Berg.  We represent Thermald Realty Associates

11   I, LP, and Doreen Alderman in this action.

12             I'm going to be asking you some

13   questions.  You already know the drill because

14   you've been answering verbally for the last two

15   hours.

16             If there's anything you don't

17   understand, let me know and I will try to

18   rephrase it to make it more understandable.

19             Prior to the time that Mr. Britt

20   was terminated from his employment by Thermald

21   or Wavecrest, did Mr. Britt ever complain to

22   you that he was being sexually harassed by Miss

23   Alderman?

24        A    No.

25        Q    How many employees does Wavecrest
```

```
 1                    J. Yablonsky

 2   Management Team Limited have?

 3          A    I would guess in the range of

 4   about 75 or 80.

 5          Q    And what is the business of

 6   Wavecrest Management Team Limited?

 7          A    Our business is third-party

 8   management of residential real estate.

 9          Q    And that residential real estate

10   is generally within the city of New York?

11          A    Primarily.

12          Q    How many buildings does Wavecrest

13   currently manage?

14          A    Well over a hundred.

15          Q    And how many units would that

16   encompass?

17          A    I think it's probably around

18   twenty thousand.

19          Q    Since the time that Mr. Britt was

20   terminated has he sought employment with

21   Wavecrest?

22          A    Other than probably asking me when

23   terminated if I had any place to put him, no.

24          Q    When he asked you at the time he

25   was terminated whether you had any place to put
```

1                          J. Yablonsky

2      him, what was your response?

3            A    My response was no.

4            Q    Did he ever give you a resume or

5      any sort of cover letter introducing himself?

6            A    I don't believe so, no.

7            Q    Did there come a point in time

8      when Wavecrest Management Team entered into

9      some form of management agreement with Thermald

10     Realty Associates I, LP?

11           A    Yes.

12           Q    Do you recall when that was?

13           A    I believe it would have been

14     sometime around 2004.

15           Q    Did you sign that management

16     agreement?

17           A    I don't believe so.

18                MS. BILUS-GOULD:   Let's mark this

19           as the next exhibit.

20                (Document is marked Exhibit 24 for

21           identification, as of this date.)

22     BY MS. BILUS-GOULD:

23           Q    Having taken a look at Exhibit 24,

24     Mr. Yablonsky, do you recognize the exhibit?

25           A    Yes, I do.

1          J. Yablonsky

2       Q   Can you tell me what it is,

3   please?

4       A   It's a management agreement

5   between Thermald Realty Associates and

6   Wavecrest Management.

7       Q   And what property or properties

8   does this agreement relate to?

9          Taking a look at the first page of

10   the agreement I'm just going to call your

11   attention to the middle of the page,

12   "description of property," paragraph 1.2.

13       A   It specifically refers to 91 East

14   3rd Street.

15       Q   You indicated in your earlier

16   testimony that Thermald Realty Associates I, LP

17   owns other property; is that correct?

18       A   That's correct.

19       Q   Does Wavecrest have agreements,

20   written agreements, for the management of those

21   other properties?

22       A   I would assume as much.

23       Q   Do you know that for a fact?

24       A   No, I don't.

25       Q   Do you know whether those

```
 1                    J. Yablonsky

 2    agreements are in the same form and format as

 3    Exhibit 24?

 4          A    I would assume they would be.

 5          Q    But you don't know; is that

 6    correct?

 7          A    That's correct.

 8          Q    Do you have an understanding of

 9    whether Wavecrest, with regard to the Thermald

10    properties, has the authority to hire employees

11    for those properties?

12          A    Yes, I do.

13          Q    And does it have authority to hire

14    employees?

15          A    Only with the owner's permission.

16          Q    And with respect to the payments

17    of employees, and in this case now I'm

18    referring to Thermald employees, who determined

19    or determines how those employees are paid?

20          A    Not sure I understand the

21    question.

22          Q    Putting aside the amount that the

23    individual is paid, who determines how they are

24    paid?  What is the procedure for being paid?

