# GOULD EXHIBIT "C"

 **COPY**

1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

3    --------------------------------------x
     RONALD BRITT,

4
                    Plaintiff,

5
                 - against -                    Index No.
6                                               13 CV 8289
     THERMALD REALTY I, LP d/b/a REALTY
7    ASSOCIATES I, LP and WAVECREST
     MANAGEMENT TEAM, LTD d/b/a WAVECREST
8    MANAGEMENT GROUP, LLC and WAVECREST
     EQUITIES, LLC, and DOREEN ALDERMAN,

9
                    Defendants.
10   --------------------------------------x

11

12         EXAMINATION BEFORE TRIAL of the Defendant,

13   DOREEN ALDERMAN, taken pursuant to Notice, held

14   at the law offices of Gould & Berg, LLP, 222

15   Bloomingdale Road, White Plains, New York

16   10605, on July 18, 2014, commencing at

17   10:05 a.m., before IRIS FERNHOFF, a Shorthand

18   Reporter and Notary Public within and for the

19   State of New York.

20

21

22

23

24

25

2

1

2      A P P E A R A N C E S:

3

4      KOERNER LAW FIRM
       Attorney for Plaintiff
5              111 John Street, Suite 420
           New York, New York 10038
6
       BY:   GREGORY KOERNER, ESQ.
7

8

9      KAUFMAN DOLOWICH VOLUCK, ESQS.
       Attorneys for Defendants
       Wavecrest Management Team, LTD.
10     d/b/a Wavecrest Management Group, LLC
       and Wavecrest Equities, LLC
11             135 Crossways Park Drive, Suite 201
           Woodbury, New York 11797
12
       BY:   JEFFREY ETTENGER, ESQ.
13

14

15     GOULD & BERG, LLP
       Attorneys for Defendants
       Thermald Realty Associates I, LP
16     d/b/a Realty Associates I, LP
       and Doreen Alderman
17             222 Bloomingdale Road
           White Plains, New York 10605
18
       BY:   JANE BILUS GOULD, ESQ.
19

20
       ALSO PRESENT:
21
               Ronald Britt - Plaintiff
22             Luis Rodriguez - Intern

23

24

25

3

1

2                           <u>STIPULATIONS</u>

3

4        IT IS HEREBY STIPULATED AND AGREED by

5    and between the attorneys for the respective

6    parties herein that the filing, sealing and

7    certification of the within deposition be

8    waived.

9        That such deposition may be signed

10    and sworn to before any officer authorized to

11    administer an oath with the same force and

12    effect as if signed and sworn to before the

13    officer before whom said deposition was taken.

14        IT IS FURTHER STIPULATED AND AGREED that

15    all objections except as to form are reserved

16    for the time of trial.

17

18

19

20

21

22

23

24

25

4

```
1                         D. Alderman
2       D O R E E N   A L D E R M A N, having been
3       first duly sworn by a Notary Public within and
4       for the State of New York, was examined and
5       testified under oath as follows:
6
7       EXAMINATION BY
8       MR. KOERNER:
9            Q      State your name for the record.
10           A      Doreen Alderman.
11           Q      State your address for the record.
12           A      1816 Hillcrest Avenue, Glendale,
13      California 91202.
14           Q      Good morning, Miss Alderman.  My
15      name is Greg Koerner.  I represent the
16      plaintiff in this case, Ronald Britt, who is in
17      the room today.
18                  We're going to have a deposition
19      today and I'm going to be asking you questions.
20      The court reporter is going to be taking down
21      my questions and your answers.
22                  The same instructions that were
23      given at the prior depositions in this case
24      will apply here.
25                  And so I'll ask you initially:
```

IRIS FERNHOFF REPORTING   (516) 317-3426

```
 1                    D. Alderman
 2      Were you in attendance at the prior depositions
 3      in this case namely of Ron Britt, Jay Yablonsky
 4      and the two nonparty witnesses?
 5           A    Yes.
 6           Q    And you understand the
 7      instructions that were given in those
 8      depositions?
 9           A    Yes.
10           Q    They all apply here.  If you need
11      a break, if you need to consult with counsel,
12      you can.
13                    Other than Doreen Alderman, have
14      you ever been known by any other names?
15           A    Skinner.  Mrs. Skinner,
16      S-K-I-N-N-E-R.
17           Q    And was that the last name of your
18      second husband?
19           A    Yes.
20           Q    No other names?
21           A    No.
22           Q    And how old are you?
23           A    Fifty-seven.
24           Q    What is your date of birth?
25           A    9/11/56.
```

6

1                    D. Alderman

2          Q      And where were you born?

3          A      Flushing, New York.

4          Q      And the current address of yours

5    in California, is that the only home you own?

6          A      I also have an apartment.

7          Q      In New York City?

8          A      Yes.

9          Q      The home in California, do you own

10   it or rent it?

11         A      Own it.

12         Q      Is there any mortgage on it?

13         A      No.

14         Q      What's the approximate value of

15   that home?

16         A      I'm not really sure actually

17   because I've been there since 1988.

18         Q      Estimate?

19         A      Maybe nine hundred thousand.

20         Q      And how many rooms?

21         A      I think seven.

22         Q      Swimming pool?

23         A      Exercise pool.

24         Q      And your apartment in New York,

25   what's the address of that apartment?

7

1                        D. Alderman

2           A      91 East 3rd Street, Apartment

3    number 2.

4           Q      Do you own that building?

5           A      Yes.

6           Q      And do you own other buildings in

7    New York City as well?

8           A      Yes.

9           Q      What are all the other buildings

10   that you own in New York City, please?

11                 MS. BILUS-GOULD:  Objection to the

12                 form of the question in the use of the

13                 word "you."  But you can proceed.

14          A      415 East 9th Street, 319 East 9th

15   Street, 115 Division Street.

16          Q      And how many apartments are in all

17   those buildings?

18          A      I think it's sixty-seven.

19          Q      And what is the approximate value

20   of those four buildings?

21          A      That I don't know.

22          Q      Again, estimate?

23          A      I don't know.  I really don't.

24          Q      Do you have any debt on those

25   buildings?

```
1                          D. Alderman
2           A      Yes.
3           Q      How much, approximately?
4           A      I think on 415 there's maybe -- I
5    think there's maybe $700,000.  And on 91 I
6    think it's about fourteen -- one point four
7    maybe, one point three.
8           Q      One point four million?
9           A      One point four, yes.
10          Q      And none of those buildings have
11   been appraised recently?
12          A      No.
13          Q      Other than those two addresses you
14   have no other residences which you own or rent?
15          A      My mother and I share a house in
16   Pennsylvania.
17          Q      What's the address of that?
18          A      106 State Road, Barnesville, PA
19   18214.
20          Q      And for the apartment in New York
21   City, do you personally have any debt or
22   mortgage obligations with respect to that
23   apartment?
24                 MS. BILUS-GOULD:  Objection to
25          form.
```

9

```
1                        D. Alderman
2                    You're talking about the
3            individual unit?
4                    MR. KOERNER:  The individual unit.
5                    MS. BILUS-GOULD:  You can answer
6            if you can answer.
7             A     It's a rental building so there's
8      no debt.  There's only debt on the building.
9             Q     You're not renting that apartment,
10     though, are you?
11            A     No.
12            Q     Have you had any other addresses
13     other than the three you mentioned in the prior
14     five years?
15            A     No.
16            Q     And are you currently employed?
17            A     I basically take care of the
18     buildings somewhat, but I'm not an employee.
19     I'm basically -- I collect a distribution.
20            Q     I'm sorry, you collect a
21     distribution?
22            A     It's a distribution.
23            Q     How much is the distribution?
24            A     Twelve thousand, I think.
25            Q     Twelve thousand per?
```

10

1                        D. Alderman

2          A     Month.

3          Q     And do you have to do work in

4     order to get that distribution?

5                MS. BILUS-GOULD:  Objection to

6          form.  You can answer if you can answer.

7          A     I think I -- when I can, I try to

8     maintain -- I basically try to make sure that

9     management and workers are doing their job.

10    And whatever I can help.  Whatever I -- if I

11    get a notice, a violation, I facilitate that.

12         Q     But my question is, and I'll get

13    to the description of what you do.

14                First of all, you have a company

15    which you own and the purpose of which is to

16    manage these buildings; is that correct?

17                MS. BILUS-GOULD:  Objection to

18         form.  You can answer.

19         A     Yes.

20         Q     And what's the name of that

21    company?

22         A     Wavecrest Management Team, LTD.

23                MS. BILUS-GOULD:  Objection to

24         form.  I'm sorry.  You can answer.

25         Q     And do you also have an ownership

11

1                           D. Alderman

2    in Thermald Realty as well?

3                   MS. BILUS-GOULD:   Objection to

4              form in terms of the name, but you can

5              answer.

6         A     Basically the buildings are owned

7    by Thermald Realty I, LP.

8         Q     And who owns Thermald Realty

9    outfit?

10        A     Basically it ends up going down to

11   me, but there's a trust that was developed, a

12   family trust.  So fifty percent ownership is

13   Thermald Realty I, LP.

14        Q     And the family trust that you're

15   talking about, you're a beneficiary of that

16   trust?

17                  MS. BILUS-GOULD:   Objection to

18             form.  You can answer if you can answer.

19        A     It's a trust really actually

20   designed for my children.

21                  MR. KOERNER:   I'll ask for

22             production of a copy of that trust

23             instrument.

24                  MS. BILUS-GOULD:   Well, when you

25             want, put anything you want in writing

D. Alderman

1

2  and I will respond accordingly.

3      MR. KOERNER:   I will also note for

4  the record I still do not have a copy of

5  Mr. Britt's transcript, which is

6  outrageous.   His deposition was

7  conducted in June.   Mr. Yablonsky's

8  deposition was conducted several weeks

9  ago and I already gave you the

10  transcript.   And it's outrageous that

11  you haven't provided the transcript.

12  I've asked at least four times.

13      So as I said in the prior

14  correspondence, we reserve the right to

15  call back all the defendants subject to

16  getting the transcript.

17      MS. BILUS-GOULD:   Well, since this

18  is a time that you are actually putting

19  something on the record, I will respond

20  as follows:

21      Number one, there's no particular

22  time frame in which I'm required to

23  provide you with the transcript.

24      Number two, you have made some

25  statements off the record at other

13

D. Alderman

1

2    depositions in which you indicated that

3    you intended to use the transcript,

4    among other ways, by providing it to

5    some member or members of the press,

6    which if you decide to do that, that

7    will be at your peril.  But if and when

8    you decide to do that, I will make sure

9    and I am ensuring that I will have a

10   copy of my client's transcript to

11   provide as well.

12           Number three, this deposition was

13   originally scheduled for June 10, 2014.

14   That was four days after the completion

15   of your client's deposition.  You would

16   have no way have had a copy of

17   Mr. Britt's deposition in order to

18   prepare for this deposition.  So the

19   fact that you claim that you need it to

20   prepare for this deposition is fine, but

21   you could have purchased, as I did

22   Mr. Yablonsky's deposition, you could

23   have purchased the deposition if you

24   needed it.

25           So you can reserve whatever rights

14

```
 1                       D. Alderman
 2          you think you have.
 3                    MR. KOERNER:  Thank you.  But I'll
 4          take issue with that discourse, but --
 5                    MS. BILUS-GOULD:  Let's proceed.
 6     BY MR. KOERNER:
 7          Q    Wavecrest Management, do you have
 8     ownership interest in that company as well?
 9          A    No.
10          Q    Do you hire Wavecrest to manage
11     the buildings that you own?
12          A    We have a contract.
13          Q    And before, what I was trying to
14     get at, and you started to describe what you do
15     with respect to these buildings, and my
16     question was for the distribution that you get
17     $12,000 a month.
18                    Is that contingent upon you doing
19     these duties or would you get that money even
20     if you didn't do these duties?
21          A    Yes.
22          Q    Yes?
23          A    Yes, I would get that money.
24          Q    Even if you didn't do any work?
25          A    Yes.
```

1                    D. Alderman

2           Q      Do you have any other sources of

3      income?

4           A      I teach privately, singing and

5      voice, but only very sporadically when I'm in

6      California.

7           Q      How much income a year have you

8      generated in that way?

9           A      Maybe it's $2000.  I actually

10     can't remember offhand.

11               MR. KOERNER:  I think we've asked

12           for plaintiff's tax returns.

13               MS. BILUS-GOULD:  No, you have not

14           asked for -- first of all, plaintiff is

15           your client.

16               MR. KOERNER:  I mean defendants

17           tax returns.

18               MS. BILUS-GOULD:  You've asked for

19           Thermald tax returns.  And I've

20           explained to you why I didn't think that

21           request was proper and you agreed that

22           you were no longer asking.

23               MR. KOERNER:  Well, we're asking

24           for Miss Alderman's tax returns.

25               MS. BILUS-GOULD:  Put your request

16

1                    D. Alderman

2          in writing and I will respond

3          accordingly.

4   BY MR. KOERNER:

5          Q     Can you tell me how much income

6   you listed on last year's tax return?

7          A     I think it was something like --

8   I'm trying to think.  I think it was around one

9   seventy.

10         Q     A hundred seventy thousand?

11         A     Yes, something like that.  Not

12  exact.  I can't exactly remember.

13         Q     And what is your approximate net

14  worth with all your assets and liabilities?

15         A     I honestly don't know.

16         Q     Can you estimate?

17         A     No.

18         Q     Is it more than a million dollars?

19         A     Yeah, probably.

20         Q     Is it more than two million

21  dollars?

22         A     That I couldn't tell you.  I don't

23  know.

24         Q     You have no idea what any of the

25  buildings you own are worth?

1                          D. Alderman

2          A     No.

3          Q     Approximately how many hours a

4     week do you work with respect to any of the

5     activities that you do to generate income?

6                MS. BILUS-GOULD:  Objection to

7          form.  She's just told you that she

8          would get a distribution from Thermald

9          whether she worked or not.

10               MR. KOERNER:  I know, but I'm

11         asking --

12               MS. BILUS-GOULD:  Objection to

13         form, but you can answer if you can

14         answer.

