UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                                      :
RONALD BRITT,                                         :
                                                      :
                              Plaintiff,              :
                                                      :
              v.                                      :
                                                      :
THERMALD REALTY I, LP, *et al.*,                      :
                                                      :
                              Defendants.             :
                                                      :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>August 18, 2015</u>

13 Civ. 8289 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge:

Plaintiff Ronald Britt brings this action against Doreen Alderman and Thermald Realty I, LP ("Thermald") (collectively, "Defendants"), under the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law §§ 290-301. Plaintiff alleges that, during his tenure as superintendent of Alderman's properties, she subjected him to unwanted sexual advances, which culminated in his participation in coerced sexual acts on two occasions in 2007. He further contends that after he refused to continue their sexual relationship, Alderman's treatment of Plaintiff changed: she became openly hostile to him, refused payments he was owed, denied him bonuses and opportunities to perform outside contracting jobs, and eventually terminated his employment as superintendent in 2013. Defendants respond that the events of which Plaintiff complains are either non-actionable, time-barred, or both, and that the termination of his employment was an entirely economic decision.

With discovery now closed, Defendants have moved for summary judgment.  For the reasons set forth in this Opinion, the motion is granted.

## BACKGROUND[1]

### A.    Factual Background

### 1.    The Parties and the Properties

Thermald is a New York-based limited partnership that owns three buildings (the "Thermald Buildings") in Manhattan's East Village neighborhood. (*See* Def. 56.1 ¶¶ 1, 3).  From 2007 through 2013, Thermald employed a small staff — generally two or three individuals.  (*Id.* at ¶¶ 63-69).  During several stretches in 2012 and 2013, however, Thermald's staff expanded to four and occasionally five employees; specifically, Thermald employed four or five employees during eight weeks in 2012, and during nine weeks in 2013.  (*Id.* at ¶¶ 68-69).

---

[1]    The facts stated herein are drawn from the parties' submissions in connection with the instant motion, including Defendants' 56.1 Statement ("Def. 56.1" (Dkt. #54)), and Plaintiff's responses thereto ("Pl. 56.1 Response" (Dkt. #58)); Plaintiff's 56.1 Counterstatement ("Pl. 56.1" (Dkt. #58)), and Defendants' responses thereto ("Def. 56.1 Reply" (Dkt. #61)).  References to individual deposition transcripts or affidavits will be referred to as "[Name] Dep." or "[Name] Aff."  For convenience, Defendants' opening brief will be referred to as "Def. Br." (Dkt. #55); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #57); and Defendants' reply brief as "Def. Reply" (Dkt. #60).

Citations to a party's 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Alderman, whose primary residence is in California, is a partner in Thermald.  (Def. 56.1 ¶ 2).  She also keeps an apartment in Manhattan, which she uses when she visits.  (Alderman Dep. 6).  Although she lives in California for most of the year, she travels to New York approximately every four to five months to check in on the Thermald Buildings.  (Def. 56.1 ¶ 53; *see also* Alderman Dep. 107; Britt Dep. 231).

In 2004, Thermald entered into agreements with Wavecrest Management Team, Ltd. ("Wavecrest"), whereby Wavecrest would assume management of the Thermald Buildings.  (*See* Def. 56.1 ¶ 4).  Jay Yablonsky, the director of property management at Wavecrest, directed the day-to-day operations of the Thermald Buildings.  (*See, e.g.*, Yablonsky Dep. 6; Alderman Dep. 105-07, 172-75).

### 2.    The Hiring of Plaintiff as Superintendent in 2007

Plaintiff began renting space in the basement of one of the Thermald Buildings located at 91 East 3rd Street in July 2005.  (Britt Dep. 18-21).  At the time, Plaintiff earned his living by performing various handyman jobs, and he used the basement space to house his tools and to serve as his workshop.  (*Id.* at 12-13, 20-21, 368).  Plaintiff is also a musician, and often invited other musicians to join him in the basement unit for rehearsals.  (*Id.* at 246, 252).

When Alderman and Yablonsky were looking to replace the superintendent of the Thermald Buildings, they settled on Plaintiff, who had occasionally performed handyman jobs for them.  (Alderman Dep. 109-14; Yablonsky Dep. 31; Britt Dep. 20-21, 60).  Ultimately, although she consulted

with Yablonsky on the decision, it was Alderman who decided that Plaintiff should be hired.  (Alderman Dep. 111 ("It was me that said, 'You know, what about Ron?  Why don't we give him a shot?"); *see also* Pl. 56.1 ¶ 74). Accordingly, in January 2007, Wavecrest, on behalf of Thermald, hired Plaintiff as the live-in superintendent responsible for the Thermald Buildings.  (Def. 56.1 ¶ 5).

Plaintiff did not, however, take on all of the previous superintendent's responsibilities.  (Britt Dep. 28-29, 192).  For instance, Plaintiff was not interested in performing janitorial duties, such as cleaning and taking the garbage and recycling out for collection.  (*See id.* at 29; Yablonsky Dep. 58-59; Alderman Dep. 114).  A porter, referred to in the parties' submissions only as "Mr. Zheng," was thus hired to perform janitorial work.  (Yablonsky Dep. 27, 58-59).[2]  In exchange for his performance of the superintendent duties, Plaintiff received a weekly salary, a rent-free apartment, payment for certain utilities, and reimbursement for the cost of his telephone.  (Def. 56.1 ¶ 13).[3]

### 3.    Plaintiff's Interactions with Alderman in 2007

Several months after he began working as superintendent in 2007, Plaintiff accompanied Alderman to a house in Pennsylvania that had previously belonged to Alderman's parents.  (Britt Dep. 199; Alderman Dep. 117).

---

[2]    Mr. Zheng's first name has also been redacted from the records submitted in connection with this motion.

[3]    It appears that Plaintiff continued to use the basement workshop unit in addition to the rent-free apartment provided to him when he took over as superintendent.  (*See* Britt Dep. 27, 50-51, 251).

4

Alderman sought Plaintiff's advice on construction work that an outside contractor had been performing on the house. (Britt Dep. 198). While in Pennsylvania, Plaintiff performed a variety of handyman jobs around the house — work for which he alleges he was never paid. (*Id.* at 200). Alderman testified that Plaintiff volunteered to do this work, but Plaintiff testified that he felt he needed to perform this work in order to keep his job as superintendent at the Thermald Buildings. (*Id.* at 203; Alderman Dep. 122-23). While in Pennsylvania, Alderman cooked meals for Plaintiff, took him out for beers, and bought him ice cream. (Britt Dep. 200-06). The two also went to a farmer's market together, and spent time fishing — the latter being an activity in which Plaintiff had expressed particular interest. (*Id.* at 202; Alderman Dep. 118).

Plaintiff and Alderman stayed in separate rooms during their trip to Pennsylvania, and did not engage in any romantic or sexual activities. (Alderman Dep. 118-19; Britt Dep. 200). Nonetheless, Plaintiff testified at his deposition that he felt "uncomfortable" during this trip because Alderman checked in on him several times to make sure he had everything he needed, while "scantily clad" in a sheer t-shirt and underwear. (Britt Dep. 201, 206). Plaintiff does not contend that Alderman made any sexual advances during this trip, but claims that "it was clear … she wanted to fool around, and I wasn't having it." (*Id.* at 206).

Later in 2007, Plaintiff and Alderman engaged in sexual relations on two separate occasions. (Def. 56.1 ¶ 16). Plaintiff and Alderman characterize these encounters differently, but it is undisputed that these two encounters occurred

during 2007.  (*See id.*; *see also* Compl. (Dkt. #1) ¶ 15 ("The sexual harassment by … Alderman continued for a period of approximately seven months and included instances of oral sex and sexual intercourse.")).

Plaintiff recalls that the first sexual encounter took place when Alderman visited Plaintiff in his apartment.  (Britt Dep. 206).  According to Plaintiff, Alderman instigated the encounter by taking her clothing off, which prompted Plaintiff to say, "This is a bad idea. … I don't want to do this.  It's a bad idea." (*Id.* at 207).  Plaintiff testified that Alderman asked him, "Do you like your apartment?  Do you like keeping your job?" (*Id.*).  Despite his protestations, Alderman began to touch him and pull at his clothing.  (*Id.* at 208).  Plaintiff testified that he eventually had sexual intercourse with Alderman.  (*Id.* at 209-11).[4]

With respect to the second sexual encounter, Plaintiff testified that Alderman had flown in from California without warning, and called him from the airport.  (Britt Dep. 213-15).  According to Plaintiff, Alderman said "she was in the mood; she was in town; and [that he] should be ready." (*Id.* at 216).  He testified that he went to her apartment, where "she jumped on [him], and [they] had sex." (*Id.*).  Unlike with the previous encounter, Plaintiff testified that he did not make any protestations; instead, he "was just going along with it, because [he] knew that [he] would lose [his] job if [he] didn't." (*Id.* at 217).