25               MR. ETTENGER:  You're talking
```

1                      J. Yablonsky

2            about regular wages?

3                  MS. BILUS-GOULD:  Right.

4                  MR. ETTENGER:  How does payroll

5            work basically?

6            A     We contract on behalf of the owner

7     with an outside payroll processing firm that

8     processes the payroll.

9            Q     And has that always been true

10    during the period of time when Wavecrest has

11    managed Thermald properties?

12           A     I believe so.

13           Q     And which outside processing firm

14    is that?

15           A     Paychex.

16           Q     And you have been asked a lot of

17    questions this morning about Ronald Britt, so

18    I'm going to assume that, of course, you do

19    know Ronald Britt; is that correct?

20           A     That's correct.

21           Q     Did there come a point in time

22    when Wavecrest entered into an employment

23    agreement with Mr. Britt?

24                 MR. ETTENGER:  Objection.

25            Wavecrest entered into?

1                    J. Yablonsky

2            MS. BILUS-GOULD:   Yes.

3       A    No.

4       Q    The answer is "no"?

5       A    The answer is no.

6       Q    Do you have knowledge as to

7   whether any other entity entered into an

8   employee agreement with Mr. Britt?

9       A    Yes.

10       Q    And what is that other entity?

11       A    It would have been Thermald Realty

12   Associates.

13       Q    Have you ever seen a fully

14   executed employment agreement between Ronald

15   Britt and Thermald Realty Associates I, LP?

16       A    Yes.

17       Q    When did you see such an

18   agreement?

19       A    I would have seen it at the time

20   that it was executed, but the most recent one,

21   because I haven't been able to locate the

22   original executed agreement, was in an exhibit

23   to Mr. Britt's lawsuit.

24       Q    And so looking at that lawsuit in

25   front of you, I don't know that all the

1                    J. Yablonsky

2    exhibits are here.

3              MS. BILUS-GOULD:  They are not.

4              MR. ETTENGER:  I have one with all

5         the exhibits.

6              MS. BILUS-GOULD:  Oh, thank you.

7              MR. ETTENGER:  What exhibit is --

8              MS. BILUS-GOULD:  What exhibit is

9         the employment agreement?  It is

10        Exhibit --

11             MR. ETTENGER:  Exhibit A?

12             MS. BILUS-GOULD:  The first

13        exhibit.  Exhibit A, I think.

14             MR. ETTENGER:  Exhibit A.

15   BY MS. BILUS-GOULD:

16        Q    So you're looking at Exhibit 2,

17   which has been marked at a prior deposition,

18   and you're looking at Exhibit A to Exhibit 2

19   which is a two-page exhibit.

20        A    Yes.

21        Q    And this is two pages.  The first

22   page of which appears to be on the Wavecrest

23   Management Team Limited stationery; is that

24   correct?

25        A    That's correct.

1               J. Yablonsky

2          Q    And the first page appears to bear

3     the date January 4, 2007; is that correct?

4          A    Yes.

5          Q    And taking a look at the second

6     page of the exhibit, is that your signature on

7     the page?

8          A    Yes, it is.

9               MR. KOERNER:  What are you looking

10              at right now?

11              MR. ETTENGER:  Exhibit A --

12              MS. BILUS-GOULD:  I'm looking at

13              Exhibit A to Mr. Britt's complaint in

14              this action.

15              MR. KOERNER:  Okay.  Thank you.

16     BY MS. BILUS-GOULD:

17          Q    Sir, I'm asking you to take a look

18     at Exhibit A and tell me whether this is the

19     entirety of an employment agreement that was

20     entered into and signed by Ronald Britt?

21              MR. ETTENGER:  If you recall.  He

22              said he hadn't seen it in a long time.

23              MS. BILUS-GOULD:  I understand.

24          A    It does not appear to be.

25          Q    What is the basis for your

1                    J. Yablonsky

2    statement that "it does not appear to be"?

3         A    It's going from on the first page

4    from an item six to on the second page the

5    middle of the sentence.

6         Q    This appears to be an incomplete

7    document; is that correct?

8         A    That's correct.

9         Q    But going back to my earlier

10   question about whether you recall whether Mr.

11   Britt entered into an employment agreement with

12   Wavecrest Management Team Limited, I note that

13   on Exhibit A to the complaint, which is Exhibit

14   2 in this deposition process, this document

15   appears to have been written on Wavecrest

16   stationery; is that correct?

17        A    That's correct.

18        Q    And it appears to have been signed

19   by you who are a Wavecrest agent; is that

20   correct?

21        A    No.  It was signed by me as an

22   agent of Thermald Realty Associates.

23        Q    Do you recall whether prior to the

24   time Mr. Britt executed whatever agreement he

25   executed, he was presented with a draft of an

```
1                        J. Yablonsky

2    employment agreement?

3            A    I don't recall specifically.

4            Q    I may ask you to take a look at a

5    document we marked in an earlier deposition as

6    Exhibit 3.

7            A    (Witness peruses document.)

8            Q    Do you recognize Exhibit 3?

9            A    Yes, I do.

10           Q    Can you tell me what this is,

11   please?

12           A    It appears to be the full version

13   of the employment agreement which I believe I

14   probably printed from my computer.

15           Q    And that is a document that's

16   dated December 28th of 2006; is that correct?

17           A    Correct.

18           Q    And do you have any knowledge as

19   to whether the document that was actually

20   signed by Mr. Britt is Exhibit 3?

21           A    It wouldn't be Exhibit 3 because

22   this is, as I said, was printed off of my

23   computer, not on letterhead.  But I believe in

24   sum and substance this would have been the

25   terms of the agreement.
```

1                    J. Yablonsky

2          Q    And just taking a look for a

3    moment as Exhibit 4 which we marked at an

4    earlier deposition.

5          A    (Witness peruses document.)

6          Q    Can you identify Exhibit 4?

7          A    Again, it appears to be the

8    agreement between Thermald Realty and Ron Britt

9    in this case with one page missing.

10         Q    Have you had a chance to search

11   Wavecrest records to ascertain whether you have

12   a copy of the fully executed agreement as it

13   was executed by Britt and Wavecrest?

14         A    It wasn't executed by Wavecrest.

15   It was executed by me as an agent of Thermald

16   Realty.

17         Q    Whether or not that is accurate,

18   have you had occasion to search your records to

19   ascertain whether you can locate the fully

20   executed agreement as executed by Mr. Britt?

21         A    Yes, I have.

22         Q    And have you been able to locate

23   that?

24         A    No, I have not.

25         Q    To the best of your recollection

IRIS FERNHOFF REPORTING    (516) 317-3426

1                        J. Yablonsky

2        did the employment agreement that was actually

3        executed by Wavecrest as agent for Thermald and

4        Mr. Britt contain a provision whereby Mr. Britt

5        would be provided an apartment free of charge

6        as part of his compensation?

7               A    I believe so, yes.

8               Q    And to the best of your

9        recollection did the employment agreement that

10       was executed by Mr. Britt and Wavecrest as

11       agent for Thermald contain a provision whereby

12       Mr. Britt would receive free utilities as part

13       of his compensation?

14              A    I believe so, yes.

15              Q    And to the best of your knowledge

16       did the employment agreement as actually

17       executed by Mr. Britt and by Wavecrest as agent

18       for Thermald contain any provision regarding

19       reimbursement for telephone expenses?

20              A    I believe it did.

21              Q    What do you recall about that

22       provision?

23              A    I believe that he was utilizing

24       his own phone and we were reimbursing him a

25       fixed amount a month.

1                    J. Yablonsky

2          Q     Do you recall what that amount

3    was?

4          A     Not without me looking.

5          Q     And do you recall what the initial

6    salary for Mr. Britt was in the employment

7    agreement that you actually executed?

8          A     Not without going back to the

9    agreement.

10         Q     Do you recall whether the

11   employment agreement that Mr. Britt actually

12   executed contained a provision whereby Mr.

13   Britt was an employee at will?

14         A     I believe it contained such a

15   provision, yes.

16         Q     Do you have an understanding as to

17   what it means to be an employee at will?

18         A     Yes, I do.

19         Q     Can you tell me what your

20   understanding is?

21         A     My understanding is that it means

22   that the employer has the right to terminate

23   the employment for any reason or for no reason.

24         Q     Looking for one more second at

25   Exhibit 3, which is a four-page document, not

1                    J. Yablonsky

2    on letterhead, dated December 28, 2006, and I'm

3    looking at -- can I just have it back for a

4    second?

5              A    (Witness complies.)

6              Q    -- the second page of the document

7    which sets forth Mr. Britt's compensation.  Do

8    you see that looking at the bottom of the page?

9              A    Yes, I do.

10             Q    What was that compensation on a

11   weekly basis?

12             A    Three hundred fifteen dollars a

13   week.

14             Q    Do you know how that compensation

15   was arrived at?

16             A    I don't recall specifically.

17             Q    And did that weekly amount ever

18   change?

19             A    I would have to look at the

20   payroll records to verify.

21             Q    What records would you have to

22   look at?

23             A    Payroll journals.

24             Q    I'm just going to show you what we

25   previously marked at a deposition as Exhibit 7,