15               MR. KOERNER:  I'll rephrase.

16    BY MR. KOERNER:

17         Q     How many hours a week do you work?

18         A     It all depends on what you mean by

19    "work."  Could you be a little more specific?

20    I think there's several things that I do.

21         Q     I'm asking you to total them all

22    up, all the activities that you do to generate

23    income, how many hours a week?

24               MS. BILUS-GOULD:  Objection to

25         form.

18

1                          D. Alderman

2           A     I don't know.   It could fluctuate.

3     It could be somewhere from four -- if you're

4     talking about everything that I do, it could be

5     anywhere from four hours to twenty hours.   It

6     all depends on the issues that arise.

7           Q     Have you ever had any full-time

8     jobs?

9           A     Yes.

10          Q     When was your last full-time job?

11          A     When I had a dancing school.

12          Q     When was that?

13          A     I stopped teaching three years

14    ago.

15          Q     The dancing school was in

16    California?

17          A     Yes.

18          Q     And how much income did that

19    dancing school generate to you?

20          A     When I had time for it, it

21    generated grossly around fifty thousand.

22          Q     A year?

23          A     Yeah.

24          Q     To you personally?

25          A     No, gross.

1                        D. Alderman

2          Q      Okay, gross.  How much did it net?

3          A      It all depended on how many people

4     were helping me or -- it fluctuated.

5          Q      Can you estimate what your net

6     income of the business was at any point?

7          A      I would have to look really at all

8     those years to see and I haven't really

9     reviewed it.

10                MR. KOERNER:  I will ask for that

11                information to be provided as well.

12                MS. BILUS-GOULD:  Again, put your

13                requests in writing and I will respond

14                accordingly.

15                MR. KOERNER:  I'll put it in

16                writing.

17    BY MR. KOERNER:

18         Q      How long was the dancing school in

19    existence when you worked full time?

20         A      Basically the last maybe seven

21    years it became a full-time job.

22         Q      And you were the sole owner of

23    that?

24         A      Yes.

25         Q      And prior to your dancing school,

1              D. Alderman

2    is it true that the maximum it ever grossed per

3    year was about $50,000?

4         A    Yes.

5         Q    And before the dancing school did

6    you have any full-time employment?

7         A    Yes.

8         Q    What was it?

9         A    I was a dancer.

10        Q    From when to when?

11        A    From the age of twenty-one to

12   twenty-nine.

13        Q    And did you stop dancing?

14        A    Yes.

15        Q    Why?

16        A    Because I had children.

17        Q    What was your maximum annual

18   income as a dancer?

19        A    Oh, boy, that fluctuated too.   I

20   mean you're going back to 1979 so...

21             MS. BILUS-GOULD:   Best you can

22        recall.

23        A    I don't know.  Maybe it was

24   anywhere from during that time period maybe

25   twenty thousand, thirty thousand.

1              D. Alderman

2          Q      And other than being a dancer and

3    then the dancing school, have you ever had any

4    other full-time employment?

5          A      No.

6          Q      You stated that you have been

7    married twice; is that correct?

8          A      Yes.

9          Q      First of all, stepping back, can

10   you give me your educational history?

11         A      I graduated high school, Flushing

12   High School, and I have two years of college.

13         Q      You didn't graduate college?

14         A      No.

15         Q      And where did you go to college?

16         A      Queens College and Glendale

17   Community College.

18         Q      And when did you get married for

19   the first time?

20         A      I think it was 1982 -- '81.

21         Q      And who did you get married to?

22         A      Kelsey Grammer.

23         Q      The actor, correct?

24         A      Yes.

25         Q      And how long were you married to

1                          D. Alderman

2     him for?

3           A     I think approximately seven years.

4           Q     And you got divorced in

5     approximately '88?

6           A     I'm not sure, maybe.

7           Q     Around that time?

8           A     Give or take.

9           Q     And when you got divorced from him

10    why did you get divorced?

11                MS. BILUS-GOULD:  I'm going to

12          give you some leeway, Counsel, but so

13          far I haven't heard one question that's

14          germane to this case.  This is not a

15          supplemental proceeding.  You don't have

16          a judgment against my client.  You're

17          not entitled to know every aspect that

18          she has nor her marital history.

19                I'm going to give you some leeway

20          but we're not going to be spending hours

21          on this.

22                Go ahead.

23          A     I'm sorry, what was the question?

24          Q     Why did you get divorced from your

25    first husband?

1                    D. Alderman

2          A    Technical term, the legal term was

3    we had differences.

4          Q    Not the legal term.  In your own

5    words.

6          A    It was a difficult marriage.

7          Q    Can you tell me how was it

8    difficult?

9          A    There were just -- we had

10   problems.  Our lifestyles were different.

11         Q    Can you describe for me, I'm

12   trying to figure out what do you mean your

13   lifestyles were different?

14              MS. BILUS-GOULD:  Again, this is

15              the last question on this topic.  Answer

16              if you can.

17         A    His way of living was different

18   than mine.

19         Q    In what way?  I need to get --

20              MS. BILUS-GOULD:  You really don't

21              need it.  It has nothing to do with this

22              case.

23              MR. KOERNER:  This is a sexual

24              harassment case, so --

25              MS. BILUS-GOULD:  Right.  So why

1              D. Alderman

2         she got divorced in 1989 is not at all

3         relevant.

4              If you can answer the question,

5         answer it.

6         A    What is the question again?

7         Q    You said you had differences in

8    lifestyles.  What were they?

9              I just want to get to the point,

10   so we can move on.

11        A    Different way of communicating.

12        Q    Did it have anything to do with

13   alcohol?

14        A    That was one of the issues.

15        Q    Can you describe what that issue

16   was?

17        A    Can you be -- what do you mean?

18        Q    Who was drinking too much, or I

19   assume it was because somebody was drinking too

20   much?

21        A    Well, Kelsey had issues.

22        Q    And did you have children with

23   Kelsey Grammer?

24        A    Yes.

25        Q    How many?

IRIS FERNHOFF REPORTING    (516) 317-3426

1                    D. Alderman

2        A      One.

3        Q      And what was her name and age?

4        A      Spencer Grammer, and she's thirty.

5        Q      And did you have any other

6   children with Kelsey Grammer?

7        A      No.

8        Q      And did you get married for a

9   second time?

10       A      Yes.

11       Q      When and to whom?

12       A      I got married in 1992 to Dr.

13   William Skinner.

14       Q      And where did that marriage take

15   place?

16       A      In California.

17       Q      And what kind of doctor was Dr.

18   Skinner?

19       A      He's internal medicine.

20       Q      And how long had you been married

21   to him?

22       A      I think -- I believe it was four

23   years.

24       Q      And did that marriage also end in

25   divorce?

```
 1                          D. Alderman
 2           A      Yes.
 3           Q      And what were the reasons for that
 4      divorce?
 5           A      Again, different lifestyles.
 6           Q      Was it the same issues as the
 7      first marriage or different issues?
 8                  MS. BILUS-GOULD:  Objection to
 9           form.  You can answer if you can answer.
10           A      Bankruptcy issues.
11           Q      His bankruptcy?
12           A      Yes.
13           Q      Did you ever file for bankruptcy?
14           A      No.
15           Q      ^RULING^ What is your Social
16      Security number?
17                  MS. BILUS-GOULD:  It's not
18           relevant to this case.
19                  THE WITNESS:  No, it's not.
20                  MS. BILUS-GOULD:  I'm directing
21           you not to answer.
22                  MR. KOERNER:  Mark it for a
23           ruling.
24      BY MR. KOERNER:
25           Q      So there were financial issues
```

27

1                         D. Alderman

2     that caused the divorce, the second divorce?

3          A     Yes.

4          Q     And did you have children with Dr.

5     Skinner as well?

6          A     Yes.

7          Q     Who and what name and when?

8          A     Her name is Madison Skinner.

9          Q     And how old is she?

10         A     She's twenty-one.

11         Q     And do either of your children

12    work?

13         A     Yes.

14         Q     What do they do?

15         A     My older daughter is an actress

16    and married to a fireman with a three-year-old

17    and -- boy.  And my younger daughter just

18    graduated from Berkeley and she's working for

19    Deloitte Management Services.

20         Q     And after Dr. Skinner have you

21    been married subsequently?

22         A     No.

23         Q     Have you been engaged

24    subsequently?

25         A     No.

```
 1                        D. Alderman
 2          Q      Are you currently in a monogamous
 3   relationship?
 4          A      Yes.
 5          Q      With whom?
 6          A      Richard Cornejo.
 7          Q      And how did you meet Richard
 8   Cornejo?
 9          A      Through the internet.
10          Q      What site?
11          A      Singles Net.
12          Q      This is out in California?
13          A      I think it's countrywide.  Maybe
14   even worldwide.  I don't know.
15          Q      When you met him was Richard
16   living in California or New York or somewhere
17   else?
18          A      California.
19          Q      Was he living near you in
20   California?
21          A      Yes.
22          Q      Where was he living?
23          A      Pilot Hill.  I'm sorry, no.
24   Signal Hill.
25          Q      And when you met Richard what was
```

1                          D. Alderman

2      he doing for a living?

3           A     He works with -- it's business

4      with credit card services, managing.  He has a

5      banking background.

6           Q     When you met him was he employed

7      on a full-time basis?

8           A     He had a contract.  And he has his

9      own businesses besides.

10          Q     What's the name of his businesses?

11          A     First Web Bill.  That's all I can

12     remember offhand.

13          Q     And you said that he has

14     companies.  So other than First Web Bill, do

15     you know the other companies?

16          A     I can't remember the other

17     companies that he has but...

18          Q     They're all --

19          A     Basically helps businesses get

20     credit card, do credit and processing and...

21          Q     But he did not have an employer,

22     he had a contract; is that correct, when you

23     first met him?

24          A     Yes.

25          Q     And today has he had an employer?

                              D. Alderman

1

2                    MS. BILUS-GOULD:   Objection.

3          BY MR. KOERNER:

4              Q     That you know of?

5                    MS. BILUS-GOULD:   Objection to

6              form.  She just said he has companies.

7                    Objection to form.  You can

8              answer.

9              A     Today does he have?

10             Q     I'm saying from the time you met

11         him until today.

12             A     He's always been self-employed.

13             Q     Do you know what his income is?

14             A     I couldn't tell you.  I don't

15         know.

16             Q     When did you meet him on the

17         internet?

18             A     Over four years ago.

19             Q     And this Singles Net, did you have

20         to submit a profile, a dating profile?

21             A     Yes.

22                   MR. KOERNER:   I ask for production

23             of that as well as Mr. Cornejo's.

24                   MS. BILUS-GOULD:   Put it in

25             writing and I'll respond.

1                          D. Alderman

2    BY MR. KOERNER:

3          Q      And Mr. Cornejo, has he ever

4    performed any work for you?

5                 MS. BILUS-GOULD:  Objection to

6          form.  You can answer.

7          A      He helps me with a lot of things.

8          Q      When you say he helps you with a

9    lot of things, describe for me the lot of

10   things that he does for you?

11         A      Whatever things come up.  I mean

12   just like my life is full of different things,

13   so is his life because we're together.

14         Q      Does he help you with respect to

15   the management of the buildings in New York?

16         A      He's definitely a sounding board

17   for me.

18         Q      In addition to being a sounding

19   board, does he actually perform work for you?

20                MS. BILUS-GOULD:  Objection to

21         form.  You can answer.

22         A      He'll sometimes, if I'm cooking,

23   he'll answer an e-mail for me.  Doreen is

24   requesting...

25         Q      Are you aware that he has

1                          D. Alderman

2     represented to tenants that he is an agent of

3     the landlord?

4                  MS. BILUS-GOULD:  Objection to

5            form.  You can answer.

6            A     If that's what he's represented,

7     no, I have no idea but that's okay.  Yeah, he

8     helps me.

9            Q     So just to clarify the record, he

10    does work for you as your agent?

11                 MS. BILUS-GOULD:  Objection to

12           form --

13    BY MR. KOERNER:

14           Q     As an agent of the landlord?

15                 MS. BILUS-GOULD:  Excuse me.

16           Objection to form.  It's a legal

17           conclusion what is an agent.

18                 MR. KOERNER:  I'm asking her --

19                 MS. BILUS-GOULD:  And objection to

20           form as to work.  I don't think that

21           that was her testimony.

22                 MR. KOERNER:  Okay.

23                 MS. BILUS-GOULD:  She indicated he

24           helps her.

25                 MR. KOERNER:  Read back the

D. Alderman

1
2          question.

3               (The record is read by the
4          reporter as recorded above.)

5               MS. BILUS-GOULD:  Objection to
6          form.  If you can answer, answer.

7          A     I don't know if I know that per
8     se, but if that's what he said, that's fine
9     because I think he's only trying to facilitate.

10         Q     ^RULING^ So you're fine with that
11    he is an agent of the landlord?

12              MS. BILUS-GOULD:  Objection to
13         form.  Now, I'm directing you not to
14         answer that.

15              MR. KOERNER:  Mark it for a
16         ruling.

17    BY MR. KOERNER:

18         Q     When he does work for you with
19    respect to the buildings in New York, is he
20    doing so on your behalf?

21         A     What do you mean on my behalf?
22    Yeah, he's trying to help me if that's what you
23    mean.

24         Q     And are you aware that he has also
25    told tenants in the buildings that you own that

1                    D. Alderman

2    he is the landlord?

3            MS. BILUS-GOULD:  Objection to

4        form.

5    BY MR. KOERNER:

6        Q    Are you aware of that?

7        A    No.

8        Q    Are you in agreement with that

9    statement?

10           MS. BILUS-GOULD:  Objection to

11       form.

12       A    No.

13       Q    Do you know why he's telling

14   people that he's acting on behalf of the

15   landlord?

16           MS. BILUS-GOULD:  Objection to

17       form.  She said she's not aware of it.

18       Move on.

19           MR. KOERNER:  That's a different

20       question.

21           MS. BILUS-GOULD:  No, not a

22       different question.  That's an

23       assumption.  Go ahead.  Move on.

24   BY MR. KOERNER:

25       Q    Can you describe some of the tasks

35

D. Alderman

1

2    that Richard performs for you with respect to

3    the buildings in New York?

4           A      When we look at work that's done

5    he'll come with me.