---

[4]     Alderman, by contrast, agrees that this sexual encounter occurred, but believes it occurred in her apartment.  (Alderman Dep. 60).  She does not recall Plaintiff making any protests, and describes it as a consensual and spontaneous occurrence.  (*See id.* at 47-48, 68-69).

Plaintiff testified that they had sex twice on this occasion.  (*Id.*).  Afterwards, Plaintiff went to a nearby bar.  Alderman called him on his cellphone repeatedly thereafter, and he eventually returned to her apartment, where he told her that he was "not her property and that [he] would not be having sex with her again." (*Id.*).  He also testified that he presented her with a "horse whip," a "piece of braided leather you use[] to whip horses"; this gesture signified that he "was not her whipping boy and … was not gonna be going to bed with her again." (*Id.* at 218).  Plaintiff testified that Alderman told him to get out, and that he never had sex with her again.  (*Id.*).[5]

### 4.    Plaintiff's Interactions with Alderman After 2007

Throughout this litigation, Plaintiff has acknowledged that after their second sexual encounter in 2007, Alderman never asked Plaintiff to have sex with her again.  (Def. 56.1 ¶ 21; *see also* Britt Dep. 220 ("Q: Did she ask you to have sex again?  A: No, she did not ask me to have sex again.")).  Indeed, according to Plaintiff, after the second sexual encounter, he and Alderman "had a little sit-down conversation," in the course of which they "agreed that [he] would remain the super," which he did for the ensuing six years.  (Britt Dep. 219).

In opposing the instant motion, however, Plaintiff offers an exception that all but swallows up the rule of his prior testimony:  He contends that while

---

[5]    Alderman agrees that the second encounter occurred, but testified that it was she who told Plaintiff that their relationship was not "a healthy situation" and should cease. (Alderman Dep. 85).  She does not recall being given a horse whip.  And she agrees that this second encounter in 2007 resulted in the termination of their sexual relationship. (*See id.* at 94).

"Alderman did not verbally request sex … after [Plaintiff] told her he no longer wanted to have sex," she "did continue to make overtly sexual advances." (Pl. 56.1 Response ¶ 21; *see also* Pl. 56.1 ¶ 72). Curiously, Plaintiff did not include any references to these "overtly sexual advances" in his Complaint, nor did he describe any such advances during his deposition, despite questions that fairly called for such a response. Instead, in response to Defendants' arguments for summary judgment based on the untimeliness of his 2007 allegations, Plaintiff submitted an affidavit that describes in general terms additional, heretofore-undisclosed advances, which are said to have occurred "[a]t various times between 2008 and 2010." (Britt Aff. ¶¶ 3-4).[6]

---

[6]    Plaintiff contends that one can find in his deposition transcript prior references to Alderman's sexual advances between 2008 and 2010. (Pl. 56.1 ¶ 72 ("Following the final instance of sexual intercourse …, Alderman continued to make unwanted sexual advances.") (citing Britt Dep. 220-21)). But the quoted transcript contains no hint of the events alleged in his affidavit:

> Q: [A]fter the incident … when she flew in … from California, you didn't have sex with her again; is that correct?
>
> A: After that night, no.
>
> Q: And she didn't ask you to have sex again; is that correct?
>
> A: Instead, she kind of left it open.
>
> Q: Did she ask you to have sex again?
>
> A: No, she did not ask me to have sex. But she called me at all hours, on Christmas and in the middle of the night. She would come over to my apartment with a bottle of wine and say, "oh, you've got to unfuck this job they're doing in my apartment renovation." She had me do all of the drawings and didn't pay me for them. She filed those drawings. And I have those drawings. So, if you want to see, did I do the work and did she have me do it without permits and — and strictly by the book, yeah, I can show you all of that, as well. *As I said, sexual harassment's about control, and it's an employment issue.*

(Britt Dep. 220-21 (emphasis added)).

In his affidavit, Plaintiff asserts that Alderman "would rub against [his] body, place her head on [his] shoulder, place her hand on [his] leg close to [his] penis, touch[] [his] arm in a flirtatious manner and ask[] if [he] 'was going to the gym,' … insist on taking [him] out for late night dinners and drinks," and "appear at [his] apartment at all hours of the night … intoxicated and scantily dressed" in order to "make unwanted sexual advances towards [him]." (Britt Aff. ¶¶ 3-4). He then asserts that the unwanted advances "continued at least [until] October of 2011." (*Id.* at ¶ 5).

By 2010, Alderman had begun a romantic relationship with another man; Plaintiff avers that this new relationship caused Alderman to "change[] her behavior from making sexual advances [towards Plaintiff] to open hostility." (Pl. 56.1 ¶ 73).[7] In particular, Plaintiff asserts that after it "became clear to … Alderman that [Plaintiff] would not put [him]self in a position where she could take advantage of [him] sexually as she had in 2007," Alderman "became aggressively and openly hostile," and engaged in a "campaign to make [Plaintiff's] life miserable." (Britt Aff. ¶ 8). During this period of time, Alderman would "consistently refer to [Plaintiff] as a moron, stupid, idiotic, a dolt, lazy, incompetent[,] and troublesome." (*Id.* at ¶ 10). Alderman also directed Plaintiff to undertake tasks he alleges were beyond the scope of his duties as

---

[7]     It is difficult to construct a coherent timeline of Alderman's purported sexual advances due to the many irreconcilable inconsistencies among Plaintiff's filings. The assertion that Alderman's sexual advances continued until October 2011, for instance, is incompatible with the assertion that her sexual advances ceased when she started a new relationship in 2010. And both of these dates are incompatible with the allegation in the Complaint that the sexual harassment was confined to a seven-month period in 2007.

superintendent, such as watering her plants, changing the locks on her apartment door, curing building code violations in the Thermald Buildings, removing graffiti from the exterior of the building, assembling furniture, and renovating apartments.  (*Id.* at ¶ 6).  Additionally, although Plaintiff had received bonuses prior to 2010, he avers that Alderman "ceased paying … bonuses of any kind" in 2010.  (*Id.* at ¶ 11).  Beginning in 2010, Alderman also started to complain about rehearsals that Plaintiff held in his basement unit with musicians — activity Alderman had previously condoned.  (*Id.* at ¶ 12; Alderman Dep. 56 ("I said, 'You know, you're playing music until three, four, five, six, [seven] o'clock in the morning and you're waking us up.  We can't sleep.'")).  Plaintiff contends that "Alderman's pattern of harassment and degradation continued from 2007 to the time of [his] termination in 2013." (Britt Aff. ¶ 13).

Separately, Plaintiff complains that he performed certain handyman or construction jobs for which Defendants never compensated him.  (*See* Britt Dep. 220 ("[Alderman] had me do all of the drawings and didn't pay me for them.  She filed those drawings.  And I have those drawings.  So, if you want to see, did I do the work … , I can show you all of that, as well."); *id.* at 221-22 ("[Alderman] approved the extra 3,000 for the windows.  And then, conveniently forgot to pay.  And this gives me a really easy way to tell you exactly when that was, because that's when she fired off the memo that, henceforth, any repairs were to be discussed, and bidded, and approved by Jay Yablonsky.")).  However, Defendants assert that Plaintiff "was paid for that additional work."

(Def. 56.1 ¶ 26).  In support of this assertion, Defendants attach email invoices from Plaintiff directed to Thermald and/or Wavecrest, and corresponding weekly payroll records that list Plaintiff's compensation for "ap[artmen]t repair work." (*See generally* Gould Aff., Ex. A7-A17).[8]  Plaintiff has not contested the validity of these records; he has not controverted the assertion that they show he was fully compensated for his work; and he has not come forward with any additional invoices for which payment was not rendered.  (*See* Def. Reply 9 n.4 ("[T]hough [Plaintiff] offered at his deposition to 'draw up a list of invoices' for which he was not paid, he never did so." (citing Britt Dep. 238))).