```
1                    J. Yablonsky
2    which is a series of pay stubs and ask if
3    taking a look at that exhibit refreshes your
4    recollection as to whether the weekly amount
5    received by Mr. Britt ever changed?
6         A    It appears to have, yes.
7         Q    And what did it change to?
8         A    Would have changed to $350 a week.
9         Q    To your understanding what
10   services were encompassed in that $350 a week?
11        A    The services outlined in Exhibit
12   3.
13        Q    Or any employment agreement that
14   he actually signed; is that correct?
15        A    That's correct.
16        Q    And was it your understanding that
17   pursuant to any agreement that Mr. Britt
18   actually signed that that number, whether it
19   was $315 or $350 a week, was supposed to be
20   full compensation for the services he performed
21   pursuant to the employment agreement?
22        A    That's correct.
23        Q    I will take it back.
24        A    (Witness complies.)
25        Q    Thank you.
```

1                    J. Yablonsky

2              Looking at the management

3    agreement, did I take that back or do you have

4    it in front of you?

5              MR. ETTENGER:  You took it back.

6         Q    Exhibit 24.  And I'm just going to

7    call your attention to page four of the

8    agreement, paragraph 3.9 that's entitled

9    "Compliance with law."

10             Do you see that?

11        A    Yes, I do.

12        Q    And it says, "Manager shall comply

13   with all applicable federal, state and local

14   governmental laws, ordinances, rules and

15   regulations with respect to the operation and

16   management of the property and performance by

17   manager of its duties and obligations under

18   this agreement"; is that correct?

19             MR. ETTENGER:  You used the word

20             "management."  It's actually

21             "maintenance."  Third line.  You said

22             "operation and management" --

23             MS. BILUS-GOULD:  "Maintenance of

24             the property and performance by

25             manager" --

1              J. Yablonsky

2              Let me read it again.

3    BY MS. BILUS-GOULD:

4         Q    Section 3.9 entitled "Compliance

5    of Laws" says, "Managers shall comply with all

6    applicable federal, state and local

7    governmental laws, ordinances, rules and

8    regulations with respect to the operation and

9    maintenance of the property and performance by

10   manager of its duties and obligations under

11   this agreement."

12             Do you see that?

13        A    Yes, I do.

14        Q    Do you have an understanding that

15   there are certain federal and state laws that

16   dictate how employees are supposed to be paid?

17             MR. ETTENGER:  Objection.

18        A    I have a cursory understanding of

19   it.

20        Q    And do you have an understanding

21   of what the name of those laws are?

22        A    Not really, no.

23        Q    Does the phrase Fair Labor

24   Standards Act mean anything?

25        A    I've heard the term.

IRIS FERNHOFF REPORTING    (516) 317-3426