6           Q      What kind of work?

7           A      Well, first thing I can think of

8    is the roofs just got repaired and the siding,

9    so things like that.

10          Q      Does he have any experience with

11   respect to construction or repair work or

12   building management?

13          A      He is -- he's owned homes.

14          Q      He's owned homes, okay.

15                 So in addition to -- you said he

16   does lots of things for you.  We talked about

17   how he looks at the work that's being done at

18   the buildings and acts as a sounding board with

19   respect to -- with respect to what?  Acts as a

20   sounding board with respect to everything

21   related to the buildings or does he act -- you

22   said he acted as a sounding board.

23          A      Yeah.  Basically, he's my partner

24   and we talk about everything.

25          Q      And in addition to acting as your

D. Alderman

1
2        sounding board and going with you and
3        consulting with you with respect to the work
4        done on the buildings, what else has he done
5        with respect to work on your behalf of the
6        buildings?
7                    MS. BILUS-GOULD:  Objection to
8             form to the word "work," but you could
9             answer.
10       A       To just the buildings?
11       Q       Yes.
12       A       Maybe talking to the porter.
13       Q       Are you aware that Richard was
14       involved with respect to having a bolt placed
15       on Mr. Britt's storage unit in the basement of
16       the building?
17                   MS. BILUS-GOULD:  Objection to
18            form.  You could answer.
19       A       Yes.
20       Q       Can you describe to me his
21       involvement?
22       A       He was there with the workers.
23       Q       And he actually helped install the
24       bolt; is that correct?
25                   MS. BILUS-GOULD:  Objection to

                          D. Alderman

1

2          form.  You can answer.

3          A    I don't know for sure.  I wasn't

4    there.

5          Q    Whose idea was it to put a bolt on

6    the door, the rear entry of Mr. Britt's storage

7    space?

8                    MS. BILUS-GOULD:  I'm going to

9               object and make a statement for the

10              record.

11                   If any response that's going to be

12              given to Mr. Koerner's questions calls

13              for a communication with counsel, I'm

14              directing you not to answer.

15                   MS. KOERNER:  I'll object to the

16              coaching of the witness while a question

17              is pending.  It's improper so go ahead.

18                   MS. BILUS-GOULD:  That's an

19              objection.  Go ahead.

20                   Can you ask the question again?

21                   MR. KOERNER:  Go ahead.  Read it,

22              please.

23                   (The record is read by the

24              reporter as recorded above.)

25                   MS. BILUS-GOULD:  Does your

1               D. Alderman

2        response call for a communication with

3        counsel?

4               MR. KOERNER:  Again, it's

5        improper.

6               Answer the question.

7               MS. BILUS-GOULD:  No, it's not.

8               MR. KOERNER:  Yes, it is.

9               MS. BILUS-GOULD:  Does your

10       response call for a communication with

11       counsel?  If not, you can answer.  If

12       so, I'm directing you not to answer.

13              THE WITNESS:  I can answer if you

14       want me to.

15              MR. KOERNER:  Yes, I do.

16              MS. BILUS-GOULD:  Then answer.

17       A       Actually the idea came up with the

18 investigator, the retired police officer.  It

19 was his idea.

20       Q       Which investigator?

21       A       There was an investigator that did

22 an investigation of the cellar storage.

23       Q       And he said you should put a bolt

24 on the --

25       A       He's the one who brought it up,

1                      D. Alderman

2      yes.

3              Q     Who hired the investigator?

4              A     I did.

5              Q     What was the investigator's name?

6              A     I don't know offhand.

7                    MR. KOERNER:  I ask for his

8              contact information.

9                    MS. BILUS-GOULD:  Same direction

10             or request.

11     BY MR. KOERNER:

12             Q     So in addition to what you

13     previously testified as far as him consulting

14     with respect to repair work, acting as a

15     sounding board, helping with the actual bolting

16     of Mr. Britt's rear entry for storage space,

17     what other types of work does he do for you

18     with respect to these buildings?

19                   MS. BILUS-GOULD:  Objection to the

20             form.  You can answer.

21             A     I mean I can't think of anything

22     else really offhand.

23             Q     You said "a lot of things."  So is

24     it a thing where if an issue comes up, you will

25     in general just have him take care of it?

```
 1                    D. Alderman
 2          MS. BILUS-GOULD:  Objection to
 3     form.
 4     A    No.
 5     Q    Well, describe for me what the --
 6          MS. BILUS-GOULD:  Wait a minute.
 7     What's your question?
 8          MR. KOERNER:  Describe for me --
 9     I'm trying to get a sense -- she's
10     testified that he did a lot of things.
11     She does -- he does a lot of things for
12     her in connection with the building.
13     And she's testified to some of it and I
14     want to make sure I have gotten all of
15     it.
16          MS. BILUS-GOULD:  And I think that
17     she said she couldn't recall offhand.
18     But go ahead, if you can recall more,
19     please tell him.
20     A    I don't know what else I can think
21     of right now.
22     Q    But with respect to the work that
23     he does perform on your behalf with respect to
24     these buildings, does he receive any
25     compensation?
```

1                           D. Alderman

2                    MS. BILUS-GOULD:  Objection to

3               form with regard to the word "work."

4               You can answer.

5          A     He actually did a forensic report

6      and he got compensation for that.

7          Q     What kind of forensic report?

8          A     When we started -- when this

9      file -- when this suit came up we really took a

10     look at all the income and expense reports and

11     all the payments that were made to employees,

12     and the W-2s, all the filings, and he did that

13     all for me.

14         Q     How was he paid; was he paid

15     directly by you, by Thermald Realty, Wavecrest

16     or something else?

17         A     I can't remember offhand, but it

18     was with a Wavecrest check and it was to one of

19     his companies.

20                    MR. KOERNER:  We ask for

21               production of that check.

22     BY MR. KOERNER:

23         Q     How much was the check for?

24         A     I don't remember offhand.

25         Q     Can you estimate?

1                    D. Alderman

2        A     Maybe it was ten thousand, fifteen

3   thousand, somewhere around there.

4        Q     Was it just one payment?

5        A     I don't -- maybe it was two.

6        Q     And was it total $15,000 or more?

7        A     No, that was it.

8        Q     And you hired him in response to

9   this lawsuit?

10              MS. BILUS-GOULD:  Objection to

11         form.  You can answer.

12        A     I didn't hire him.  He just -- he

13   knows how to work with all the banking, you

14   know, it's just easy for him.  So he started

15   asking all the information from management.

16        Q     And was it your idea or his idea

17   or somebody else's idea to pay him for the work

18   that he was doing on your behalf?

19        A     It was my idea.

20        Q     And how did you arrive at the

21   dollar figure that you were going to pay him?

22        A     I asked him to supply me an

23   invoice because he put so much time in.

24        Q     And, again, can you give me the

25   approximate date that you met Richard on this

43

1                     D. Alderman

2    dating site?

3         A      It was -- actually I know the

4    date.   It was May 8, 2010.

5         Q      And do you have sex with Richard?

6         A      Yes.

7         Q      When was the first time you had

8    sex with Richard?

9              MS. BILUS-GOULD:  All right.  I'm

10             directing her not to answer.

11             MR. KOERNER:  I'll say for the

12             record, this case is about Miss Alderman

13             having sex with her employee.  We

14             already established that Richard is

15             having sex with her, is also her

16             employee.  And so we're going to get

17             into these details.  And if you're going

18             to instruct her not to answer, it's

19             ridiculous.

20             MS. BILUS-GOULD:  I'll tell you

21             what, I'm going to give you some leeway

22             but we're not going to spend an hour on

23             when's the first time, the second time,

24             the third time, the eighth time.

25             MR. KOERNER:  No, not at all.

```
1                        D. Alderman
2               MS. BILUS-GOULD:  We're not going
3          to do that.
4               MR. KOERNER:  We're going to do
5          whatever I feel is relevant.
6               MS. BILUS-GOULD:  Go ahead.
7    BY MR. KOERNER:
8          Q    When was the first time you had
9    sex with Richard after your first meeting?
10         A    A few months after.
11         Q    How many times had you met him in
12   person at that point?
13         A    Oh, I don't know.  I couldn't tell
14   you.  Maybe six, maybe ten, maybe twelve.
15         Q    And you went on dates with him
16   before you had sex with him?
17         A    Yes.
18         Q    And who initiated the sexual
19   contact with you and Richard?
20         A    It was mutual.
21         Q    Is it your contention that your
22   sexual relationship with Mr. Britt that you
23   acknowledged in prior discovery was consensual
24   also?
25         A    Yes.
```

                        D. Alderman

1
2                MS. BILUS-GOULD:   Objection to

3           form with the word "relationship," but

4           you can answer.

5                Was that a yes?

6                THE WITNESS:   Yes.

7    BY MR. KOERNER:

8           Q     And it was mutual?

9           A     Yes.

10          Q     Other than Richard and Mr. Britt,

11   have you ever slept with any of your other

12   employees?

13          A     No.

14               MS. BILUS-GOULD:   Objection to

15          form.   You can answer it.   Sorry.

16   BY MR. KOERNER:

17          Q     Do you feel it's proper to sleep

18   with your employees?

19               MS. BILUS-GOULD:   Objection to

20          form.   You could answer.

21          A     I don't think there's anything

22   wrong with people meet working all the time.   I

23   mean it happens all the time.

24          Q     And it's fine for employers to

25   initiate sexual contact with their employees?

D. Alderman

1

2          MS. BILUS-GOULD:  Objection to

3          form.  Her testimony was not that she

4          initiated it.

5     BY MR. KOERNER:

6          Q     I'm asking you, it's fine with

7     you --

8          MS. BILUS-GOULD:  Objection to

9          form.  You can answer.

10         A     It all depends on the situation.

11         Q     But if the situation is right,

12    it's fine for an employer to initiate sexual

13    contact with an employee?

14         A     Like I said, it all depends on the

15    situation.

16         Q     Describe what you mean.

17         A     Well, if it's agreeable.  It has

18    to be agreeable.  It has to be a mutual

19    consent.

20         Q     How do you establish if it's a

21    mutual consent?

22         A     I think when it just happens.

23         Q     With respect to your relationship

24    with Mr. Britt, who initiated the sexual

25    contact?

1                      D. Alderman

2          A     I don't think there was anybody

3     that initiated it.  I think it just kind of

4     happened.

5          Q     Just spontaneously?

6          A     Yes.

7          Q     There wasn't one person who

8     started the sexual contact?

9          A     No.

10         Q     Mr. Britt didn't start the sexual

11    contact on his own?

12               MS. BILUS-GOULD:  Objection to

13          form.  You can answer.

14         A     I mean it was -- I don't know.

15    Two people get together.  They're talking.

16    They're enjoying each other's company and one

17    thing leads to another.  I don't know how you

18    could explain it.  He didn't force himself on

19    me.  I didn't force myself on him.

20         Q     But as far as who initiated the

21    contact, neither one of you is what you're

22    saying?

23               MS. BILUS-GOULD:  Objection to

24          form.  She said it was mutual.  Things

25          just happened.

1                          D. Alderman

2                     You can answer.

3           A     I mean if you're talking about the

4      sexual context, that's what I'm referring to.

5      If you're talking about initiating a

6      friendship, I would say he would be the

7      initiator.

8           Q     I'm talking about the sexual

9      contact.

10          A     That was -- that just happened.

11          Q     Okay.

12               MS. BILUS-GOULD:  Just give me one

13          second.

14               (Whereupon, a recess was taken.)

15     BY MR. KOERNER:

16          Q     With respect to Richard, when you

17     initially had sex with him did you have oral

18     sex with him?

19               MS. BILUS-GOULD:  If you can

20          remember.

21          A     Yes.

22          Q     Was that on the first occasion

23     that you had sex with him?

24          A     Yes.

25          Q     And did you perform oral sex on

1                        D. Alderman

2       him?

3           A       Yes.

4           Q       Did he perform oral sex on you?

5           A       Yes.

6           Q       And with respect to the first time

7       you had sex with Mr. Britt, did you perform

8       oral sex on him?

9           A       I can't remember offhand.

10          Q       Did he perform oral sex on you?

11          A       I can't remember.

12          Q       Did you ever perform oral sex on

13      Ron Britt?

14          A       Yes.

15          Q       How many times?

16          A       Maybe once.

17          Q       You mean at least once?

18              MS. BILUS-GOULD:  Objection to

19          form.  She said "maybe once."

20              MR. KOERNER:  Well, did you or did

21          you not ever perform oral sex on Ron

22          Britt?  I thought she said yes.

23              THE WITNESS:  Maybe once.

24              MS. BILUS-GOULD:  You asked how

25          many times and she said maybe once.

1                          D. Alderman

2     BY MR. KOERNER:

3          Q     Not more than once?

4          A     Not that I can recall.

5          Q     Did he ever perform oral sex on

6     you?

7          A     Not that I can recall.

8          Q     Did you ever ask him to?

9          A     Not that I can recall.

10         Q     Did he ever refuse to?

11         A     Not that I can recall.

12         Q     Can you describe your relationship

13    with Richard in your own words?

14              MS. BILUS-GOULD:   Objection to

15         form.  You can describe it.  I think she

16         used the word "partner" earlier, but you

17         can describe it.

18         A     No, that's basically it.  He's a

19    very trustworthy honest loving person and he

20    has a good mind and so he makes an excellent

21    life partner.

22         Q     Do you have any plans to get

23    married to him?

24         A     I don't think I'm going to get

25    married again, no.

1                    D. Alderman

2        Q      Have you discussed that with him?

3        A      We have.

4        Q      And have you both agreed that

5   you're not going to get married?

6        A      Yes.

7        Q      I asked you before have you ever

8   had sex with any employees other than

9   Mr. Britt, Richard and you said no; is that

10  correct?

11              MS. BILUS-GOULD:  And I objected

12         to form.

13       A      No.

14       Q      Have you ever had any romantic

15  involvement with any other employees other than

16  those two individuals?

17              MS. BILUS-GOULD:  Objection to

18         form.

19       A      No.  But Richard is not an

20  employee.

21       Q      Right.  He performs work for you

22  without compensation, correct?

23              MS. BILUS-GOULD:  Objection to

24         form.  You can answer.