### 5. The Termination of Plaintiff's Employment in 2013

Plaintiff continued to work as a superintendent until April 30, 2013, when he was terminated.  (Def. 56.1 ¶ 22).  Mr. Zheng was terminated on the same day.  (*Id.* at ¶ 23).  Yablonsky testified that the main reason why Plaintiff and Mr. Zheng were terminated was economic:  "It was more cost effective for the building to terminate the superintendent and the porter and hire an outside service and rent the apartment that was being used by the superintendent."  (Yablonsky Dep. 39; *see also id.* at 63; Alderman Dep. 144 ("[Yablonsky] came up with the idea to get a management company and it was brilliant.")).  To that end, Alderman located a company called Bernardini Associates ("Bernardini"), which provided the superintendent and janitorial

---

8       For example, on January 4, 2011, Plaintiff sent an email invoice for $882 for work performed at two of the Thermald Buildings.  (Gould Aff., Ex. A8 at 1).  A January 14, 2011 pay stub (*id.*, Ex. A7 at 2) and a compensation report for calendar-year 2011 (*id.*, Ex. A10 at 1), list a corresponding $882 in apartment repair earnings.

services for the Thermald Buildings thereafter.  (Def. 56.1 ¶ 29).[9]  On an annual basis, the cost of outsourcing this work to Bernardini is $9,160 cheaper than paying Plaintiff and Mr. Zheng.  (*Id.* at ¶ 38).  In addition, since Plaintiff vacated his apartment, which had been provided free of rent, Thermald has generated $25,200 per year in addition rental income.  (*Id.* at ¶ 39).  Accordingly, outsourcing the superintendent and porter jobs benefits Thermald in the aggregate amount of $34,360 per year.

In addition to economic motivations, Alderman and Yablonsky each testified that there were issues with Plaintiff's job performance that contributed to his termination.  Alderman testified that Plaintiff's work was "inconsistent." (Alderman Dep. 124).  Alderman also indicated that she believed, based on complaints from contractors and from a real estate broker, that Plaintiff was interfering with the renovation and leasing of units in the Thermald Buildings. (*Id.* at 125, 140-42; Gould Aff., Ex. I; *see also* Yablonsky Dep. 41 ("I received complaints from contractors.  I received complaints from a broker that we used.")).  According to Yablonsky, Plaintiff "had a tendency to complicate matters, to put himself in the center of things, [which generated] complaints, … both from tenants and from contractors [and] … created issues."  (Yablonsky

---

[9]    Plaintiff's responses to paragraphs 28 through 32 and 37 through 40 of Defendants' 56.1 Statement do not controvert the facts set forth by Defendant.  In response to each of the assertions contained in these paragraphs, which relate to the costs and savings associated with outsourcing the superintendent and porter responsibilities, Plaintiff simply asserts that "he disputes the facts … set forth in [the] paragraph" because "Plaintiff was fired as part of the years-long campaign of harassment and degradation by Alderman."  (Pl. 56.1 Response ¶¶ 28-32, 37-40).  Accordingly, because Plaintiff has failed to controvert the costs and savings figures supplied by Defendants, they are deemed true for the purpose of this motion.  *See* Local Civil Rule 56.1(c), (d).

Dep. 40-41).  Plaintiff contends that his job performance was satisfactory, as demonstrated by the letter of recommendation that Yablonsky provided him after he was terminated, and by letters from multiple residents who commended his performance as superintendent.  (Pl. 56.1 Response ¶ 44; *see generally* Koerner Aff., Ex. B & C).  Yablonsky testified that Mr. Zheng's porter work was "satisfactory."  (Yablonsky Dep. 60; *see also* Alderman Dep. 146 ("Zheng wasn't problematic.")).  Mr. Zheng was terminated because Bernardini wanted its contract with Thermald to cover the provision of superintendent and porter services to the Thermald Buildings.  (*See* Alderman Dep. 145-56).

## B.    Procedural Background

On November 20, 2013, Plaintiff filed the Complaint in this action.  (Dkt. #1).  In it, he brought claims against Wavecrest, Thermald, and Alderman for discrimination under the NYSHRL, and for unpaid overtime compensation under the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201-219, and the New York Labor Law (the "NYLL").  (Compl. ¶¶ 34-57).[10]  He also brought claims against Wavecrest for discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17.  (*Id.* at ¶¶ 29-33).

Following discovery, Plaintiff sought leave to amend his Complaint to add a claim for discrimination under the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 to 8-131, and a claim for assault

---

[10]    Plaintiff initially filed a complaint on July 16, 2013, prior to receiving a right-to-sue letter from the EEOC.  (*See generally Britt* v. *Thermald Realty I, LP*, No. 13 Civ. 4941 (KPF)).  The Court permitted Plaintiff to withdraw his complaint without prejudice and re-file after a right-to-sue letter was issued.  (*Id.*).  When the instant case was filed, it was designated as related; it was thereafter assigned to this Court.

and battery against Alderman.  (Dkt. #25).  Counsel for Plaintiff explained that he was "a solo-practi[ti]oner [with] virtually no experience with employment discrimination," who "only became aware of the failure to include causes of action under [the NYCHRL] during settlement discussions following the close of discovery in this matter."  (*Id.* at 4).  With respect to the assault and battery claim, counsel for Plaintiff argued that he was not aware of the "extent and scope of … Alderman's sexual harassment of Plaintiff" until his client's deposition.  (*Id.*).

Defendants opposed Plaintiff's motion for leave to amend, on the grounds that all facts necessary to bring claims for assault and battery were known to Plaintiff, and should have been known to Plaintiff's counsel, at the time the Complaint was filed, and, further, that an attorney's lack of familiarity with the NYCHRL did not constitute "good cause" under Fed. R. Civ. P. 16(b) to modify the deadline for amendments set forth in the Case Management Plan and Scheduling Order.  (*See* Dkt. #24 at 2-3).  The Court held oral argument on Plaintiff's motion for leave to amend on October 2, 2014, at which time the Court rendered an oral decision denying Plaintiff's motion for lack of good cause under Rule 16(b).  (Dkt. #42 at 25-26).  The Court also heard from Defendants on their anticipated motions for summary judgment, and thereafter set a briefing schedule.

The day after the conference, Plaintiff filed a letter requesting a stay of the instant action while "Plaintiff pursues [his NYCHRL claim] and all related claims in New York Supreme Court."  (Dkt. #31).  Defendants filed a joint letter

14

opposing this request (Dkt. #35), and, on October 10, 2014, the Court denied Plaintiff's request for a stay (Dkt. #36).

On October 23, 2014, Plaintiff submitted a letter requesting leave to voluntarily dismiss the instant action without prejudice.  (Dkt. #38).  After requesting additional briefing on the issue (Dkt. #44, 45), the Court denied Plaintiff's request to voluntarily dismiss the case (Dkt. #46).

On November 20, 2014, Plaintiff settled all of his claims against Wavecrest (Dkt. #50 ¶ 2), and agreed to dismissal with prejudice of the FLSA and NYLL claims against Alderman and Thermald (*id.* at ¶ 5).  Accordingly, all that remains in this action are Plaintiff's NYSHRL claims against Alderman and Thermald.  (*See* Def. Br. 7).  Alderman and Thermald filed their motion for summary judgment on December 2, 2014 (Dkt. #52-55); Plaintiff filed an opposition on February 3, 2015 (Dkt. #56-58); and the motion was fully briefed upon the filing of Defendants' reply on February 11, 2015 (Dkt. #59-61).

## DISCUSSION

### A.   Applicable Law

#### 1.   Summary Judgment Motions Generally

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986) (internal citation and quotation marks omitted); *see also Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the

15

initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v.

16

*U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).  Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)) (internal quotation marks and citations omitted); *see also Vargas* v. *Transeau*, 514 F. Supp. 2d 439, 442 (S.D.N.Y. 2007) (observing that "the mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat summary judgment (internal quotation marks and citations omitted)), *aff'd sub nom. Vargas* v. *Pfizer, Inc.*, 352 F. App'x 458 (2d Cir. 2009) (summary order).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  However, in considering "what may reasonably be inferred" from witness testimony, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts."  *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (citing *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).

### 2.     Reviewing the Evidence in Summary Judgment Motions

On a motion for summary judgment, a court "should not weigh evidence or assess the credibility of witnesses." *Hayes* v. *N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (citing *United States* v. *Rem*, 38 F.3d 634, 644 (2d Cir. 1994)).  However, the Second Circuit has recognized that, "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys*, 426 F.3d at 554 (internal quotation marks and citations omitted).