```
1                         J. Yablonsky
2            Q     And have you heard the term New
3    York State Labor Law?
4            A     Yes, I have.
5            Q     During the course of your duties
6    as director of property management for
7    Wavecrest, did you have any training with
8    respect to the laws that are applicable to the
9    payment of employees in companies such as
10   Thermald?
11           A     No.
12           Q     What was the procedure by which
13   Mr. Britt was paid?
14                 MR. ETTENGER:  Objection.
15                 MS. BILUS-GOULD:  Let me build up
16           to it.
17   BY MS. BILUS-GOULD:
18           Q     You've indicated in response to
19   Mr. Koerner's questions that Mr. Britt did not
20   submit time sheets, correct?
21           A     That's correct.
22           Q     So what was the procedure by which
23   he got his weekly or biweekly paycheck?
24           A     He was on a regular payroll.  So
25   if there were no deviations, a check would be
```

1                     J. Yablonsky

2      cut on a biweekly basis through our payroll

3      people and through Paychex, which is an outside

4      payroll processing firm.

5           Q    And was there some interface with

6      what you call your payroll people and Paychex?

7           A    They would have to -- I don't know

8      if it was call in or by writing, but they would

9      have to somehow have the check initiated.

10          Q    And who or what entity determined,

11     for example, what the withholdings were on Mr.

12     Britt's paycheck?

13          A    Mr. Britt would have submitted a

14     -- I guess it's a W-4 form, indicating what his

15     deductions are.  The calculation of the

16     deductions based on that would be done as part

17     of the payroll processing through Paychex.

18          Q    Now you indicated that Wavecrest

19     manage many other properties; is that correct?

20          A    That's correct.

21          Q    Are there any properties where the

22     employees do submit time sheets?

23          A    There might be some.

24          Q    Do you know of any?

25          A    I don't know specifically.

1                         J. Yablonsky

2        Q     Do you know how it's determined

3   which employee submit time sheets and which do

4   not?

5        A     It would probably be based on the

6   number of employees and the type of employee.

7        Q     And when you say "be based on the

8   number of employees," what do you mean by that?

9        A     A building that has a larger staff

10  where there would be deviation of, you know,

11  hours is more likely to have had time sheets

12  than where there was a regular set weekly

13  amount that somebody was being paid.

14       Q     And when you say whether an

15  employee submits time sheets might depend upon

16  the type of employee, what are you referring

17  to?

18       A     I'm referring to the distinction

19  between a superintendent and a handyman,

20  porter.

21       Q     And what is that distinction to

22  your knowledge as to when an employee would

23  submit time sheets and when they would not?

24       A     In the case of a superintendent,

25  again, certainly on a smaller building such as

J. Yablonsky

1

2     this, there was a set weekly amount that the

3     employee was being paid rather than a porter

4     which would be more based on the actual time

5     worked.  Mr. Britt was not punching a time

6     clock.

7          Q     And with regard to the

8     withholding, for example, that Mr. Britt had in

9     his paychecks, did Ms. Alderman have anything

10    to do with determining those withholdings?

11         A     I wouldn't think so, no.

12         Q     Mr. Koerner asked you who signed

13    payroll checks for Mr. Britt; is that correct?

14         A     Yes, he did.

15         Q     And you answered -- you gave two

16    possibilities; is that correct?

17         A     No.  I gave three possibilities.

18         Q     What were those three

19    possibilities?

20         A     I believe the three possibilities

21    were one of the principals of the firm,

22    Mr. Camerata.  It might have been Miss Alderman

23    or there might have been direct deposit.

24         Q     And with regard to Mr. Britt, do

25    you recall the period of time that he worked at

1                       J. Yablonsky

2    91 East 3rd Street, do you know who signed his

3    payroll checks?

4             A     It might have been all three

5    depending on the timing.

6             Q     And is there somebody at Wavecrest

7    that would actually know who actually signed

8    Mr. Britt's paychecks?

9             A     Not without seeing the actual

10   canceled checks.

11            Q     Now, you made reference, I

12   thought, during the course of your testimony

13   and answers to Mr. Koerner's questions, that

14   Mr. Britt received payment in addition to his

15   regular weekly paychecks; is that correct?

16            A     That's correct.

17            Q     Was there some sort of agreement

18   between Wavecrest and/or Thermald and/or Mr.

19   Britt as to how Mr. Britt would be paid for

20   these extra services?

21            A     Generally it would be on a

22   case-by-case basis.

23            Q     And case-by-case as a general

24   proposition, what was the procedure by which

25   Mr. Britt would do additional work and by which

             IRIS FERNHOFF REPORTING    (516) 317-3426

1                      J. Yablonsky

2       you and/or Thermald would agree to additional

3       payment?

4            A    There were times that something

5       would have come up where he would have advised

6       us in advance, requested it, and told us what

7       the price would be for a specific work.   There

8       were other times that work might have come up

9       that he was doing and submitting an invoice

10      for.

11           Q    As a general proposition, when Mr.

12      Britt was going to do extra work, did he submit

13      a proposal to you in advance of doing the work?

14           A    As I said, part of the time there

15      would have been something in advance.   Part of

16      the time it would have been an invoice.   But

17      generally he would have advised us in advance

18      that this was something that he was doing.

19           Q    And who would agree on behalf of

20      Thermald to permit him to do it and as to what

21      price he would be paid?

22           A    Most often it would be me.

23           Q    And when Mr. Britt submitted these

24      proposals and/or the invoices, were there any

25      hours mentioned in those proposals or invoices?

```
1                     J. Yablonsky

2         A    No.  It was generally a

3    description of work and amount.

4         Q    I'm going to ask you to take a

5    look at Exhibit 8, which we had marked at an

6    earlier deposition.

7         A    (Witness peruses document.)

8              MR. KOERNER:  Which one is this?

9              MS. BILUS-GOULD:  Invoices for

10        2011 through August 15, 2011.

11   BY MS. BILUS-GOULD:

12        Q    So do you recognize the invoices

13   that are part of Exhibit 8?

14        A    Yes, I do.

15        Q    And those are generally the type

16   of invoices that Mr. Britt submitted for this

17   extra work that we are talking?

18        A    That's correct.

19        Q    And with regard to Exhibit 8, is

20   it accurate that there are no hours set forth

21   anywhere in the invoices that are part of this

22   exhibit?

23        A    Not that I saw as I leafed through

24   it.

25        Q    How did you come to an agreement
```

1                    J. Yablonsky

2    with Mr. Britt about how he would be paid for

3    work that's represented in these invoices on

4    Exhibit 8?

5         A    As I said, based on the scope of

6    the work, there was times he would have told us

7    in advance and we may have agreed to it or

8    negotiated it, or he would submit an invoice

9    and if we thought that the amount was fair and

10   in line with the scope of work that he was

11   doing, we would approve it.

12        Q    And is it accurate that there was

13   no discussion of hours either by him or by you

14   as it related to payment of those invoices?

15        A    Not that I recall.

16        Q    Was there any discussion of an

17   hourly rate that Mr. Britt would be paid for

18   work reflected on the invoices in Exhibit 8,

19   for example, $35 an hour, did he ever discuss

20   that with you?

21        A    Not that I recall, no.

22        Q    In the instances where Mr. Britt

23   submitted proposals in advance for work, did

24   you have any contact with Miss Alderman to get

25   her approval for that work?

1                    J. Yablonsky

2         A    On some occasions, I believe, I

3    did.

4         Q    But not on all; is that correct?

5         A    That's correct.

6              MS. BILUS-GOULD:  Let's take a

7         quick break.

8              (Whereupon, a recess was taken.)

9    BY MS. BILUS-GOULD:

10        Q    Mr. Yablonsky, I'm going to show

11   you an exhibit that we marked at an earlier

12   deposition as Exhibit 7, which is a series of

13   Mr. Britt's pay stubs, check stubs for January

14   2011 through August of 2011.  And then I have a

15   couple of questions.

16        A    (Witness peruses document.)

17        Q    Have you had a chance to look at

18   the exhibit?

19        A    Yes, I have.

20        Q    I'm going to ask you to look at

21   the second page of the exhibit, it's actually

22   marked page two.

23        A    Okay.

24        Q    On that page I see an entry for

25   something called "apartment repair" and an

1                      J. Yablonsky

2    amount of "$882."

3              Do you see that?

4         A    Yes, I do.

5         Q    Who determined that there would be

6    a classification on these paychecks or pay

7    stubs as apartment repair?

8         A    I don't know who specifically came

9    up with that equation.

10        Q    Was it you?

11        A    No.

12        Q    Was it somebody at Wavecrest?

13        A    I don't know whether it was

14   somebody at Wavecrest or somebody at Paychex.

15        Q    Was it Miss Alderman?

16        A    I would think not.

17        Q    Is it accurate to assume that

18   someone from Wavecrest would tell Paychex how

19   Wavecrest wanted that invoice characterized for

20   purposes of a pay stub?

21        A    I don't know whether they have

22   predetermined categories or whether there is

23   latitude in what you would call something, so I

24   really couldn't answer it.

25        Q    You have no knowledge of that?