25       A      Yeah, I mean...

1                          D. Alderman

2           Q       Do you perform work for him?

3           A       Yes.

4           Q       With kind of work?

5           A       Grocery shopping, cooking,

6      cleaning.

7           Q       Does he maintain any other

8      residences other than the residences that

9      you've listed today?

10          A       He has his own house.

11          Q       In?

12          A       In Pilot Hill.

13          Q       In California?

14          A       Yes.

15          Q       And does he own that house?

16          A       Yes.

17          Q       Does he have a mortgage on that

18     house?

19          A       Yes.

20          Q       Do you know how much his mortgage

21     is?

22          A       No.

23          Q       Does he also live with you in

24     addition to owning the house in California?

25          A       Yes.

53

D. Alderman

2      Q      And he lives with you at your

3   house in California as well as the apartment in

4   New York?

5      A      Yes.

6      Q      Does he pay any rent in connection

7   with living there?

8      A      No.

9      Q      Do you live at his house at Pilot

10  Hill?

11     A      When I have time.

12     Q      How far is your residence in

13  California from his residence in California?

14     A      It's between San Francisco and

15  Tahoe.  And I'm in Los Angeles County.

16     Q      How far is that?

17     A      By car it's seven hours.

18     Q      Approximately how many times a

19  year do you spend at his residence in Pilot

20  Hill?

21     A      Maybe a week or two.

22     Q      Did you consult with Richard with

23  respect to the decision to have Ron Britt's

24  back entrance bolted?

25            MS. BILUS-GOULD:  Objection to

54

D. Alderman

1

2          form.  You can answer.

3          A      We talked about it, yes.

4          Q      And what did he say?

5          A      He agreed with the retired police

6      officer.

7          Q      Do you know what the rationale was

8      for closing the back door?

9               MS. BILUS-GOULD:  Objection to

10              form.

11              Did he tell her what the rationale

12              was; is that what you're saying?

13     BY MR. KOERNER:

14         Q      I'm asking do you know?

15         A      There was a lot of safety and

16     security issues with the building, and so the

17     way to really stop those issues was to put that

18     door up.

19         Q      So he was in favor of bolting Mr.

20     Britt's entry to the storage place?

21         A      Yes.

22              MS. BILUS-GOULD:  Objection to

23              form.

24     BY MR. KOERNER:

25         Q      With respect to that storage

1                          D. Alderman

2        space, Mr. Britt initially had that storage

3        space as a lessee; is that correct?

4                    MS. BILUS-GOULD:   Objection to

5                form.   You can answer.

6        A      He has a lease, yes.

7        Q      When does that lease expire?

8        A      In 2018.

9        Q      And are you aware that he

10       sometimes played music in that basement space?

11       A      Unfortunately, yes.

12       Q      How long has he been playing music

13       in that basement space?

14       A      I've only been aware of it since

15       I've moved into that apartment.   I didn't

16       always live there.

17       Q      When was that?

18       A      I believe it in was 2010 or '11.

19       Q      And what was the date that you

20       first had sex with Mr. Britt, approximately?

21       A      I believe it was sometime in 2007,

22       somewhere between spring and summer.   Maybe

23       closer to summer because it was definitely warm

24       so...

25       Q      Spring or summer of 2007?

1                          D. Alderman

2          A      Summer.  Summer.  Not spring.

3          Q      Summer of 2007?

4          A      Yes.

5          Q      And can you describe for me how

6     you first met Mr. Britt?

7          A      He basically had the storage

8     cellar for lease and I met him after he had the

9     space for a while.

10         Q      And with respect to the music down

11    in the basement, when was the first time that

12    you complained to Mr. Britt about that?

13         A      A few years ago.

14         Q      What did you say?

15         A      I said, "You know, you're playing

16    music until three, four, five, six, 7 o'clock

17    in the morning and you're waking us up.  We

18    can't sleep."

19         Q      Are you aware that there are other

20    units in that building in the basement where

21    people also play music?

22         A      But nobody hears them.

23         Q      But they are other units where

24    people play music?

25         A      There is another unit, yes.

1                          D. Alderman

2          Q       And it is also a basement unit

3    similar to Mr. Britt's unit?

4          A       No, it's different.

5          Q       How is it different?

6          A       It has -- it doesn't go through

7    the entire building.  It's enclosed with, not

8    only with a door with the trap, but there is a

9    door inside.  And they only play music like an

10   hour at a time.  It's just different.  They

11   never play at night until 7 o'clock in the

12   morning.

13         Q       Which unit is that?

14         A       I don't know how to describe it

15   except that the entry to the residence, there's

16   like four traps, there's two in front of the

17   edge -- there's four traps to the cellars.  The

18   resident's door is in the center, and it's the

19   first one if you're looking at it to your

20   right.

21         Q       And there's a lease for that

22   space.  Does it say anything about music?

23         A       You know, I don't know.

24                 MR. KOERNER:  I'll ask for

25                 production of that lease as well.

```
1                    D. Alderman
2              MS. BILUS-GOULD:  Same request.
3         Put it in writing.
4         Q     Do you know whether Richard takes
5    Viagra?
6         A     I don't think so.
7         Q     Do you know whether or not
8    Mr. Britt ever took Viagra?
9         A     I wouldn't know.
10        Q     On the occasion when you performed
11   oral sex on Mr. Britt, did you do so to help
12   arouse him sexually?
13             MS. BILUS-GOULD:  Objection to
14        form.  You can answer.
15        A     No.
16        Q     What was the purpose?
17        A     Because it was -- I'm having
18   trouble answering this question.  I'm sorry.
19             MS. BILUS-GOULD:  Do the best you
20        can.
21        A     It was romantic in nature.
22        Q     Did he ask you to perform oral sex
23   on him?
24        A     I can't recall.
25        Q     Was he erect when you began
```

D. Alderman

1

2    performing oral sex on him?

3          A    I believe he might have been.  I'm

4    not sure.  I don't really remember.

5          Q    First of all, did Mr. Britt

6    achieve orgasm on the occasion that you

7    performed oral sex?

8          A    I really don't remember.

9          Q    Do you know how long you performed

10   oral sex on him?

11         A    No.

12         Q    And your testimony is you don't

13   remember whether or not he performed oral sex

14   on you?

15         A    No, I can't recall.

16         Q    After you performed oral sex on

17   Mr. Britt, did you also have sexual intercourse

18   with him?

19         A    Yes.

20         Q    Do you know whether he achieved

21   orgasm?

22         A    I don't remember.

23         Q    And that was on the first time you

24   had any sexual contact with Mr. Britt; is that

25   correct?

```
1                        D. Alderman
2           A     No, I don't think so.
3           Q     When was the first time you had
4      sexual contact with Mr. Britt?
5                 MS. BILUS-GOULD:  Objection.
6                 Asked and answered.  I thought she said
7                 in the summer of 2007.
8      BY MR. KOERNER:
9           Q     So the first time you had any
10     sexual contact with Mr. Britt you don't
11     remember the date; is that correct?
12          A     It was sometime around the summer.
13          Q     And where did that take place?
14          A     I believe it was my apartment.
15          Q     And at that time Mr. Britt was in
16     your employ; isn't that correct?
17          A     Yes.
18          Q     And did you invite him to your
19     apartment on that occasion?
20          A     I can't recall.
21          Q     Did he invite himself to your
22     apartment on that occasion?
23          A     I'm not sure.  I don't think so.
24          Q     Did you go to the apartment
25     together or did he come to the apartment while
```

```
1                         D. Alderman

2    you were already there?

3         A      I think he came to the apartment.

4         Q      And you were already there?

5         A      Yes.

6         Q      And can you describe what you were

7    wearing?

8         A    No.

9         Q      And what was the purpose of him

10   coming to your apartment?

11               MS. BILUS-GOULD:   Objection to

12          form.  If you know.

13        A      It could be a myriad of things,

14   honestly.

15        Q      But you don't remember?

16        A      No, because you know we did work

17   together too, so it could have been -- there

18   could have been something wrong with my

19   apartment.  I don't know.  You know, I'm not

20   sure.  I really don't know.

21        Q      But you don't recall discussing

22   any work-related matters on that occasion or do

23   you recall?

24               MS. BILUS-GOULD:   Objection to

25          form.
```

1                              D. Alderman

2           A      Could have been.

3           Q      It could have been, but you don't

4    recall?

5           A      Yeah, no.

6           Q      Can you describe for me what

7    happened when he came in?

8           A      I can't remember the details

9    honestly except that some sexual intimacy took

10   place.

11          Q      Other than the fact that there was

12   some sexual intimacy, you don't recall any

13   other details?

14          A      No.   Just when I started thinking

15   about it I remember that I had some mouse

16   issue, and I know he came to seal up the mouse

17   holes.  So that could have been -- it was

18   during that time.  So it could have been that.

19   I don't know.  I'm just trying to remember.

20          Q      You sat through Mr. Britt's

21   deposition about, I think it was a

22   month-and-a-half, two months ago, correct?

23          A      Yes.

24          Q      Was there any portion of his

25   testimony that you found was false?

<pre>
 1                        D. Alderman
 2              MS. BILUS-GOULD:  Objection to
 3         form.
 4         A    Yeah.  There were some things that
 5    he said that in my perception was different.
 6         Q    Okay.  What were they?
 7         A    I can't remember exactly offhand.
 8         Q    In general.
 9         A    I don't remember the things that
10    he's ever -- I've never witnessed or felt that
11    at any time I sexually harassed him.
12         Q    What's your definition of sexual
13    harassment?
14         A    I can only go to the legal term of
15    what I've read since I've been accused of it.
16    And I definitely don't fall under those
17    headings of what is defined by the law for
18    sure.
19         Q    Why not?
20         A    Because I didn't do any of those
21    things.
22         Q    What things?
23         A    That the law defines as sexual
24    harassment.
25         Q    Specifically.
</pre>

1                        D. Alderman

2           A      Talking in any kind of vulgar

3     manner, distastefully in a sexual manner.

4     Demanding sex from a person or they would lose

5     their job.  I didn't do any of those things.

6                  THE WITNESS:  Can I take a break,

7           please?

8                  MR. KOERNER:  Sure.

9                  MS. BILUS-GOULD:  Sure.

10                  (Whereupon, a recess was taken.)

11                  MR. KOERNER:  Back on the record.

12     BY MR. KOERNER:

13          Q      So Mr. Britt comes into your

14     apartment.  You don't know whether or not you

15     invited him or he invited himself or the reason

16     why he was there, but he's in your apartment;

17     and can you describe for me everything that you

18     remember about that incident?

19          A      He came into the kitchen and

20     somehow we ended up in the front room where the

21     bed is.

22          Q      Walk me through the whole

23     incident.

24          A      That's basically all I can

25     remember.

IRIS FERNHOFF REPORTING    (516) 317-3426

1                          D. Alderman

2          Q        You ended up in the front room

3    where the bed is and then no recollection of

4    anything else happening?

5          A        It's seven years ago -- over seven

6    years ago.

7          Q        You had some sexual contact with

8    him on that occasion, correct?

9          A        Basically, yes.

10         Q        Can you describe for me the nature

11   of the sexual contact?

12               MS. BILUS-GOULD:  Objection to

13           form.  Asked and answered.

14               MR. KOERNER:  No, it's not.

15         Q        Because this is before the oral

16   sex incident, correct?

17         A      No.  That's the same day.

18         Q        Okay.  So let's -- so I'm just

19   trying to slow it down because this is the

20   first incident and it's very important that we

21   break this down.

22               So you don't remember why he's

23   there, but somehow you ended up in the bedroom,

24   correct?

25         A      Yes.

D. Alderman

1

2       Q      Do you know whose idea it was to

3  go to the bedroom?

4       A      No.

5       Q      You can't recall if it was Mr.

6  Britt's idea?

7       A      I can't recall, honestly.

8       Q      Once you were in the bedroom what

9  happened?

10      A      We had some sexual experience.

11      Q      But I need -- I really --

12      A      I can't remember.  It was seven

13  years ago.

14      Q      You can't remember anything about

15  it?

16      A      Not really.

17      Q      Well, what's the really part?

18      A      The really part is I know we had

19  some type of sexual encounter.  That's about

20  it.

21      Q      You heard Mr. Britt testify about

22  that sexual encounter, correct, about that

23  specific sexual encounter, correct?

24      A      I don't know if it was

25  specifically that or it was the other time.  If

1                    D. Alderman

2   there was another time.  I'm not sure.  I think

3   there was.

4          Q     Other than the fact that you

5   disagree that there was sexual harassment that

6   took place, is there anything else about

7   Mr. Britt's description of that event that you

8   disagree with?

9                    MS. BILUS-GOULD:  Objection to

10           form.

11         A     I can't even respond to the things

12   that he said because it was just absolutely

13   horrendous.  I'm sorry, I just can't because it

14   was personally -- it was demoralizing what he

15   said.

16         Q     What he said at his deposition,

17   you're saying?

18         A     Yes.  And so I can't.  Please

19   don't ask me.

20                    MS. BILUS-GOULD:  You can ask

21           another question.

22   BY MR. KOERNER:

23         Q     Do you recall Mr. Britt ever

24   saying anything to you during that first

25   incident where you had sexual contact with him?

1                    D. Alderman

2          A     No.

3          Q     Do you recall your saying anything

4    to him during that sexual contact incident?

5          A     Nothing that wouldn't be said

6    during personal moments.

7          Q     For example, what was said?  I'm

8    asking what was said.

9          A     I can't remember offhand.  When

10   you're romantic you say things.

11         Q     For example?

12         A     I don't know.  Like, "Oh."  I

13   mean...

14         Q     Do you recall Mr. Britt saying,

15   "This is a bad idea"?

16         A     Actually I don't recall that, no.

17         Q     Do you recall him saying "This is

18   a mistake"?

19         A     No.

20         Q     Did you resist at all?

21         A     No.

22         Q     Were you glad that you were having

23   a sexual encounter with him?