Likewise, in *Rojas* v. *Roman Catholic Diocese of Rochester*, the Second Circuit affirmed the district court's decision to grant defendant's motion for summary judgment.  660 F.3d 98 (2d Cir. 2011) (per curiam), *cert. denied*, 132 S. Ct. 1744 (2012).  In *Rojas*, evidence submitted by plaintiff in opposition to the motion directly contradicted factual allegations made in her pleadings.  *Id.* at 103-06.  The Court determined that the district court did not err when, after the plaintiff failed to explain her inconsistent remarks, it granted summary judgment on the basis that no reasonable jury could credit the plaintiff's later, inconsistent allegations.  *See id.* at 106.

Relatedly, "[i]t is well settled in [the Second Circuit] that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack* v. *United States*, 814

18

F.2d 120, 124-25 (2d Cir. 1987) (citing, *inter alia*, *Perma R & D Co.* v. *Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)); *accord Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts [his] own prior deposition testimony." (internal citations omitted)), *quoted in Ramos* v. *Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 n.2 (2d Cir. 2013).  Such a rule serves to prevent a party from creating, *post hoc*, a triable issue of fact, thus defeating a motion for summary judgment.  *Mack*, 814 F.2d at 124-25; *see generally Moll* v. *Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014) (discussing "sham issue of fact" doctrine).

There are, of course, limits to the sham issue doctrine.  Courts have suggested that it will not bar an affidavit when "an issue was not fully explored in the deposition, or the deponent[']s responses were ambiguous." *Giliani* v. *GNOC Corp.*, No. 04 Civ. 2935 (ILG), 2006 WL 1120602, at *3 (E.D.N.Y. Apr. 26, 2006) (citing *Palazzo* v. *Corio*, 232 F.3d 38, 43 (2d Cir. 2000)).  Similarly, courts have found that "where a party's conflicting affidavit statements are corroborated by other evidence, the affidavit may be admissible, since the concern that the affidavit is a 'sham' is alleviated." *Id.*  More broadly, the Second Circuit has recognized the "need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on

a dispute as to the employer's intent." *Holcomb* v. *Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

### 3.   Discrimination Under the NYSHRL

The NYSHRL makes it "an unlawful discriminatory practice ... [f]or an employer ... because of an individual's ... sex ... to discharge from employment such individual or to discriminate against such individual in ... terms, conditions or privileges of employment."   N.Y. Exec. Law § 296(1)(a).   It is likewise "an unlawful discriminatory practice ... [f]or any employer ... to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."   N.Y. Exec. Law § 296(1)(e).

The NYSHRL does not so much define what a qualifying employer *is* as what it is *not*: it excludes from the term's reach "any employer with fewer than four persons in his or her employ."   N.Y. Exec. Law § 292(5); *see generally Robins* v. *Max Mara, U.S.A.*, Inc., 923 F. Supp. 460, 470 (S.D.N.Y. 1996). Additionally, claims under the NYSHRL are subject to a three-year statute of limitations.   *Campbell* v. *Cellco P'ship*, 860 F. Supp. 2d 284, 296 (S.D.N.Y. 2012) (citing N.Y. C.P.L.R. 214(2)); *accord Kassner* v. *2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007).

As with discrimination claims brought pursuant to Title VII, discrimination claims under the NYSHRL are subject to the burden-shifting framework established in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802-

04 (1973).  *See Tolbert* v. *Smith*, 790 F.3d 427, 434 (2d Cir. 2015) ("The Title VII, § 1981, and NYSHRL discrimination claims are governed at the summary judgment stage by the burden-shifting analysis first established in *McDonnell Douglas Corp.* v. *Green*[.]").  Under the *McDonnell Douglas* analysis, once a plaintiff makes out a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  411 U.S. at 802-03.  If the defendant meets its burden of establishing such a reason, the plaintiff must raise an issue of material fact that the defendant's reason is merely a pretext.  *Id.* at 804; *see also Holcomb*, 521 F.3d at 138; *see generally Zann Kwan* v. *Andalex Grp. LLC*, 737 F.3d 834, 842-47 (2d Cir. 2013).

**B.    Analysis**

**1.    The Court Denies Summary Judgment Based on Employee Numerosity**

**a.    The Parties' Arguments and the Applicable Law**

Unlike the NYSHRL, Title VII includes an express temporal component to the numerosity requirement:  It defines as an "employer" "a person … who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year[.]"  42 U.S.C. § 2000e(b).  Defendants argue that they were not — at any point from 2007 through 2013 — "employers" under the NYSHRL because Title VII's temporal requirement must be imported into a court's numerosity analysis under the NYSHRL.  (Def. Br. 9-11).  Because NYSHRL claims are "analytically identical to claims brought under Title VII," Defendants argue, Title VII's twenty-week-per-

21

year threshold applies to the NYSHRL's numerosity requirement.  (Def. Br. 11).

Consequently, under Defendants' theory, a company only qualifies as an

"employer" under the NYSHRL if it has four or more employees during twenty

weeks out of a calendar year.  Thermald's occasional crests above the three-

employee cutoff are, they argue, inconsequential because, at most, they

occurred for nine weeks out of a calendar year.

Plaintiff offers no direct counterargument.  Instead, he argues that

Wavecrest and Thermald should be considered "joint employers" of Plaintiff,

such that at all times the NYSHRL's threshold was met.  (Pl. Br. 12-17).[11]

Although Defendants have submitted detailed records regarding the number of

employees working at Thermald, which number fluctuated between two and

five employees at various points, Plaintiff makes no effort to count noses to

reach the four-person threshold.  Instead, Plaintiff argues that Wavecrest,

which presumably has a larger number of employees, was Plaintiff's formal

employer, and that Defendants — as his joint employers — constructively meet

the numerosity threshold.  (*See id.* at 13).  Defendants, in their reply papers,

address in a perfunctory manner Plaintiff's argument for aggregation under a

joint employer theory.  (*See* Def. Reply 2).  The parties have, unfortunately,

managed to talk past one another on this issue; the Court will therefore

---

[11]    Plaintiff's other argument, that Alderman admitted during her deposition that Thermald employed more than three employees (*see* Pl. Br. 12-13), mischaracterizes her testimony (*see* Def. Reply 4), and fails to address the personnel records supplied by Defendants that detail precisely when and how many individuals Thermald employed (*see id.* at 4-5).

unpack their arguments and discern the proper legal standard to apply to the facts that are not in dispute.

First, while Defendants raise a creditable argument, the Court is not persuaded of the appropriateness of importing Title VII's twenty-week prerequisite into the NYSHRL. *Cf. Echevarria* v. *Insight Med., P.C.*, — F. Supp. 3d —, No. 13 Civ. 3710 (KPF), at *14, 2014 WL 7250956 (S.D.N.Y. Dec. 22, 2014) (noting "the absence of temporal restrictions on the numerosity requirement" in the NYCHRL, which contains a numerosity provision identical to the NYSHRL's).  The Court agrees that claims brought under Title VII and the NYSHRL are analytically identical, which, among other things, justifies a court's reliance on Title VII precedent when analyzing cases arising under the NYSHRL.  *See Aurecchione* v. *N.Y. State Div. of Human Rights*, 98 N.Y.2d 21, 26 (2002) ("Because both the [NYSHRL] and [T]itle VII address the same type of discrimination, afford victims similar forms of redress, are textually similar and ultimately employ the same standards of recovery, federal case law in this area also proves helpful[.]").  But while Title VII is *analytically* identical to the NYSHRL, it is not substantively or procedurally identical.  For example, under the NYSHRL, a plaintiff need not exhaust administrative remedies before bringing suit.  To adopt Defendants' theory would require courts to import as well Title VII's exhaustion requirement into NYSHRL claims, and yet the law is clear that they may not.  *See, e.g.*, *Ross-Caleb* v. *City of Rochester*, 512 F. App'x 17, 17 (2d Cir. 2013) (summary order) ("Dismissing [plaintiff's] NYSHRL …

claim[] on this ground was error, because th[is] claim[] [is] not subject to the procedural requirements of Title VII claims.").