```
1                    J. Yablonsky

2         A     No, I don't.

3         Q     I'm going to ask you to take a

4    look at what we marked at an earlier deposition

5    as Exhibit 10, which is entitled "Compensation

6    Report."  And it appears to be the compensation

7    report for Mr. Britt for the year 2011.

8              Do you see that?

9         A     Yes, I do.

10        Q     And looking at pages one and two

11   and four of that exhibit, is it accurate that

12   there are entries for apartment repairs, but

13   there are no hours listed for those repairs?

14        A     That appears to be the case, yes.

15        Q     But looking again at page four of

16   Exhibit 10, I'm going to call your attention to

17   the bottom third of the page and the third

18   entry from the bottom of the page, there's also

19   an entry for apartment repairs.

20             Do you see that?

21        A     Yes, I do.

22        Q     And here there is an amount, a

23   gross earnings with regard to the apartment

24   repairs of $2179.99."

25             Do you see that?
```

1                         J. Yablonsky

2          A     Yes, I do.

3          Q     And next to it there's a box

4     called "hours" and it says "249.14 hours."

5                Do you see that?

6          A     Yes, I do.

7          Q     And next to that there appears to

8     be an hourly rate of $13.125; is that correct?

9          A     That's correct.

10         Q     Do you have any knowledge as to

11    why the entries for apartment repairs change to

12    reflect some number of hours?

13         A     No, I don't.

14         Q     Do you have any knowledge as to

15    whether Mr. Britt actually spent 249.14 hours

16    on the repair that's reflected in this entry?

17         A     No, I don't.

18         Q     Do you believe that he spent that

19    many hours in that repair?

20         A     I would assume that the twenty one

21    seventy nine was an agreed amount and that the

22    hours and rate were backed in to it

23    mathematically.

24         Q     What is the basis of that

25    assumption?

1                    J. Yablonsky

2          A     The basis is that we were

3     approving invoices that had lump-sum amounts.

4     Not specific hours.

5          Q     And so the numbers that are

6     reflected when you have a number of hours and

7     an hourly rate are reflective of backing in to

8     the amount of the invoice; is that correct?

9          A     That's my assumption.

10         Q     Did Miss Alderman have anything to

11    do with the determination that this

12    calculation, which is reflected on this entry,

13    third from the bottom of page four of Exhibit

14    10, would be reflected in the manner in which

15    it was reflected?

16         A     Not to my knowledge.

17         Q     And if I showed you, and I can

18    show you many other entries for apartment

19    repairs that are reflected in this particular

20    manner with an hourly rate and a number of

21    hours, would your testimony be the same that

22    those numbers are reflective of backing in to

23    an invoice as presented?

24         A     That would be my assumption, yes.

25         Q     During the course of Mr. Britt's

1                    J. Yablonsky

2    employment by Thermald/Wavecrest, do you have

3    any knowledge as to whether he performed work

4    for any other entity?

5                    MR. ETTENGER:   I'm going to object

6             to the form, but you can answer.

7         A    Specifically, no.

8         Q    Well, generally speaking, were you

9    aware that Mr. Britt did contracting work or

10   handyman work for entities other than Thermald

11   during the period of his employment?

12                    MR. ETTENGER:   Or people.

13        Q    Or people?

14        A    I don't know of any specific work

15   that he did.  We certainly knew that he was

16   able to when there was something that was

17   allowed.

18        Q    So you answered my next two

19   questions.

20                    Did Mr. Britt --

21        A    You're welcome.

22        Q    Did Mr. Britt at any point in time

23   complain to you during the course of his

24   employment that he was not paid the amount that

25   he thought he should be paid during the course