24               MS. BILUS-GOULD:  Objection to

25               form.  You can answer.

```
 1                      D. Alderman

 2           A      Usually if you're engaging in that

 3      type of behavior it's consensual, so I would

 4      think at that time it was something that was

 5      pleasant for me to a degree.

 6           Q      Did Mr. Britt ever say anything to

 7      indicate that he wanted to have sex with you?

 8                  MS. BILUS-GOULD:  Objection to

 9           form, but you can answer.

10           A      I believe he was interested, yes.

11           Q      So what did he say?

12           A      I can't remember offhand.

13                  MR. KOERNER:  Off the record.

14                  (Discussion is held off the

15           record.)

16      BY MR. KOERNER:

17           Q      That first sexual contact with

18      him, was it a good experience for you?

19                  MS. BILUS-GOULD:  Objection to

20           form.  You can answer.

21           A      It had its challenges.

22           Q      What do you mean?

23           A      It was uncomfortable in some ways.

24           Q      How so?

25           A      Just sometimes, you know, people
```

1                    D. Alderman

2    are not -- let's see.  How do I say this?

3    Sometimes the physiotomy is not -- it maybe

4    doesn't work quite right.

5          Q    Was Mr. Britt, did he have a hard

6    time getting an erection?

7          A    No.

8          Q    So I'm trying to understand what

9    you mean there was some challenges.  What were

10   the challenges?

11         A    I think that peoples body types

12   sometimes don't necessarily fit.

13         Q    What do you mean?

14         A    I just mean that the physiotomy

15   (sic) of a person's body can sometimes be a

16   challenge.

17         Q    Was Mr. Britt's penis large?

18         A    I mean that's basically what --

19   what --

20         Q    Is that what you're referring to?

21         A    That's what I'm -- yeah.

22              MS. BILUS-GOULD:  Would you like

23         to take a break, Mr. Koerner?

24              MR. KOERNER:  No.

25              MR. ETTENGER:  I would.  I would

```
1                        D. Alderman
2            like to take a break.
3    BY MR. KOERNER:
4            Q    Was that the first time you had
5    ever seen Mr. Britt's penis?
6                 MS. BILUS-GOULD:  What was the
7            question?
8    BY MR. KOERNER:
9            Q    Is that the first time you had
10   ever seen Mr. Britt's penis?
11           A    I believe so.
12           Q    And it was on the large side?
13           A    Yes.
14           Q    Was it the largest penis you had
15   ever seen?
16                MS. BILUS-GOULD:  Objection to
17           form.  Really, Greg, where are we going
18           with this?  Where are we going with
19           this?  Move on.
20                MR. KOERNER:  This is a sexual
21           harassment case.  I'm asking --
22                MS. BILUS-GOULD:  Where are we
23           going with this?
24                MR. KOERNER:  Off the record.
25                (Discussion is held off the
```

72

1                    D. Alderman

2          record.)

3                    MS. BILUS-GOULD:   What was the

4          question?

5     BY MR. KOERNER:

6          Q     Was that the largest penis you had

7     actually seen in person?

8          A     No.

9          Q     And do you remember who actually

10    touched who first when you had that first

11    sexual contact with him?

12         A     No.

13         Q     Did you take your clothes off?

14         A     Probably, yes.

15         Q     Did Mr. Britt take his clothes

16    off?

17         A     Yes.

18         Q     And were you happy with his body?

19                   MS. BILUS-GOULD:   Objection to

20         form.   You can answer if you can answer.

21         A     It was okay.

22         Q     Were you happy with his sexual

23    performance?

24                   MS. BILUS-GOULD:   Objection to

25         form.   You can answer.

D. Alderman

1

2    A    It was uncomfortable.

3    Q    Because he was too large?

4    A    Yes.

5    Q    How long approximately did this

6    sexual episode last?

7    A    I don't know.

8    Q    Approximately?

9    A    Maybe fifteen minutes.  Maybe a

10   half-hour.  I wasn't keeping track.

11   Q    And did it start with oral sex?

12   A    That I couldn't -- I don't know.

13   Q    Did oral sex happen and then

14   sexual intercourse?

15   A    I don't know.

16   Q    And how did the sexual episode

17   end?

18   A    It was uncomfortable so we -- we

19   stopped.  It was uncomfortable for me.

20   Q    And what did you do after you

21   stopped having sex?

22   A    We -- we went about our business.

23   I don't know.  I can't remember.

24   Q    Did he stay in the apartment for

25   sometime after you had sex?

1                         D. Alderman

2          A      I don't -- I don't -- I can't

3    recall.

4          Q      Did you tell him to leave?

5          A      No.  I think it was just a mutual,

6    you know, we both have busy lives and we have

7    things to do and...

8          Q      Is it true that you at one point

9    bought Ron a gym membership?

10         A      Yes.

11         Q      Where did you buy him the gym

12   membership?

13         A      At the YMCA.

14         Q      And when did you buy him the gym

15   membership?

16         A      I guess early on.  It might have

17   been a gift for him.

18         Q      Was it before or after you had sex

19   with him?

20         A      I think it might have been after.

21         Q      Was it as a result of your desire

22   to have him have a better body?

23                MS. BILUS-GOULD:  Objection to

24                form.  You can answer.

25         A      No.  I'm a fitness person and I

1                         D. Alderman

2     thought he wanted to get in shape, and not that

3     I thought he was out of shape, but he said

4     he -- as a gift I got him a gym membership.

5              Q     Where was the gym membership to?

6                    MS. BILUS-GOULD:   Objection.

7              Asked and answered.   Go ahead.

8              A     The YMCA.

9              Q     And it was an annual membership?

10             A     It was for the year, yeah.

11             Q     How much did it cost?

12             A     I can't remember.   I don't know.

13                   MR. KOERNER:   I ask for that to be

14             provided.

15                   MS. BILUS-GOULD:   Same request,

16             put it in writing.

17     BY MR. KOERNER:

18             Q     After that first sexual contact

19     you had with Mr. Britt, did you have sexual

20     contact with him again after that?

21             A     I believe so.

22             Q     Approximately how long after the

23     first time?

24             A     I think it was -- it was somewhere

25     maybe -- maybe in September or October.   It had

1                    D. Alderman

2    to be after my daughter went back to school.

3          Q     Did you ever notify Ron that you

4    would be arriving from LA?

5                MS. BILUS-GOULD:  Objection to

6          form.  At what point in time?

7    BY MR. KOERNER:

8          Q     After you had sex with him.

9                MS. BILUS-GOULD:  After the first

10         occasion?

11               MR. KOERNER:  That's correct.

12         A     Yeah.  I believe when I came to

13   New York in either September or October I

14   called him and said that I was in town.

15         Q     And what else did you say to him?

16         A     That's it.  I said, "I'm here.  I

17   would like to see you."

18         Q     Did you want to see him in a

19   romantic way?

20         A     Yes.

21         Q     And did you tell him he better get

22   ready?

23         A     No.

24         Q     Where did you call him from?

25         A     I believe I called him from the

```
1                      D. Alderman

2    airport.

3           Q      In California?

4           A      I think so, yeah.  No, no, no.

5    When I got off the plane.

6           Q      And when you got off the plane did

7    you go to the building where you were living?

8           A      Yes.

9           Q      And did you see Mr. Britt that

10   day?

11          A      Yes, he came over.

12          Q      And this was approximately a month

13   or two after the first sexual contact?

14          A      Yeah, it was either September or

15   October.  September maybe.

16          Q      You called him?

17          A      Yeah, because I called him and I

18   told him I just got off the plane.

19          Q      Was it your intent when you called

20   him to have sex with him?

21          A      Yes.

22          Q      And you initiated that?

23          A      I called him and said, "I would

24   like to see you."

25          Q      And what did he say?
```

1                          D. Alderman

2        A      He said, "Okay."

3        Q      And then what happened?

4        A      Then he came over.

5        Q      And then what happened?

6        A      And then we had sex.

7        Q      Who initiated it?

8        A      It was, again, it happened.

9        Q      But you are not testifying that

10   Mr. Britt initiated it, correct?

11              MS. BILUS-GOULD:  Objection.  She

12          said "it happened."

13        A      I don't believe either one party

14   forced the other party.  It was -- it happened.

15        Q      Do you agree that there is a

16   difference between physical force and forcing

17   for economic reasons?

18              MS. BILUS-GOULD:  Objection to

19          form.  You can answer.

20        A      Absolutely.

21        Q      Did you understand when you

22   initiated the second sexual contact that

23   Mr. Britt was your employee, correct?

24        A      Yes.

25        Q      And you understood that his

1                       D. Alderman

2    residence was also in your building, correct?

3            A      No.

4            Q      Where was his residence at the

5    time?

6            A      His residence was -- oh, I mean my

7    residence was in another building.  I was at

8    415 East 9th Street and he was at 91.

9            Q      Right.  But I'm saying at the time

10   that you initiated the second sexual episode

11   you were aware that he was your employee and

12   was living in a building you owned, correct?

13           A      Yes.

14           Q      And you were aware at that time

15   that you had ultimate authority to decide

16   whether or not Mr. Britt would continue working

17   there and would be allowed to continue living

18   there; is that correct?

19                   MS. BILUS-GOULD:  Objection to

20           form.  But you can answer.

21           A      That never occurred to me,

22   honestly.

23           Q      As you sit here today, during the

24   entire time that Mr. Britt worked as your

25   superintendent of these two buildings and that

1                              D. Alderman

2       you had sexual contact with him, during that

3       entire time, sitting here today, would you

4       agree that you had ultimate authority to hire

5       or fire him and also to have him evicted from

6       his apartment?

7            A      Yes, because they are my buildings

8       but that thought never came into my mind.

9            Q      ^RULING^ Do you think it should

10      have come into your mind?

11                  MS. BILUS-GOULD:  Objection to

12           form.  I'm directing you not to answer

13           that.

14                  MR. KOERNER:  Mark that for a

15           ruling.

16      BY MR. KOERNER:

17           Q      Do you think it was a mistake to

18      have sex with Mr. Britt?

19                  MS. BILUS-GOULD:  Objection to

20           form.  You can answer if you can.

21           A      Today?

22           Q      Sitting here today.

23           A      Sitting here today I think it was

24      a definite mistake.

25           Q      Are you sorry that happened?

1                          D. Alderman

2                MS. BILUS-GOULD:  Objection to

3          form.

4          A     Yes, I'm very very sorry it

5     happened.

6          Q     So the second sexual episode which

7     you initiated, can you describe for me if you

8     recall anything that was said by either of you?

9          A     Yes.  I called him and he was very

10    angry at me for not letting him know that I was

11    coming.  And I said, "Well, I always do that.

12    I always show up unannounced.  That's the only

13    way I know that the work is getting done.  So

14    nobody really knows ever when I'm coming to

15    town."  Today that's how it is.

16                So and he was very angry.  He

17    said, "You should always let me know when

18    you're coming to town."

19                And I was like, "But that's not

20    going to happen, Ron."

21          Q     Anything else that you can recall

22    was said?

23          A     That's all I can remember.  And he

24    was angry at me.

25          Q     And can you describe what

                IRIS FERNHOFF REPORTING   (516) 317-3426

1                      D. Alderman

2  happened?  He came into the apartment and you

3  recall that he was angry.  What else do you

4  recall?

5       A     That's it.  I mean we -- we

6  talked.  He didn't say anything else past that.

7  And then after he left.

8       Q     But let's -- I know you don't

9  recall anything else that was said.

10             Do you recall anything else that

11 happened?

12      A     No.

13      Q     Do you recall whether or not you

14 performed oral sex on that occasion?

15      A     No, I actually don't.

16      Q     You don't know?

17      A     I don't remember.

18      Q     Do you recall whether you had

19 sexual intercourse on that occasion?

20      A     We may have.

21      Q     Do you recall whether or not

22 Mr. Britt ever achieved orgasm?

23      A     I don't remember.

24      Q     Did you ever achieve orgasm?

25      A     Don't think so.

                              D. Alderman

1

2          Q     Either of the times?

3          A     I don't think so.

4          Q     And, again, the second episode you

5    don't recall who touched who first; is that

6    correct?

7          A     No, it just happened.

8          Q     And how long did this episode

9    last?

10         A     Not long.

11         Q     Approximately how long; about

12   fifteen minutes to a half-hour?

13         A     Yeah.

14         Q     And then he left shortly

15   thereafter?

16         A     He left and he said he would come

17   back.

18         Q     And did he come back?

19         A     Yeah, after I called him a couple

20   of times.

21         Q     Where did he say he was going?

22         A     He was going with his friends to

23   have -- to meet with his friends at a bar and

24   he would come back in a couple of hours,

25   something like that.  And then he didn't come

D. Alderman

1

2      back.

3                Q      And then you called him?

4                A      And I called him.  I said, "Well,

5      where are you?"  I said, "You know, I'm not

6      sleeping cause I'm waiting."  So...

7                Q      Did you leave messages for him?

8                A      I can't remember.  I know I called

9      him at least a couple of times.

10               Q      How many times?

11               A      At least a couple.

12               Q      Was it more than five times?

13               A      No, I don't think so.

14               Q      And you don't recall if you ever

15     left any phone messages?

16               A      I can't recall.

17               Q      Did you leave any text messages?

18               A      No.

19               Q      Were you angry that he had left

20     and then did not come back?

21               A      Yeah, because he said he would be

22     back in a couple of hours and it wasn't a

23     couple of hours.  It was longer than that.  And

24     I didn't feel cared for.

25               Q      And did he eventually come back?

1                         D. Alderman

2          A    He did.

3          Q    About how long afterwards?

4          A    I think it was like maybe four or

5     five -- 4 o'clock in the morning maybe.  And it

6     was very light and I just said, "This isn't a

7     healthy situation."  And neither of us were

8     happy.

9          Q    Did he say at that point that you

10    don't own him?

11         A    No.

12         Q    Did he ever give you a whip?

13         A    A whip?

14         Q    A whip.

15         A    A whip?

16         Q    Yes.

17         A    No.

18         Q    Why did you have sex with Ron

19    Britt?

20              MS. BILUS-GOULD:  Objection to

21              form.  You can answer if you can answer.

22         A    It was very innocent.  I mean we

23    saw each other whenever I was in New York.  I

24    saw him because he was either working on the

25    buildings or a super and we just, you know,

1                         D. Alderman

2    whenever I was in town he was there.  At least

3    I saw him once.  And I was single and it just

4    happened.