Moreover, Defendants' suggestion that the numerosity provisions in Title VII and the NYSHRL should be construed as coextensive is belied by other substantive differences in these provisions.  Title VII defines employers to include only larger companies (those with 15 employees), whereas the NYSHRL's broader definition includes all but the smallest of companies (those with only three employees).  The NYSHRL is therefore intended to cover a wider swath of "employers" — a breadth that is consonant with the omission of a temporal prerequisite on numerosity.  *See Margerum* v. *City of Buffalo*, 24 N.Y.3d 721, 736 (2015) (Rivera, J., concurring in part and dissenting in part) ("As a precursor to the 1964 Civil Rights Act, the [NYSHRL] is not modeled on [T]itle VII, and has certain significant distinctions that extend its coverage beyond that of [T]itle VII.  For example, … the [NYSHRL] applies to more employers than does [T]itle VII.").  For these reasons, the argument that the NYSHRL must be construed to be consistent with Title VII where the NYSHRL is silent on the issue of a temporal prerequisite for numerosity is rejected.

Conversely, the Court disagrees with Plaintiff that the collective employee counts of Defendants and Wavecrest can be aggregated haphazardly under a joint employer theory to satisfy the NYSHRL's numerosity requirement.  While the Court agrees that aggregation of certain Thermald and Wavecrest employees is a possibility on this record, it cannot endorse Plaintiff's approach.

Courts have allowed plaintiffs raising claims under the NYSHRL to aggregate employees of different entities in order to satisfy the numerosity requirement, pursuant to what has come to be known as the "single employer" (or "single integrated employer") and the "joint employer" doctrines. *See, e.g.*, *Barbosa* v. *Continuum Health Partners*, 716 F. Supp. 2d 210, 216 (S.D.N.Y. 2010) (applying "joint employer" doctrine to claims under the NYSHRL); *Argyle Realty Assocs.* v. *N.Y. State Div. of Human Rights*, 882 N.Y.S.2d 458, 466 (2d Dep't 2009) (applying "single employer" theory under NYSHRL); *see also Echevarria*, 2014 WL 7250956, at *12-13 (describing same theories under Title VII and the NYCHRL).[12]

Significantly, under the joint employer theory, a court does not aggregate employees who work for only one of the two entities; rather, "only the

---

[12]    The joint employer doctrine is at issue here.  "[J]oint employment 'assumes that [there] are separate legal entities, but that [the entities] handle certain aspects of their employer-employee relationship jointly.'"  *Dias* v. *Cmty. Action Project, Inc.*, No. 07 Civ. 5163 (NGG), 2009 WL 595601, at *3 (E.D.N.Y. Mar. 6, 2009) (alterations in original). Under this doctrine, liability may be found when "separate legal entities have chosen to handle certain aspects of their employer-employee relationships jointly."  *Lima* v. *Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009) (quoting *Gore* v. *RBA Grp., Inc.*, No. 03 Civ. 9442 (KMK), 2008 WL 857530, at *3 (S.D.N.Y. Mar. 31, 2008)).  "Where this doctrine is operative, an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violation of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer."  *Arculeo* v. *On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005).  A separate theory, known as the "single employer" (or "single integrated employer") doctrine, is not at issue here because there is no evidence that Thermald and Wavecrest are run as a "single integrated enterprise."  *Lima*, 634 F. Supp. at 399-400 (quoting *Arculeo*, 425 F.3d at 198) (internal quotation marks omitted); *see also Argyle Realty*, 882 N.Y.S.2d at 463 (considering the "[i] interrelation of operations, [ii] centralized control of labor relations, [iii] common management, and [iv] common ownership or financial control").  Wavecrest and Thermald may have a degree of interrelated operations and control of labor relations, as a result of the management contract between the parties, but there has been no showing that the companies have common management or ownership.

employees who are jointly employed can be aggregated[.]" *Ingenito* v. *Riri USA, Inc.*, No. 11 Civ. 2569 (MKB), 2013 WL 752201, at *5 n.3 (S.D.N.Y. Feb. 27, 2013) (citing *Dias* v. *Cmty. Action Project, Inc.*, No. 07 Civ. 5163 (NGG), 2009 WL 595601, at *3 (E.D.N.Y. Mar. 6, 2009)).  That is, the analysis is not as simple as saying that Wavecrest and Thermald employees must be considered in the aggregate for numerosity purposes.  Instead, Plaintiff must point to specific Wavecrest employees who, while not officially Thermald employees, can fairly be counted as such.  *See Echevarria*, 2014 WL 7250956, at *13-15 & n.12.  Plaintiff, however, does not allege the existence of any other joint employees who should be added to the numbers of employees supplied by Thermald.  The only Wavecrest employee mentioned during the depositions is Jay Yablonsky, who was responsible for overseeing the day-to-day operation of the Thermald Buildings.  "Such facts might justify adding [Yablonsky] to the employees directly employed by [Thermald] to determine the number of the [Thermald's] employees for [numerosity] purposes.  But these facts would furnish no logical justification for adding ... other [Wavecrest employees] (assigned to work for other companies) to the number of employees of [Thermald]."  *Arculeo* v. *On-Site Sales & Mktg., LLC*, 425 F.3d 193, 199 (2d Cir. 2005).  Accordingly, even with aggregation under a joint employer theory, Plaintiff can only conceivably add one employee to the numbers Thermald has supplied.

### b.      The Record Before the Court

The Court now turns to Thermald's personnel records.  In 2008 and 2010, Thermald employed only two individuals.  Even with the addition of Yablonsky into the mix, Thermald cannot be considered a qualifying "employer" under the NYSHRL during these years.  In 2007, 2009, and 2011, Thermald employed three individuals.  Adding Yablonsky would result in Thermald qualifying as an "employer" for those time periods.  In 2012 and 2013, there were several weeks in which Thermald employed four individuals (without adding any of Wavecrest's employees), and thus Thermald certainly qualifies as an "employer" during these time periods.

While the Court could attempt to prune conduct occurring during the years 2008 and 2010 (or other discrete periods in which Thermald employed three or fewer individuals) from the actionable claims, such an approach would be impracticable on summary judgment; indeed, any such attempt would only invite issues of fact as to when precisely Defendants' allegedly discriminatory conduct occurred.  Moreover, the Court is not aware that any other court has engaged in this type of approach with respect to the NYSHRL's numerosity requirement.  Instead, courts look to see whether "documentary evidence ... demonstrate[s] conclusively that during the relevant time period [the] defendant ... employed fewer than four persons." *Francis* v. *Eisenbeiss*, 955 N.Y.S.2d 23, 24 (1st Dep't 2012).  Only where an employer consistently has three or fewer employees during the relevant time period does the NYSHRL's numerosity requirement preclude liability.  *See id.* (the possibility that "overlap

in ... employment" brought a company's staff up from three to four during the relevant period was enough to defeat summary judgment).

Given the undisputed fluctuations in Thermald's headcount, coupled with a colorable, if inchoate, argument for inclusion of Yablonsky as jointly employed by Thermald, the Court is unable to say conclusively that Thermald was not an "employer" during the time period he alleges he was subject to discrimination.   Accordingly, Defendants' argument for summary judgment on this basis is denied.

### 2. The Court Grants Summary Judgment as to Plaintiff's Discrimination Claims

The Court thus proceeds to consider the merits of Plaintiff's claims. Plaintiff advances three theories of discrimination: first, that he was subjected to *quid pro quo* harassment stemming from Alderman's sexual advances; second, that he was subjected to a hostile work environment as a result of Alderman's sexual advances, unreasonable demands, verbal abuse, and assorted mistreatment of him after he rebuffed her advances; and third, that he was subject to unlawful retaliation after he made clear that he would no longer have sex with Alderman.  Defendants maintain that each of Plaintiff's theories fails as a matter of law because Plaintiff's claims are time-barred, because Plaintiff has failed to state a *prima facie* case, and because Defendants have proffered a legitimate, non-discriminatory basis for Plaintiff's termination.  The Court will address each of Plaintiff's theories, and Defendants' responses thereto, in turn.

### a. Plaintiff Has Failed to Demonstrate *Quid Pro Quo* Harassment

"When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable" under the NYSHRL. *Schiano* v. *Quality Payroll Sys., Inc.*, 445 F.3d 597, 603-04 (2d Cir. 2006) (quoting *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742, 753-54 (1998)). To establish a *prima facie* case of what is commonly termed "*quid pro quo* harassment, a plaintiff must present evidence that [he] was subject to unwelcome sexual conduct, and that [his] reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of [his] employment." *Karibian* v. *Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994). In general, a tangible employment action for purposes of this analysis is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Schiano*, 445 F.3d at 604 (quoting *Mormol* v. *Costco Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir. 2004)). "A tangible employment action in most cases inflicts direct economic harm, but there is no requirement that it must always do so." *Mormol*, 364 F.3d at 57 (internal citations and quotation marks omitted; emphasis in the original) (holding that plaintiff did not suffer a significant change in employment status where she was issued a disciplinary notice that was not put in her file or, per her employer's policy, signed by a manager); *see also Jin* v. *Metro. Life Ins. Co.*, 310

F.3d 84, 97 (2d Cir. 2002) (holding that where a plaintiff "submit[s] to sexual acts ... as a basis for [his employer] granting [him] a job benefit," the plaintiff has established a claim of *quid pro quo* sexual harassment).