```
1                    J. Yablonsky
2    of his employment?
3              MR. ETTENGER:  Objection.
4              You're talking about specific
5         hours or generally not being paid enough
6         money?
7              MS. BILUS-GOULD:  No.  Withdrawn.
8    BY MS. BILUS-GOULD:
9         Q    Did he ever tell you that he
10   wasn't paid what he was entitled to be paid?
11        A    What he was entitled to be paid,
12   no.
13        Q    Thinking back now to the point in
14   time when Mr. Britt became employed by
15   Thermald, which was at the beginning of 2007;
16   is that correct?
17        A    That's correct.
18        Q    Was there any year from 2007
19   through the termination of Mr. Britt's
20   employment that Thermald had four or more
21   employees who worked each day for twenty or
22   more weeks?
23              MR. ETTENGER:  To your knowledge.
24        Q    To your knowledge?
25        A    No.
```

J. Yablonsky

1

2      Q    During the period in which Mr.

3   Britt was employed by Thermald/Wavecrest, who

4   was responsible for making the appropriate

5   filings with the various governmental agencies,

6   for example, the New York State Department of

7   Labor Unemployment Insurance Division or the

8   Treasury for Federal Uninsurance filings?

9           MR. KOERNER:  Objection.

10          You can answer it.

11     A    That would have been part of the

12   work that Paychex did.

13     Q    And was there somebody at

14   Wavecrest that reviewed those filings prior to

15   the time they were made?

16     A    There was somebody at Wavecrest

17   who interacted with Paychex.  Whether they

18   reviewed it or what their procedures was, I

19   couldn't answer you.

20     Q    Who was the person at Wavecrest

21   who interacted with Paychex?

22     A    A woman by the name of a Tara.

23     Q    Is it Tara Clyburn?

24     A    Thank you.

25     Q    Is that who it was?

1                         J. Yablonsky

2          A     Yes.

3                MS. BILUS-GOULD:   C-L-Y-B-U-R-N.

4    BY MS. BILUS-GOULD:

5          Q     Do you know how many employees

6    Thermald had during the year 2007 at any point

7    in 2007?

8          A     Typically there were two

9    employees.   There may have been some point

10   where somebody else was put on payroll for some

11   specific work.

12               MS. BILUS-GOULD:   Please mark the

13               next exhibit, Exhibit 25.

14               (Document is marked Exhibit 25 for

15               identification, as of this date.)

16               MR. KOERNER:   Let me take a break.

17               (Whereupon, a recess was taken.)

18   BY MS. BILUS-GOULD:

19         Q     Mr. Yablonsky, taking a look at

20   Exhibit 25, do you know what this exhibit is

21   comprised of?

22         A     It appears to be a tax filing for

23   Thermald Realty.

24         Q     This is for the year 2007; is that

25   correct?  Looking at the top of the page, where

1                          J. Yablonsky

2    it says "tax year '07" in very small print, to

3    the right.

4                  MR. ETTENGER:  I see it over there

5            (indicating.)

6        A    Well, actually it appears to be a

7    filing for one quarter of '07, if I'm reading

8    it correctly.

9        Q    Well, we can talk about what's

10   filed in the last quarter.

11               On this page there appears to be

12   three employees listed; is that correct?

13       A    That's correct.

14       Q    Mr. Zheng?

15       A    Correct.

16       Q    Mr. Burke?

17       A    Correct.

18       Q    That's the Brendan Burke that you

19   were talking about before?

20       A    I would suspect as much.

21       Q    And Ronald Britt; is that correct?

22       A    That's correct.

23       Q    Do you have any reason to believe

24   that Thermald Realty I, LP had any other

25   employees during the year 2007?

1                    J. Yablonsky

2        A     No, I don't.

3        Q     And was Mr. Burke, and I believe

4    Mr. Koerner asked you this question, but just

5    to clarify, did Mr. Burke work at any point in

6    time simultaneously with Mr. Britt?

7        A     I don't recall if there was any

8    overlap.

9        Q     Thank you.

10             MS. BILUS-GOULD:   Please mark the

11             next exhibit, number 26.

12             (Document is marked Exhibit 26 for

13             identification, as of this date.)

14    BY MS. BILUS-GOULD:

15        Q     Mr. Yablonsky, looking at Exhibit

16    26, which is entitled "Compensation Report

17    Thermald Realty Associates, LP," and there is

18    the name "Paychex, Inc." on the bottom.   And it

19    also says on the top of this page "check dates

20    3/31/2008 to 12/24/2008."

21             Do you see that?

22        A     Yes, I do.

23        Q     Do you understand this to be a

24    compensation report for all employees of

25    Thermald Realty Associates I, LP for the period

1              J. Yablonsky

2    of time listed 3/31/2008 to 12/24/2008?

3         A    It appears to be.

4         Q    With regard to this particular

5    exhibit, is it accurate there appears to be

6    listed two employees Ronald J. Britt and a Mr.

7    Zheng.  We've redact his first name.

8              Do you see that?

9         A    Yes, I do.

10        Q    Do you have any reason to believe

11   that there were more than two employees of

12   Thermald Realty Associates I, LP during the

13   period 3/31/2008 to 12/24/2008?

14        A    Not that I recall.

15        Q    And do you know how many employees

16   Thermald Realty Associates I, LP had during the

17   first quarter of 2008?  In other words, during

18   the time not reflected on this compensation

19   report in 2008?

20        A    I would assume it's the same two

21   employees.

22             MR. ETTENGER:  Are you going to do

23        this for every year?

24             MS. BILUS-GOULD:  I am.

25             Please mark the next exhibit.

IRIS FERNHOFF REPORTING    (516) 317-3426

```
 1                  J. Yablonsky
 2          MR. ETTENGER:  The documents
 3      should speak for themselves.
 4          MS. BILUS-GOULD:  Well, somebody
 5      has to support those documents and I'm
 6      going to be doing what I need to be
 7      doing.
 8          MR. KOERNER:  I also object.  It's
 9      repetitive and wasteful of everyone's
10      money and time.
11          (Document is marked Exhibit 27 for
12      identification, as of this date.)
13          MS. BILUS-GOULD:  Mark these
14      exhibits 28 through 35.
15          (Documents are marked Exhibits 28
16      through 35 for identification, as of
17      this date.)
18  BY MS. BILUS-GOULD:
19      Q    Mr. Yablonsky, can you take a look
20  at what's been marked as Exhibit 27?
21      A    Yes.
22      Q    Can you tell, me can you identify
23  the exhibit, please?
24      A    It's a quarterly payroll tax
25  filing for 2008.
```

1                     J. Yablonsky

2          Q     And is it for the entire year of

3     2008?

4          A     Appears to me to be for the first

5     quarter.

6          Q     Keep looking at the document,

7     please.

8          A     Second quarter.

9          Q     Is it for the first two quarters

10    of 2008?

11         A     No.  It seems to be four separate

12    documents that comprise the full year.

13         Q     And that's the quarterly filing

14    for Thermald Realty Associates I, LP?

15         A     The heading appears to have left

16    off the Roman numeral one, but yes.

17         Q     Based upon that filing, can you

18    tell me how many employees Thermald had during

19    the year 2008?

20         A     During the first two quarters it

21    appears to indicate they've had two.  During

22    the third quarter they indicate that it had

23    one.  And during the fourth quarter it

24    indicates two again.

25         Q     Thank you.  Let me take that back

1                    J. Yablonsky

2    from you.

3                    Looking at Exhibit 28, can you

4    identify that exhibit, please?

5         A    Yes, I can.

6         Q    Please tell me what it is?

7         A    It's the quarterly tax filing for

8    2009.  Appears to be four separate documents,

9    which in the aggregate comprise the entire

10   year.

11        Q    And can you tell me based upon

12   these documents how many employees Thermald

13   Realty Associates I, LP had during the course

14   of 2009?

15        A    In January they had one.  In

16   February and March two.  In April two.  In May

17   one.  In June two.  In July two.  In August

18   three.  In September one.  In October one.

19   November one.  And in December three.

20        Q    And looking at Exhibit 29, which

21   is the compensation report for Thermald Realty

22   Associates, and again it leaves off "one LP"

23   for the year 2009, is this document supportive

24   of what you just testified to regarding the

25   number of employees of Thermald Realty

1                        J. Yablonsky

2      Associates I, LP for the year 2009?

3            A     What I testified to was what was

4      shown on a month-to-month basis based on the

5      quarterly reports.  Without doing their

6      reconciliation, I can't answer that.

7            Q     Well, do you have any reason to

8      believe that Exhibit 28 is incorrect?

9            A     No, I don't.

10           Q     And to your recollection with

11     regards to the year 2009, did Thermald ever

12     have four or more employees?

13           A     Not to my recollection.

14           Q     So looking at Exhibit 29, which is

15     entitled "Compensation Report" and it's for the

16     year 2009 for Thermald Realty Associates LP,

17     although it's -- you say the one is left off,

18     does this document support the fact that there

19     was no time during 2009 where there were four

20     or more employees of Thermald?

21           A     That's correct.

22           Q     Please take a look at Exhibit 30.

23           A     (Witness peruses document.)

24           Q     This is entitled "Compensation

25     Report."  It's for the year 2010 for Thermald

1                    J. Yablonsky

2    Realty Associates.  It says "LP."  You say the

3    one is left off.

4              Can you tell me based upon this

5    report how many employees Thermald Realty

6    Associates I, LP had during the course of 2010?

7         A    Two.

8         Q    And do you have any reason to

9    believe that there was any point in time during

10   the year 2010 where Thermald Realty Associates

11   I, LP had four or more employees?

12        A    No, I don't.

13        Q    Looking at Exhibit 31, can you

14   identify the exhibit?

15        A    Yes.  It's 2010 quarterly employee

16   tax returns that appear to be covering first

17   and second quarter.

18        Q    And based upon what you're seeing

19   in Exhibit 31, is this report consistent with

20   Exhibit 30 with regard to the number of

21   employees that Thermald Realty Associates I, LP

22   had during the first and second quarters of

23   2010?

24        A    Again, this is listing different

25   amounts of employees for one of the periods.