5              Q     Did you find him attractive?

6              A     Yes.

7              Q     Did he ever tell you that he found

8    you attractive?

9              A     Yes.

10             Q     What did he say?

11             A     "Oh, that's a cute shirt."   I

12   don't know.

13             Q     Anything else?

14             A     "Oh, I like your jeans."  I don't

15   know.

16             Q     So other than complimenting your

17   clothing?

18             A     Yeah.  I mean that's all I can

19   remember.

20             Q     And then when he came back on

21   that -- approximately 4 o'clock in the morning,

22   the second sexual episode, can you describe

23   what was said?

24             A     Well, I think neither of us were

25   happy because he really wanted to be out with

D. Alderman

1
2    his friends and I was disappointed because he
3    didn't show up when he said.  And it just
4    wasn't comfortable for either of us anymore.
5    So it was like, you know, it just didn't work.
6    I wasn't happy.  He wasn't happy.  And you
7    know, if you're unhappy, move on.
8         Q      Did one of you communicate to the
9    other first that you were unhappy?
10        A      I believe it was me because I was
11   the one that was saying, "Hey, you said you
12   were going to be here.  You said you were going
13   to show up.  You're going to be here at 2
14   o'clock or 3 o'clock.  You said you were coming
15   in two hours.  It's now four hours, and you
16   know what?  This is not healthy for me because
17   I have responsibilities and I can't be waiting.
18   You know, it's just not working."
19              And you know, he didn't really say
20   anything.  He just walked out.
21        Q      You stated before that, you know,
22   you're sorry that you had sex with Mr. Britt.
23   Why are you sorry?
24        A      Well, because this definitely --
25   this issue why we're here today for sure.

```
 1                    D. Alderman
 2        Q      Because he sued you; is that why
 3   you're sorry?
 4        A      Yes.
 5        Q      You testified before that you have
 6   two daughters.  Have both of yours daughters,
 7   have they met Mr. Britt?
 8        A      I know Madison definitely has.  I
 9   couldn't really say for sure with Spencer.  I
10   think so.  Maybe in the hall because she did
11   live in the apartment so she must have.
12        Q      Did either of your daughters know
13   about your sexual relationship with Mr. Britt
14   before the filing of this lawsuit?
15              MS. BILUS-GOULD:  Objection to
16        form.  You can answer if you know.
17        A      I didn't go into detail about it
18   in all, no.  They knew that -- I mean we did
19   have a social outing with Madison when we went
20   to Coney Island when she was around during the
21   summer, and -- but, you know, we went out on a
22   social outing to Coney Island and to the beach.
23   And that's all there was.
24              We had no interaction on a
25   personal level other than with Madison.  And he
```

1                           D. Alderman

2      had a boy that helps him that was with us also.

3           Q      Is that Marcello?

4           A      No, I don't think his name is

5      Marcello.  I don't know his name.  Jake maybe.

6           Q      Was that visit to Coney Island,

7      was that before or after you had had sex with

8      Mr. Britt?

9           A      That was definitely after that

10     first time.

11          Q      But before the second time?

12          A      Yes.  Yeah.  Because -- yeah.

13          Q      So you saw Mr. Britt in between

14     the first and the second sexual encounters,

15     correct?

16          A      Yes.  But my daughter was around

17     then because she was off for the summer and so

18     there was no kind of -- so it was -- we didn't

19     get together on any personal level.

20          Q      How many times approximately did

21     you see Mr. Britt between the first and second

22     episodes?

23                 MS. BILUS-GOULD:  At all?

24                 MR. KOERNER:  Yes.

25          A      I mean maybe in the hall or, you

                 IRIS FERNHOFF REPORTING   (516) 317-3426

1                           D. Alderman

2      know, with the buildings.  I was still at 415

3      East 9th Street, so I mean maybe it was once a

4      week, but dealing with the buildings.

5               Q      In between the first and second

6      episode did you ever give him direction as far

7      as his employment?

8               A      I don't think so because at that

9      point we were -- it was new.  He was a new

10     super and there wasn't much I had to say to

11     him.  I mean I think I might have -- maybe we

12     talked about the trash bins and fixing those,

13     and maybe we talked if I saw graffiti possibly.

14     But I don't remember seeing a lot of graffiti

15     or the lights out in front of the building,

16     things like that nature.  But that didn't

17     happen much.  I wasn't aware of that in the

18     beginning.  There weren't many of those

19     instances, honestly.

20               Q      With respect to Spencer, is it

21     true that she has played music with Mr. Britt

22     in the basement; are you aware of that?

23               A      See, I really don't know.

24               Q      Or Madison?

25               A      I really couldn't tell you.

1                          D. Alderman

2          Q     Would it surprise you if that was

3    true?

4                MS. BILUS-GOULD:  Objection to

5          form.

6          A     You know what, I really don't

7    know.  I have no opinion.

8          Q     Would it be okay with you if they

9    played music down in the basement?

10               MS. BILUS-GOULD:  Objection to

11         form.

12         A     I have my own opinions about that.

13         Q     And I'm asking what they are.

14         A     And I don't approve of it, no.

15         Q     Is it true that at one point you

16   had Mr. Britt throw Spencer out of her

17   apartment in the building?

18         A     Yes.

19         Q     Can you describe for me what

20   happened there?

21         A     Actually she decided to leave and

22   that's what happened there.

23         Q     Did you ask --

24         A     I didn't actually throw her out.

25   We had to change the lock because she took all

                          D. Alderman

1

2    the furniture.

3              Q     Why did she take all the

4    furniture?

5              A     Because she was angry at me.

6              Q     Why?

7              A     Because I was her mother and she

8    didn't like what I was telling her, what she

9    needed to do with the apartment, and so she got

10   angry.

11             Q     What were you telling her that

12   needed to do with the apartment?

13             A     She needed to keep ·it clean.

14             Q     It was just too dirty?

15             A     Yeah.

16             Q     And you felt you wanted to control

17   that situation?

18             A     Well, it was our apartment and she

19   made a deal with me that that's what she would

20   do.

21             Q     That's the apartment that you're

22   currently living in?

23             A     Yes.

24             Q     What did you ask Mr. Britt to do

25   in connection with this?

D. Alderman

1

2      A      I asked him to make sure that she

3   took whatever she wanted and that he changed

4   the locks after she was gone.  She had like a

5   weekend to take everything, whatever she

6   wanted, she took it.  And I said, "Then change

7   the lock."

8      Q      And was this incident where

9   Mr. Britt assisted you in having your daughter

10   moved out of the apartment, was this before or

11   after you had sex with him?

12      A      After.

13      Q      Was it before the second episode

14   where you had sex with him?

15      A      It was after.

16      Q      After both?

17      A      Yes, because we were in the new

18   apartment.  We weren't at 415 anymore.  We were

19   at 91.

20      Q      After that second episode which

21   happened in October 2007 --

22      A      I think it was September.

23      Q      -- September 2007 --

24      A      Because it wasn't really really

25   cold yet.

1                      D. Alderman

2          Q      -- did you have any other sexual

3      contact with Mr. Britt after that second

4      incident?

5          A      No.

6          Q      Did you ever have any subsequent

7      discussions with Mr. Britt about sex?

8          A      No.

9          Q      Did you ever have a conversation

10     with him subsequent to that second sexual

11     episode where you discussed not having sex?

12         A      No.

13         Q      Did Mr. Britt ever indicate to you

14     after that second episode that he wanted to

15     have sex with you?

16         A      No.

17         Q      Did he ever indicate to you prior

18     to the second episode, but after the first

19     episode, that he wanted to have sex with you?

20         A      Wait a minute.

21         Q      After the first episode, but prior

22     to the second episode, did he ever indicate to

23     you --

24         A      After the first episode, but prior

25     to the second episode?

1                          D. Alderman

2          Q     Did he ever indicate that he

3    wanted to have sex?

4          A     No.  My daughter was there so it

5    wasn't appropriate.

6          Q     Prior to the first episode of

7    sexual contact with you, did he ever indicate

8    to you that he wanted to have sex with you?

9          A     He was complimentary.  He was

10   outgoing.  He was pleasant.

11         Q     Did you ever communicate to him

12   that you wanted to have sex with him?

13               MS. BILUS-GOULD:  Objection.  At

14         what point in time?

15               MR. KOERNER:  At any point.

16               MS. BILUS-GOULD:  Objection.  You

17         can answer if you can answer.

18         A     No.

19         Q     It just happened?

20         A     Yes.

21         Q     With respect to Richard, who

22   initiated sexual contact in that relationship?

23               MS. BILUS-GOULD:  Objection to

24         form.  Asked and answered.  You can

25         answer it again.

96

1                         D. Alderman

2          A     It's -- that was mutual.

3          Q     But I agree with you.  I'm not

4     asking whether it was mutual.  I'm asking who

5     initiated?

6               MS. BILUS-GOULD:  Objection to

7               form.  Asked and answered.  She said it

8               was mutual.  Answer it one more time --

9               MR. KOERNER:  I don't think that

10              answers the question.

11              MS. BILUS-GOULD -- and that's the

12              last.

13         A     I mean he kissed me.  I kissed him

14     back.

15         Q     In that situation he initiated the

16     contact?

17         A     He kissed me.  I kissed him back,

18     yeah.

19         Q     Do you recall with Mr. Britt if he

20     kissed you first or if you kissed him first?

21         A     I can't recall that.

22         Q     How many sexual partners have you

23     had in your life?

24              MS. BILUS-GOULD:  You know what?

25              I'm going to object and direct you not

1                     D. Alderman

2           to answer.

3                MS. KOERNER:  That's a totally

4           proper question.

5                MS. BILUS-GOULD:  That's totally

6           improper.  Move on.

7    BY MR. KOERNER:

8           Q    How many sexual encounters have

9    you had other than Mr. Britt where you can't

10   recall who initiated it?

11          A    I can't tell you that.  I don't

12   know.

13          Q    You don't know?

14          A    No.

15          Q    That's happened to you before,

16   though?

17               MS. BILUS-GOULD:  Objection to

18          form.  What's happened to her before?

19               MR. KOERNER:  Where there was a

20          sexual episode and she doesn't know who

21          initiated.

22               MS. BILUS-GOULD:  Maybe she hasn't

23          been asked before.

24               MR. KOERNER:  I'm asking now.

25               MS. BILUS-GOULD:  What's the

1                       D. Alderman

2          question?

3                    MR. KOERNER:  Whether or not she

4          can recall any other incident where she

5          had sex with somebody but she can't

6          recall who initiated it.

7                    MS. BILUS-GOULD:  I think she

8          answered the question, but answer it

9          again.

10         A     No.

11         Q     You have a dog, right?

12         A     Yes.

13         Q     Just one dog?

14         A     Yes.

15         Q     What kind of a dog?

16         A     Miniature pincher chihuahua mix.

17                    MR. KOERNER:  Off the record.

18                    (Discussion is held off the

19         record.)

20         Q     So your dog, how old is he?

21         A     She is -- was born September 27,

22         2005.

23         Q     Does she bark?

24         A     She can if somebody is making

25         noise outside.

```
1                         D. Alderman
2            Q      Does she frequently bark?
3            A      She can.
4            Q      Does she ever bite?
5            A      She can.
6            Q      She does it pretty frequently?
7                   MS. BILUS-GOULD:  Objection to
8       form.
9            A      No.
10           Q      How many time has she ever done
11      it?
12           A      I've known her to do it twice so
13      I've been told anyway.  I think I've actually
14      only known once.  I've only been told twice.
15           Q      Has there ever been any litigation
16      in relation to that dog?
17           A      No.
18           Q      Have you ever been a defendant in
19      any other lawsuit?
20           A      In regards to what?
21           Q      In any capacity.
22           A      You mean like my divorces?
23           Q      Other than the two divorces you
24      discussed?
25           A      I think I was just with a
```

1                          D. Alderman

2       deposition maybe.

3              Q      Anything.

4              A      I mean there is a lead lawsuit

5       that I was in a deposition for just a few

6       months back.

7              Q      Related to the buildings in New

8       York?

9              A      Yes.

10             Q      What's the lawsuit about other

11      than just lead?

12             A      It's a very very very unusual

13      claim.   That's all I can say.

14             Q      And you're a U.S. citizen, of

15      course, right?

16             A      Yes.

17             MR. KOERNER:   And no Social

18             Security number, you're not allowing

19             that?

20             MS. BILUS-GOULD:   What's the

21             relevance in anyway of a Social Security

22             number?  If the Judge directs it, I'll

23             provide it.

24      BY MR. KOERNER:

25             Q      Have you ever been arrested

101

D. Alderman

1

2     before?

3          A     No.

4          Q     Never been convicted of anything?

5          A     No.

6          Q     Never been to jail?

7          A     No.

8          Q     Have you ever entered into any

9     agreement with anyone other than your lawyer

10    regarding this lawsuit?

11         A     No.

12         Q     With respect to payment for your

13    legal expenses for this lawsuit, who is paying

14    your legal bills?

15               MS. BILUS-GOULD:  Objection.  I

16          direct you not to answer.

17    BY MR. KOERNER:

18         Q     Are any of your companies paying

19    your legal bills in connection with this

20    lawsuit?

21               MS. BILUS-GOULD:  Go ahead.

22         A     The Thermald Realty Associates I,

23    LP.

24         Q     They're paying a hundred percent

25    of all your legal expenses?

IRIS FERNHOFF REPORTING   (516) 317-3426

```
 1                    D. Alderman

 2        A     Yes.

 3        Q     So you haven't had to go into

 4   pocket at all with respect to this lawsuit?

 5             MS. BILUS-GOULD:  Objection to

 6        form.  It is her pocket.  But go ahead,

 7        you can answer.

 8   BY MR. KOERNER:

 9        Q     Personally?

10        A     Yes, yes, yes.  I've had to spend

11   a substantial amount of money.

12        Q     ^RULING^ how much?

13             MS. BILUS-GOULD:  Objection.  I

14        direct you not to answer.

15             MR. KOERNER:  Mark it for a

16        ruling.

17   BY MR. KOERNER:

18        Q     Is there a cap on the amount of

19   legal fees you're going to pay in this case?

20        A     No.

21        Q     You stated that before when you

22   were married to Dr. Skinner he filed for

23   bankruptcy.  Did you also file for bankruptcy

24   at that point?

25        A     No.
```

1                    D. Alderman

2          Q      Have you ever been a plaintiff in

3    any litigation other than divorces?