Before analyzing whether Plaintiff has met his *prima facie* burden with respect to his claim under a *quid pro quo* theory, the Court must address Defendants' antecedent argument that the statute of limitations bars Plaintiff's claim. Plaintiff alleged in his Complaint, and testified at his deposition, that Alderman's sexual advances were limited to 2007. (*See* Compl. ¶ 15; Britt Dep. 220). Therefore, to the extent Plaintiff is alleging that *quid pro quo* harassment occurred entirely within 2007, resulting from Alderman's threat that he would lose his job if he did not have sex with her, this claim is time-barred. In so holding, the Court does not minimize the seriousness of Plaintiff's claims that Alderman conditioned his continued employment in 2007 on the performance of sexual acts. "Requiring an employee to engage in unwanted sex acts is one of the most pernicious and oppressive forms of sexual harassment that can occur in the workplace," *Jin*, 310 F.3d at 94, and such conduct would certainly be actionable if proven to have occurred within the limitations period, *see Karibian*, 14 F.3d at 778 ("[A defendant's conduct] constitute[s] *quid pro quo* harassment [where the defendant] ... threaten[s] to make decisions affecting the terms and conditions of ... employment based upon ... submission to ... sexual advances."). Plaintiff's claim — again, to the extent based on this conduct occurring in 2007 (*see* Pl. Br. 18) — was simply brought three years too late.

30

Turning to Plaintiff's argument that *quid pro quo* harassment also occurred within the limitations period (Pl. Br. 18-19), the Court finds suggestion of this only in the affidavit Plaintiff submitted in opposition to the instant motion.[13]  But "factual issues that a party creates by filing an affidavit crafted to oppose a summary judgment motion that contradicts that party's prior testimony are not 'genuine' issues for trial."  *Moll*, 760 F.3d at 205; *see also Hayes*, 84 F.3d at 619 ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.").  Plaintiff was deposed at length, and, although he described in great detail the two sexual encounters in 2007 — as well as extensive post-2007 conduct by Alderman that he considered demeaning and/or hostile — he never mentioned the conduct occurring between 2008 and 2010 that he now describes in his affidavit.

Compounding this issue, Defendants were not put on notice until the submission of Plaintiff's affidavit that *any* sexual advances occurring after 2007 formed the basis for Plaintiff's lawsuit, because the Complaint alleges (and Plaintiff confirmed during his deposition) that the advances occurred only during a seven-month window entirely within 2007.  (*See* Compl. ¶ 15; Def. 56.1 ¶¶ 16-20).  *See also Rojas*, 660 F.3d at 106 ("[P]arties [cannot] defeat summary judgment simply by testifying to the allegations in their pleadings (or,

---

[13]     Plaintiff's affidavit, in which he avers that Alderman's advances took place "between 2008 and 2010," leaves just over one month (from November 20, 2010 to December 31, 2010), during which actionable *quid pro quo* harassment could have taken place.

as here, to facts *not* alleged in their pleadings).” (emphasis in original)).  The

Court concludes that the averments regarding Alderman's sexual advances

between 2008 and 2010 — which appear for the first and only time in an

affidavit generated in response to Defendants' timeliness arguments — fail to

raise “genuine” issues of material fact.  *Hayes*, 84 F.3d at 619 (“[F]actual

issues created solely by an affidavit crafted to oppose a summary judgment

motion are not ‘genuine’ issues for trial.”).

Assuming *arguendo* that Alderman's advances had continued into the

limitations period, Plaintiff would still need to demonstrate that “[his] reaction

to [her] conduct was then used as the basis for decisions affecting the

compensation, terms, conditions or privileges of [his] employment.”  *Karibian*,

14 F.3d at 777.  He cannot: Plaintiff's only reaction to Alderman's advances

occurred when he told her he would no longer have sex with her sometime

during the latter part of 2007.[14]  And Plaintiff did not testify (and does not now

aver) that his refusal to submit to Alderman's sexual advances resulted in her

changing the terms or privileges of his employment.  (*Cf.* Britt Dep. 219 (after

the second encounter, they “had a little sit-down conversation, and ... agreed

that [he] would remain the super”)).

Instead, Plaintiff avers that, three years later, “[i]n 2010, it became clear

to ... Alderman that [Plaintiff] would not put [him]self in a position where she

could take advantage of [him] sexually as she had in 2007.”  (Britt Aff. ¶ 8).  No

---

[14]    Though Plaintiff lists ways in which Alderman “attempted to coerce [him] into a
continued sexual relationship” (Britt Aff. ¶ 2), nowhere in his affidavit does he indicate
any response to these “unwanted advances” (*id.* at ¶ 5).

facts as to how Alderman came to understand this are asserted, nor does Plaintiff offer any reason why Alderman developed this clarity only in 2010. Perhaps more significantly, Plaintiff avers that "[i]n approximately 2010, … Alderman began a sexual relationship with her current boyfriend.…  It was following this time that … Alderman changed her behavior from trying to have sex with me to open hostility."  (Britt Aff. ¶ 9).  In other words, rather than as a reaction to Plaintiff's refusal in 2007, any change in Plaintiff's treatment that occurred three years after his refusal was — in Plaintiff's own estimation — a result of Alderman's new romantic relationship.

Furthermore, the proffered "decisions affecting Plaintiff's employment" do not suffice.[15]  Plaintiff testified that Alderman failed to pay him for work she had previously approved.  (Pl. Br. 19-21).  But when faced with Defendants' work invoices and payroll records showing that he was in fact paid, Plaintiff made no effort to controvert this documentary proof.  He also testified that Alderman made him obtain approval and submit bids to secure contracting jobs.  But Plaintiff performed these contracting jobs in addition to and separate from his superintendent duties, and was compensated separately for completing them.  Requiring Plaintiff's rates for these extra jobs to be reasonable and competitive, therefore, would not not constitute a significant change in the terms of his employment as the superintendent for the Thermald Buildings.

---

[15]    Indeed, these arguments seem doomed to fail, since Plaintiff concedes that he retained his superintendent's position until 2013.

33

Additionally, Plaintiff complains that Alderman became more restrictive over how he could use the basement workshop space.  Of course, Plaintiff's use of the basement space for holding music rehearsals, even if condoned by Alderman in the past, was simply not a part of the terms of his employment with Thermald.  Plaintiff also averred (in his affidavit and nowhere else) that he stopped receiving bonuses from Thermald in 2010.  However, Plaintiff points to no event in 2010, such as a refusal on his part to resume sexual relations with Alderman, that raises an inference that any curtailment of bonuses was discriminatory.

Finally, Plaintiff cites his eventual termination in 2013 as the tangible change in employment he suffered.  But Plaintiff presents no explanation as to how his refusal to have sex with Alderman in 2007 (or, reading Plaintiff's affidavit most generously, in October 2011) was used as the basis for his termination in 2013.[16]  The lack of temporal proximity, or of any other intervening sexual advances and refusals, defeats any inference that his termination was the culmination of *quid pro quo* harassment.  *Manko* v. *Deutsche Bank*, 554 F. Supp. 2d 467, 480-81 (S.D.N.Y. 2008) ("Given that the incidents in question occurred ... outside the applicable limitations period, the causal nexus between [plaintiff's] rejections and complained of employment

---

[16]    Such a generous reading requires the Court to accept Plaintiff's averment that "Alderman's unwanted advances continued until at least October of 2011" (Britt Aff. ¶ 5), and draw an inference (despite the lack of any record support) that Plaintiff *rejected* Alderman's advances that occurred in October 2011.  Significantly, there remains an 18-month gap between any implicit rejection of Alderman's advances in October 2011 and his termination in April 2013.

decisions [two years later] is, at best, tenuous."), *aff'd*, 354 F. App'x 559 (2d

Cir. 2009) (summary order); *Adeniji* v. *Admin. for Children Servs.*, 43 F. Supp.