```
 1                    J. Yablonsky
 2   And without my reconciling the reports I have
 3   no way of telling you that.
 4          Q     But to the best of your
 5   recollection, was there any point during those
 6   two quarters, the first two quarters of 2010,
 7   where Thermald had four or more employees?
 8          A     No, there wasn't.
 9          Q     Can you identify Exhibit 32,
10   please?
11          A     Thirty-two is Compensation Report,
12   covering 2011.
13          Q     Have you had a chance to take a
14   look at it?
15          A     (Witness peruses document.)
16                Yes, I have.
17          Q     And in total, at any point in the
18   year 2011, can you tell me how many people
19   Thermald employed at any point in time?
20          A     There appears to be a total of
21   four people employed.
22          Q     One of them was Mr. Britt; is that
23   correct?
24          A     That's correct.
25          Q     One of them is a Mr. Lin, looking
```

128

1                        J. Yablonsky

2      at page nine of the report; is that correct?

3           A     That's correct.

4           Q     Do you know who Mr. Lin was?

5           A     There was a point in time where

6      Mr. Zheng was injured, not able to come to

7      work.  I believe Mr. Lin was substituting for

8      him at that time.

9           Q     So is it your recollection that

10     Mr. Lin and Mr. Zheng did not work at the same

11     time?

12          A     If my assumption as to who he is

13     is correct, that's correct.

14          Q     And looking at page nine of

15     Exhibit 32, is it accurate that it appears that

16     Mr. Lin only worked for four weeks during the

17     course of that year?

18          A     That's correct.

19          Q     Now, there's a third employee

20     named -- last name is Willis on page ten?

21          A     Yes.

22          Q     Who is that?

23          A     He was somebody that we had

24     brought in to do certain specific work in the

25     building.

1                   J. Yablonsky

2          Q     You said "specific work."  You

3     mean apartment repair work; is that correct?

4          A     I'm not sure whether some of it

5     was in the common areas as well as in

6     apartments.

7          Q     Is it accurate, based on this

8     report, Mr. Willis worked for a total of three

9     weeks during the year 2011?

10          A     I'm not sure how the time he

11     worked corresponded to the checks that were

12     issued so I couldn't say that definitively.

13          Q     Well, did he work for twenty or

14     more weeks during the year 2011?

15          A     No.

16          Q     And the fourth employee is Mr.

17     Zheng; is that correct?

18          A     That's correct.

19          Q     Would you look at Exhibit 33?

20          A     Yes.

21          Q     And can you identify the exhibit?

22          A     It's a compensation report for

23     2012.

24          Q     And during the totality of 2012 at

25     all points in time in total, how many employees

1                    J. Yablonsky

2    did Thermald Realty Associates I, LP have?

3          A     Appears to be seven.

4          Q     And the first one was Mr. Britt;

5    is that correct?

6          A     That's correct.

7          Q     And then there is a Byers is the

8    last name; is that a he or a she?

9          A     That's a he.

10         Q     What was Mr. Byers doing for

11   Thermald during the year 2012?

12         A     He's done some miscellaneous

13   repair work for us.

14         Q     Based upon this report, Exhibit

15   33, for how many weeks did Mr. Byers work for

16   Thermald during the year 2012?

17         A     There appears to be six checks

18   that are issued to him, but what period of time

19   that encompassed I couldn't tell you.

20         Q     Two of those checks were issued on

21   March 2, 2012; is that correct?

22         A     That's correct.

23         Q     Another one on April 6, 2012?

24         A     That's correct.

25         Q     August 31, 2012?

1                    J. Yablonsky

2         A      Correct.

3         Q      October 5, 2012?

4         A      That's correct.

5         Q      And November 16, 2012?

6         A      Correct.

7         Q      Is it accurate to state that

8    Mr. Byers did not work for Thermald for twenty

9    or more weeks during the year 2012?

10        A      Again, I can't tell you what

11   period of time those checks encompassed, so I

12   can't say that definitively.

13        Q      So is it your testimony that

14   looking at six checks that you can't say that

15   Mr. Byers was not employed for twenty or more

16   weeks during the course of the year?

17        A      What I see here it looks like the

18   total that Mr. Byers worked appears to be 98

19   hours over the course of the year.  How many

20   weeks that 98 hours fell into, I'm not able to

21   tell from this.

22        Q      And 98 hours constitutes how many

23   work days?

24               MR. KOERNER:  I object to this

25               whole line of questioning as to

1                    J. Yablonsky

2           relevance.

3                   Go ahead and finish.

4                   MS. BILUS-GOULD:  Thank you.

5           A    It would depend on how many hours

6    a day the person is working.

7           Q    Looking at the next employee, I

8    believe it's Miss Kotulski; is that correct?

9           A    That's correct.

10          Q    And what work did she perform

11   during the year 2012?

12          A    I believe she's done some

13   administrative work for Thermald.

14          Q    What kind of administrative work?

15          A    I couldn't tell you specifically.

16          Q    Did she work at the buildings?

17          A    No, she did not.

18          Q    Where did she work?

19          A    I believe she's located in New

20   Jersey.

21          Q    But you don't know the nature of

22   the work that she performed?

23          A    She did some administrative work

24   requested by the owner.

25          Q    And looking at this compensation