4          A      No.

5          Q      Have you ever been a witness in

6    any lawsuit?

7          A      No, not that I can recall.

8          Q      We talked about your education.

9    Have you had any education or training with

10   respect to building management?

11         A      Only by what I've been doing for

12   the last ten years.  Whatever I've learned.

13         Q      Just your hands-on experience?

14         A      Whatever I've learned from

15   management.  I'm always asking questions.

16         Q      Have you ever had any training or

17   education with respect to employee/employer

18   relation?

19         A      No.

20         Q      How many employees currently do

21   you have?

22                MS. BILUS-GOULD:  Objection to

23         form in terms of "you."

24                What are you referring to?

25   BY MR. KOERNER:

104

1                         D. Alderman

2          Q      You personally and Thermald

3    Realty.

4                 MS. BILUS-GOULD:  Let's take one

5          at a time.

6    BY MR. KOERNER:

7          Q      You personally?

8          A      Well, I mean it's Thermald Realty

9    I, LP.  It trickles down to me, but it's

10   Thermald Realty I, LP that has three employees.

11         Q      And you personally don't have any

12   employees?

13         A      No.

14         Q      And the three employees are Jay

15   Yablonsky and who else?

16                MS. BILUS-GOULD:  Objection.

17                MR. KOERNER:  I'm sorry.

18   BY MR. KOERNER:

19         Q      Who are the three employees?

20         A      Amy Prince, William Byers and

21   Margaret Kotulski.

22         Q      And what do they do?

23         A      Basically general maintenance,

24   cleaning, painting, repairs.

25                Margaret Kotulski does clerical

```
1                        D. Alderman

2       work.

3              Q      And have you ever had any

4       education or training with respect to sexual

5       harassment?

6              A      No.

7              Q      Or Title 7?

8              A      No.

9              Q      Have any of your employees

10      received such training?

11             A      No.

12             Q      Do yu supervise the three that you

13      mentioned before?

14                    MS. BILUS-GOULD:  Objection to

15             form.  You can answer.

16             A      I think I kind of guide them.

17      They basically -- I'll say maybe -- we kind of

18      have a plan and then they just execute it.

19             Q      When Mr. Britt was an employee of

20      Thermald Realty, did you have supervisory

21      authority over him?

22                    MS. BILUS-GOULD:  Objection to

23             form.  You can answer.

24             A      I basically -- I didn't do the

25      day-to-day, but when I came to town, which was
```

1                    D. Alderman

2    you know -- we would get together with Jay.

3    And Jay --

4         Q    Jay Yablonsky?

5         A    Jay Yablonsky and Ron and myself,

6    we would talk about the buildings and what was

7    going on and what was getting done.  And you

8    know, if I came to town and I saw graffiti, I

9    would send a picture to him and say, "Look,

10   there's graffiti."  If there's no lights in the

11   front of the building, I would say, "There's no

12   lights."

13        Q    So is it safe to say that you had

14   supervisory authority over both Jay Yablonsky

15   and Ron Britt?

16             MS. BILUS-GOULD:  Objection to

17        form.  You can answer if you can answer.

18        A    Basically because -- basically the

19   buildings are my responsibility.  I ultimately

20   do check to see that the tenants and the

21   buildings are in a safe and secure environment.

22             But I had management, who

23   basically was there day-to-day because I

24   couldn't be.  I was raising my children and I

25   had a dancing school in Los Angeles, so I tried

1                    D. Alderman

2    to come in every three to four months, but it

3    would only be for maybe six days because that's

4    when my daughter was with her father.  And so I

5    depended very much on management to do the

6    day-to-day operations.  I looked to Jay for,

7    you know, to make sure the buildings were safe.

8               MR. KOERNER:  I'll move to strike

9          the nonresponsive portion of the answer.

10   BY MR. KOERNER:

11        Q    My question to you is:  At the

12   time that Mr. Britt was working for Thermald

13   Realty, didn't you understand that you had

14   supervisory authority over him?

15               MS. BILUS-GOULD:  Objection to

16          form.

17        A    I ultimately have responsibility

18   for the buildings so yes.

19        Q    Was it your understanding that

20   Mr. Britt also understood that you had

21   supervisory authority?

22               MS. BILUS-GOULD:  Objection to

23          form.  I believe that wasn't his

24          testimony.

25               But objection to form.  You can

1                         D. Alderman

2          answer.

3          A     He knew that I owned the buildings

4     too, so yes, in essence.

5          Q     In your supervisory position were

6     you responsible for making sure that the law

7     was complied with with respect to the building

8     management?

9               MS. BILUS-GOULD:  Objection to

10          form.

11         A     I rely completely on management to

12    take care of all the legal and technical

13    aspects of the buildings because that's what I

14    hired them for.  I wanted somebody to help me

15    because it was overwhelming.  It was an

16    overwhelming job.

17         Q     With respect to the hiring of Mr.

18    Britt, can you recall when that took place?

19         A     I believe it was in 2007.  I think

20    that's what I saw in the complaint.  It was in

21    January 2007.

22         Q     Did you offer him a job as a

23    superintendent?

24              MS. BILUS-GOULD:  Objection to

25          form.  You can answer.

1                        D. Alderman

2          A     I believe what happened was Jay

3    met him on the street and he wanted the storage

4    cellar.  And after that I met him.  He did some

5    work in the other buildings.  And then we saw

6    what kind of work he did.  And Jay and I

7    discussed it.  And I believe we decided to ask

8    him if he wanted to be the super/janitor.

9          Q     Did you ask him or did Jay ask

10   him?

11         A     I think it was Jay.

12         Q     Whose idea was it; your idea or

13   Jay's idea?

14         A     I think it was my idea.  I said,

15   "Why don't we give him a chance.  I mean it

16   looks like he can do some painting.  Maybe if

17   we have him in the building, the tenants will

18   be taken care of and I'm not here all the

19   time."

20         Q     The superintendent at the time

21   when you hired him was this guy named Brendan,

22   correct?

23         A     Yes.

24         Q     What's his last name?

25         A     Brendan Burke.

1                           D. Alderman

2           Q      Was he living in the building?

3           A      Yes, he was in that apartment.

4           Q      Why did he leave as

5    superintendent?

6           A      He left because he was unhappy

7    because I cut his pay in half because he wasn't

8    doing his job.

9           Q      Did you have any romantic

10   involvement with Brendan?

11          A      No.

12          Q      And you weren't happy with his

13   work?

14          A      No.  It started to slip.

15          Q      Did you communicate that to

16   Brendan?

17          A      Yes.

18          Q      In writing?

19          A      No.  It was all verbally with Jay.

20   It might have even been Jay.  I don't know if I

21   said it.  It may be it was Jay.

22          Q      Was he terminated eventually?

23          A      He left.

24          Q      So it was your idea to hire

25   Mr. Britt, correct?

1                    D. Alderman

2          A      I -- well, I always would talk to

3     Jay.  It was me that said, "You know, what

4     about Ron?  Why don't we give him a shot?"

5          Q      And how did you first meet

6     Mr. Britt?

7          A      It was after he had the lease with

8     the cellar.  I think he was in the cellar and

9     he said he was a handy guy in New York City.

10    And I was, "Oh, wow, that's what I need for

11    these buildings."

12                 And so he did a couple of hallways

13    at the 9th Street buildings.  And he did an

14    okay job.  He painted them and did the lighting

15    and the tiles.

16         Q      Can you recall the first time you

17    ever met Mr. Britt?

18         A      No.  I think it was maybe outside

19    in front of the building possibly.  I don't

20    know.  I can't recall really.

21         Q      And how long did you know him

22    before you had the idea to hire him as a

23    superintendent?

24         A      I think it was -- if he had got

25    the lease, the lease I believe was in 2005 or

D. Alderman

1

2    '4.  It was a few years after.  A couple of

3    years at least after that.  And then he became

4    super in January 2007.  So whenever he signed

5    that lease is somewhere after that I had met

6    him.

7          Q    And you understood at the time

8    when you met him that he was renting a space in

9    the basement, correct?

10         A    Yes.

11         Q    And you understood at that time

12   that he was using it as a shop for a handyman,

13   correct?

14         A    He was storing tools.  It was

15   supposed to be storage.  I was told he had all

16   these tools.  He had to get out from where he

17   was and he had all these tools he needed to

18   store.  And that was all I was told.

19         Q    You were aware he was doing work

20   down there, correct?

21         A    I saw things but, again, it was

22   dealing with tools.  It was...

23         Q    What do you mean "saw things"?

24         A    I saw him maybe carrying wood or

25   putting it down there.  I mean I can't remember

```
1                      D. Alderman

2   offhand.

3        Q     You did know he was doing work

4   there at any time before 2011?

5        A     I remember Jay complaining about

6   him having people working down there.  That

7   he -- that he was very upset about it.

8        Q     Who, Jay was?

9        A     Yeah, Jay was upset with that.  I

10  don't remember offhand him doing anything

11  except when I moved into the apartment, he

12  started doing a lot of sawing in the backyard

13  outside.

14       Q     And this was before you hired him

15  as a superintendent?

16       A     No, no.  I'm sorry.

17             MS. BILUS-GOULD:  Objection to

18       form.

19       A     Sorry.  That's way after.

20       Q     With respect to Jay being upset

21  that there was work being done in the --

22       A     Yeah, something about --

23       Q     My question is:  When did that

24  happen?

25       A     That was during the process of him
```

1                       D. Alderman
2    being super.  There was something -- he was
3    very upset about him having people work and not
4    being paid properly and that they weren't
5    employees.  And he was like, "The insurance
6    can't cover this."  And he was really really
7    upset with Ron.  What if something happens to
8    him while he's working, you know.
9         Q     You directed Jay Yablonsky to
10   offer the superintendent job to Mr. Britt; is
11   that correct?
12             MS. BILUS-GOULD:  Objection to
13        form.
14        A     We discussed it and then agreed.
15        Q     And did you have any conversations
16   with Mr. Britt directly about the job?
17        A     No, it was all through Jay.
18        Q     And then you heard it through Jay
19   that he had been hired?
20        A     Yeah.  Basically Jay showed me
21   the -- the super agreement.  And we discussed
22   it.  And Ron said he didn't want to do the
23   cleaning.  So then it went back.  We said,
24   "Well, what about can you paint the apartments
25   when we turn them over."  So he agreed to do

1                        D. Alderman

2    that.  So that's basically it.

3                    And then it was off to Jay, and

4    Jay submitted the four pages and I never saw

5    anything after that.

6            Q      Prior to the first sexual episode

7    that you testified to today and it's your

8    testimony that there were only two sexual

9    episodes?

10           A      That's what I recall.  I'm not

11   even sure if there was a second one, honestly.

12           Q      With respect to or prior to the

13   first sexual episode with Mr. Britt, did there

14   come a time where Mr. Britt traveled with you

15   to your home in Pennsylvania?

16           A      That was before.

17           Q      I'm saying it was before the

18   sexual episode?

19           A      Yes, yes.

20           Q      How much sooner before?

21           A      That was like sometime -- it had

22   to be during one of -- maybe it was in the

23   early part of the summer.  That's all I can

24   think of.

25           Q      So it was a month or two before

1                    D. Alderman

2      you actually had sex with him?

3           A     Maybe it was in June sometime

4      because it was definitely warm because we went

5      fishing and my feet were in the lake 'cause it

6      was hot but I didn't bring a bathing suit.

7           Q     So it was approximately two months

8      before you had sex with him that you went to

9      Pennsylvania; is that about right?

10          A     Could be.  Or a month or something

11     like that.

12          Q     Did you invite him to go to

13     Pennsylvania?

14          A     I don't think so.  I think he

15     basically -- no, maybe I did.  Because I was

16     having problems with a contractor and I said,

17     "Do you want to come out?"

18                He said, "yeah."

19                Somehow it was -- I think it was a

20     decision we decided together because he liked

21     to fish.  I said, "Oh, we got two lakes in

22     Pennsylvania."

23                So it was very friendly.  And I

24     had a contractor who was doing work.  And I

25     wanted him to look at the work and give me his

D. Alderman

2    opinion on it.  So that was it.

3        Q      And you asked him to try to help

4    you deal with this contractor that you were

5    having problems?

6        A      I said, "Look at the work and tell

7    me if you can see anything that he's doing

8    wrong."  Because I'm not, you know, I was

9    looking to him for his professional experience,

10   you know, if he could see anything.  And he did

11   point out some things with the work that he did

12   so...

13       Q      And how did you travel to

14   Pennsylvania?

15       A      I think he had some type of a van

16   or something or a truck.

17       Q      You drove in his vehicle?

18       A      I think so, yes.

19       Q      How far of a drive was it?

20       A      Well, it's -- if you just go

21   straight from New York to PA it's about three

22   hours but we stopped at my mom's house.

23       Q      Why did you stop at your mom's

24   house?

25       A      Because she likes to feed us.

IRIS FERNHOFF REPORTING   (516) 317-3426

1                        D. Alderman

2            Q      And when you went to Pennsylvania

3    was it your intent to spend the night there?

4            A      Oh, yes.  We were going to spend

5    the night for sure because there was the

6    Farmer's Market.  There was the Pennsylvania.

7    There was the fishing.  You know, it's just

8    like it's a great place.

9            Q      You were planning on staying just

10   one night?

11           A      I think we spent more than one

12   night.  I think it was two because we went --

13   there's no way we could have done the Farmer's

14   Market and gone fishing and done cooking.  I

15   just don't see how we could have done it all in

16   one day.  I think we were there for two.

17           Q      And when you went out there, prior

18   to going out there, did you ever discuss what

19   your sleeping arrangements would be?

20           A      I just -- I said, "Look, there's

21   four bedrooms.  You can have my mom's.  My mom

22   has the nicest room."  It was, "You could have

23   my mom's room and I will be in my room."