2d 407, 433 (S.D.N.Y. 1999) ("The Court cannot infer causation here, where

there is no temporal proximity between [plaintiff's] alleged rejection of [sexual

advances] and his suspension [11 months later] and termination [16 months

later]."), *aff'd*, 201 F.3d 430 (2d Cir. 1999).[17]  Plaintiff has therefore failed to

satisfy his *prima facie* burden.

Significantly, even if Plaintiff had put forth a *prima facie* case based on

his termination, Defendants have come forward with a legitimate, non-

discriminatory reason for the adverse employment action.  *See McDonnell

Douglas*, 411 U.S. at 802-03.  The economic benefits that flow from

outsourcing Plaintiff's job are supported by documentation included in the

record on summary judgment, and are not (except in conclusory fashion)

contested by Plaintiff.  "By offering this evidence, defendant satisfied its

obligation to produce proof of a nondiscriminatory reason for the outsourcing."

*Hunter* v. *Citibank, N.A.*, 862 F. Supp. 902, 909 (E.D.N.Y. 1994), *aff'd*, 60 F.3d

810 (2d Cir. 1995); *see also Darrell* v. *Consol. Edison Co. of N.Y.*, No. 01 Civ.

8130 (JGK), 2004 WL 1117889, at *9 (S.D.N.Y. May 18, 2004) (finding the

outsourcing of plaintiff's and other employees' work to be a legitimate, non-

---

[17]    Plaintiff also, for the first time in opposition to Defendants' motion, argues that
        Alderman attempted to evict Plaintiff from his basement workshop following his
        termination, and that this conduct was a result of his refusal to have sex with her.  (Pl.
        Br. 20).  As this act took place after Plaintiff's termination, it is even further removed as
        a temporal matter from his refusal to engage in sexual relations with her.  Furthermore,
        as far as the record indicates, Plaintiff's lease of the basement workshop was not a
        privilege of his employment.

discriminatory reason for termination); *Pace* v. *Ogden Servs. Corp.*, 692

N.Y.S.2d 220, 224 (3d Dep't 1999) (finding a legitimate, non-discriminatory

reason for plaintiff's termination where defendant "produced evidence that it

outsourced [plaintiff's] laboratory work and saved itself a significant amount of

money by doing so").  Defendants' simultaneous termination of Mr. Zheng (who

no one suggests had an intimate relationship with any Defendant) bolsters the

legitimacy of the decision.  Faced with the proffer of Defendants' legitimate,

non-discriminatory reason, Plaintiff has made no effort to establish that the

Defendants' reason for terminating him is merely a pretext.  *McDonnell*

*Douglas*, 411 U.S. at 804.[18]  Accordingly, Plaintiff's *quid pro quo* claim cannot

survive summary judgment.

### b.   Plaintiff Has Failed to Demonstrate a Hostile Work Environment

A plaintiff claiming relief for a hostile work environment in violation of

the NYSHRL must allege facts demonstrating that the treatment in question:

"[i] 'is objectively severe or pervasive — that is, ... creates an environment that

a reasonable person would find hostile or abusive'; [ii] creates an environment

'that the plaintiff subjectively perceives as hostile or abusive'; and [iii] 'creates

such an environment because of the plaintiff's sex.'"  *Patane* v. *Clark*, 508 F.3d

---

18   The Court need not reach whether Plaintiff's poor performance constituted a further legitimate basis for his dismissal.  The record on summary judgment contains conflicting information with respect to Plaintiff's performance of his superintendent duties.  Yablonsky and Alderman each testified to issues with Plaintiff's job performance.  On the other hand, Plaintiff appears to have been well-liked by many tenants, and he did receive a letter of recommendation from Yablonsky following his termination.

106, 113 (2d Cir. 2007) (quoting *Gregory* v. *Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)); *accord Tolbert*, 790 F.3d at 439.

The "discriminatory intimidation" of the plaintiff must be "sufficiently severe or pervasive to alter the conditions of his or her work environment." *Rojas*, 660 F.3d at 106 (quoting *Mack*, 326 F.3d at 122). "Isolated instances of harassment ordinarily do not rise to this level." *Cruz* v. *Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000), *superseded on other grounds by* Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005). If, however, a single incident was "extraordinarily severe," it can suffice to state a claim. *Id.*

The severity of discriminatory conduct "has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Alfano* v. *Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citing *Harris* v. *Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Useful, though not exclusive, criteria to assess allegations of harassment include: "[i] the frequency of the discriminatory conduct; [ii] its severity; [iii] whether the conduct was physically threatening or humiliating, or a mere offensive utterance; [iv] whether the conduct unreasonably interfered with plaintiff's work; and [v] what psychological harm, if any, resulted." *Richardson* v. *N.Y. State Dep't of Corr. Serv*., 180 F.3d 426, 437 (2d Cir. 1999) (internal quotation marks omitted) (quoting *Harris*, 510 U.S. at 23).

"[H]ostile work environment claims are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct." *Nat'l R.R.*

*Passenger Corp.* v. *Morgan*, 536 U.S. 101, 115 (2002).  Consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period.  *Morgan*, 536 U.S. at 105.  Accordingly, if any act falls within the statutory time period, a court must "determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice."  *Morgan*, 536 U.S. at 120.[19]

Alderman's sexual advances in 2007, and her alleged coercion of Plaintiff into two sexual encounters during that year, would be severe enough to sustain a hostile work environment claim.  A claim based on this 2007 conduct, however, is time-barred unless sufficiently related conduct occurred within the limitations period.  Once Plaintiff's averments regarding Alderman's sexual advances between 2008 and 2010, which do not raise genuine issues of material fact, are put to the side, the remaining conduct underlying Plaintiff's hostile work environment claim bears no relationship to Alderman's alleged conduct during 2007.  *See Batista* v. *Waldorf Astoria*, No. 13 Civ. 3226 (LGS), 2015 WL 4402590, at *6 (S.D.N.Y. July 20, 2015) ("[G]eneralizations and unsupported assertions based solely on Plaintiff's self-serving testimony … [were] insufficient to show that the 2008 acts [were] 'sufficiently related' to the

---

[19]     Although the Supreme Court's decision in *Morgan* related to Title VII discrimination claims, the same standard for evaluating the timeliness of hostile work environment claims applies to the NYSHRL.  *See Bermudez* v. *City of New York*, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011).

2010 incidents.").  In sum, after 2007, Plaintiff complains that Alderman was unreasonably demanding of him, required him to perform work outside the scope of his employment, insulted his intelligence in the presence of others, prohibited him from holding rehearsals in his basement workshop unit, and withheld certain payments from him.  These "[f]acially neutral incidents" cannot sustain a hostile work environment claim.  *Alfano*, 294 F.3d at 378.  There is simply no "circumstantial or other basis for inferring that [these] incidents [that are] sex-neutral on their face were in fact discriminatory," and no "reasonable fact-finder could conclude that they were, in fact, based on sex."  *Id.*

And even assuming *arguendo* that there were discriminatory acts that fell within the limitations period, the Court cannot say that these acts "were sufficiently related to" acts outside of the limitations period "to be part of the same alleged hostile work environment practice."  *McGullam* v. *Cedar Graphics, Inc.*, 609 F.3d 70, 76 (2d Cir. 2010).  In 2007, the alleged advances were explicitly sexual and physical; the statements regarding the consequences if Plaintiff did not submit were unequivocal.  Within the limitations period — which would span the time period from November 20, 2010, to Plaintiff's termination in 2013 — the Court sees no parallels.  The conduct was not similar "in nature, frequency, [or] severity [such] that they must be considered to be part and parcel of the hostile work environment."  *Id.* at 78 (citation omitted)).

39

Moreover, as subjectively unpleasant for Plaintiff as Alderman's treatment of him during this period may have been, it was not objectively severe or pervasive, and it bears none of the hallmarks of discrimination. *Cf. Oncale* v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at '*discriminat[ion]* … because of … sex.'" (emphasis in original)); *Littlejohn* v. *City of New York*, — F.3d —, No. 14-1395-cv, 2015 WL 4604250, at *16 (2d Cir. Aug. 3, 2015) (finding, in context of motion to dismiss, that "allegations could not support a finding of hostile work environment that is so severe or pervasive as to have altered the conditions of … employment," where plaintiff's supervisor "made negative statements about [plaintiff] to [another supervisor]," was "impatient and used harsh tones," "wrongfully reprimanded" plaintiff, and "increased [plaintiff's] reporting schedule").