```
 1                     J. Yablonsky

 2    run, Mr. Yablonsky, Exhibit 33, based upon this

 3    run is it accurate to state that Ms. Kotulski

 4    did not work twenty or more weeks for Thermald

 5    during the year 2012?

 6         A    That appears to be the case, yes.

 7         Q    And looking at the next employee,

 8    do you see Mr. Lin again; is that correct, or

 9    do you have somebody else?

10         A    No.  Mr. Lin is the next person I

11    see.

12         Q    What was Mr. Lin brought in to do

13    in the year 2012?

14         A    I don't know whether he was

15    brought in to do anything or there was money

16    that was owed him from his prior work filling

17    in for Mr. Zheng, and that's when the payment

18    was made.

19         Q    But the payments that are

20    reflected on this run reflect checks cut on

21    January 6, 2012, January 13, 2012 and January

22    22, 2012; is that correct?

23         A    No.  What it reflects is one of

24    the checks being reversed.  So that --

25         Q    Which check was that?
```

1                    J. Yablonsky

2          A    Let's me see if I can tell from

3    here.  I can't tell which of these two checks

4    were reversed, but one of them was reversed.

5    It looks that the January 13th check was

6    voided.

7          Q    So in total Mr. Lin appears to

8    have worked a period of two weeks during this

9    year; is that correct?

10         A    No.  He looks to have worked a

11   period of one week.

12         Q    Thank you.

13              Looking at the next employee, last

14   name is Prince?

15         A    Not on the exhibit that I have.

16         Q    May I see it, please?

17         A    (Witness complies.)

18              MS. BILUS-GOULD:  Off the record.

19              (Discussion is held off the

20         record.)

21              MR. ETTENGER:  Look at this.

22         She's showing you that the document was

23         improperly photocopied, the exhibits.

24         So page fourteen, there's a Mr. Lublin.

25   BY MS. BILUS-GOULD:

```
1                     J. Yablonsky

2          Q    Who is Mr. Lublin?

3          A    If memory serves, I believe Mr.

4    Lublin provided vacation relief when Mr. Britt

5    was on vacation.

6          Q    So it's your best recollection

7    that Mr. Britt and Mr. Lublin did not work at

8    the same time; is that correct?

9          A    That's correct.

10         Q    And for how many weeks in 2012 did

11   Mr. Lublin work, if you can tell?

12         A    I can't really tell.

13         Q    Is it accurate that he did not

14   work twenty or more weeks for Thermald during

15   the year 2012?

16         A    That appears to be the case.

17         Q    And turning to the next employee,

18   and that's the last name Prince; is that

19   correct?

20         A    That's correct.

21         Q    Is that a man or a woman?

22         A    That's a woman.

23         Q    And that was Amy Prince?

24         A    That's correct.

25         Q    What was she brought in to do?
```

IRIS FERNHOFF REPORTING    (516) 317-3426

1                    J. Yablonsky

2          A    She did cleaning and helped with

3    apartment repairs.

4          Q    And for how many weeks did Miss

5    Prince work in the year 2012?

6          A    From this it appears that she

7    worked two weeks plus sporadic hours in

8    additional weeks.

9          Q    Is it accurate to state that at no

10   point in 2012 did Miss Prince work twenty or

11   more weeks for Thermald?

12         A    Similar to my answer with Mr.

13   Byers, she worked a total of 106-and-a-half

14   hours during the course of the year.  I can't

15   tell from this how the checks corresponded to

16   actual weeks or partial weeks of work.

17         Q    And looking at the next employee

18   that is Mr. Zheng; is that correct?

19         A    That's correct.

20         Q    Looking at Exhibit 34, is that in

21   front of you?

22         A    Yes, it is.

23         Q    Can you identify that exhibit?

24         A    It's the quarterly tax returns for

25   2012.

```
 1                     J. Yablonsky

 2          Q    Is this for Thermald?

 3          A    For Thermald Realty Associates LP.

 4          Q    And --

 5          A    And it's four separate reports

 6   which encompass the entire year.

 7          Q    And looking at the report for the

 8   second quarter, you see it?

 9          A    Yes, I do.

10          Q    There's a notation in the third

11   month of the second quarter there were four

12   employees; is that correct?

13          A    That's correct.

14          Q    But then looking at the report for

15   the third quarter, there's an indication that

16   in the first month of that quarter there were

17   only two employees; is that correct?

18          A    That's correct.

19          Q    So if there were four employees it

20   was not for more than the course of a month; is

21   that correct?

22          A    That's what this would indicate.

23          Q    And looking at the report for the

24   third quarter, which is the next page, there

25   was no month during that quarter where there
```

```
1                    J. Yablonsky
2    were four or more employees; is that correct?
3              MR. ETTENGER:  According to the
4         report?
5              MS. BILUS-GOULD:  Yes, according
6         to the report.
7              MR. KOERNER:  Just give me a
8         second.
9              MR. ETTENGER:  It's 233.
10             MS. BILUS-GOULD:  Right, 233 on
11        the bottom.
12             MR. ETTENGER:  On the bottom
13        right-hand corner you see 233?
14             MR. KOERNER:  Oh, I'm sorry.
15        A    That's correct.
16        Q    And looking at 236, which is the
17   report for the last quarter of 2012, do you see
18   that?
19        A    Yes.
20        Q    Do you see that the first month
21   there's an indication that there were four
22   employees; is that correct?
23        A    That's correct.
24        Q    And in the second month there's an
25   indication that there was five employees; is
```