24           Q      And did you sleep in separate

25   rooms on that trip?

```
                           D. Alderman
  1
  2          A      Yes.
  3          Q      You think it was for two nights?
  4          A      Yes.
  5          Q      And do you recall what you wore to
  6   sleep in?
  7          A      Yeah, I think it was like a
  8   T-shirt and shorts.
  9          Q      Did you ever visit Mr. Britt in
 10   the room that he was sleeping in after he had
 11   gone to bed?
 12          A      No.
 13          Q      And was there any romantic
 14   activity during those two nights?
 15          A      No.
 16          Q      Were you romantically interested
 17   in Mr. Britt at the time you went out to
 18   Pennsylvania?
 19          A      Not really.
 20          Q      What's the really part?
 21          A      I mean he was very nice.  We had a
 22   lot of fun fishing.  We had a lot of fun going
 23   to the Farmer's Market.  We cooked the fish --
 24   no, we didn't.  I know I did a lot of cooking.
 25   I don't know.  It was just pleasant.
```

120

1                          D. Alderman

2          Q      Did Mr. Britt ever attempt to

3    initiate any sexual contact during that

4    weekend?

5          A      No.

6          Q      Did you?

7          A      No.

8          Q      Going back to the first sexual

9    episode you had with Mr. Britt, before

10   Mr. Britt came and visited you on that night,

11   had you entertained the notion of him as a

12   romantic interest?

13                MS. BILUS-GOULD:  Objection to

14          form.

15         A      I don't think it was at night.  It

16   was more during the day.

17         Q      Okay.  Before that, whenever?

18         A      Yeah, I think it was a very

19   pleasant situation.  You know, we'd gone out a

20   few times.  We had gone to Pennsylvania.

21   Everything was very pleasant.  And we went

22   Salsa dancing.  And I don't know.

23         Q      The two of you went Salsa dance?

24         A      Yeah, we went to Lincoln Center

25   Salsa dancing.  That was --

1                      D. Alderman

2          Q      That wasn't the same weekend of

3    Pennsylvania?

4          A      No.   That was another time, but it

5    had to be the summer.

6          Q      My question is:   To cut to the

7    chase, that first time that you had sexual

8    contact with Mr. Britt, before the moment when

9    it just happened, had you ever entertained the

10   notion of having sexual contact with Mr. Britt?

11         A      Yeah, it seemed like a very

12   romantic situation.

13         Q      So I'm trying to say, when was the

14   first time that you had the idea that you were

15   interested in Mr. Britt sexually?

16         A      I couldn't tell you.

17         Q      I'm asking you to please --

18                MS. BILUS-GOULD:   She said she

19         can't give you --

20                MR. KOERNER:   I know.

21         Q      But I'm not expecting you to name

22   the date, but we've talked about the

23   Pennsylvania visit.   At what point in the

24   continuum, if you know, did you have sexual

25   interest in Mr. Britt?

122

1                            D. Alderman

2          A      I don't know.

3          Q      When you were out there in

4     Pennsylvania did Mr. Britt paint the bathroom

5     for you?

6          A      Yes.

7          Q      Was he paid for that?

8          A      No.

9          Q      Did he put up lights in the house

10    in Pennsylvania?

11         A      Yes.

12         Q      Was he paid for that?

13         A      No.

14         Q      Did he clean out the basement?

15         A      Yes.

16         Q      Did you pay him for that?

17         A      No.

18         Q      Did he consult regarding the

19    contractor that you were having problems with?

20         A      He basically -- he basically

21    looked at the work and gave me some pointers of

22    what he hadn't done right with like the

23    woodwork and that was it.  I paid the guy.  He

24    never worked for me again.

25         Q      And did you ask him to do these

123

1                         D. Alderman

2    jobs?

3         A    No.

4         Q    It was his idea to do the work?

5         A    Yes.  He was very kind.  I mean

6    that was what was appealing.

7                   (Phone rings.)

8              MR. KOERNER:  Off the record.

9                   (Discussion is held off the

10             record.)

11   BY MR. KOERNER:

12        Q    Other than that incident in

13   Pennsylvania where he did work that he was not

14   compensated for, was there other instances

15   while he was in your employ that he was not

16   compensated for?

17             MS. BILUS-GOULD:  Objection to

18             form.  You can answer.

19        A    Not that I'm aware of.

20        Q    When you hired Mr. Britt, can you

21   describe for us what his job responsibilities

22   were?

23             MS. BILUS-GOULD:  Objection to

24             form.  You can answer.

25        A    I can only -- I don't have the

124

1                           D. Alderman

2     four pages in front of me, but it was basically

3     it was the care of the buildings and instead,

4     in lieu of not cleaning, he was to paint the

5     turnover apartments and basically he was to get

6     a salary.  He was to get an apartment.  He was

7     to get utilities.  He was to get a phone

8     compensation, payment for reimbursement.  And

9     that's all I can -- I mean I'm just giving you

10    the general.

11         Q     Did you have an understanding he

12    was not going to be doing the cleaning?

13         A     Yeah, he made that clear.  He

14    didn't want to do that, so he brought Zheng,

15    Z-H-E-N-G, in as the porter.

16         Q     And with respect to his

17    responsibilities as a superintendent, did he do

18    a good job?

19              MS. BILUS-GOULD:  Objection to

20              form.  You can answer.

21         A     I found it to be inconsistent.  I

22    mean there were things that he did okay and

23    then sometimes -- and sometimes he just would

24    do things that were just odd, you know, and

25    problematic.  So I found it difficult at times.

125

D. Alderman

1

2    Q    Did you have any of these

3    difficulties before you had sexual relations

4    with him?

5    A    It was too soon.  He just became a

6    super so he was definitely trying his best.

7    Q    Did you ever give him a

8    performance evaluation?

9    A    No, no.  We would always talk.  I

10   would always -- we were always direct.  I was

11   with Jay most of the time.

12   Q    With respect to any problems that

13   you had with Mr. Britt, did you ever

14   communicate to him in writing with respect to

15   any of these problems?

16   A    There were issues with some of his

17   behavior that -- with the loud music, with the

18   dog, with the broker.  Those are the only

19   things I can remember offhand where I

20   communicated to him.

21   Q    Was there ever any written

22   communication or was it oral?

23   A    No.  That was like with e-mails,

24   those communications.  But there were some that

25   were more oral.

126

D. Alderman

1

2    Q    And you produced any e-mails

3  regarding any complaints with Mr. Britt?

4    A    I believe I did.  Those were given

5  to my attorney.

6         MS. BILUS-GOULD:  Which we

7         exchanged, whatever we had.

8  BY MR. KOERNER:

9    Q    Did you ever get any negative

10  complaints about Mr. Britt's work from the

11  tenants there?

12    A    I didn't have firsthand knowledge

13  of what was going on with the tenants because I

14  really basically relied on management to take

15  care of that during that time.

16    Q    Were you aware that --

17    A    If you want my opinion about what

18  happened with my apartment as a tenant, I could

19  tell you that.

20    Q    Go ahead.

21    A    There was a major leak the first

22  year I was in my apartment coming from an

23  apartment above me and then it caused severe

24  damage to the floor.  And that made me a little

25  concerned because I was wondering why wasn't

1                           D. Alderman

2      the leak taken care of.  It was huge.  It

3      caused water damage.

4              Q     And you viewed that --

5              A     And then there was another leak.

6              Q     You view these leaks as Mr.

7      Britt's fault?

8              A     Well, he's the super.  He's

9      supposed to make sure that when a leak happens

10     that it gets -- that it gets repaired.  And it

11     was such a huge leak that to me I wondered why

12     it was so bad, why wasn't it fixed.

13             And then there was another leak

14     where I asked him to fix it and he never fixed

15     it.  It kept coming back.  And it kept

16     dripping.  And it kept dripping.  And so my

17     apartment -- I was -- that made me concerned.

18     I was like if the owner has an apartment that

19     has leaks coming in two different areas and

20     it's not getting repaired, then how is the

21     other apartments doing.

22             Q     Did you have to hire a third party

23     to fix these leaks?

24             A     Yes.  And I did get them fixed

25     finally, but I had to find somebody myself.

1                          D. Alderman

2          Q     Was that a plumber?

3          A     It was actually Bill Byers finally

4    fixed the leak above.  The leak with Danny

5    Chevez was huge, so there was a plumber that

6    did it.  But the one that kept reoccurring

7    never got fixed.  And Bill finally fixed it for

8    me.

9          Q     Who's Bill Byers?

10         A     Bill Byers is the maintenance.  He

11   finally figured out what the problem was and

12   fixed it.  Now it's not there anymore.

13         Q     He's an employee of Wavecrest?

14         A     He's employed by Thermald Realty.

15   He's one of my employees.

16         Q     Right.  And he personally fixed

17   the problem?

18         A     Yes.                    ,

19         Q     Other than these leaks in the

20   buildings, were there any other complaints that

21   you're aware of regarding Mr. Britt?

22         A     I can only say from what I could

23   see.  I didn't really talk to the tenants.  Jay

24   told me -- advised me not to, and I listened to

25   him.  He said, you know, "You're going to open

1                        D. Alderman

2       up a big Pandora's box if you talk to the

3       tenants."

4                        I listened to him and I said,

5       "Okay, I guess I shouldn't do that."

6                        But I could tell that when I would

7       do walk-bys that lights were out, graffiti.  I

8       mean it was -- anytime I showed up there was

9       always something.

10          Q     Is that continued to this day that

11      there are always issues in the building?

12          A     No.  It's changed.  It's really

13      changed.  There's people that actually really

14      do walk-bys and actually there's no more

15      graffiti.  So that makes me happy.

16          Q     Are you aware that there were

17      certain tenants who valued Mr. Britt's services

18      as a superintendent?

19                   MS. BILUS-GOULD:  Objection to

20                   form, but you can answer.

21          A     I honestly really don't know

22      firsthand because like I said, I was not

23      involved.  I'm not involved with the tenants.

24      Since this lawsuit I've become much more

25      involved with the tenants.  But up until then I

                              D. Alderman

1

2    don't know what -- and I really don't go into

3    it.  All I want to do is move forward and take

4    care of my tenants.

5         Q    Well, let's talk about that.

6              You were at the deposition of the

7    non-party witnesses which included the tenant.

8    And she had a very positive, favorable view of

9    Mr. Britt's services as a superintendent.

10             Do you agree with that?

11             MS. BILUS-GOULD:  I'm going to

12        object to form.  That's your

13        characterization.

14             MR. KOERNER:  That's why I'm

15        asking if she agrees with it.

16   BY MR. KOERNER:

17        Q    Do you agree with that?

18             MS. BILUS-GOULD:  I'm going to

19        object to form, but you can answer it.

20        A    You know, tenants -- I have a

21   responsibility.  I'm a landlord.  These

22   buildings are important to me.  The people that

23   live in them are important to me.  Whatever

24   opinions she had has no consequence.  I have to

25   take care of my tenants period.

D. Alderman

1

2    Q    She is a tenant?

3    A    Yes.  And what she has -- whether

4    he's a good person or not, or whether she likes

5    him or whether she feels sorry for him --

6    Q    Or whether he does a good job?

7    A    -- or whether he --

8         MS. BILUS-GOULD:  Please, do you

9         have a question?  She's answering your

10        question.

11   A    I don't know because I haven't

12   seen her apartment.  I couldn't be a firsthand

13   witness.  All I know is that my apartment, I

14   felt concerned.  And -- and it was -- and I had

15   a job to do.  I could see -- I just, you know,

16   instincts told me things weren't being handled.

17   And so I did the best I could.

18   Q    Did you ask the tenants what their

19   input was?

20        MS. BILUS-GOULD:  Objection to

21        form.  At would point in time?

22   BY MR. KOERNER:

23   Q    When you decided to fire

24   Mr. Britt?

25   A    I -- I basically -- like I said,

1                     D. Alderman

2      before I was not involved in the tenants.   It

3      was management that took care of them.

4           Q     Okay.

5           A     All I can tell you was what I saw

6      happening from the roofs to the basement.

7                     MS. BILUS-GOULD:   The question was

8             whether you asked the tenants before you

9             decided to fire him.

10                    THE WITNESS:   No.

11     BY MR. KOERNER:

12          Q     And you don't feel that's

13     relevant, the tenants' opinion of the super's

14     quality of work?

15          A     I think it has a place but then

16     again, they don't -- they don't -- they don't

17     have as much knowledge of what it takes to

18     actually take care of a building and an

19     environment that's safe like a person that's

20     actually a building owner.

21                    They have an apartment.   When they

22     have a problem, they call someone and it gets

23     fixed.   I mean I have had plenty of people

24     after the fact tell me several things, but

25     before that I had no clue.   All I knew is what

1                    D. Alderman

2   I was going on from what I could see.

3        Q      You stated before, you said you

4   have responsibilities with respect to these

5   buildings.  Responsibilities to who?

6        A      To the tenants to make sure that

7   they're in a safe environment.

8        Q      And their view of whether or not

9   they're in a --

10       A      No, actually --

11       Q      -- safe environment or not --

12              MS. BILUS-GOULD:  Let him finish

13   the question.

14   BY MR. KOERNER:

15       Q      -- is that relevant?

16       A      Yes.

17              MS. BILUS-GOULD:  Objection to

18       form.

19       A      Yeah.

20       Q      Why didn't you communicate, why

21   didn't you ask them?

22       A      Because Jay told me not to.  Jay

23   told me -- and I listened to Jay.  Jay is a

24   professional manager.

25       Q      This has been previously marked as

1                    D. Alderman

2    an exhibit.  This is a letter that Jay wrote

3    and signed and testified that it was his own

4    language and it's a rave review of Mr. Britt.

5    I can read it into the record if you'd like.

6                    MS. BILUS-GOULD:  Well, I think

7              it's already --

8                    MR. ETTENGER:  It's written in the

9              record.

10                   MR. KOERNER:  "She calls.  She

11             says he's extremely talented.

12             Communication skills are excellent.  He

13             has shown her a willingness to learn and

14             improve his skill set.  Demonstrated a

15             unique and creative problem solving

16             ability.  He always looked out for the

17             tenants of the building and had their

18             interests at heart.  He has proven

19             himself a loyal, hard working dedicated

20             employee."

21   BY MR. KOERNER:

22             Q     Is there anything in this that you

23   disagree with?

24                   MS. BILUS-GOULD:  Objection to

25             form.  You could answer.