It is undisputed that Alderman was present in New York City only for brief periods every four to five months, and Plaintiff does not contend that she harassed him from California. Necessarily, therefore, the conduct of which Plaintiff complains was no more than occasional. *See Alfano*, 294 F.3d at 380 (affirming summary judgment in favor of defendant because "the [12] incidents [over a five-year period] were infrequent and episodic"). The Court also notes that the nature of Alderman's conduct — her insults to Plaintiff's intelligence, her vocal dissatisfaction with his performance, and her assignment to him of tasks outside the scope of his superintendent duties — does not raise an inference of discrimination based on Plaintiff's sex. *See id.* at 377 ("[M]any

40

bosses are harsh, unjust, and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination."); *Sampson* v. *City of New York*, No. 07 Civ. 2836 (BSJ), 2009 WL 3364218, at *6 (S.D.N.Y. Oct. 19, 2009) (rejecting plaintiff's hostile work environment claim where plaintiff alleged "she was given additional work responsibilities and was not given all necessary resources to complete her job functions").

Furthermore, Alderman's conduct was not physically threatening, and, while Plaintiff surely did not wish to have his intelligence impugned, such sex-neutral excoriation cannot alone form the basis of Plaintiff's hostile work environment claim.  *Ferraro* v. *Kellwood Co.*, No. 03 Civ. 8492 (SAS), 2004 WL 2646619, at *10 (S.D.N.Y. Nov. 18, 2004) (finding that "generic profanities such as 'fucking idiot' and 'stupid motherfucker'" constituted non-actionable "harassment … of a neutral, nondiscriminatory tone").  There is, similarly, no evidence that Alderman's intermittent contact with Plaintiff interfered with his work.  Finally, although Plaintiff testified that he had started taking antidepressants several months *after* he was terminated, for a period of a few weeks (*see* Britt Dep. 299-304), there is no evidence that (i) he suffered psychological harm while exposed to Alderman's alleged hostility; or (ii) he continues to suffer from any concomitant psychological issues.  Plaintiff's hostile work environment claim, therefore, cannot survive summary judgment.

### c.    Plaintiff Has Failed to Demonstrate Retaliation

As noted previously, the NYSHRL makes it unlawful for any employer "to discharge, expel or otherwise discriminate against any person because he or she has opposed [unlawful discriminatory practices] or because he or she has filed a complaint, testified or assisted in any proceeding" relating to an unlawful discriminatory practice.  N.Y. Exec. Law § 296(1)(e).  As with Plaintiff's *quid pro quo* discrimination claim, Plaintiff's claim for retaliation under the NYSHRL are subject to the *McDonnell Douglas* burden-shifting framework.

To establish a *prima facie* case of retaliation under Title VII, "a plaintiff must demonstrate that [i] []he engaged in protected activity; [ii] the employer was aware of that activity; [iii] the employee suffered a materially adverse action; and [iv] there was a causal connection between the protected activity and that adverse action."  *Kelly* v. *Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (internal quotation marks omitted). "The standard[] for evaluating ... [a] retaliation claim [is] identical under Title VII and the NYSHRL."  *Id.*  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted).

As the Supreme Court made clear in *Burlington*, Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  548 U.S. at 67.  By contrast, "[a]ctions that are 'trivial harms' — i.e.,

'those petty slights or minor annoyances that often take place at work and that all employees experience' — are not materially adverse." *Tepperwien* v. *Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (quoting *Burlington*, 548 U.S. at 68).  As the Second Circuit explained:

> Material adversity is to be determined objectively, based on the reactions of a reasonable employee.  "Context matters," as some actions take on more or less significance depending on the context.  Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct.

*Id.* (quoting *Burlington*, 548 U.S. at 69) (internal citations omitted).

Defendants argue that Plaintiff cannot make out a *prima facie* case for retaliation because, prior to being terminated, he did not engage in any form of protected activity.  Specifically, they note that Plaintiff never lodged a complaint with a governmental agency or with Yablonsky, his day-to-day supervisor at Wavecrest.  (Def. Br. 17).  Plaintiff counters that "[r]efusing to carry out a directive or order an individual reasonably believes to be discriminatory is … considered a protected activity."  (Pl. Br. 22).  In this case, Plaintiff argues that his refusal to have sexual relations with Alderman constituted protected activity.  (*Id.*).  This Court will "offer no opinion on whether merely rejecting a sexual advance is cognizable" under the NYSHRL.  *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 116 (2d Cir. 2013); *see also Reid* v. *Ingerman Smith LLP*, 876 F. Supp. 2d 176, 189 (E.D.N.Y. 2012) (collecting cases, and recognizing split among district courts).

Instead, the Court finds that summary judgment is appropriate here because Plaintiff cannot establish the requisite causal connection between the purported protected activity (his refusal to have sex with Alderman) and the materially adverse action (his termination six years later).[20]  *See Clark County Sch. Dist.* v. *Breeden*, 532 U.S. 268, 274 (2001) (stating in the context of a Title VII retaliation claim that "[a]ction taken ... 20 months later suggests, by itself, no causality at all"); *Harrison* v. *U.S. Postal Serv.*, 450 F. App' x 38, 41 (2d Cir. 2011) (summary order) ("[T]he temporal gap of almost two years between the date of this protected activity and the alleged retaliation is too great to give rise to an inference of causation."); *Sanchez* v. *Conn. Natural Gas Co.*, 421 F. App'x 33, 35 (2d Cir. 2011) (summary order) ("[T]here is insufficient evidence in this case to give rise to an inference that a causal connection exists between his protected speech ... and his subsequent termination at least two years later[.]"); *Burkybile* v. *Bd. of Educ.*, 411 F.3d 306, 314 (2d Cir. 2005) (finding no causation where more than a year passed between protected activity and alleged retaliation); *Gorman-Bakos* v. *Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001) (noting that a causal connection may be established indirectly based on proximity in time between protected activity and an adverse employment action, but that the temporal relationship may also be too attenuated to establish such a link); *Morris* v. *Lindau,* 196 F.3d 102,

---

[20]    Significantly, even if the Court were to credit Plaintiff's affidavit, and read into it an implicit rebuffing of Alderman's advances occurring as late as October 2011, the period between rejection and termination remains too attenuated.  *See* n.16, *supra.*

113 (2d Cir. 1999) ("[S]ince two years elapsed between [the plaintiff's allegedly protected activity] and his discharge, no inference of causation is justified.").[21]

Additionally, even if Plaintiff had made out a *prima facie* case for retaliation, he would need to respond to Defendants' proffered non-discriminatory reason for terminating him: their decision to outsource his work to save money.  (*See* Yablonsky Dep. 39, 63).  Plaintiff has failed to point to evidence raising an issue of fact that this reason was mere pretext.  Therefore, Plaintiff's retaliation claim cannot survive summary judgment.

---

[21]    The Court focuses its analysis on Plaintiff's termination, as it is the only "materially adverse action" that has been alleged (*see* Compl. ¶¶ 2, 36), and it is the only action Plaintiff raises in opposition to summary judgment (*see* Pl. Opp. 22-23).  Although Plaintiff hints that other actionable conduct occurred, he has failed to point to any specific employment actions in his opposition that the Court should consider retaliatory.  (*Cf. id.* at 22 ("Following his refusal to have sexual relations with … Alderman, Alderman engaged in a years[-]long campaign of humiliation and degradation of the Plaintiff with the retaliatory intent of making Plaintiff's life miserable.")).  Moreover, the Court has already determined that none of the interim employment decisions of which Plaintiff complains constitutes a "tangible employment action."  *See* Discussion Sec. B(2)(a), *supra*.  The logic applies equally (if not with greater force) in the retaliation context, because demonstrating a "materially adverse action" would appear to require a greater showing than a "tangible employment action."  *See Gonzalez* v. *Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 351 (S.D.N.Y. 2003) (noting that the Supreme Court's definition of "tangible employment action" in *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742, 761 (1998), "perhaps indicat[es] a less rigid standard under which a meaningful modification to an employee's job conditions could qualify as actionable even if the change could not be considered 'materially adverse'").

## CONCLUSION

For the reasons discussed in this Opinion, Defendants' motion for summary judgment is GRANTED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and mark this case closed.

SO ORDERED.

Dated:      August 18, 2015
            New York, New York

                                        _____
                                        KATHERINE POLK FAILLA
                                        United States District Judge

46